**UNITED STATES DISTRICT
SOUTHERN DISTRICT OF NEW YORK**

---

REBECCA BRAZZANO,

                        Plaintiff,

v.

THOMSON HINE LLP,
RICHARD ANTHONY DEPALMA
(in his individual and professional capacities),
DEBORAH ZIDER READ (in her individual
and professional capacities), and
THOMAS LAWRENCE FEHER
(in his individual and professional capacities),

                        Defendants.

Index No.:

**Verified Complaint**

**Jury Trial Demanded**

---

       Rebecca Brazzano ("Brazzano" or "Plaintiff"), as her own counsel, by and through Brazzano Law PLLC, as and for Brazzano's Verified Complaint (the "Complaint") herein against Thompson Hine LLP ("Thompson Hine"), Richard Anthony DePalma ("DePalma"), Deborah Zider Read ("Read") and Thomas Lawrence Feher ("Feher"), and together with Read, DePalma and Thompson Hine, the "Defendants") alleges as follows:

PRELIMINARY STATEMENT

       1.      Justice, with its deliberate rhythm, is an unstoppable force in motion holding those who violate the law, Defendants here, accountable for their unlawful conduct.

       2.      The Defendants are determined to conceal (and/or seal) their unlawful and illicit behavior, which includes, among other claims alleged here, sexual harassment, gender discrimination, retaliation, aiding and abetting, retaliation, abuse of process, defamation, and negligent infliction of emotional distress, within an impenetrable ring of wagons, shamelessly lying to protect their

1

undeserved shiny reputations as legal professionals.

3. As the #MeToo movement reverberated across the United States, exposing predators in diverse professions, the legal community, including Defendants, remain a fortress of secrecy where unlawful sexual harassment flourishes unchecked and unabated.

4. Thompson Hine cloaks their equity predators, like DePalma, behind the camouflage of its Ivory Tower, and enables rampant and disturbing discriminatory conduct by partners with actual ownership to strategically veil and shelter their unlawful conduct from the unforgiving scrutiny of the Courthouse.

5. For more than a decade, DePalma ruled the New York office as its Vice Chair of Litigation like a toxic boys club locker room, starting with his comment about getting "jerked-off" by a Judge, disturbingly requiring only Plaintiff (and she was singled out) to report her whereabouts to DePalma if she left the building, to his Monday morning meetings that consisted of DePalma's recounting of his weekend escapades making beer and playing in his "boy band," weaponizing his position to exclude Plaintiff from billable work, client interaction, and DePalma was intent on sabotaging Plaintiff's professional career.

6. Without equivocation, Plaintiff distinctly and explicitly highlighted DePalma's sexual harassment, discriminatory treatment, along with his open contempt for formidable female litigators like Plaintiff to equity partners, including Read.

7. Defendants orchestrated efforts here expose a brazen endeavor to obstruct and obscure any lawful scrutiny that might illuminate their targeted sexual harassment, misogynistic and toxic work environment, their discriminatory and retaliatory conduct, all as suffered by Plaintiff.

8. Plaintiff stands unwavering and resolute against Defendants' intentional efforts to

smear her name, tarnish her reputation, and impugn her character, in their collaborative duplicity, including Thompson Hine and Thomas Feher literally lying to the United States Equal Employment Opportunity Commission to evade the consequences of their unlawful conduct, hoping to tip the scales of justice with their falsifications to deter any meaningful investigation into the claims pled in this Verified Complaint.

9.      Neither Thompson Hine nor Feher can hide behind the absolute privilege that would otherwise attach to such administrative proceeding and submissions, as the words they intentionally used were not pertinent to the EEOC investigation, and were so needlessly defamatory and warrant the factual inference of express malice, strips away any semblance of protection afforded by absolute privilege, laying bare their liability to the claims advanced herein for defamation and abuse of process.

10.      The facts remain, Plaintiff expressed complaints about DePalma and his unlawful conduct for more than a decade.

11.      When Plaintiff escalated her complaints in April of 2022, identifying audit results that confirmed that DePalma had falsified New York *pro bono* hours, and reporting obligations, in violation of, *inter alia*, 22 NYCRR §118.1[e][14], DePalma's visceral and immediate reaction was to make sure Plaintiff was permanently silenced, and fired; Plaintiff's resignation was demanded by Read just seven (7) days later.

12.      It is alleged here that Plaintiff's exposure of DePalma's sham *pro bono* endeavor, along with Plaintiff's stated intention to close DePalma's ability to enter any new related time entry, triggered a volatile reaction; the prospect of a female lawyer, Plaintiff, exerting authority over him proved insufferable, resulting in a tumultuous and visceral eruption of DePalma's ego and further fueled his discriminatory conduct directed at Plaintiff.

3

13.     In furtherance of his sexual harassment of Plaintiff, it is no leap that DePalma immediately reached out to his fishing buddy, Joseph Koczko, who was on the firm's Executive Committee with Read, with the direct and proximate result of Plaintiff's termination.

14.     Defendants were not satisfied with just demanding Plaintiff's resignation (a/k/a "you're fired"), to be sure Plaintiff's humiliation was complete, they weaponized and retaliated against Plaintiff further in the termination process.

15.     Plaintiff understands that the path of righteousness is often fraught with obstacles, she nevertheless opted to bring her claims to the fore in a Court of law, where Defendants cannot evade accountability in the shadows of lawless injustice.

16.     Plaintiff will not fall silent into the abyss by Defendants abusive conduct and is resolute in her belief that the sexual harassment that she endured over more than a decade was in fact the reason she was shoved out the door.

17.     Despite Defendants feigned protestations, Plaintiff has no obligation, contractually or otherwise, to arbitrate with Thompson Hine in a secret forced arbitration, under foreign laws, that is untethered in content or time, to her claims here that are grounded in sexual harassment by DePalma.

18.     Thompson Hine's predispute arbitration clause, that is contained in its partnership agreement, is void and unenforceable for the claims here that are grounded in sexual harassment arose after the enactment of the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 ("EFAA").

19.     Where, as here, the dispute presents multiple claims – the EFAA blocks arbitration of the entire case, not just the sexual harassment claims, as all of the additional unlawful conduct alleged is intertwined with Defendants' systematic efforts to retaliate, humiliate, defame and silence the

4

Plaintiff to prevent the exposure of the claims presented.

21.     Plaintiff is a New York lawyer, a former employee of Thompson Hine, with lawful

rights to have her claims adjudicated under New York law, in a New York Courthouse with a New

York jury.

22.     Plaintiff presents these claims in this forum, with the awareness that justice derives its

strength and vitality from purposeful illumination of genuine tested truth in a Court of law.

23.     Thompson Hine permitted, allowed, condoned and enabled all of the sexual

harassment, discriminatory, retaliatory, abuse of process, defamation and negligent infliction of

emotional distress, alleged herein, from the top-down and now it can own it.

24.     As the supposed keepers of the law, lawyers and law firms, like Defendants here,

bear a profound responsibility to "uphold the rule of law" and their conspicuous and dismal failure

to do so here, is unwaveringly "unacceptable"[1] and constitutes a total mission failure.

**THE PARTIES**

**PLAINTIFF**

25.     Plaintiff Brazzano is a resident of Florida, registered to vote in the State of Florida and

is over 40 years old at the time of this filing.

---

[1] *See*, *Women Lawyers On Guard's Survey on Sexual Misconduct and Harassment in the Legal Profession*, available at https://womenlawyersonguard.org/wp-content/uploads/2020/07/Still-Broken-Full-Report.pdf ("Ultimately, this is all about power and respect (or lack thereof) in the workplace…[T]he powerful still protect each other…there is still enormous pressure not to challenge the powerful. I believe that we still have a long way to go in terms of changing mindsets in the legal profession" "[A]s an associate, you cannot report your superiors and expect to make partner. As a partner, you aren't a team player if you report a fellow partner. As…especially a litigator, you are expected to address these situations yourself, one on one, or suck it up.")(Last visited Feb. 22, 2023).

26.     At all times relevant Plaintiff was an employee of Thompson Hine, in its office located in this Judicial District in the City of New York, State of New York.

27.     At all times relevant, the improper and unlawful acts committed by Thompson Hine, Read and DePalma against Plaintiff had their impact in this District in the City of New York, State of New York.

28.     Plaintiff's worked from Thompson Hine's New York City office from 2008-2022 located at 330 Madison Avenue, New York, New York.

29.     At all relevant times, Plaintiff met the definition of an "employee" or "eligible employee" under all applicable federal, state and city statutes.

**THOMPSON HINE LLP**

30.     Defendant Thompson Hine is foreign limited liability partnership, with its principle office located at 900 Key Center, 127 Public Square, Cleveland, Ohio 44114, with an office in New York City, now relocated at 300 Madison Avenue, 27th Floor, New York, NY 10017-6232.

31.     At all relevant times, Thompson Hine was and met the definition of an "employer" or "covered employer" under all applicable federal, state and city statutes as they relate to Plaintiff.

32.     Thompson Hine derives substantial revenue from its purposeful activities in this District, and its equity/general partners, and each of them, likewise derive substantial income/compensation/renumeration, based upon the actions directed at this District in New York.

**RICHARD ANTHONY DEPALMA**

33.     Defendant DePalma is, upon information and belief, a resident of the State of New York, residing at 27 Deerfield Road, Pound Ridge, New York 10576-1413, and is registered to vote in the State of New York.

6

34.    At all relevant times, DePalma was an equity/general partner/owner of defendant Thompson Hine, and in the alternative, acted as an agent of, Thompson Hine.

35.    DePalma meets the definition of an "employer" or "covered employer" under all applicable federal, state and city statutes.

36.    DePalma is an "general partner" of Thompson Hine LLP, as that term is relevant and defined in Section 4 of the Thompson Hine LLP Partnership Agreement, dated as of November 15, 2017 (the "2017 Partnership Agreement"[2]), and DePalma is a signatory thereto. *See*, Exhibit 1.

37.    At all relevant times, DePalma received renumeration and/or compensation derived from Thompson Hine's provision of legal services to clients in the State of New York.

DEBORAH ZIDER READ

38.    Defendant Read is, upon information and belief, a resident of the State of Ohio, residing at 23700 Stanford Road, Shaker Heights, Ohio 44122-2673, is registered to vote in the State of Ohio, and owns real property in the State of New York located at 38 East 85th Street, Unit 7E, New York, New York 10028.

39.    At all relevant times, Read was an equity/general partner/owner of defendant Thompson Hine, and in the alternative, acted as an agent of Thompson Hine.

40.    Read meets the definition of an "employer" or "covered employer" under all applicable federal, state and city statutes.

41.    Read is an "general partner" of Thompson Hine LLP, as that term is relevant and defined in Section 4 of the Thompson Hine LLP Partnership Agreement, dated as of November 15,

---

[2] A true and correct copy of the 2017 Partnership Agreement that was provided to Plaintiff after her departure from Thompson Hine in June 2022 is Exhibit 1 hereto.

2017, and Read is a signatory thereto. *See*, Exhibit 1.

42.     At all relevant times, Read received renumeration and/or compensation derived from Thompson Hine's provision of legal services to clients in the State of New York.

THOMAS LAWRENCE FEHER

43.     Defendant Feher is, upon information and belief, a resident of the State of Ohio, residing at 3105 Van Aken Boulevard, Shaker Heights, Ohio 44120 and is registered to vote in the State of Ohio.

44.     At all relevant times, Feher was an equity/general partner/owner of defendant Thompson Hine, and in the alternative, acted as an agent of Thompson Hine.

45.     Feher meets the definition of an "employer" or "covered employer" under all applicable federal, state and city statutes.

46.     Feher is an "general partner" of Thompson Hine LLP, as that term is relevant and defined in Section 4 of the Thompson Hine LLP Partnership Agreement, dated as of November 15, 2017, and Feher is a signatory thereto. *See,* Exhibit 1 hereto.

47.     At all relevant times, Feher received renumeration and/or compensation derived from Thompson Hine's provision of legal services to clients in the State of New York.

48.     Feher authored the February 23, 2023 defamatory letter to the Equal Employment Opportunity Commission ("EEOC"), New York Division, with the intent that it be received in this District (the "Defamatory Letter").[3]

_____

[3] A true and correct copy of the February 23, 2023 Thompson Hine and Feher's Defamatory Letter is annexed hereto as Exhibit 2 hereto.

**JURISDICTION AND VENUE**

49.     The Court has original subject matter jurisdiction over this civil action pursuant to 28 U.S.C. §§1331 and 1343 as this action involves federal questions about the deprivation of Plaintiff's rights under federal law.

50.     The Court likewise has original diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is diversity of citizenship between Plaintiff, a resident of Florida, and Defendants, who are either, residents of the State of New York or the State of Ohio, or are headquartered in the State of Ohio with an office in the State of New York, and this action involves a matter in controversy that far exceeds $75,000, exclusive of interest and cost.

51.     This Court has supplemental subject matter jurisdiction over Plaintiff's related state and local law claims pursuant to 28 U.S.C. § 1367(a).

52.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because all, or a substantial part of, the events or omissions giving rise to these claims alleged in this action, including sexual harassment, discrimination, retaliation, abuse of process, defamation, and negligent infliction of emotional distress all occurred in this district.

53.     Thompson Hine maintains a law office in office in this District in which DePalma, Read and Feher derive substantial renumeration and compensation for the activities conducted by each of them and by Thompson Hine, its employees and general partners, in this District.

**ADMINISTRATIVE PROCEDURES**

54.     Prior to commencing this action, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission on July 1, 2022 (Charge No.: 520-2022-06410) alleging charges against Thompson Hine for its unlawful conduct pursuant to Title VII of the Civil Rights Act

of 1964, 42 USC § 2000e ("Title VII"), the New York State Human Rights Law, NY. Exec. Law § 290 et seq., and New York City Human Rights Law, NYC Admin. Code § 8-107. The gender discrimination is emblematic of a broader and systemic pattern and practice at Thompson Hine LLP.

55.     Thompson Hine, with Feher as the author, penned a response to Plaintiff's Charge on February 23, 2023 (*see*, Defamatory Letter Exhibit 2 hereto).

56.      Plaintiff submitted her reply to the EEOC on August 23, 2023.

57.     On December 28, 2023, the EEOC issued Plaintiff a "Right to Sue Letter."[4]

58.     Pursuant to NYCHRL § 8-502, Plaintiff served a copy of the Verified Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel within ten days of filing the Verified Complaint, thereby satisfying the notice requirements of this action.

59.     Plaintiff has complied with all other prerequisites to filing this action.

FACTUAL ALLEGATIONS RELEVANT TO ALL CLAIMS

PLAINTIFF HAS EMPLOYEE STANDING

60.     Plaintiff began her employment with Thompson Hine in September 2008 as "Of Counsel."

61.     For the years 2008 through 2012, Plaintiff received renumeration from Thompson Hine and was issued a W-2.

62.     In 2013, Plaintiff was elevated to "Income Partner" in the New York office, which is

---

[4] A true and correct copy of the EEOC Right to Sue Letter dated December 28, 2023 is Exhibit 3 hereto.

a meaningless title more akin to an albatross.

63.     As an income partner, Plaintiff was not permitted to share any of Thompson Hine's profits/losses or liabilities.

64.     Plaintiff was not permitted or entitled to purchase any capital in the Firm.

65.     Plaintiff has no internal access to compensation information for any partner, general, or income.

66.     Plaintiff had no input or influence over Thompson Hine's hiring, firing, policies, rules, or decisions.

67.     Since Plaintiff was not entitled or permitted to vote, she had no influence over Thompson Hine's management, who joined the firms' partners' ranks, or even who was promoted to partner, or from income partner to equity partner.

68.     Thompson Hine's Executive Committee controlled Plaintiff's compensation, with input from her direct supervisors, Todd Mason, as Office Partner in Charge New York, and Firmwide Practice Group Leader, Business Litigation, Brian Lamb, to whom she reported.

69.     All Thompson Hine income partners are treated as employees.

70.     The 2017 Partnership Agreement is only signed by equity/general partners, there is no signatory provision for any income partner.

71.     The 2017 Partnership Agreement is specifically relevant here, as Thompson Hine seeks to hide behind its borders asserting to the EEOC that Plaintiff title of income partners strips her of the protections afforded by Title VII of the Civil Rights Act of 1964, 42 U.S.C. §20003 (Title VII), the New York State Human Rights Law, N.Y. Exec. Law, 290 *et seq*., and the New York Human Rights Law, N.Y.C. Admin. Code §8-107.

72.     Regardless of the title, Plaintiff was in fact an employee of Thompson Hine during the entirety of her tenure at the firm.

73.     For the tax years 2013-2022, Thompson Hine issued Plaintiff a K-1 that confirms she had zero percent (0%) ownership interest in the firm.

74.     Plaintiff inquired of the Internal Revenue Service ("IRS"), submitting IRS Form 4506 with the requisite payment for a copy of Thompson Hine partnership return for tax year ending 12/31/2022 (during a year Plaintiff was considered an "income partner"), to which all partner owners would be entitled; the IRS declined to provide copies to Plaintiff, ostensibly based upon her lack of ownership in the firm based upon the firm K-1 issued to Plaintiff showing zero ownership.

75.     All Thompson Hine income partners, including Plaintiff, were treated, and are employees as that term is used for purposes of protection against discrimination.

**PLAINTIFF'S EMPLOYMENT AT THOMPSON HINE**

76.     Plaintiff commenced her employment with Thompson Hine in September 2008.

77.     At the genesis of her association, the Plaintiff was recruited as an "Of Counsel" luminary and was designated as a "service" attorney, a role in the legal industry domain that connotes one bereft of an independent clientele but rather devoted to servicing the clients of the firm's partners.

78.     Read, who was the hiring partner at the time, interviewed Plaintiff and declined the request that Plaintiff be hired as a partner, and instead firm records confirm that Plaintiff came to the firm "*as a service attorney to service*" a particular partner's clients.

79.     Upon arrival Plaintiff was excited to work with then New York Vice Chair of

12

Litigation, Douglas Grover, Esq., the New York Office Partner in Charge, George Walsh, Esq., the New York representative on the firm's executive committee, John Gould, Esq., along with firmwide head of the Business Litigation, William Jacobs, Esq. (then based in Cleveland).

80.     Plaintiff was the only Of Counsel in the New York Business Litigation Group, and there were no female partners in the group when Plaintiff joined in 2008.

81.     Plaintiff had a thriving and successful legal practice before Thompson Hine, and Plaintiff continued her path of success and accomplishment in her professional journey.

82.     Plaintiff's prowess drew clients to her, partners from other practice groups and partners from various firm office outposts sought her invaluable counsel.

83.     Plaintiff forged her reputation as a premier "go-to" attorney for all thing complex and challenging, earning the respect of those she practiced alongside.

84.     Plaintiff's colleagues esteemed her not only for her legal finesse and professionalism but also for the sincere and unapologetic care she demonstrated for the well-being of the legal teams under her purview.

85.     Plaintiff has "repeat" litigation clients, and they sought out her legal expertise and exceptional advocacy style.

**STEERING WORK TO SERVICE INCOME PARTNERS WAS STANDARD OPERATING PROCEDURE**

86.     Thompson Hine, like most law firms, have management level designations to equity partners who manage the influx and flow of client billable work.

87.     The role of Vice Chair of Business Litigation at Thompson Hine is no different, and by design for each of the firm's offices, is the point where all litigation is funneled, meaning, other

offices and/or other partners had clients who required New York (of New Jersey or Connecticut) legal counsel, would reach out to the Vice Chair of Business Litigation in New York.

88.     This was the practice of the firm when Plaintiff arrived, and Mr. Douglas Grover was the Vice Chair of Litigation in New York.

89.     When Mr. Grover received an inquiry from attorneys outside New York, he would evaluate the synergy of available attorneys in New York to perform the work the client needed by way of New York legal counsel.

90.     Mr. Grover routinely determined that Plaintiff's legal acumen was the right fit and connected her with the firm attorney who was seeking New York legal counsel.

91.     This firm practice continued in other offices; by way of example only, when a new Vice Chair of Litigation was put in place in Cincinnati, Brian Lamb (then and current firmwide head of the Business Litigation Group) informed that Vice Chair that being the actual Vice Chair would significantly increase her hours, as litigation incoming to Cincinnati would flow directly through her as Vice Chair and she was able to delegate and distribute that work based upon her best judgment of synergy between the needs of the client and the business litigators in her office, including herself as running point.

92.     Then DePalma joined the firm.

93.     Then Douglas Grover stepped down as Vice Chair of Litigation in New York at the end of 2010.

94.     At the time, Plaintiff was already fully cognizant of DePalma's bias (looking to only subordinate those female attorney that were demure) and disturbing conduct directed at Plaintiff.

95.     This included, but was not limited to, soliciting Plaintiff's company for shopping

14

excursion under the pretext of impressing a female client, constantly bragging about his second marriage to his former associate, his overreaching boys club demeanor, jokes and colloquy, his failure to protect his own secretary from his male clients sexual harassment (demanding that she sit on his clients' lap),[5] his kissing other female lawyers in his entourage "hello" at firm meetings and his ever disturbing and improper interest in Plaintiff's whereabouts, demanding that Plaintiff advise him if she was leaving the office; DePalma's unwarranted interest in Plaintiff's activities only served to compound the discomfort and distress inflicted by his actions, as he had no legitimate reason to demand to track Plaintiff's presence in the office, and he did not require such from male litigators or anyone else for that matter, in the New York office.

96.     DePalma's obsessive behavior in this regard as to Plaintiff's physical location, even though Plaintiff had no active litigation matters with DePalma, began to permeate the New York office and other male equity partners began to ask Plaintiff if she was in the office (those inquiries were stalking in nature, because Plaintiff was not working on any active matter with them either).

97.     DePalma's demand to know where Plaintiff was at any given moment were devoid of any discernible business purpose, but was solely to ensure and interject his dominance over her professional interactions.

**DePalma is Anointed as Vice Chair of the Business Litigation Group – NY**

98.     When Mr. Grover advised Plaintiff that DePalma was going to be anointed as the new

---

[5] In that incident, when De Palma's assistant GL entered a meeting that De Palma was conducting with clients, the client harassed GL and demanded that GL come and sit on his lap.  De Palma's assistant reported this sexual harassing conduct to the office manager, and De Palma knew, as he was present during the harassment.  Neither De Palma nor the firm did anything about it.  The firm thereafter fired GL on Sunday, May 10, 2015, Mother's Day.  Who does that?  Perhaps because GL sat outside De Palma's office for years, watching and observing the closed door policy that only applied to a particular pandering female associate it seeks to preemptively discredit her in advance of sworn testimony.

Vice Chair, Plaintiff pleaded with Mr. Grover to remain in the Vice Chair role, and said in sum and substance at the time, that if DePalma takes the reins of litigation in New York, he will destroy Plaintiff's professional career at the firm.

99.     In assuming the mantle of New York Vice Chair of Litigation, DePalma swiftly enacted his misogynistic and discriminatory agenda, reshaping the cultural landscape into a warped reflection of his exclusive locker room vision.[6]

100.    DePalma implemented and perpetuated the old boys' network and created a hostile frat boy work environment in the Business Litigation Group in the New York Office, including his command performance litigation meetings were he merely recanted tales of his weekend escapades which were off topic and off color.

101.    As Vice Chair, DePalma was supposed to evaluate the incoming work for distribution to available and best suited for the legal needs of the incoming New York client matter.

102.    Instead, DePalma disregarded that long standing protocol, and made sure that the litigation work flow into the firm's New York office was either horded by DePalma himself to falsely increase his own billable hours or he directed the work to male (equity) attorneys in New York, and to the specific exclusion of Plaintiff.

103.    DePalma intentionally created a biased and discriminatory culture by excluding Plaintiff from any billable workflow, and specifically steering billable hourly work to male attorneys (including himself) to the exclusion of Plaintiff and other junior female attorneys (as Plaintiff was the

---

[6]  *See*, Kate Gibson, CBS News, Sexual harassment rife in the legal profession, Feb. 5, 2019 (https://www.cbsnews.com/news/sexual-harassment-rife-in-the-legal-profession/ (Last visited January 24, 2024) ("Why would you mess with a female attorney?" The resounding answer is because "sexual harassment is more pervasive in male-dominated professions, and law firms remain the ultimate "boys-club."

only Of Counsel, continuing into 2013, there were still no female partners (either general partners (a/k/a equity partners or income partners)).

104.    From the time DePalma assumed the Vice Chair position until Plaintiff's departure from the firm twelve years later in 2022, there was not a single occasion where DePalma steered incoming New York work in Plaintiff's direction or bothered to convey that a particular matter was well-suited for Plaintiff's professional strengths or that a specific matter was a perfect match for Plaintiff's demonstrative legal skill set.

105.    DePalma's intent was unremarkable, DePalma knew that Plaintiff had voiced complaints about his unlawful behavior (to Read, Lamb, Mason, and others), and he was determined to improperly use his power and influence to exclude Plaintiff from any opportunity to gain billable hours, as he knew that to be the primary measure used by the firm as it relates to compensation.

106.    Indeed, immediately following DePalma's underserved elevation to New York Vice Chair of Business Litigation, DePalma targeted and sexually harassed and discriminated against Plaintiff because of her female gender.

107.    DePalma's unmistakable decade long hostility and sexual harassment was obvious and well known in the New York office, as well as by the Executive Committee members, including Read.

108.    DePalma's harassment was not physically threatening, but it was in fact purposefully humiliating, demanding the Plaintiff account to DePalma if she was going to be out of the office, DePalma bad mouthed Plaintiff at every opportunity, told lawyers not to work with Plaintiff, excluded Plaintiff from his Friday night office network gatherings, made snotty comments to Plaintiff when she actually attended his command performance meetings ("nice of you to show up" type comments), thought it was worthy of a patronizing comment when Plaintiff had to leave an afterhours meeting

because it was her wedding anniversary that since he was twice divorced, he could stay in attendance, all of which took an unreasonable toll on Plaintiff's work performance, and had a direct and derogatory impact on Plaintiff's professional reputation.

109.    The hostile work environment paradigm of sexual harassment under the laws confirm that the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment and/or the victim must also subjectively perceive that environment to be abusive and/or that the Plaintiff has been treated less well than others.

110.    Plaintiff specifically pleads that she was treated less well than her male colleagues by DePalma, and was the subject of a hostile work environment for more than a decade, that DePalma singled Plaintiff out because of her gender (and because Plaintiff would not subordinate herself to DePalma's misogynistic values) and rallied his discriminatory efforts against her.

111.    DePalma's sexual harassment did not go completely unnoticed, as Lamb asked DePalma, upon information and belief, to step down as Vice Chair of Business Litigation in 2019, and DePalma steadfastly refused to relinquish his grip on the power of the position.

112.    DePalma's conduct and unlawful sexual harassment violates federal, state and city prohibitions against sex discrimination based upon DePalma's creation, perpetuation, and the firm's indifference to, the hostile work environment in the New York office.

**DEPALMA'S LEWD AND PERVERSE DESCRIPTION OF**
**GETTING JERKED OFF BY A JUDGE ECHOED RESOUNDINGLY**

113.    During the period when DePalma was Plaintiff's direct supervisor, DePalma lured Plaintiff into his office under the guise of discussing participating in appellate *pro bono* work, as DePalma knew of Plaintiff's keen and demonstrated interest in providing *pro bono* legal services to

the under privileged.

114.    Plaintiff was specific in her actions of never being in an office alone with DePalma, because she was fearful of his sexual harassment and did not want either to be the subject of his misogynistic behavior.

115.    It was during this meeting that DePalma described a new *pro bono* opportunity that was at the appellate level, and stated that "judges know lawyers who provide legal services are working on a *pro bono* basis, and it's like getting jerked off by a judge."

116.    The sexual images of DePalma masturbating with a Judge were truly disturbing and disgusting, and that is the image that stuck with Plaintiff.

117.    Every time DePalma demanded a litigation meeting/lunch, Plaintiff was left with the image of DePalma masturbating with a Judge, and that thought was repulsive for obvious reasons.

118.    DePalma deliberately made his lewd and vulgar comment in his office and only to Plaintiff to elicit a reaction from Plaintiff and to degrade and humiliate her.

119.    During this same period of time, DePalma as Plaintiff's supervisor, advised Plaintiff in her annual review in May of 2012, that he would absolutely not recommend Plaintiff for admission into the firm partnership.

120.    Plaintiff contemporaneously shared DePalma's May 2012 masturbating comments and his description of being jerked off by a Judge, with equity partners in the New York, Cleveland and Atlanta offices, but no investigation or remedial action was ever taken.

**DePalma Was Enraged When He Could Not Block Plaintiff 2013 Income Partner Designation**

121.    In 2013, Plaintiff was anointed with the ostensibly meaningful but ultimately hollow

title of "income partner" within the confines of the Business Litigation Group, in New York.

122.    Plaintiff's ascent to income partner did not just stir the waters; it unleashed a tempest of controversy because of the outspoken venomous opposition from DePalma, who vociferously proclaimed his disapproval.

123.    During this period, DePalma spewed his critical views of Plaintiff and spared no effort in broadcasting his vehement objections, extending well beyond the walls of the firm's New York office.

124.    DePalma, with audacious disregard, tarnished Plaintiff's reputation wide and far with a relentless campaign of defamation, disseminating his prejudiced views to any audience that would heed his prejudiced words.

125.    DePalma traveled to the firm's Atlanta office during this period and confirmed to Russell Rogers (who was aware of DePalma's personal animus and hostility toward Plaintiff) that he intended to block Plaintiff's elevation to partner.

126.    At the time, Mr. Muccia informed Plaintiff that unless Plaintiff "kissed the ring" and "made nice" with DePalma, she would never be considered for partner.

127.    It was the later intervention of Mr. Muccia and Mr. Grover, who wrote a memorandum for the business case to support Plaintiff's election to partner that they sent to DePalma to encourage his reconsideration of Plaintiff's candidacy.

128.    In his continuing effort to stifle Plaintiff's professional career, DePalma, even with the report from Messrs. Muccia and Grover in hand that recommended Plaintiff be elevated to partner, DePalma remained steadfast in his personal objection, counting on the fact that his vote was needed to put Plaintiff in the queue for partner consideration in 2012.

129.     As DePalma was adamantly opposed, the prospects were indeed grim that Plaintiff could surmount DePalma's formidable equity based and public objection.

130.     Before becoming income partner, and ever since, it was widely known in the New York office and repeatedly expressed by DePalma, that he strongly opposed Plaintiff's elevation from counsel to partner in the firm.

131.     DePalma trashed the recommendation and Plaintiff, and refused to call a meeting amongst the litigation partners to consider Plaintiff's elevation.

132.     To her credit, Kathie Brandt, who was the Office Partner in Charge at the time, was made aware by someone of the Muccia/Grover report on Plaintiff's behalf, and she directed and demanded an all hands on deck New York partners meeting where a vote was taken, over DePalma's fierce objections, to elevate Plaintiff for further consideration as income partner.

133.     During this meeting, all of the New York equity partners voted in favor of Plaintiff's candidacy, many equity partners spoke on Plaintiff's behalf and her partner qualifications, except DePalma, who voted no, and two non-litigation female equity partners (members of the DePalma fan club at the time) one abstained and the other voted no with DePalma.

134.     Despite the Thompson Hine's heralding of Plaintiff's promotion to income partner as a triumph, it paradoxically fueled DePalma's deep-seated and fervent animosity and he leaned into his ongoing sexual harassment and discriminatory treatment of Plaintiff.

135.     Even though DePalma no longer had a strangle hold on Plaintiff's compensation, he was still the Vice Chair of Business Litigation in New York, and had a vice-grip over the billable work that was directed into the New York Office, and who got it.

136.     DePalma made sure Plaintiff did not get a single billable hour through his intentional

21

effort to exclude Plaintiff from any incoming work, forcing Plaintiff to forge relationships with partners outside New York to try and obtain the billable work directly.

137.    Indeed, far from quelling DePalma's disdain, Plaintiff's elevation only served to amplify DePalma's poisonous hatred, discrimination and toxic work environment as applied to Plaintiff.

138.    DePalma's hostility remained unabated, fueling relentless efforts to undermine and sabotage Plaintiff's career and seize every opportunity to subject her to humiliation, question her legal qualifications and continue to exclude her from billable hours in New York and beyond.

139.    Since DePalma was an equity (general) partner, and Plaintiff was an income partner, DePalma still had improper influence and sway over Plaintiff.

140.    As an income partner, Plaintiff knew her place, and knew she could not accuse an equity partner of discrimination, harassment, or any other legally cognizable theory, as her career would be in direct jeopardy as the result of DePalma's hostile and unlawful sexual harassment of Plaintiff.

141.    During these years of Plaintiff's employment with Thompson Hine, the #MeToo phrase had not yet entered the lexicon, and the social movement and awareness campaign against sexual harassment was nowhere to be found.

142.    Lawyers who spoke up about sexual harassment and discrimination were passively demoted, ignored, and "blackballed" in the legal community.

143.    Gretchen Carlson had not yet sued then Fox News chairman and CEO Roger Ailes for harassment, discrimination and retaliatory conduct (2016) or teamed up with political consultant Julie Roginsky, in their creation of Lift Our Voices (2019).

144.    Carlson and Roginsky have now forever transformed the legislative landscape with their unapologetic efforts in getting bipartisan support and enactment of EFAA.

145.    During this period, unlawful sexual harassment went unchecked at Thompson Hine; instead, the predators like DePalma, were shielded from any consequence for their actions

146.    Plaintiff knew all of this and kept her head down and performed exceptionally for her clients, both internal and external, and avoided DePalma like the plague.

147.    DePalma specifically and intentionally retaliates against any female attorneys (including Plaintiff) who do not embrace his misogynistic culture or agree to his sexist submissive behavior by engaging in a campaign to end their employment by freezing them out of billable litigation firm work, his pattern is unmistakenly pervasive.

148.    There can be no legitimate dispute that Plaintiff endured and reported DePalma's misogynistic and unlawful conduct to Thompson Hine's management for literally more than a decade, including Read, who is now on the way out of the firm-wide Managing Partner role, after more than a dozen years at the helm.

149.    Read knew of the toxic and harassing work environment and unlawful conduct that permeated Plaintiff's professional life in the New York office and did precisely and exactly nothing and allowed it to continue (the *Queen Bee Syndrome*[7] is alive and well at Thompson Hine, irrespective of

---

[77]*See*, Olga Khazan, *Why Do Women Bully Each Other at Work?*
https://www.theatlantic.com/magazine/archive/2017/09/the-queen-bee-in-the-corner-office/534213/ ("The bitches… came in three varieties. She categorized them on her personal blog, in a post titled 'Beware the Female BigLaw Partner.' First was the "aggressive bitch" - a certain kind of high-ranking woman at the firm where she worked who didn't think twice about 'verbally assaulting anyone.'… Next was the two-faced 'passive-aggressive bitch,' whose 'subtle, semi-rude emails' hinted that 'you really shouldn't leave before 6:30.' She was arguably worse than the aggressive bitch, because you might never know where you stand…'tuned-out, indifferent bitch,'… 'is so busy, both with work and family, that they don't have time for anything…This partner is not trying to be mean, but hey, they got assignments at midnight when they were associates. So you will too.'"

the artificial accolades and trophies that clutter its marketing narrative).

150.    Thompson Hine's unsworn Defamatory Letter to the EEOC claims in secretive missives offered in the shadows, posturing that Plaintiff raised her claims only after being asked to resign, serve as a covert attempt to mask their decade-long failure to take any action; the Federal Rules of Civil Procedure, Rule 11, will compel Defendants to substantiate their assertions, as consequences for duplicity exist and are enforced in this forum, in essence, put up or shut up.

151.    DePalma's demand that Plaintiff acquiesce to his distorted ideology, positioning himself as the patriarch, and marginalizing female lawyers, Plaintiff here, who refused to bow to his grandiose self-concept, was raised by Plaintiff with each of the following equity partners who stood in her line of firm supervision from 2013-2022, Read (both before she was elected Managing Partner, and after), Brian Lamb and Todd Mason (amongst others not named here as they were outside Plaintiff's reporting/supervision structure).

152.    Likewise, Plaintiff had the same discussions with income partners and attorneys across the firm's offices, as well as paralegals and secretaries.

153.    Plaintiff specifically warned new female lawyers and staff in New York of DePalma's sexually in appropriate tendencies, of DePalma's harassment of female lawyers and staff who did not subordinate themselves and his unbridled efforts to sabotage female lawyers and staff who did not "kiss his ass".

154.    Equally important, Plaintiff unapologetically highlighted DePalma's abusive behaviors and misuse of power through the manipulation of billable hours in the New York office under his covenanted Vice Chairmanship to Read, Lamb and Mason year after year.

155.    Todd Mason, as the New York Office Partner in Charge, (a position that DePalma

volleyed for and wanted to expand his powerbase, but was rejected) in his effort to bring "peace," offered to "mediate" the decade long complaints Plaintiff had voiced against DePalma; Plaintiff respectfully declined because she could not afford to arm DePalma with the knowledge that his sexual harassment and discriminatory conduct was crippling her professional advancement, as that would only serve to drive him to intensify his unlawful conduct.

156.    Plaintiff did not just complain about DePalma with regard to his disgusting behavior toward her, she complained on behalf of other female attorneys as well.

157.    True, Plaintiff, well versed in employment law, was specifically careful in her written communications with Read, Lamb and Mason, and others, not to write the words describing DePalma as "misogynistic," "sexist," "sexual harasser," "androcentric bigot," "chauvinistic pig," "woman-hating," "anti-feminist," "biased," "male supremacist," "male chauvinist," "woman-disparaging," "anti-women," "offender," "gender-biased," or as "predator," because as an income partner employee, accusing a male equity partner of unlawful discriminatory and sexual harassment in fulsome written form would have unequivocally put Plaintiff's career in jeopardy.

158.    Plaintiff has seen Thompson Hine's playbook in this regard, and it is a worn out blueprint that when complaints are made by women: no meaningful investigation or one that is wholly biased, blame the victim accuser of poor performance, support the abusive equity partner, and buy silence.

**PENÉLOPE**[8]

159.    When Penélope joined the firm, Plaintiff recognized her as a female litigator with great potential, and immediately and specifically warned her of DePalma's unlawful conduct and warned her to be careful in her personal and professional interactions with him.

160.    Plaintiff's prescient warnings to Penélope were not to be taken lightly, as events unfolded exactly as foretold.

161.    DePalma, with laser-focused intent, later directed his discriminatory and harassing rhetoric squarely at Penélope when she too declined to subordinate herself and resisted becoming a pawn in DePalma's ominous entourage.

162.    The accuracy of Plaintiff's cautionary words became chillingly evident as Penélope found herself ensnared in the crosshairs of DePalma's targeted animosity.

163.    When Penélope specifically complained about DePalma's discriminatory and sexist conduct towards her based on her race, gender and pregnancy, and his ongoing retaliatory campaign to get her terminated (during 2016 and 2017), the firm failed to conduct any proper or meaningful investigation, leaving Palma unleashed to continue to target Penélope upon her return from maternity leave by, among other purposeful humiliation, openly denying her an opportunity to engage in any billable firm work and disparaging her professionally to partners in the firm.

164.    DePalma, along with his sidekick, Joeseph Koczko (and at the time "Larry") were tagged and known in the New York Office as the "three-blind mice," or the "three stooges," because

_____

[8] Henceforth in this Verified Complaint, Plaintiff has employed pseudonyms to shield the identities of the female attorneys referenced therein, unless explicit consent has been obtained to divulge their names. This measure is undertaken to spare these individuals the indignity of revisiting instances of sexual harassment endured at Thompson Hine, or any potential adverse repercussions to their reputations.

once DePalma zeroed in on a female attorney for harassment and mistreatment, they piled on.

165.    DePalma was relentless in his sexual harassment, gender, pregnancy and racial bias and discrimination against Penélope, weaponizing his position as NY-Vice Chair against her.

166.    It was only after Penélope inked her written and formal complaint, that the firm and DePalma ramped up and leaned into to their discriminatory mistreatment and retaliation against her.

167.    Thompson Hine then too, and thereafter, circled the wagons claiming that others (beyond DePalma) had some unknown issues with Penélope; yet neither of these attorneys remain at the firm, one was asked to leave involuntarily and the other departed to join a client, leaving DePalma as the sole source of Penélope's forced departure.

168.    DePalma repeatedly disparaged Penélope's reputation to attorneys in the litigation group, including to Plaintiff, in attendance at meetings in New York, refused to give Penélope any billable work upon her return from maternity, until she was literally physically and mentally beaten down and humiliated sufficiently.

169.     Plaintiff intervened, despite knowing that her involvement would further enrage DePalma and increase his hostility and discriminatory focus on Plaintiff – Plaintiff could not stand by and watch another female attorney, a new mother, be repeatedly humiliated and her professional career trashed by DePalma.

170.    Plaintiff attempted to negotiate a severance package for Penélope, advising the firm and its equity and income partners alike that if Penélope filed suit against the firm and DePalma, and Plaintiff was deposed, Plaintiff would not lie to coverup or shield DePalma's unlawful discriminatory conduct against Penélope.

171.    Ultimately, Thompson Hine rallied behind DePalma and treated Penélope as an

inconsequential afterthought, and consigned her and her earnest grievances to the depths of disregard.

172.     Penélope was shoved out the door by DePalma and paid to shut up by Thompson Hine's hush money, and silenced under a perpetual shackling non-disclosure agreement; DePalma's unlawful behavior was again swept under Thompson Hine's rug of shame.

173.     DePalma had improperly used his authority to humiliate, intimidate and harass Penélope from further complaints about him and had a ruinous impact on Penélope's career trajectory.

174.     Thompson Hine's utter and stark lack of initiative in investigating, addressing, or penalizing DePalma's documented, and well-known discriminatory, harassing, and retaliatory behaviors served as a damning confirmation of its pattern here as against Plaintiff.

175.     In the face of this institutional inertia, Plaintiff's awareness solidified: embarking on the arduous path of filing a formal complaint against DePalma as an equity partner for sexual harassment or gender discrimination in this time frame would, regrettably, prove to be a futile endeavor with the potential to irreversibly end her professional career at the firm.

176.     Thomson Hine's pattern of complicity, both then and now, in the face of unlawful sexual harassment, discrimination and disparate treatment, combined with its failure to take any action to remedy the known unlawful pattern of conduct by its equity partner DePalma, remains indefensible, even as it now attempts to disingenuously feign ignorance.

177.     After Penélope's departure, DePalma, with the firm's blessing, and no consequence for his conduct directed at Penélope, redoubled his efforts to sabotage Plaintiff in a concerted pattern of discriminatory conduct as he was furious that Plaintiff had come to Penélope's aide and that she wasn't just fired and tossed out with the trash.

178.     DePalma was enraged that Plaintiff helped Penélope secure an exit strategy from the

firm and that she was not simply fired as the result of the tsunami of lies DePalma spread about her and her legal acumen and performance.

179.   In a pivotal moment, when a female partner, "Patrice," rightfully suggested to DePalma that he be thankful that Plaintiff had navigated a path for the firm to escape the high six figure fall out of his unlawful behavior directed at Penélope and sparing the firm from potential legal repercussions, DePalma's visceral reaction was palpable.

180.   DePalma's physical display of anger was immediate, and he adamantly refused to engage or even talk to Patrice (another female litigator) for months.

**READ: THE QUEEN BEE SYNDROME**

181.   Thompson Hine anticipated attempt to showcase having a female managing partner, as if it could somehow overshadow or excuse the pervasive unlawful conduct in the New York office, is nothing but an empty gesture.

182.   Thompson Hine's attempt to parade and pander Read as a shield to distract the EEOC, or this Court, from the prevalent and systemic discrimination and sexual harassment in the New York office holds no substance.

183.   Plaintiff repeatedly and consistently raised concerns about DePalma's unlawful treatment of Plaintiff in the New York office, his lewd comments and his tight vice grip on the flow of billable work directly to Read, and she did nothing.

184.   One of the few, if only written example, following a meeting with Read on August 25, 2017, Plaintiff wrote the very next day: "Thanks for your time yesterday – always good to catch up and appreciate your insights on my BD strategies… Lit Vice chair issues – definitely need a change – and although I'm not equity would volunteer – we have 16 practice group leaders – 2 women, and in Lit we

29

have 6 vice chairs, 1 woman…"

185.    In the verbal conversations with Read throughout the years, Plaintiff was more direct in her descriptions of DePalma's unlawful conduct, but was cautious not to put anything in writing, as such would have triggered a formal investigation, and put Plaintiff's professional career in dire jeopardy.

186.    Read too was specifically informed by Plaintiff of DePalma's "jerking off" comments, Friday night invitation only networking/drinking parties in DePalma's office, his parading his divorce details and weekend escapades littering the New York office with his filth and Plaintiff repeatedly advised Read of DePalma's strangle hold on the flow of litigation work in the New York office and the negative impact it had on Plaintiff's billable performance numbers.[9]

187.    Regrettably, and consistently, Read comfortably ensconced in her Cleveland enclave, has repeatedly watched from the bleachers, knowing of the plight of women income partners in New York, who have stood up and tried to voice the inequitable distribution of work and discrimination by male equity partners overseeing the New York office, seeking her counsel and guidance, and she did literally nothing.

188.    Read's pattern of shameful indifference and utter lack of leadership is evident in the case of Mildred Quinones Holmes, a former income partner in New York.

189.    Ms. Holmes too experienced the gender discrimination in the New York office and lodged a complaint to Read regarding Irv Apar.

---

[9] "Sexist and sexually suggestive comments were the most common forms of harassment" See, 5 Barney Thompson, Sexual harassment and bullying rife in legal profession, Financial Times, May 14, 2019 (https://www.ft.com/content/cf4517ac-7657-11e9-be7d-6d846537acab) (Last visited Jan. 29, 2024).

190.   Apar, who continues to be the male equity lead of the firmwide Commercial & Public Finance group (with the associated perks and payment for that position), systematically directed work to select male equity partners, deliberately excluding Ms. Holmes.

191.   Rather than address Ms. Holmes' claims of disparate treatment, the firm gave Ms. Holmes the unpaid kitchen duty role of New York Diversity Vice Chair.

192.   As Read follows the revenue, not the law, she sided with Apar and took no action to investigate or address the glaring discriminatory or disparate treatment suffered by Ms. Holmes, eventually driving her to resign.

193.   Read's hollow and resounding silence in the face of such unlawful circumstances speaks volumes about Read's glaring lack of support for women income partners in New York or for the rule of law.

194.   Read's failure to instill a sense of lawful conduct is stark, as she instead chose to align herself with, and remain loyal to, and lean into, and was allegiant only to, the firm's revenue stream.

195.   Confirming Read's apathetic pattern, Maranda Fritz, another former female income partner, became yet another a victim of the glaring gender discrimination within the New York office.

196.   Ms. Fritz raised her complaints to Read about the inequitable, discriminatory and disparate treatment by Norman Block, the then firmwide chair of White Collar and an equity male partner.

197.   Ms. Fritz's complaints to Read again fell on indifferent ears.

198.   Block unapologetically hoarded white collar work and purposefully excluded Ms. Fritz from her rightful area of specialty, affirming his steadfast clench on the flow of work and the resulting discriminatory treatment of Ms. Fritz.

199.    Adding to the injustice, work that rightfully belonged in New York that Ms. Fritz was perfectly suited to handle was dispatched to Washington, DC male equity partners.

200.    Despite Ms. Fritz's complaints, Read's stance remained unchanged, as she aligned herself with the male equity partner, Block, signaling her support for the discriminatory status *quo*.

201.    The ostrich analogy aptly captures Read's response, as she chose to bury her head in the sand rather than confront the pervasive gender bias and discriminatory conduct in New York.

202.    Read's alignment with the male equity revenue stream hoarders perpetuates a system riddled with bias and discrimination.

203.    Plaintiff's complaints here specifically adds to the systemic pattern of gender bias and discrimination, as DePalma misdirected work to himself and other male equity attorneys, and intentionally excluded Plaintiff and other strong women litigators; Read knew about it, and again, lacking any leadership, did nothing.

204.    Read's actions, and inaction, confirm that she, and by extension Thompson Hine, condoned the unlawful and harmful conduct inflicted upon Plaintiff and now they can own the consequences of those failures.

**THE EVENTS LEADING UP TO READ DEMANDING PLAINTIFF'S RESIGNATION AND ULTIMATE RETALIATION**

205.    DePalma's fury, which ultimately led to the orchestrated discriminatory termination (aided by his confederate Koczko, an Executive Committee member) of Plaintiff was triggered by her denial of approval for a *pro bono* expense in mid-March 2022.

206.    A seemingly trivial incident given the allegations outlined in this Verified Complaint, yet Plaintiff's declination of DePalma's request somehow affronted his masculinity and further ignited

his discriminatory rage against her.

207.    In March 2022, in an effort to undermine Plaintiff's position as then uncompensated Firmwide Chair of the *Pro Bono* Committee, DePalma requested that Plaintiff approve an expense to a vendor with regard to a pending *pro bono* matter he was pursuing.

208.    Plaintiff responded and relayed to DePalma that such expenditures were contrary to Thompson Hines policy.

209.    Plaintiff declined to approve the expenses request.

210.    DePalma dismissed Plaintiff's decision entirely, despite Plaintiff providing the explanatory basis that was embodied in a contemporaneous email from Read.

211.    DePalma was not going to be told "No" by a woman, and certainly not Plaintiff, who he had spent more than a decade sexually harassing.

212.    Instead, DePalma ignored Plaintiff and went to a male equity attorney, Business Litigation Practice Group Leader, Lamb, to undermine and override Plaintiff's directive.

213.    DePalma would not have disregarded a male Firmwide Chair decision, and Lamb would not have questioned the interpretation of a firm policy if it had been conveyed to him by a male attorney.

214.    Lamb then emailed Plaintiff seeking an explanation for declining the DePalma expense request and challenging her interpretation of the firm *pro bono* policy.

215.    Plaintiff advised Lamb in writing that under DePalma's supervision, the "*pro bono*" case at issue had already spent $15k in hard and soft costs (that had not been approved by Plaintiff), that 350 hours against that case had been entered into the system, which amounted to approximately $228,500 in attorney time and that the case in question "stretches the boundaries of our policy" as it was a $1.2 million dollar dispute over damages to significant art work in a storage unit, which does not

meet the firm's policy requirements to be a *pro bono* matter in the first place.

216.    DePalma had opened a *pro bono* matter that sought $1,280,000 million in damages for artwork/paintings that were damaged in a flooding at a storage unit; this client and case never qualified as a *pro bono* client under the firm's strict policy, the client is not indigent, and the matter does not concern an impactful community cause.

217.    DePalma engaged in false and deceptive conduct by falsely portraying the case as *pro bono*, in a calculated effort to advance and promote his self-created "Art Law" group (and groupies) which is in fact a violation of firm policy and in direct contravention of 22 NYCRR §118.1[e][14].

218.    Neither DePalma nor Lamb ever responded to Plaintiff.

219.    DePalma purposely disregarded Plaintiff's decision as firmwide Chair of the *Pro Bono* Committee (that if rendered by a male partner would have been accepted) and sought the funds directly from Lamb.

220.    Lamb too disregarded Plaintiff's directives concerning the Thompson Hine's *pro bono* policy as applied to payment for expenses in *pro bono* cases and approved DePalma's demand for payment, that was in fact violative of the very policy that Read had reminded Plaintiff to enforce on March 15, 2022 (Read writing "we do not pay costs in connection with pro bono work, so I hope the charity has some dollars to pay for any registration fees, filing fees, etc.")

221.    Following this complete disregard for Plaintiff's function as protector of the firm's *pro bono* policy, Plaintiff collaborated with members of the *Pro Bono* Committee.

222.    Together, the *Pro Bono* Committee embarked on an investigation into the firm's *pro bono* portfolio, thoroughly examining each open and closed matter on the firm's pro bono roster.

223.    As the firm had previously modified the *pro bono* engagement template to address

expenses and payment responsibilities, our goal in the audit was to ensure we had a comprehensive overview of the portfolio and the appropriate engagement letters for each open case, having uncovered DePalma's fraud on the firm.

224.    On April 22, 2022, Plaintiff sent an email to all New York City office attorneys with open *pro bono* matters.

225.    Fellow *pro bono* committee leads for each office sent similar emails for attorneys in their respective offices with open pro bono matters.

226.    The communication instructed that moving forward, Plaintiff was to be designated as the "billing attorney for all New York office pro bono matters" to streamline and track billing on these matters and monitor expense management, and the other office liaisons sent similar communications to attorneys in their offices reflective of the audit inquiry.

227.    The April 22, 2022 email further requested responses by May 6, 2022, and cautioned that matters lacking details beyond this date would be closed and time entries disabled.

228.    DePalma was among the recipients of Plaintiff's April 22, 2022 and seemingly became incensed and enraged by Plaintiff's oversight of the New York *pro bono* matters, including his *faux* pro bono matter which was the genesis of the *pro bono* audit.

229.    Plaintiff was terminated (asked to resign) just seven (7) days after her April 22, 2022 audit communication in a call from Readd.

**APRIL 29, 2022**

230.    Despite an exemplary and unblemished record of successful performance for the firm's most important clients, Read called Plaintiff at 1:35pm on April 29, 2022, and asked her to resign under the pretext that Plaintiff's billable hours were too low.

Case 1:24-cv-01420-ALC   Document 7   Filed 02/26/24   Page 36 of 89

231.    When Read called on Friday April 29, 2022, Plaintiff was in the midst of drafting a memorandum of law in support of a motion to dismiss Key Bank, N.A., its Board of Directors and leadership team as counsel of record for all of them.

232.    Plaintiff's response to Read was straightforward and pragmatic – she could not afford the disruption of being fired while immersed in important client legal work product that demanded her attention with a Court Ordered deadline later that day.

233.    Plaintiff's call with Read lasted 9 minutes, as Plaintiff informed Read that she would coordinate with Read's secretary to schedule a suitable time the following week for what essentially amounted to her termination; Plaintiff did not have time to be fired, she was too busy working on April 29, 2022.

234.    Read's admission during that April 29, 2022 telephone call that she was oblivious to Plaintiff's steep involvement in a crucial Key Bank matter during the termination call exposed a significant lapse in Read's judgment and was demonstrative of her unfortunate and negligent lack of awareness of the firm's client needs in New York or Plaintiff's ongoing critical legal work for vital firm clients.

235.    The PACER entry for that consequential day confirms the KeyBank filing on Aril 29, 2022.

236.    Plaintiff was literally stunned by Read's demand that she resign, no one had ever, in writing, orally, or otherwise, ever hinted that Plaintiff's employment with the firm was in any jeopardy.

237.    Plaintiff was subjected to profound humiliation as a result of Read's groundless demand, fully aware that her initiation of the *pro bono* audit and her notification to DePalma regarding the *Pro Bono* Committee's scrutiny of his spurious *pro bono* matter were the precise factors underlying the

36

directive for her resignation.

238.    Plaintiff was thrust into an impossible professional conundrum as the direct result of Read's negligent call on April 29, 2022: either to persist diligently in her work on KeyBank's critically important memorandum of law, supporting declaration and dozens of exhibits or stay paralyzed in the knowledge that DePalma's Machiavellian and misogynistic tactics to derail Plaintiff career had reached its apex.

239.    Plaintiff could not inform her team that she was asked to resign during that afternoon, because that would have distracted their work product for the client, and that decision weighed heavily on Plaintiff.

240.    Plaintiff was besieged by profound emotional apprehension, stress, and anxiety in the continued performance of her work for KeyBank that afternoon – the dissonance of continuing to bill hours for the firm as the firm was shoving Plaintiff out the door permeated and reverberated over and over in Plaintiff's mind and in every action she took after Read elected to unlawfully terminate Plaintiff's employment.

241.    Despite enduring discriminatory and unlawful treatment, Plaintiff knew that her unwavering commitment to KeyBank had to sustain the pursuit of legal excellence after her call with Read.

242.    Read owed Plaintiff a duty not to interfere with Plaintiff's ability to perform her legal services for KeyBank on April 29, 2022, and breached that duty by unlawfully demanding Plaintiff resign mid-afternoon.

243.    Read was fully negligent, if not reckless, in not being fully informed of the firm matters that Plaintiff was working on April 29, 2022, Read could have informed herself, but did not bother.

244.    Read knew that calling Plaintiff in the midst of that Friday afternoon would have a profound and negative impact on Plaintiff's ability to perform at her professional best.

245.    As a direct and proximate result of Read's negligent failure to inquire of Plaintiff's firm docket (that is available to literally every person in the firm), Read created circumstances that essentially guaranteed genuine harm to Plaintiff.

246.    With the United States District Court filing deadline looming, Plaintiff knew she could not allow DePalma's sexual harassment, gender discrimination and long game to ruin her career, or Read's utter incompetence in demanding her resignation during a critical KeyBank project, to negatively impact the client legal interest.

247.    Plaintiff knew she had to compartmentalized her emotions, metaphorically relegating them to metaphorical box on the shelf to get through the rest of that day.

248.    Amidst a deluge of incoming client emails demanding her attention on KeyBank and other legal matters, with her team requesting revisions and confirmations on exhibit conformity to her supporting declaration, along with diligent citation checks to ensure the accuracy of decisional law, every key stoke she typed was weighted with stress and anxiety soaring to unprecedented emotional levels, but Plaintiff remained steadfast in her commitment to providing exceptional work product to her client, a commitment she unwaveringly upheld until the very moment she signed the last documents and waited for the KeyBank filing to be completed.

249.    Plaintiff leveraged her decades of legal experience and expertise, tapping into every reserve of professionalism to fulfill her obligations, Plaintiff diligently completed the requisite KeyBank filing as mandated. (The Motion to Dismiss and its accompanying filings made by Plaintiff's April 29, 2022, on behalf KeyBank and its leadership, was ultimately granted by the Court).

38

250.     The negligent infliction of emotional distress by Read was entirely preventable had she bothered to intelligently assess Plaintiff's workload, reviewed the firm's docket, contact Plaintiff after business hours, or explore alternative timing of her unlawful resignation demand; instead it is clear that the decision to terminate Plaintiff just seven days after her *pro bono* audit email, which had evidently incensed DePalma and sparked his egotistical frenzied reaction, was given precedence over important client legal deadlines.

251.     Read should be ashamed of her utter failure to contemplate the impact of her negligence, her valiant salute to DePalma's sexual harassment and discrimination of Plaintiff of which she was fully cognizant, and her deplorable decision and pathetic choice to toss Plaintiff's fourteen year allegiance to Thompson, and its most important clients, into the trash.

252.     Plaintiff ultimately had the fulsome conversation with Read on May 9, 2022 and reiterated her decade long complaints of DePalma's misogynistic and discriminatory conduct.

253.     Read's unsupportive response was "I can't believe YOU'RE doing this," and advised that Read would inform the firm counsel and Plaintiff should expect a termination agreement to follow.

254.     What followed was a sham investigation of nothing, and a termination agreement and process that was retaliatory.

**THOMPSON HINE'S SHAM INVESTIGATION OF SEXUAL HARASSMENT AND GENDER DISCRIMINATION**

255.     Thompson Hine's meandering effort to cloak DePalma's creepy and unlawful behavior behind the silence of its whitewashed walls, to protect its unwavering allegiance to revenue and shielding its elitist equity partner, is shameful.

256.     The firm's glaring failure to adhere to even the most rudimentary investigative procedures in response to years long complaints about discrimination inflicted by DePalma is nothing

short of purposeful ignorance and feigned blind oblivion to the facts and unlawful conduct of which it was firmly aware.

257.    Thompson Hine advised the EEOC that Plaintiff declined to engage in the "investigation" without her counsel present, a spin on the actual events that transpired.

258.    What actually transpired is, once Plaintiff advised Thompson Hine that she had retained counsel, and that they were open to having a dialogue, Thompson Hine never contacted Plaintiff again about its phony investigation.

259.    Instead, predictable, it circled the wagons, closed ranks and readied its perjurious lies to later obstruct and obfuscate the EEOC's investigation.

260.    Thompson Hine employment lawyers have conducted hundreds of these types of client investigations, and the first rule of the road, higher impartial counsel so that the results of the investigation cannot be challenged as bias.

261.    Thompson Hine is perfectly willing to bill clients substantial sums for comprehensive investigations; however, when its own wrongdoing is under scrutiny, it conducts a clandestine and biased investigation that only serves to justify and approve its and its equity partner's unlawful behavior.

262.    Thompson Hine's circle the wagon investigation was just that, talk to the perpetrator DePalma and self-validate its biased findings.

263.    The facts confirm that Thompson Hine partner Deborah Brenneman reached out to Plaintiff on May 11, 2022, writing "I understand that you have raised concerns regarding potential gender issues in the New York office.  I have been asked by the Firm's Office of General Counsel to investigate those concerns.  Could we set up a time to talk when you get back to the office?  Thanks! Debbie."

40

Case 1:24-cv-01420-ALC   Document 7   Filed 02/26/24   Page 41 of 89

264.     Plaintiff responded on May 16, 2022 that she was open for a call to that Friday (May 20) or Monday (May 23).  Brenneman wrote back on May 19, 2022 "Hey Rebecca sorry I am just now getting back to you.  Would you have some time Wednesday Thursday or Friday of next week?" (May 25, 26 or 27).  Brenneman wrote on May 27, 2023 "Hi Rebecca – following up again.  Could we talk on Tuesday after the holiday?"  Plaintiff again replied that day: "Good afternoon.  Thank you for your note.  I have procured the Linesch Firm as my counsel, and they are open to engaging in a dialogue with the firm as part of its investigation.  Cheers Rebecca."

265.     Plaintiff never heard from Brenneman again.

266.     Thompson Hine did not conduct any meaningful investigation of Plaintiff's sexual harassment or gender discrimination claims and she never declined to participate in that investigative process.  Thompson Hine claims to the EEOC otherwise were false.

267.     Thompson Hine's *faux* investigation was limited to selective inner circle equity partners.

268.     During that purported "investigation" that the Thompson Hine claims to have conducted, only after the fact, conveniently excluded any meaningful communication with Plaintiff nor did it engage in discussions with any of the partners (whether income or equity) with whom Plaintiff collaborated with or worked with over the past decade.

269.     Instead of conducting any meaningful investigation, and prior to Plaintiff's last day at the firm in June 2022, DePalma was already scheming to step into and take over Plaintiff's billable cases in New Jersey, despite lacking admission (or qualification) to the New Jersey Bar.

270.     DePalma wrote on June 2, 2022 to a New York paralegal "When you have a chance, can you look and see what the rules are for NY admitted attorneys getting admitted (permanently, not pro hac vice) to NJ? Is there reciprocity?  If so how long must you be admitted to NY, any thing else,

etc." Really pathetic.

271.   Before Plaintiff was even out the door, DePalma was already on the hunt to capture the billable work that Plaintiff had performed for firm clients under her New Jersey law license.

272.   A pathetic scene that definitively confirmed DePalma's excitement of the success of sexual harassment and discriminatory conduct in having Plaintiff ousted.

273.   Wielding his authority as the New York Vice Chair, he shamelessly took advantage of the vacuum in workflow and billable hours left in Plaintiff's wake, exposing a calculated intent to capitalize on the fallout from his own orchestrated discriminatory and sexually harassing conduct.

274.   Further, Thompson Hine confirmed its violation of its own policies by its utter failure to conduct an investigation of Plaintiff's claims of misogynistic and discriminatory conduct be DePalma that was conveyed by Plaintiff to Read in a phone call on May 6, 2022.

275.   It was during this second termination call that Plaintiff again complained that DePalma's unlawful conduct be investigated and dealt with, while it would not alter Plaintiff's professional trajectory, perhaps it would save another woman from DePalma's despicable and disgusting conduct in the future.

276.   Read's feigned surprise that Plaintiff wanted an investigation to prevent further harassment even after Plaintiff's departure was truly awful, Read knew of DePalma's unlawful conduct and was annoyed that Plaintiff was not going to go quietly into the night.

277.   Read offered Plaintiff six months of salary, and Plaintiff could continue working for the firm (and billing clients) will looking for a job at the ripe young age of 53, and report to the firm on her progress in her search for a new career.

278.   Read promise of a fulsome investigation was an empty gesture.

279.   Thompson Hine utterly failed to follow its policies or even its own advice to clients, never conduct an investigation yourself, as the institutional bias will cloud the conclusion.

280.   Thompson Hine excluded Plaintiff from the investigation by failure to ever even take her fulsome statement, failed to interview the countless witnesses to DePalma's unlawful behavior both inside New York and beyond, failed to interview the attorneys and staff that worked with Plaintiff for a decade, instead, they interviewed DePalma, circled the wagons and later offered the EEOC a false and fraudulent account of Plaintiff's career at the firm.

281.   Defendants fraud on the EEOC is self-evident from the flat out lies it inked, the omissions it failed to include and its effort to alter the playing field to gain an unfair advantage as alleged herein.

282.   Hold your gasps for the jaw-dropping moment in the firm "investigation" when DePalma, in a brilliant display of selective memory (fraud), somehow missed the chance to admit his own shining moments as a male chauvinist pig and the charming instances of sexual harassment and discrimination against Plaintiff. Oh, and let us not forget his subtle exploitation of a personal relationship with side-kick Executive Committee Member Joe Kokszo (who go fishing together in Montauk with their significant others) to seamlessly engineer Plaintiff's termination – all because she dared to intrude into his utterly faux *pro bono* endeavors and dared to expose him. Case closed with the shocking discovery that Thompson Hine's biased and self-serving investigation of nothing, yielded precisely nothing.

283.   Similarly, the voices of associate attorneys and Thompson Hine staff, who Plaintiff interacted with daily, who were fully aware of the DePalma's gender bias that permeated his interactions with and as against Plaintiff, were never heard – instead they too were silenced – and completely

disregarded by the secretive and wholly selective review.

284.    Thompson Hine's attempt at an investigation appears to be nothing more than a facade to back fill the hole it dug by its failures to protect Plaintiff, a New York employee, from unlawful sexual harassment and discriminatory conduct.

285.    The fact remains, the timeline contemporaneously articulated in Plaintiff's EEOC Charge, that DePalma, and his fishing buddy and discriminatory cohort Joe Kozcko, sought and used the Executive Committee as the instrumentality to terminate Plaintiff as the direct result of DePalma's long game in forcing Plaintiff's unlawful termination, coupled with Plaintiff's ousting of DePalma's *faux* pro bono case and client, in the ultimate act of discrimination, terminating Plaintiff's employment with the firm, under the later formed guised pre-text, of low hours.

286.    Indeed, fluctuating hours is directly linked to the sexual harassment claims here, "[s]exual harassment is one reason attorneys suffer from anxiety, depression, trauma, and reduced productivity and focus at work." *See, Sexual Harassment and Retaliation in the Legal Profession: How To Stop It,* December 15, 2021 (https://nysba.org/sexual-harassment-and-retaliation-in-the-legal-profession-how-to-stop-it/) (Last visited January 24, 2024).

287.    What follows is the actual timeline of events that followed Plaintiff's departure that rendered the termination process entirely retaliatory, as evidenced by the contemporaneous communications, and renders the firm's bogus investigation an empty self-serving gesture.

288.    On or about May 9, 2022, Thompson Hine, through Feher, sent Plaintiff a separation document rife with ludicrous demands (the "Initial Demand"), including that Plaintiff would continue working at Thompson Hine though October of 2022 (which would give the firm the ability to bill all of Plaintiff's time), Plaintiff had to agree that Ohio law governed, and that secret arbitration would

be the only forum available to Plaintiff for any redress.

289.     Plaintiff flatly rejected the Initial Offer.

290.     Thompson Hine revised and issued a Second Offer that was even worse.

291.     The Second Offer still demanded that Plaintiff waive her right to a judicial proceeding, required application of Ohio law, sought to incorporate the firm's 2017 Partnership Agreement, required Plaintiff to continue to represent firm client in a pending matter in Atlanta, and demanded that Plaintiff "remain available, including after the Separation Date, and undertake any reasonable efforts to be available for consultation regarding any matter or issue related to her practice or other matters while at the Firm", without compensation.

292.     The Second Offer was met with an unequivocal rejection.

293.     Plaintiff, resolute and unyielding, took a definitive stance, adamantly rejecting Thompson Hine's insidious offer to buy her silence with tainted ink.

294.     Plaintiff too was unwavering in her conviction, making a bold choice, refusing to barter her voice for the ink Thompson Hine sought to use as a tool of suppression.

295.     In facing this formidable decision, Plaintiff understood the weight of her actions: if she succumbed to Thompson Hine's offer and accepting its piddly settlement offer, she would effectively perpetuate a culture of toxicity, sexism, discrimination, and gender biases, thereby endangering the prospects of future women lawyers who might later pass through Thompson Hine's New York office and be subject to DePalma's toxicity, sexism, discrimination, and gender biases.

**PLAINTIFF INSTEAD FILED A CHARGE WITH THE EEOC**

296.     On July 1, 2022 Plaintiff submitted, under penalties of perjury, her sworn EEOC and NYS Commission on Human Rights Charge of Discrimination against Thompson Hine.

297.    The EEOC Charge included allegations against Thompson Hine of unlawful conduct

pursuant to "Title VII of the Civil Rights Act of 1964, 42 USC § 2000e ("Title VII"), the New York

State Human Rights Law, NY. Exec. Law § 290 et seq., and New York City Human Rights Law,

NYC Admin. Code § 8-107. The gender discrimination is emblematic of a broader and systemic

pattern and practice at Thompson Hine LLP."

298.    On February 23, 2023 Thompson Hine submitted its Defamatory Letter, inked by

Feher to the EEOC.  *See*, Exhibit 2 hereto.

299.    Plaintiff was provided a copy of Thompson Hine's Defamatory Letter on June 9, 2023.

300.    On August 23, 2023, Plaintiff submitted, through then counsel of record, a Rebuttal to

Thompson Hine's Position Statement.

301.    Thompson Hine's February 23, 2023 Defamatory Letter is not entitled to any

privilege, as Thompson Hine and Feher defamed Plaintiff, lied to the EEOC, abused the process, and

as such, no privilege attaches to its submission.

302.    For avoidance of doubt, the Defamatory Letter and the lies included herein area

specifically addressed and rebutted in detail here.

303.    In reviewing Plaintiff's original EEOC Charge, and then reviewing Thompson Hine's

position statement, what is most illuminating is the lack of response, the details that are intentionally

omitted and the utterly false picture stroked with vengeful ink.

304.    Thompson Hine's response reads more like a firm puff marketing piece reaching for

national stature than an EEOC position statement responsive to the sworn statement that evidenced

intentional unlawful discriminatory and disparate treatment against me in violation of Title VII.

305.    Plaintiff's EEOC Charge confirms that in Thompson Hine's New York office,

DePalma engaged in abhorrent behavior served as a distressing portrayal of misogyny, as he consistently engaged in discriminatory, demeaning and derogatory treatment of women, and specifically directed his toxic biased and unlawful conduct towards Plaintiff.

306.     With an unwavering grip on his prestigious role as Litigation Vice Chair-NY, he shamelessly weaponized the redistribution of billable legal work, perpetuating the pervasively and absolutely hostile and discriminatory work environment.

307.     Let it be unequivocally known that the unsworn statement presented by Thompson Hine's internal "counsel," aiming to depict Plaintiff's ongoing complaints against DePalma as some recent fabrication at the time of Plaintiff's separation from the firm, is a brazen lie.

308.     Thompson Hine dares to cloak this falsehood in an unsworn submission to the EEOC, seeking to shield it from scrutiny under the guise of absolute privilege and frustrate the EEOC rightful investigation.

309.     Plaintiff's clients (both internal partners who steered Plaintiff work) and Plaintiff's outside clients, were all informed, advised and contemporaneously aware of DePalma disgusting and unlawful conduct over the last decade and can attest to that knowledge under oath rendering the Thompson Hine's unsworn pixie dust submission simply and fully irrelevant.

310.     In its Defamatory Letter, Thompson Hine deliberately sidesteps the significance of the Title VII employee issue, relegating it to an inconsequential footnote.

311.     Thompson Hine's hollow claim that Plaintiff was classified as a partner, therefore exempt from Title VII protection, lacks support in the law and is contrary to every Court decision that has issued on the topic across this country.

312.     Thompson Hine is clearly attempting to evade the law.

313.    Protected in the very fabric of Second Circuit jurisprudence lies an incontrovertible truth – while Thompson Hine possesses the latitude to artfully sculpt its partnership agreement, weaving a tapestry of empty partnership status among its employees, it has crafted a document that only rewards its equity partners with any true partnership benefits.

314.    There is no ambiguity here, Plaintiff had no authentic ownership interest – listed as 0% on the tax documents issued by Thompson Hine, no fiduciary alliance with or from anyone, no share in the fortunes and misfortunes, no grip on the helm of management, no voting prowess, and zero sway over firm decisions.

315.    Indeed, the 2017 Partnership Agreement does not even bother to provide a line where Plaintiff could ink any agreement thereunder, those signature lines are reserved for the elitist equity partners only.

316.    Plaintiff was in fact a diligent employee, entitled to the robust protections granted by, *inter alia*, Title VII.

317.    The insidious discrimination, the glaring disparate treatment that Plaintiff endured, a product of DePalma's despicable gender bias and sexual harassment of Plaintiff, and he punished Plaintiff when she steadfastly rejected his demand that she subordinate herself.

318.    Such unlawful conduct violates the protections afforded under Title VII.

319.    Plaintiff reported to the EEOC in her Rebuttal that there is no legitimate dispute that Plaintiff reported DePalma's misogynistic and unlawful conduct to the firm management for literally more than a decade.

320.    Without hesitation, Plaintiff distinctly and explicitly highlighted DePalma's discriminatory treatment, along with his open contempt for Plaintiff.  DePalma's demand that women

acquiesce to his distorted ideology, positioning himself as the patriarch, and marginalizing those who refused to bow to his grandiose self-concept, was unequivocally raised with equity partners, including Read, from 2012-2022.

321.    Plaintiff too had the same discussions with income partners and attorneys across the firm's offices, as well as paralegals and secretaries.

322.    Equally, Plaintiff unapologetically highlighted DePalma's misuse of power through the manipulation of billable hours under his covenanted Vice Chairmanship of Business Litigation in New York.

323.    Thompson Hine concedes, it was "clear that Mr. DePalma and Ms. Brazzano did not get along – both complained about each other at different point over the years…"

324.    What is missing from Thompson Hine's missive, is Plaintiff's complaint about DePalma were grounded in unlawful conduct. DePalma's complaints about Plaintiff were sexist, discriminatory, and permeated with defamatory and reputational insults.

**THOMPSON HINE'S MISSING FACTS AND DUPLICITOUS LIES TO THE EEOC AND DEPALMA'S VICE CHAIRMANSHIP REIGN ENDS**

325.    Thompson Hine's Defamatory Letter clammers on from its Ivory Tower in Cleveland about its covenanted equity partner DePalma, but failed to advise the EEOC that it was only after Plaintiff's formal complaint to the EEOC filed in July 2022, that the firm finally knocked DePalma off his eleven yearlong perch as Vice Chair Litigation – New York, on December 7, 2022.

326.    Accordingly, Thompson Hine's empty accolades towards DePalma in its Defamatory Letter resoundingly confirms its lack of credibility, given the fact that it demoted DePalma and consequently stripped away the lucrative salary perks tied to the coveted "Vice Chair" position and

title and failed to advise the EEOC of this the fact.

327.    Removal of DePalma from his management position illustrates and confirms the fact that he did indeed abuse his position weaponizing the flow of billable work, and directed his hostile, discriminatory and disparate treatment, and sexual harassment, at Plaintiff during his reign.

328.    Thompson Hine's deliberate omission of DePalma's ceremonial demotion only serves to erode the credibility (and lack thereof) of its EEOC submission and its perverted and improper purpose.

329.    Thompson Hine too extensively whined to the EEOC about Plaintiff's alleged financial under-performance, but it provided scant evidence to support its gas lighting claims, confirming its penchant for fabrication and flak jacket style.

330.    Thompson Hine's venomous energy is boundless against anyone who dares to chip away at its white equity armor.

331.    Despite it's after the fact claims to the EEOC, no one, ever, consulted Plaintiff about her client billing, her hours (low or high), her performance as clients repeatedly asked for Plaintiff, including the firm's largest paying clients by far.

332.    Thompson Hine's fraud on the EEOC included its newly minted story that Plaintiff was a "heavy biller," it demands inquiry, did Thompson Hine share that view with the top firm clients Plaintiff routinely provided legal services to? Or just a specious attempt to cloak its discriminatory determination of Plaintiff?  The facts scream that it is the latter.

333.    Indeed, since Lamb, Plaintiff's direct supervisor, took on the role as Firmwide Chair for Business Litigation, he never once told Plaintiff that she had a reputation of being inefficient, or of being a "heavy biller," or that Plaintiff's job was ever in jeopardy due to any of the foregoing.

334.    In fact, after the April 29, 2022 phone call with Read, but before Plaintiff advised the firm that she had retained counsel (May 25, 2022), Lamb wrote to Plaintiff on May 4, 2022 as follows:

> Rebecca: I am writing to say thank you.  As part of a strategic initiative to explore what BizLit associates think our group and firm are doing right and what we could be doing better, we engaged an outside consultant to conduct a one-on-one interviews with each BizLit associate. The consultant then gave me a summary of their feedback, but without attributing any particular comments to any particular associate. As part of the interviews, the consultant asked each associate, among other things, "if they wanted to name anyone who was particularly helpful or meaningful at the firm." Your name was provided by one or more associates. I want to thank you for making a positive impact on our BizLit associates. You have always gone above and beyond in looking out for them. Regards, Brian.

335.    Clearly not the messaging of a supervisor on a mission to permanently separate Plaintiff from the firm.

336.    Lamb never communicated anything to Plaintiff that the firm attributes to him in its shameful campaign to revise history, fabricating groundless pretextual performance issues that literally never happened in a transparent bid to defame Plaintiff character under the guise of the explicit protections and privileged afforded to EEOC submissions to cloak its deceptions.

337.    Likewise, Thompson Hine's revisionist history offered to the EEOC that there was some concern over Plaintiff's relocation to Florida is literally made up.

338.    Lamb never raised any concern over Plaintiff's remote work from Florida, as he knew that many of the firm's lawyers, including Plaintiff, had scattered during COVID-19 when the firm's offices were shuttered.

339.    Lamb equally knew that during COVID closures, DePalma worked remotely from Connecticut, Norman Block was in Rhode Island with his grandchildren and other members of the New York BusLit group were working remotely from other states, including Florida.

340.    While Lamb was an ever constant supporter of Plaintiff, including her dedication to

the firm's *pro bono* efforts as well as Plaintiff's billable work and wrote in response to a slow billable period identified by Plaintiff, in September 2021, "Thank, Rebecca. If something good comes up, I'll steer it your way. Have a great weekend. -Brian."

341.     As such, Thompson Hine's miserable assertion that partners do not engage in steering work to one another is a big fat lie.

342.     The question to steering work can likewise be verified by former income partners Ms. Holmes, Mrs. Fritz and Ms. Heather Hawkins, as noted *supra*.

343.     Plaintiff complained for years that DePalma steered the New York billable work to himself and other male attorneys to Plaintiff's exclusion, weaponizing the Vice Chair designation and position as against Plaintiff.

344.     In a predictable display of its well-worn disingenuous tactics, the Thompson Hine's EEOC Defamatory Letter echoes the same standard toxicity it employs whenever an employee dares to expose the cracks in its facade of credibility.

**FEHER'S REACH FOR IMPRECISION: LIAR**

345.     Thompson Hine's reliance on Feher to draft its lackluster EEOC response is perplexing, particularly with a wealth of seasoned employment lawyers in its ranks.

346.     Perhaps it was Feher's profound awareness of Plaintiff's exceptional legal acumen through years of working collaboratively that renders his authorship of such a shameless and mythical narrative the epitome of irony.

347.     Indeed, when Feher sought exceptional New York counsel for his own family member's sexual harassment contingency case that he brought to the firm, Feher did not seek legal counsel from either of the equity litigators in New York (DePalma or Koczko), instead he turned to

Plaintiff to run point for his family's high stakes dispute.

348.    Plaintiff achieved an exceptional outcome, such that Feher's family member was ensured maximum benefit, and that very benefit ultimately led the firm and Plaintiff's team to lose billable hours and caused the firm further financial losses.

349.    While Feher reaches to reshape the narrative of Plaintiff's tenure with the firm, and futilely claims that Plaintiff was responsible for the firm's dismissal from a client matter in early 2022, this audacious assertion stands in stark contradiction to his own and the client's contemporaneous communications, which all confirm he is lying: Feher himself described the results Plaintiff achieved for the client to be literally "perfect."

350.    Feher likewise omits the fact that once Thompson Hine improperly terminated Plaintiff, two of her clients was not satisfied by the Thompson Hine lawyer who was staffed to replace Plaintiff in a complex RICO/ERISA claim then running hot in Atlanta, Georgia.

351.    An equity partner from Atlanta reached out to Plaintiff, after the firm had terminated Plaintiff, knowing that Plaintiff had been terminated, and upon information and belief, with Feher's blessing, inquiring if Plaintiff would take on the clients and continue representing them.

352.    If as Feher claims to the EEOC, Plaintiff was such an inept lawyer, why would Thompson Hine refer Plaintiff clients? The answer is obvious, Feher just lied to the EEOC to gain an unfair advantage and stomp on the scales of justice.

353.    Notably, Thompson Hine's submission omits all these vital details, as it endeavors to craft a distorted and egocentric account of events in hindsight to camouflage its unlawful conduct here.

354.    Thompson Hine, mired in its own web of deceit and evasion, fails to provide any valid

attestation to its submission and instead offers cryptic accounts of events that never happened or alludes to words that were never spoken.

355.    Thompson Hine and Feher's very fabric of fraud on the EEOC is interwoven with verifiably false information and deflections, often cunningly hidden away in footnotes.

356.    Yet, when subjected to scrutiny, the evidence here highlights Thompson Hine, and Feher, lied to the EEOC.

357.    If Thompson Hine had engaged counsel to conduct a proper investigation of Plaintiff's, perhaps it would not have to spin the story so hard that it boomerangs to reveal its subversion.

358.    It was regrettable but necessary to burden the EEOC with the weight of undeniable evidence, laying bare Thompson Hine's fraudulent response where it reaches to shield itself from accountability for fostering an environment rife with systemic discriminatory and disparate treatment.

359.    Thompson Hine's pretentious act of defiance seeks to conceal its true nature, but its dismal effort to cover its tracks crumble in the face of the unwavering truth and is equally demonstrative of the length and lies it will spin to deflect attention of a legitimate and fulsome investigation by the EEOC.

360.    Feher offered in the Defamatory Letter, footnote 3, that "[t]he client immediately fired Ms. Brazzano and the Firm. The Firm was ultimately paid only about 30% of the time Ms. Brazzano billed. As discussed below, this was an example of Ms. Brazzano's apparent problems with (and reputation for) inefficiency, which was a likely contributor to her problem from finding sources of consistent work."

361.    The client that is the subject of the firm's footnote 3, was brought to the firm with an

urgent matter by a now former female income partner in January 2022.

362.    As such, the normal formalities of Thompson Hine, obtaining a significant financial retainer for litigation and the provision of a formal budget to the client, were not in place.

363.    Plaintiff was not the originating or billing attorney; instead, Plaintiff was asked to run point in New Jersey, file a complaint and obtain, by order to show cause, a temporary restraining order and shut down a former employee from unlawful competition.  And Plaintiff did just that.

364.    In an extraordinary display of efficiency and skill, in the span of merely twenty-five days, between January 13, 2022, and February 7, 2022, Plaintiff conducted research drafted and filed the complaint, conducted expedited written discovery, liaised with the client on almost a daily basis, and secured an Order that temporarily restrained the former employee and his company.

365.    Additionally, the Court there set an accelerated schedule for further discovery and briefing on a preliminary injunction – a series of decisive achievements that precisely aligned with the client's stated legal objectives.

366.    In early February, the female income partner sent a bill to the client and the client was shocked by its amount, as it was in excess of $100,000 (based on the Thompson Hine's EEOC response, as Plaintiff did not see the bill before it issued) and the time spent on certain matters.

367.    It was at this point that Feher was alerted that the client was extremely agitated about the bill and had raised billing issues.

368.    On the morning of February 7, 2022 Feher, after having apparently audited and reviewed the client invoice, wrote as follows: "As I read the charges, Rebecca charged 15.5 hours for drafting the complaint and 10.1 on the TRO.  [Partner], I'm going to suggest that you respond to him so that we can have a nice exhibit if we ever need it.  You can indicate that he can talk to Todd as he

requests (we'll refer to him as Managing partner in NY).  Can you draft something that includes some history (including the volumes of documentation we had to prepare on a short leash) the perfect results and then the fact that he rejected your efforts to talk to him about the bill?"

369.    The Partner then wrote to the client: "… I am very surprised by your reaction.  You retained us to file a complaint and seek an emergency TRO against a former employee. …In other words, you saw for yourself the tremendous amount of work that the team did on a very expedited time frame.  On top of that, we achieved exactly the result you wanted… I understand that you feel differently, and, at this point, we agree it would be best for a change of counsel as soon as possible.  Although I 100% stand by the work done by the team…Please have new counsel contact us by no later than tomorrow – today if possible…In the meantime, [Plaintiff] will reach out with some deliverable for today and some next steps that your new counsel may consider taking."

370.    The client responded, in part requesting an explanation from Plaintiff with regard to the number of hours billed to draft the complaint, as the client mistaken thought the invoice had billed 25 hours on the complaint (as confirmed by Feher's own audit of the invoice), that was not the case.

371.    The next communication Plaintiff has from this client reads "…Rebecca Brazzano, you[r] work product is excellent and I thank you very much.  Thanks."

372.    Feher lied to the EEOC when he advised Plaintiff got Plaintiff and the firm fired – Plaintiff was thanked by the client for her excellent work.

373.    Plaintiff was later informed that Read wanted to avoid any confrontation with the client concerning the firms billings, and instructed that a deal be struck.  At the end of the day the firm discounted the invoice by a percentage, which impacted all who worked on the matter.

374.    Accordingly, Thompson Hine's after the fact reach back to a February 2022 client

issue as a basis for Plaintiff's unlawful termination on April 29, 2022 is demonstrably false.

375.    The clients own parting words thanking Plaintiff, not anyone else at the firm, for her excellent work.

376.    Feher's reach for an excuse that is tied to Plaintiff's unlawful termination in timing utterly fails.

**THE FABRICATED "EARLY 2022" ALLEGED EXECUTIVE COMMITTEE VOTE**

377.    In its false narrative construction, the Thompson Hine painstakingly highlighted to the EEOC that the firm Executive Committee vote that purportedly led to Plaintiff's separation, and how each of the women on the Executive Committee voted, pinpointing it as occurring in the ambiguous period and wholly unspecified time frame of "early 2022."

378.    No date is stated, no minutes of the meeting were offered to the EEOC, and any attempt by Thompson Hine to hereafter pinpoint that date will be fabricated.

379.    Thompson Hine gas permanently waived its opportunity to establish the timing of the undated vote in any later defense.

380.    In this calculated concealment, Thompson Hine failed to reveal to the EEOC and deliberately withheld the date of this alleged pivotal decision.

381.    Thompson Hine's glaring omission of the date of the "vote" only serves to confirm that the timing of its alleged decision perfectly aligns with Plaintiff's complaints regarding DePalma's dubious fraud on the firm in his fake *pro bono* case, just a week before Plaintiff was terminated.

382.    Indeed, if Thompson Hine was so intent on Plaintiff's separation in "early 2022," why did the firm give Plaintiff a $3,5000 bonus in February 2022?  Why would Read wait from "early 2022" until April 29, 2022 to finally make the call demanding that Plaintiff resign?

383.    Further demonstrative of Thompson Hine's lack of integrity in Plaintiff's unlawful termination, less than an hour after Read delivered the termination message, Anthony White, an Executive Committee member, an heir apparent to the Managing Partner Role effective May 2024, apparently then having received Read's communique that the call ending Plaintiff's longtime career with the firm had been made, so he urgently approached Plaintiff to complete an extensive Order to Show Cause for a significant case involving his most prominent client.

384.    As if Thompson Hine, and White, now wanted to squeeze every last bit of billable work from Plaintiff before throwing her out of the proverbial building.

385.    Thompson Hine's deliberate evasion and lack of transparency only serves to fortify the case against its complicity in orchestrating a pretextual termination.

386.    As Thompson Hine shrouds the truth in ambiguity and withholds crucial information, its actions inadvertently provide further weight to the mounting evidence that exposes its involvement in a deceitful and unlawful and discriminatory termination.

**THOMPSON HINE RELEGATES FEMALE ATTORNEYS TO HOUSEKEEPING FUNCTIONS**

387.    As detailed in Plaintiff's original EEOC Charge, Thompson Hine relegates the housekeeping functions to female income partners and reserves its paid more important firm management roles for equity male partners.

388.    By definition, the kitchen work committee leads at Thompson Hine were income partner women, like Plaintiff, running the firm's *Pro Bono* Committee for years, and such was not incident to the management or leadership of the firm, as those management positions were reserved for the equity partners.

389.    Thompson Hine attempt to characterize these unpaid positions hoisted upon income

female partners (ESG Collaborative Committee, the Diversity & Inclusion Initiative Committee, the Women's Initiative Committee and the Pro Bono Committee), claiming that these "coveted positions sought after by some of the Firm's most successful attorneys" is utterly propaganda.

390.    Thompson Hine's acknowledgment of Plaintiff's status as one of its "most successful attorneys," entrusted with running the Pro Bono Committee for years, creates an inherent contradiction. If these positions are indeed deemed "important" to the firm, then it becomes puzzling why the firm steadfastly refuses to compensate female income partners for their literally thousands of hours of dedicated efforts.

391.    In the last four years alone, Plaintiff worked close to 500 hours for Thompson Hine's pro bono committee with no compensation.  Yet equity partners who had similar administrative roles were in fact generously compensated.

392.    After Plaintiff was terminated in June 2022, and through the February 2024, there was no Chairperson of the firm's pro bono Committee, apparently Thompson Hine did not consider it an important enough role to fill.

393.    While it was the audit of the *pro bono* committee that Plaintiff initiated that enraged DePalma, it was done as part of Plaintiff's unpaid responsibilities as firm-wide committee chair.

394.    Despite Thompson Hine's attempts to showcase to the EEOC its supposed commitment to supporting women and diversity through a laundry list of initiatives, and box-checking strategies, Plaintiff knows, and its employees know, that it fails woefully short of any meaningful progress.

395.    Thompson Hine spins the talking points, pours money into meaningless dinners and panels, but fails to support or protect its own employees, including Plaintiff.

396.   The glaring truth of its statistics is far from impressive and paints a dismal picture of its Ivory Tower hallways filled with ageing white men, with a speck of color and gender added as mere souvenir tokens.

397.   Thompson Hine's hustle to the EEOC reeks of desperation and hollowness as it attempts to elude accountability and promote a subterfuge that strains credibility.

398.   First, Thompson Hine offered that long before Plaintiff was elected as an income partner, DePalma "expressed concern that she did not work from the office enough, choosing instead to work from home.  He believed the in-office interaction was important for her growth as an attorney and to build relationships at her then-new firm" is indeed true: DePalma was the only person who fixated, objected and complained about Plaintiff's physical presence in the New York office, which was creepy in any event.

399.   Indeed, despite making a conscious efforts to steer clear of any professional interaction with DePalma once he ascended to the Vice Chair position in February 2011, like avoiding the plague, DePalma continued to harbor a bizarre discontent about Plaintiff's physical proximity.

400.   It becomes increasingly evident that his Vice-Chair role, a role that the firm steadfastly refused to wretch form his clenched fists until Plaintiff's EEOC Charge

401.   DePalma's whing about Plaintiff's physical presence bore a striking resemblance to that of a Grand Poobah, etched at the end of a meaningless conference table, or during COVID-19, a computer monitor, exercising some feigned control and authority over where Plaintiff worked for firm clients.

402.   Yet, it was in fact Plaintiff's proficiency with remote work that proved to be an exceptional skill to have when the COVID-19 pandemic rolled across the county.

403.    The COVID-19 pandemic prompted a universal shift to remote work, offering a humorous spectacle as DePalma and the rest of the firm's old, and white, management hastened to acclimate.

404.    In contrast, Plaintiff had long ago honed her skills in the remote environment, seamlessly serving firm clients with ease while the older white males scrambled to navigate the complexities of remote system connections, and working without a secretary at their beck and call.

405.    Thompson Hine's newly minted assertion to the EEOC that Plaintiff's change of residency to Florida went unnoticed within the New York office likewise rings hollow like the 13th chime on a broken clock.

406.    In reality, the New York office was shuttered at the time due to the global pandemic in 2020, there was literally no one in the building to notice anything.

407.    It was only DePalma as Vice Chair of Litigation, that was preoccupied by Plaintiff's physical whereabouts.

408.    This is equally disturbing because Plaintiff had no client matters with DePalma in the decade long time he was Vice Chair of Litigation in New York.

409.    Thompson Hine's purported concern about Plaintiff's physical whereabouts during COVID is nothing more than an afterthought, as it is evident that other firm groups and offices faced no such scrutiny.

410.    This glaring disparity renders its reliance on proximity as mere pretextual rubbish.

411.    By way of example only, the firm's New York real estate group expressed no issue with the pandemic movements of its lawyers when "Karen" permanently relocated to Florida during COVID, in New Port Richey, FL and registered to vote in Florida.

61

412.    Moreover, the firm had no issue with the extended stays of male equity partner and Executive Committee Member, White, at his Anna Maria Island, Florida residence.  Or "Dominic's" (corporate group), a partner in Chicago, who actually lives in Texas and works entirely remote.  Or "Eva" (in the environmental and real estate groups), a partner in New York, lives in Connecticut and works remotely fulltime.  It was only Plaintiff's remote work that seems to disturb Thompson Hine after the fact in its reach to justify her unlawful termination.

413.    Thompson Hine's contrived whining about Plaintiff's physical presence in the New York office is simply a failed effort to deflect from its real discriminatory motives in carrying out DePalma's long game of biased and toxic hostility.

414.    Ninety five percent of Plaintiff's billable work emanated from the Atlanta and at times the Ohio offices, so being in the (closed) New York office was irrelevant.

415.    And, since the Courthouses in New York and New Jersey were literally shut during the COVID-19 pandemic, Thopson Hine's feeble echoes longing for the now faded era where lawyers were chained to their desks so the firm could squeeze every last billable hours are long past.

416.    Thompson Hine's failure to embrace the concept that true excellence transcends physical boundaries leaves them paying for fancy brick and mortar offices, with stunning views of nothing, whining "she was not at her desk" like a good inferior income partner, screeches of old school pondering.

**THE FIRM'S AVERSION TO HYBRID WORK THE JULIA SYNDROME**

417.    In truth, Thompson Hine's aversion to remote work has nothing to do with Plaintiff (or the feigned need to build relationships with hoarding equity partners in New York) but instead stems from its own unlawful conduct in 2011 that lingers heavily on its conscious.

418.    Thompson Hine then discovered, upon information and belief, that one of its own equity partners, Julia, who often worked and entertained clients from her lavish home had in fact billed clients for millions of dollars of work without performing any related legal services.

419.    When, upon information and belief, the firm finally discovered the unethical conduct, akin to the 1990's movie "*The Firm*" (wherein attorneys commit mail and wire fraud by unlawfully billing clients for work never performed), it booted Julia from the partnership, voting her out as an equity partner and handsomely paying her off.

420.    Upon information and belief, the firm's deliberate failure to report Julia's fraud and ethical violation to the bar, combined with its hushed reimbursement of over $2 million to clients who were ripped off and fell victim to her fraud, reveals a calculated effort to shield itself at all costs, irrespective of the law or ethics, to any public review of its unlawful conduct.

421.    Thompson Hine's submission to the EEOC here too bears the same dirty fingerprint and blueprint of deception, camouflaging DePalma's discriminatory conduct, as well as the firm's own complicity in concealing the *pro bono* fraud Plaintiff uncovered and was actively trying to rectify before the firm demanded her resignation.

**THE PARTNERSHIP AGREEMENT, PLUS THE EXPIRED LETTER AGREEMENT, EQUAL NOTHING**

422.    In 2013, Plaintiff was provided with a copy an October 28, 2011 Partnership Agreement.

423.    However, unbeknownst to Plaintiff, the firm equity partners amended their partnership agreement in 2017, and it was never provided to Plaintiff.

424.    Plaintiff first saw the contents of the 2017 agreement after Read called to terminate her employment.

425.   Plaintiff did not sign either the 2011 or the 2017 Partnership Agreement and either contemplate signatures by the inferior income partners.

426.   Thompson Hine relies upon that agreement and its annual Letter Agreement that incorporated the Partnership Agreement by reference, to demand that Plaintiff arbitrate (even though the predispute clause is void under governing federal law).

427.   Each Letter Agreement expired by its own terms on December 31 of the year it was provided: "is anticipated that you will continue as an Income Partner pursuant to this letter agreement until at least December 31" of the date of the letter.

428.   The last letter agreement Plaintiff signed with Thompson Hine, as evidenced by the firm's Initial Offer, dated January 1, 2021, expired on December 31, 2021.

429.   As such, as of January 1, 2022, and thereafter, Plaintiff was not bound by any agreement with the firm.  The firm never sent Plaintiff a letter agreement in 2022.

430.   While the firm reaches to cloak Plaintiff's dispute under the shadows of a future clandestine arbitration, on its home turf in Ohio, governed by Ohio law, that effort will fail.

431.   Thompson Hine cannot ever legitimately say it intended for Plaintiff to be bound by the 2017 Partnership Agreement, where it only provides signatures by its select and elitist equity partners.

**PLAINTIFF'S RELOCATION TO FLORIDA: BLESSED BY FIRM MANAGEMENT**

432.   Thompson Hine's after the fact revisionist tale that they were unaware of Plaintiff's intentions to move and service firm clients based in Florida is unequivocal perjury, and does not in any event support its reach for a non-pretext basis for Plaintiff's termination.

433.   Considering the firm's Florida client base, in which the firm derives a significant

percent of its reportedly $252,988,000 million in annual revenue for 2022, its calculated attempt to deceive and deny that its management knew of Plaintiff plans, is intentional deflection to obstruct the EEOC's investigation, evidenced by the firm's own blog.

434.     The firm's claims of lack of knowledge is both unlawful and morally bankrupt.

435.     The facts conform that on May 18, 2020, Plaintiff reached out to the firm's then ethics expert, Karen Rubin, and explained her plan to take the Florida bar, along with the client financial details noted above, and inquired if there was any ethical problem or concern with her continued practice for Plaintiff's New York, New Jersey and Connecticut clients from Plaintiff's planned residency in Florida.

436.     Ms. Rubin then consulted with Frank DeSantis, then Chair of the firm's Ethics Committee.

437.     Plaintiff later spoke with Mr. DeSantis directly and confirmed there was no ethical or other issue with Plaintiff practice law for non-Florida clients.

438.     The one issue that Mr. DeSantis raised was whether there would be any tax consequence to the firm for Plaintiff's Florida presence and practice. At that point in time, the taxation and finance issue discussion was premature.

439.     Management was well-informed of Plaintiff's explicit intentions to not only bear the cost of taking the Florida Bar but also to change her residency to Florida, all with the aim of offering enhanced litigation client service to the firm's Florida-based clients.

440.     The firm's denial and feigned astonishment in its EEOC submission is nothing more than a concoction of deceitful excuses.

441.     Indeed, three months after Plaintiff's discussions with Rubin and DeSantis, Rubin

wrote about her findings based upon Plaintiff's Florida inquiry on the firm's Ethics Blog on July 9,

2020.  That article titled: "It's five o'clock somewhere: Lawyers working remotely from other

jurisdictions during COVID-19" is available at

https://www.thelawforlawyerstoday.com/2020/07/5101/.

442.    Feher then wrote another Florida article, published on the firm's legal blog dated

August 20, 2020 titled: "Your Florida house is safe!" (available at

https://www.thelawforlawyerstoday.com/2020/08/your-florida-house-is-safe /(specifically

addressing a New Jersey licensed attorney living in Florida and providing legal services for his New

Jersey clients).

443.    Ms. Rubin likewise alerted Plaintiff to the August 17, 2020 advisory Opinion from

the Florida Bar Standing Committee on the Unlicensed Practice of Law, FAO#2019-4, Out-of-State

Attorney Working Remotely From Florida Home: Proposed  Advisory Opinion that Mr. Feher

highlighted in the above firm Blog.

444.    Thompson Hine's after the fact feigned "surprise," is pure rank dishonesty and fraud

upon the EEOC, as it issued Plaintiff's tax documents for 2021 and 2022 to Plaintiff's Florida

address.

445.    Thompson Hine offering to the EEOC, desperate to cloak its shameful and unlawful

conduct, served up sweeping falsehoods to tilt the scales of justice.

446.    As a result of the unlawful conduct alleged herein, Plaintiff has suffered severe

damage to her reputation severe and utter humiliation, chronic sleeplessness, anxiety, stress, and the

physical manifestations all as a direct result of Defendants collective unlawful misconduct.

447.    Defendants used their positions of power to sexually harass, discriminate against,

and retaliate against former Thompson Hine employee Rebecca Brazzano.

448.     Defendants Thompson Hine further retaliated against Plaintiff in the termination process in the unauthorized use of her attorney bar licenses.

**UNAUTHORIZED USE OF PLAINTIFF'S BAR LICENSES IN NEW YORK AND CONNECTICUT**

449.     On June 9, 2022, Thompson Hine was advised that: Plaintiff "is currently counsel of record for several Thompson Hine clients in New York, New Jersey, and Connecticut, and she has signed various affirmations admitting other firm attorneys *pro hac vice* in these jurisdictions.  In light of [Plaintiff's] impending termination, and the associated termination of her Firm computer access privileges we are concerned about her ability to file the appropriate paperwork in these cases reflecting her withdrawal. Specifically,  [Plaintiff's] notices of appearance and pro hac vice petitions in these cases require the immediate need to reflect [Plaintiff's] withdrawal and the replacement of [Plaintiff's] existing authorizations by successor counsel. Please provide written confirmation of the Firm's compliance with this notice."

450.     Thompson Hine's deafening silence in response to Plaintiff's demand to be replaced as counsel of record speaks volumes, revealing a deliberate and calculated decision by Thompson Hine to continue exploiting her New York and Connecticut bar licenses without any semblance of authorization.

451.     As a direct consequence of Thompson Hine's vindictive and retaliatory conduct throughout the termination process, Plaintiff refrained from notifying clients involved in various matters of her termination and imminent departure, as such parties were under the blanket representation of Thompson Hine's engagement letters to which Plaintiff had no access.

452.     Fueled by apprehension and driven by fear of further reprisal from Thompson Hine,

compounded by the uncertainty of the implications to Plaintiff, the firm and the professional duties they each owed to the respective clients, Plaintiff did not reach out to advise these clients of her termination or imminent departure, or the requirement that new counsel make a formal appearance in each matter.

453.     Thompson Hine put Plaintiff's legal license and professional licenses in jeopardy as follows:

*New York*: Thompson Hine used Plaintiff's attorney license and admission without authority to the United States District Court, Northern District of New York, in the matter Index No.: 1:20-cv-01167-JLS (June 10, 2022 - June 22, 2022);

*New York*:  Thompson Hine used Plaintiff's attorney license and admission without authority to the New York Supreme Court, County of Ulster, in the matter Index No.: EF2022-872 (June 10, 2022 through July 1, 2022 (NYSCEF 23));

*New York*: Thompson Hine used Plaintiff's attorney license and admission without authority to the New York Supreme Court, County of Kings, in the matter Index No.: 511501/2021 (June 10, 2022 through April 27, 2023 (NYSCEF 36));

*Connecticut*:  Thompson Hine used Plaintiff's attorney license and admission without authority to the United States District Court, District of Connecticut, in the matter Index No.: 3:21-cv-00417-VAB (from June 10, 2022 through February 14, 2023).

454.     Thompson Hine had no authority to use Plaintiff's law license in the State of Connecticut or New after her departure, and Thompson Hine's use of Plaintiff's license is an abuse of process, unethical and violative of the Rules of Professional Conduct in New York.

455.     On June 16, 2022 a Preservation Letter was sent to Thompson Hine, so any efforts to

destroy or alter evidence after that date is demonstrative spoliation.

456.    The age-old depiction of blindfolded Lady Justice embodies the principles of impartiality, equity and justice; this legal symbolism must never be distorted or wielded as a sword by the powerful, affluent and arrogant, as seen in the unlawful actions of Defendants here.

FIRST CAUSE OF ACTION
SEXUAL HARASSMENT NEW YORK STATE HUMAN RIGHTS LAW
(AS AGAINST DEPALMA AND THOMPSON HINE)

457.    Plaintiff hereby repeats, reiterates, and realleges each and every allegation in each of the preceding paragraphs of this Verified Complaint, as though fully set forth herein.

458.    Plaintiff has set forth facts that constitute sexual harassment, hostile work environment, and discrimination on the basis of gender as against DePalma herein.

459.    DePalma and Thompson Hine's conduct is a violation of the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290 *et seq.*

460.    Having specifically alleged unlawful conduct by DePalma constituting a sexual harassment dispute, neither of DePalma or Thompson Hine can cloak their unlawful and unenforceable predispute arbitration clause upon Plaintiff, as Plaintiff's claims here arose, at earliest upon her termination on April 29, 202,2 or on July 1, 2022, when she filed her EEOC Charge, both of which fall after the EFAA trigger date of March 22, 2022.  9 U.S.C. § 402(a).

461.    The EFAA defines a "sexual harassment dispute" as "a dispute relating to conduct that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law."

462.    The unlawful conduct here alleged constituted sexual harassment under New York law.

463.    By the acts described above, Thompson Hine and DePalma discriminated against,

69

and sexually harassed Plaintiff based on her gender, in violation of Executive Law of New York, §

296 et seq. by subjecting Plaintiff to sexual harassment, disparate treatment, retaliation based upon

her gender including, but not limited to, subjecting her to unlawful sexual harassment, and a hostile

work environment.

464.    Defendants are liable under the NYSHRL as Plaintiff's "employer.

465.    As a direct and proximate result of DePalma and Thompson Hine's unlawful

discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and will continue to

suffer economic harm entitling her to an award of monetary damages and other relief, including

attorneys' fees, costs, and expenses.

466.    As a direct and proximate result of DePalma and Thompson Hine's unlawful

discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer,

emotional distress and mental anguish entitling her to an award of monetary damages and other

relief, including attorneys' fees, costs, and expenses.

467.    DePalma and Thompson Hine's unlawful and discriminatory actions were

intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference

to Plaintiff's rights under the NYSHRL, entitling Plaintiff to an award of punitive damages.

**SECOND CAUSE OF ACTION**
**SEXUAL HARASSMENT, HOSTILE WORK ENVIRONMENT, AND DISCRIMINATION**
**IN VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW**
**(AS AGAINST DEPALMA AND THOMPSON HINE)**

468.    Plaintiff hereby repeats, reiterates, and realleges each and every allegation in each of

the preceding paragraphs of this Verified Complaint, as though fully set forth herein.

469.    Plaintiff has set forth facts that constitute sexual harassment, hostile work

70

environment, and discrimination on the basis of gender as against D DePalma and Thompson Hine

herein in violation of the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code

§§ 8-502 *et seq.*

470.    Thompson Hine and DePalma's unlawful conduct described above confirm that they

sexually harassed and discriminated against Plaintiff based on her gender in violation of the

Administrative Code of the City of New York, § 8-107 et seq. by subjecting Plaintiff to disparate

treatment based upon her gender, but not limited to, subjecting her to sexual harassment, and a

hostile work environment.

471.    Thompson Hine and DePalma are liable under the NYCHRL as Plaintiff's

"employer," and because they coerced, intimidated, threatened or interfered with, or attempted to

coerce, intimidate, threaten, or interfere with, Plaintiff's exercise or enjoyment her rights granted or

protected under Section 8-107 of the Administrative Code of the City of New York.

472.    As a direct and proximate result of Thompson Hine and DePalma's unlawful

discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered and will continue to

suffer economic harm entitling her to an award of monetary damages and other relief, including

attorneys' fees, costs, and expenses.

473.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer,

emotional distress for which she is entitled to an award of monetary damages and other relief.

474.    Defendants unlawful, discriminatory, and retaliatory actions constitute malicious,

willful, and wanton violations of the NYCHRL, for which Plaintiff is entitled to an award of

punitive damages

475.    Thompson Hine and DePalma's unlawful and discriminatory actions were

intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYCHRL entitling Plaintiff to an award of punitive damages.

### THIRD CAUSE OF ACTION
### AIDING AND ABETTING/INCITING/COMPELLING/COERCING IN VIOLATION OF THE NYSHRL
### (AS AGAINST ALL DEFENDANTS)

476.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

477.    Defendants knowingly or recklessly aided and abetted the unlawful employment practices, discrimination, sexual harassment, and retaliation against Plaintiff in violation of the NYSHRL.

478.    As a direct and proximate result, Plaintiff suffered and continues to suffer monetary and/or economic harm, including, but not limited to, loss of past income, future income, compensation, and benefits, for which she is entitled to an award of monetary damages and other relief.

479.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of monetary damages and other relief.

480.    Defendants unlawful, discriminatory, and retaliatory actions constitute malicious, willful, and wanton violations of the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

### FOURTH CAUSE OF ACTION
### AIDING AND ABETTING/INCITING/COMPELLING/COERCING IN VIOLATION OF THE NYCHRL
### (AS AGAINST ALL DEFENDANTS)

481.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

482.     Defendants each knowingly or recklessly aided and abetted the unlawful employment practices, discrimination, sexual harassment, and retaliation against Plaintiff in violation of the NYCHRL.

483.     As a direct and proximate result, Plaintiff suffered and continues to suffer monetary and/or economic harm, including, but not limited to, loss of past income, future income, compensation, and benefits, for which she is entitled to an award of monetary damages and other relief.

484.     As a direct and proximate result, Plaintiff has suffered, and continues to suffer, emotional distress for which Plaintiff is entitled to an award of monetary damages and other relief.

485.     Defendants unlawful, discriminatory, and retaliatory actions constitute malicious, willful, and wanton violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

### FIFTH CAUSE OF ACTION
### RETALIATION AND POST-EMPLOYMENT RETALIATION IN VIOLATION OF THE NYSHRL
### (AS AGAINST ALL DEFENDANTS)

486.     Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

487.     By the acts described above Defendants retaliated against Plaintiff in the terms and conditions of Plaintiff's for opposing unlawful employment practices, rejecting advances, in violation of the Executive Law of New York, § 296 *et seq.,* by, *inter alia¸* ignoring Plaintiff's protected complaints about the discriminatory treatment of herself and other employees, subjecting her to increased scrutiny and harassment, ultimately terminating her, then afterwards engaging in an ongoing campaign to disparaging her, lying to the EEOC, and using threats and actual legal abuse

of process to dissuade her and other employees from bringing and maintaining claims against Defendants.

488.    Defendants are liable under the NYSHRL as Plaintiff's "employer."

489.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered and will continue to suffer economic harm entitling her to an award of monetary damages and other relief, including attorneys' fees, costs, and expenses.

490.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, emotional distress and mental anguish, entitling her to an award of monetary damages and other relief, including attorneys' fees, costs, and expenses.

491.    Defendants' unlawful and retaliatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYSHRL entitling Plaintiff to an award of punitive damages.

### SIXTH CAUSE OF ACTION
### Retaliation and Post-Employment Retaliation in Violation of the NYCHRL
### (AS AGAINST ALL DEFENDANTS)

492.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

493.    By the acts described above, Defendants retaliated against Plaintiff in the terms and conditions of her employment for opposing unlawful employment practices, in violation of the Administrative Code of the City of New York, § 8-107 *et seq*.

494.    Defendants are liable under the NYCHRL as Plaintiff's "employer," and because

they coerced, intimidated, threatened or interfered with, or attempted to coerce, intimidate, threaten, or interfere with, Plaintiff's exercise or enjoyment of rights granted or protected under Section 8-107 of the Administrative Code of the City of New York.

495.     By the actions described above, among others, Defendants retaliated against Plaintiff on the basis of her protected activities in violation of the NYCHRL by, *inter alia*, ignoring her protected complaints about the discriminatory treatment of herself and others, subjecting her to increased scrutiny and sexual harassment, ultimately terminating her, then afterwards engaging in an ongoing campaign to disparaging her, lying to the EEOC, and using threats and actual legal process to dissuade her and other employees from bringing and maintaining claims against Defendants.

496.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered and will continue to suffer economic harm entitling her to an award of monetary damages and other relief, including attorneys' fees, costs, and expenses.

497.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, emotional distress and mental anguish, entitling her to an award of monetary damages and other relief, including attorneys' fees, costs, and expenses.

498.     Defendants' unlawful and retaliatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYCHRL, entitling Plaintiff to an award of punitive damages.

**EIGHTH CAUSE OF ACTION**

**Whistleblower Retaliation and Post-Employment Retaliation in Violation of NYLL § 740
(AS AGAINST DEPALMA AND THOMPSON HINE)**

499.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully

set forth herein.

500.    As detailed above, Defendants subjected, and continues to subject, Plaintiff to

multiple adverse employment actions because Plaintiff disclosed and/or objected to an activity,

policy, or practice of Thompson Hine and DePalma is in violation of a law, rule, or regulation that

creates a substantial and specific danger to the public health or safety, including, but not limited to,

their false and faux pro bono cases, reporting of same, and quashing Plaintiff's audit of their

unlawful conduct by terminating Plaintiff just seven (7) days later.

501.    Defendants retaliated against Plaintiff in violation of the NYLL, because she

initiated and was in the process of conducting a firmwide audit, as she had already determined that

DePalma's *pro bono* case violated the firm policy and violated 22 NYCRR §118.1[e][14], by

adversely altering the terms and conditions of her employment and terminating to conceal their

unlawful conduct, thereby sabotaging her work, terminating her, then afterwards engaging in an

ongoing campaign to disparaging her, lying to the EEOC, and using threats and actual legal process

to dissuade her and other employees from bringing and maintaining claims against Defendants.

502.    As a direct and proximate result of Defendant's willful and unlawful conduct in

violation of the NYLL, Plaintiff has suffered, and continues to suffer, harm for which she is entitled

to an award of damages, to the greatest extent permitted by law.

503.    The foregoing conduct of Defendants constitutes willful violations of the NYLL for

76

which Plaintiff is entitled to an award of punitive and/or liquidated damages.

### NINTH CAUSE OF ACTION
### DEFAMATION
### (AS AGAINST THOMPSON HINE AND FEHER)

504.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

505.    Thompson Hine and Feher's Defamatory Letter, dated February 23, 2023, as submitted to the EEOC, that contained specific and false statements, including, *inter alia*, that Plaintiff got her self and the firm fired, that she was known as "heavy biller," are statement that impute incompetence or dishonesty to the Plaintiff are defamatory *per se*, as there is specific reference, direct and indirect, in the words chosen by Thompson Hine and Feher, which connects the charge of incompetence or dishonesty to the Plaintiff's particular profession as an attorney at law.

506.    The statements contained in the Defamatory Letter are defamatory *per se*.

507.    The Defamatory Statements conveyed to the EEOC that Plaintiff was violating the Rules of Professional Conduct, engaged in some billing practice that was improper, tagging her as a "heavy biller" lying about pretextual reasons for unlawfully terminating Plaintiff in an effort to dissuade the EEOC from further investigation the firm, are all actionable words that were included with malevolent intent injure Plaintiff in her profession as an attorney.

508.    The Defamatory Letter was not a general reflection upon Plaintiff's character or qualities, the choice of word used were specific and intended to convey to the EEOC that Plaintiff's was a poor performer with a reputation of "heavy" legal billing, statements that are untrue, unsupported, directly contradicted by the contemporaneous evidence, repeat client accolades, and

improperly associate Plaintiff with improper proper conduct in her business as a professional attorney at law.

509.   Where, as here, Thompson Hine and Thomas Feher's statements that no relevance whatsoever to the heart of the dispute with Plaintiff and that are demonstratively false statements, inherently devoid of truth, and as such can never be deemed relevant as their very nature precludes any semblance of factual foundation.

510.   Thompson Hine and Feher find themselves bereft of the sanctuary of privilege to conceal the untruths they peddled to the EEOC to avoid its investigatory power.

511.   Thompson Hine and Feher's falsehoods, had they been truthful, might have found some refuge under the aegis of quasi-judicial proceedings.

512.   However, Thompson Hine and Feher's false statements of fact undeniably expose themselves as egregious falsehoods, devoid of any semblance of truth – a fact that precludes any possibility of invoking the protective veil of privilege.

513.   The Thompson Hine Defamatory Letter was issued pursuant to regularly issued process.

514.   The content of the Defamatory Letter was stroked with vindictive inked with an intent to harm Plaintiff, obfuscate Thompson Hine's unlawful conduct, deceive and mislead the EEOC's investigation, attempt to intimidate and humiliate Plaintiff such that she would not file this lawsuit, gain an unfair and false advantage in both the EEOC investigation and this lawsuit and each was done without excuse or justification.

515.   The Defamatory Letter was intentionally and malevolently concocted with the purpose of achieving a sinister and improper collateral objective, as outlined herein, including a deliberate

and strategic evasion of the EEOC investigation with the intent to manipulate and pervert the results in its favor, coupled with a blatant disregard for professional, ethical, and legal authorities that expressly forbid lawyers from engaging in fraud and treachery upon a tribunal of any kind.

516.    Thomson Hine and Feher cannot shield their lies behind any claim of immunity simply because their lies were submitted to the EEOC.

517.    As Thompson Hine and Feher's written statements were made with specious malice and with the intention to harm Plaintiff and abuse the administrative process at the EEOC, as such they are not entitled to either qualified immunity nor absolute immunity.

518.    Thompson Hine and Feher's Defamatory Letter constitutes defamation *per se.*

519.    As a direct and proximate result of Defendant's malice and unlawful defamation of Plaintiff, Plaintiff has suffered, and continues to suffer, harm and reputational harm, for which she is entitled to an award of damages, to the greatest extent permitted by law.

TENTH CAUSE OF ACTION
ABUSE OF PROCESS
(AS AGAINST THOMPSON HINE, READ AND FEHER)

520.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

521.    Defendant conduct herein constitutes an abuse of process tortious injury as against Plaintiff.

522.    The *post hoc* justifications proffered in Thompson Hine's Defamatory Letter to rationalize the demand for Plaintiff's resignation, reveal a desperate reach for a non-discriminatory or non-retaliatory after the fact basis, all of which form a deluge of false factual assertions,

including: (A) the false statement of fact that Plaintiff and the firm were fired as a result of Plaintiff's billings to a particular client; (B) the statement that Plaintiff's remote work/relocation to Florida was unknown and unauthorized by Thompson Hine and such impacted and/or hastened the decision to demand Plaintiff's resignation; (C) false statement that Plaintiff was known as a "heavy biller".

523.    Each of the foregoing false fabrications constitutes an abuse of process under New York law, as each was made pursuant to normal process, but with the specific improper purpose of misdirecting and committing fraud upon the EEOC investigation and to derail Plaintiff's stated intention to sue Thompson Hine under the protections afforded by Title VII and other statutes that protect employees from unlawful discrimination.

524.    If Thompson Hine or Feher actually believed in their disparagement of Plaintiff's legal work, ethical obligations would require filing an official complaint and informing firm top tier clients, along with all of the additional clients that Plaintiff worked, that Thompson Hine believed that a lawyer under its authority had billed for legal services that were not provided, under its term "heavy biller".

525.    Thompson Hine has never identified a single invoice it issued, that included any billable time from Plaintiff, as being "heavy" to any client or any submission by the firm to any ethical body concerning Plaintiff, as it has no legal basis to do so.

526.    Thompson Hine and Feher's endeavor to trash Plaintiff legal performance in the eyes of the EEOC, which is an improper and unprotected perverted purpose and abuse of process, at the expense of their own clients, in stating (not opining) that Plaintiff was a "heavy biller" is a total mission failure, and the epitome of Thompson Hine and Feher's rancid deceit and abuse of process.

527.    Thompson Hine and Feher, mired in their own web of deceit and evasion, fail to provide any valid attestation to false statements to the EEOC and instead offer cryptic accounts of events that never happened or allude to words that were never spoken.

528.    Thompson Hine and Feher's very fabric of fraud on the EEOC and abuse of process is interwoven with verifiably false information and deflections, that are nothing short of disgraceful.

529.    While Thompson Hine fosters an environment rife with systemic discriminatory and disparate treatment, it is a whole new level of deception and fraud to blatantly lie in response to an EEOC investigation to conceal Thompson Hine's discriminatory and other unlawful conduct.

530.    Thompson Hine's pretentious act of defiance, ineptly scribed by Feher, seeks to conceal the true nature of the unlawful conduct, but their dismal effort to cover their tracks crumble in the face of the unwavering truth and is equally demonstrative of the length and lies Thompson Hine will spin to deflect attention of a legitimate and fulsome investigation by the EEOC or claims like the ones alleged here.

531.    If the firm had engaged counsel to conduct a proper investigation of Plaintiff's claims of unlawful conduct, and provided a truthful response to the EEOC, it would not have to spin the story so hard that it boomerangs to reveal its subversion.

532.    Thomson Hine, Feher, with upon information and belief, with Read blessing, submitted a falsified position statement to the EEOC that contained malevolent, and malice laced false statements, for an improper purpose, that being to gain an unfair advantage in their effort to dissuade the EEOC from its investigatory powers to fairly evaluate Plaintiff charge.

533.    Thomson Hine, Feher, with upon information and belief, with Read blessing, intentionally tried to harm Plaintiff without excuse or justification.

534.    Thomson Hine, Feher, with upon information and belief, with Read blessing used the EEOC process in a perverted manner to obtain a collateral objective, to interfere with the administrative process, intimidate Plaintiff from pursuing her EEOC charge, by including false statements and defamatory statements therein.

535.    In fact, if Thompson Hine or Feher actually believed the vengeful ink they spewed to the EEOC with regard to heaving billing by Plaintiff, they would be required to render full disclosure and refunds to the identified clients and file ethic complaints in multiple jurisdictions, and they did neither because their false statement was a complete and utter fabrication.

536.    Since no such effort has been undertaken by Thompson Hine, it should *put up* the evidence of heavy billing, *or shut up* as it has none.

537.    Thompson Hine and Feher's use of the EEOC process for an improper purpose, to state, not opine, that these three factors, improper billing issues, remote/relocation/heavy billing issues specifically lead to Plaintiff's termination constitute an abuse of process as such were made, without privilege, and with an improper purpose: to impede the EEOC investigation, and gain unfair advantage and as scare tactics so Plaintiff would refrain from filing a public complaint.

538.    Liars are not protected by litigation privilege, and thus Thompson Hine and Feher cannot shield their lies under any of the protections it offers.

539.    Liars are not protected by quasi-litigation privilege, and thus Thompson Hine and Feher cannot cloak their lies under its shield either.

540.    The making of multiple false statement of fact to the EEOC, as Thompson Hine and Feher did, is both professionally and ethically pathetic and unlawful, was done with the malice intent to do harm to Plaintiff without excuse or justification, their use of the process was perverted

to obtain a collateral objective.

541.    By lying to the EEOC, Thompson Hine and Feher sought to obtain a collateral advantage or corresponding detriment to Plaintiff (e.g., retribution for her complaint) which is outside any legitimate ends of the EEOC claims process.

542.    Thompson Hine and Feher should be held accountable for their abuse of process under New York law.

543.    Plaintiff has suffered damages as the result of Thompson Hine and Feher's abuse of process, including costs of suit and reputational damage, in a sum to be determined by a jury, in having to disclose their abuse of process in order to demonstrate a claim (which Thompson Hine and Feher knew and relied upon in putting their abuse of process false statements in the Thompson Hine Position Statement in the hopes such would never be illuminated or scrutinized) and as such punitive damages are available to compensate Plaintiff.

544.    As a direct and proximate result of Thompson Hine, Feher's and Read's abuse of process violations, that were done with intentional malice, Plaintiff has suffered, and continues to suffer, harm and reputational harm, for which Plaintiff is entitled to an award of damages, to the greatest extent permitted by law, including punitive damages.

**ELEVENTH CAUSE OF ACTION**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**(AS AGAINST THOMPSON HINE AND READ)**

545.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein

546.    Thompson Hine and Read engaged in conduct negligently inflicted emotional distress upon Plaintiff.

547.    The claim for negligent infliction of emotional distress in New York does not require a physical injury nor extreme or outrageous conduct.

548.    Thompson Hine and Read conduct in terminating Plaintiff on the afternoon of April 29, 2022 whilst Plaintiff was performing legal services for the firm's most important client, constitute negligence and were intended to put Plaintiff in emotional peril as described and alleged herein.

549.    Read owed Plaintiff a duty not to interfere with Plaintiff's ability to perform her legal services for KeyBank on April 29, 2022, and breached that duty by unlawfully demanding Plaintiff resign mid-afternoon.

550.    Read was fully negligent, if not reckless, in failing to inform herself of the firm matters that Plaintiff was working on April 29, 2022, Read could have informed herself, but did not bother.

551.    As a direct and proximate result of Read's negligent failure to inquire of Plaintiff's firm fling docket or any other available avenue of inquiry to determine Plaintiff's workload, Read thereby created circumstances that essentially guaranteed genuine harm to Plaintiff.

552.    With a federal Court filing deadline looming, Plaintiff knew she could not allow DePalma's sexual harassment, gender discrimination and long game success to ruin her career, or Read's utter incompetence in demanding her resignation during a critical KeyBank project.

553.    These actions were taken with the intent to cause, or disregard for, the substantial probability of causing negligent emotional distress.

554.    As a direct and proximate result of Thompson Hine and Read's negligent conduct, Plaintiff has suffered severe emotional distress.

555.    Thompson Hine and Read's conduct was wanton, malicious, willful and/or cruel,

entitling Plaintiff to an award of punitive damages.

### TWELFTH CAUSE OF ACTION
### HOSTILE WORK ENVIRONMENT, SEXUAL HARASSMENT AND GENDER DISCRIMINATION UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### (AS AGAINST THOMPSON HINE)

556.    Plaintiff hereby repeats and realleges each allegation in the preceding paragraphs as if set forth fully within.

557.    Thompson Hine has discriminated against Plaintiff on the basis of her gender in violation to Title VII by subjecting her to sexual harassment, hostile work environment and disparate treatment based upon her gender, including, but not limited to, subjecting her to sexual harassment, a hostile work environment, and disparate treatment.

558.    Title VII of the Civil Rights Act of 1964 provides that it is unlawful for Thompson Hine to discriminate against Plaintiff, an employee, because of that Plaintiff's race, color, or sex.  42 U.S.C.A. § 2000e-2.

559.    Title VII prohibits Defendants intentional discrimination and disparate treatment of Plaintiff here based upon her gender.

560.    Plaintiff has alleged violation of Title VII herein based upon, *inter alia*, Defendants' discriminatory intent, by both direct or circumstantial evidence, of animus as against Plaintiff.

561.    By the wrongful actions described above, *inter alia*, Thompson Hine discriminated against Plaintiff because of her sex when it, among other wrongful acts, fueled by DePalma sexist biases and misogynistic conduct, fired her in response to decades long allegations of sexual harassment against Thompson Hine's equity partner, DePalma.

562.    As a result, Plaintiff was denied the opportunity to work in an employment environment free of unlawful discrimination.

563.    Thompson Hines actions are in violation of Title VII of the Civil Rights Act of 1964, as amended.

564.    Plaintiff was an employee of Thompson Hine at the time of its unlawful conduct and is  a protected employee under this statute.

565.    As a direct and proximate result of Thompson Hine's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

566.    As a direct and proximate result of Thompson Hine's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

567.    Thompson Hine's unlawful discriminatory and wrongful conduct constitutes a willful and wanton violation of Title VII, was outrageous and malicious, and was intended to injure Plaintiff and was committed with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

**THIRTEENTH CAUSE OF ACTION**
**RETALIATION AND TRANSITION RETALIATION UNDER TITLE VII**
**OF THE CIVIL RIGHTS ACT OF 1964**
**(AS AGAINST THOMPSON HINE)**

568.    Plaintiff hereby repeats and realleges each allegation in the preceding paragraphs as if set forth fully within.

86

569.   Thompson Hine has retaliated against Plaintiff because she engaged in protected activity as defined by Title VII of the Civil Rights Act by, *inter alia,* firing her and terminating her employment.

570.   Thompson Hine engaged in unlawful transition retaliation in its conduct post termination as described herein.

571.   As a direct and proximate result of Thompson Hine's unlawful retaliatory conduct and transition retaliatory conduction, both of which were done in intentional violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

572.   As a direct and proximate result of Thompson Hine's unlawful retaliatory and transition retaliatory unlawful conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and for which she is entitled to an award of monetary damages and other relief.

573.   Thompson Hine's unlawful retaliatory and transition retaliatory wrongful conduct constitutes a willful and wanton violation of Title VII, was outrageous, malicious and cruel, was intended to injure Plaintiff and was committed with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Rebecca Brazzano demands judgment against the Defendants, jointly and severally, in an amount to be determined at trial for the following relief:

1.   A declaratory judgment that the unlawful actions, conduct, and practices of Defendants here violated federal, state, and city laws;

2.      An award of economic damages, compensatory damages and punitive damage, plus such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award, in an amount not less than Fifteen Million Dollars ($15,000,000);

3.      An award of monetary damages for mental anguish and emotional distress;

4.      An award of reasonable attorneys' fees, costs, and expenses of this action;

5.      Permanent equitable and injunctive relief as against each Defendant for their unlawful conduct; and

6.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.


Dated: New York, New York                      /s/ Rebecca Brazzano
        February 23, 2024                      Rebecca Brazzano

## VERIFICATION

I, Rebecca Brazzano, pursuant to 28 U.S. Code § 1746, do hereby verify under penalty of perjury under the laws of the United States of America as follows:

1.      I have personal knowledge of the allegations contained in the foregoing Verified Complaint;

2.      I have read the foregoing Verified Complaint, and know the contents thereof. The same are true to my knowledge, except as to those allegation made upon information and belief, as to those, I believe them to be true.

3.      The allegations of the Verified Complaint to which this Verification is attached, are of facts admissible in evidence to which the undersigned is competent to testify.

4.      I do hereby verify under the penalties of perjury that the foregoing is true and correct. I am aware if any of the foregoing statements made by me are willfully false, I am subject to punishment by law.

Executed on this 23rd day of February, 2024.


/s/ Rebecca Brazzano
Rebecca Brazzano