# EXHIBIT 2



THOMPSON HINE

|  |  |  |  |
|---|---|---|---|
| ATLANTA | CINCINNATI | COLUMBUS | NEW YORK |
| CHICAGO | CLEVELAND | DAYTON | WASHINGTON, D.C. |

February 23, 2023

Andrea Reddy, Investigator
U.S. Equal Employment Opportunity Commission
33 Whitehall St
5th Floor
New York, NY 10004

Re:  EEOC Charge No.:  520-2022-06410
      Rebecca Brazzano/Thompson Hine, LLP

Ms. Reddy:

     This letter constitutes the preliminary position statement of Respondent, Thompson Hine LLP ("Thompson Hine" or the "Firm").  In her Charge, Charging Party Rebecca Brazzano ("Charging Party" or "Ms. Brazzano") alleges that the Firm discriminated against her on the basis of her sex and retaliated against her in violation of Title VII.  The Firm categorically denies those allegations.[1]

### I.  __Introduction__.

     Ms. Brazzano started employment in the New York City office of Thompson Hine in September 2008.  She was hired as part of a group of attorneys from another firm that included two male partners who, at the outset of her employment with the Firm, provided most of the work

---

[1] This Position Statement is submitted solely in the interest of cooperating with the EEOC in an effort to achieve an informal administrative resolution of the Charge.  Respondent does not intend to waive any defenses it may have to the Charge or in any way prejudice itself as to any issue, whether procedural or substantive, including its position that Charging Party was a partner and therefore not protected by Title VII.  The information contained herein is submitted based upon the author's current understanding of the facts, which may change as more information is gathered.  Respondent submits this statement with the understanding and on the condition that it will be excluded from evidence at any trial of this matter pursuant to the "conference and conciliation" protection, Federal Rules of Evidence, and any corresponding state rule of civil procedure or evidence.

Tom.Feher@ThompsonHine.com  Fax: 216.566.5800  Phone: 216.566.5532

THOMPSON HINE LLP
ATTORNEYS AT LAW

3900 Key Center
127 Public Square
Cleveland, Ohio  44114-1291

www.ThompsonHine.com
O:  216.566.5500
F:  216.566.5800



Andrea Reddy, Investigator
February 23, 2023
Page 2

she performed. She was part of the Firm's Business Litigation practice group, though over her tenure she focused her work as much or more on employment matters as business disputes. In 2013, based upon the nomination and support of William Jacobs, her male Practice Group Leader, and Katherine Brandt, the female Partner-in-Charge of the New York office (and the affirmative vote of the Firm's Executive Committee), she was elected to Thompson Hine's partnership.

Like most any private law firm, Thompson Hine measures the productivity of its attorneys. In general, that productivity is largely measured by how much money is collected on client-chargeable hours. Ms. Brazzano's productivity ebbed and flowed considerably during her entire tenure as a partner with the Firm. In a very few years, her productivity was acceptable, but for most of the nine years when she was a partner, her productivity was insufficient to cover the cost of her compensation and associated overhead. In other words, the Firm lost money on its relationship with Ms. Brazzano almost every year she was a partner.

Partners that consistently fail to cover their compensation and share of overhead present a significant problem for the business because their shortfall requires other partners to be far more productive in order to cover the shortfall. The Executive Committee considered the initial years of losing money on Ms. Brazzano to be an investment in a female partner they hoped would ultimately become productive and continued the financially-unsatisfactory relationship for several years based on that hope.



Andrea Reddy, Investigator
February 23, 2023
Page 3

In 2020 and 2021, Ms. Brazzano's productivity was very low.[2]  In early 2022, based on this lack of productivity and not hearing any viable plan from her for how her productivity would improve, Thompson Hine's Executive Committee determined it was time to sever the Firm's relationship with Ms. Brazzano.[3]

On April 27, 2022, Deborah Read, Thompson Hine's Managing Partner, informed Ms. Brazzano of the Committee's decision by telephone.  In that call, Ms. Read informed Ms. Brazzano that, while the Partnership Agreement required only 30 days' notice of termination, the Firm was willing to allow her to continue as a partner in the Firm at her existing compensation level for up to six months.  This significant concession would allow her to search for employment while employed.  In return, she would need to execute a standard release of claims.

In a subsequent communication with Ms. Read on May 6, Ms. Brazzano claimed that her performance problems were attributable to misconduct by Richard De Palma, another partner in the New York office.  Ms. Brazzano's unacceptable work levels had been the subject of many prior discussions between her and Firm management, but this discussion (after the announcement of the

---

[2] As discussed below, Ms. Brazzano acknowledged in writing that her hours were "dismal."
[3] At about the same time, a problem developed with a client for which Ms. Brazzano had handled a non-compete dispute.  In that matter, the client received a bill for $100,000 for the first month of work, which was mostly Ms. Brazzano's time.  The client was very upset and asserted that the case had been overbilled by Ms. Brazzano. The client immediately fired Ms. Brazzano and the Firm. The Firm was ultimately paid only about 30% of the time Ms. Brazzano billed. As discussed below, this was an example of Ms. Brazzano's apparent problems with (and reputation for) inefficiency, which was a likely contributor to her problem from finding sources of consistent work.



Andrea Reddy, Investigator
February 23, 2023
Page 4

decision to terminate the relationship) was the first time she ever asserted that her performance had been impacted by Mr. De Palma (or anyone else).

In that call, Ms. Brazzano also indicated that she had retained counsel. Her counsel wrote to Ms. Read on May 25, 2022. In that letter, he asserted that Ms. Brazzano's lack of production was attributable to Mr. De Palma and demanded that she be paid 18 months of severance (*i.e.*, she would depart immediately and retain all payments even if she was immediately hired elsewhere).

In response to this new claim, the Firm investigated the allegations. Discussions were had with Mr. De Palma, who served as the New York Business Litigation Vice-Chair, Brian Lamb, Ms. Brazzano's Practice Group Leader, other partners about the role (or lack thereof) Mr. De Palma played in how work in the office was disseminated and members of the Executive Committee that had decided to end the relationship. Those discussions confirmed that whatever difficulties Ms. Brazzano and Mr. De Palma had in their working relationship, Mr. De Palma had no effect on the work levels of Ms. Brazzano (or any other Business Litigation partner in the New York office), and that her gender had no role in the decision.

The Firm responded to Ms. Brazzano's allegations, pointing out that Mr. De Palma had no effect on Ms. Brazzano's hours because, as is true for all partners, she was responsible for keeping herself busy, either by bringing in her own clients or convincing other partners to send her work representing their clients. Her counsel responded with more detailed allegations about Mr. De Palma, none of which changed the basic fact that, as a partner, it was Ms. Brazzano's responsibility for finding work to keep herself productive. Ms. Brazzano, through counsel,



Andrea Reddy, Investigator
February 23, 2023
Page 5

ultimately rejected the Firm's offer to remain for six months and filed this Charge of Discrimination.

In her Charge, Ms. Brazzano does not seem to deny that her productivity was too low but blames that lack of work on "retaliation" by Mr. De Palma.  Alternatively, she asserts that the Executive Committee's decision to end her relationship with the Firm because of consistently low work levels was "pretext."[4]  She also seems to argue that Thompson Hine does not provide women, including her, with equal opportunity to succeed as men.  All of her claims are demonstrably false.

There is no real question that partners need to be productive for the business to succeed, and Ms. Brazzano herself frequently acknowledged that her productivity was unacceptably low. But there is no connection between Mr. De Palma and Ms. Brazzano's productivity.  Likewise, the facts show that the Firm works hard to support women and no reason to suspect that the Executive Committee was in any way biased against women.

**II.    Ms. Brazzano's Gender Played No Role in the Termination of the Relationship with Thompson Hine.**

The basis for the Executive Committee's decision was Ms. Brazzano's prolonged inability to find enough billable work to keep herself busy, combined with a lack of confidence that the situation could or would improve in the foreseeable future.  Even Ms. Brazzano recognized this

---

[4] The specific allegation from her Charge is: "Despite an exemplary and otherwise unblemished record of successful performance for the Firm's most important clients, I was suddenly terminated on April 29, 2022, under the pretext that my billable hours were too low."



Andrea Reddy, Investigator
February 23, 2023
Page 6

deficiency, acknowledging to the Executive Committee in her annual self-evaluations that her billable hours in both 2020 and 2021 were "dismal."

The decision to end her relationship with the Firm was made by the Executive Committee, which is the same Committee that selected her to become a partner nine years ago. That Committee has been led by a female Managing Partner for the last seven years. Of the eight current members of the Committee, three are women. All members, including all three women, voted in favor of ending the relationship. Any suggestion that the Executive Committee's decision was pretext for discriminating against Ms. Brazzano based on her gender simply ignores the facts. The decision, as clearly communicated to her, was based on her lack of work.

A.    **Ms. Brazzano's Work (and lack thereof).**

At Thompson Hine, like most any private law firm, the enterprise survives (and hopefully thrives) based on the contributions of its partners. Lawyers, and especially partners, are not interchangeable functionaries that the organization can keep or reassign like clerical or even management positions in other kinds of enterprises. Unlike companies that manufacture or sell products, in a private law firm the lawyers' work for clients is the only product. The clients' payment of fees is the only real source of revenue and *clients* decide what lawyers and what law firms they will hire and pay to do their work. The partners are the source of the revenue that pays the rent, employee salaries, benefits and, after these expenses, the partners' compensation.



Andrea Reddy, Investigator
February 23, 2023
Page 7

Partners are expected to bring in ("originate") legal work that keeps themselves and others busy performing billable[5] work for clients. That work generates revenue for the Firm as the clients pay for the work (these fees are referred to as "originations"). Some partners originate more work from clients than others, and often that work is performed by other lawyers and other partners. Some partners originate less work from the clients for whom they are responsible but keep busy performing work originated by other partners. Non-originated work flows to those partners when the originating partner (or his/her client) asks them to work on the matter.

Ms. Brazzano did not consistently originate business. In her 9+ years as partner, Ms. Brazzano had only one year (2015) in which she originated enough work to more or less cover her own compensation and overhead. In 2016, the fees collected on her originations fell precipitously by 75% to ¼ of her 2015 collections, and her origination numbers declined further in each of the next four years --2017, 2018, 2019, and 2020. By 2021 (the year reviewed when the Executive Committee made its decision), the fees collected on Ms. Brazzano's originations covered only <u>5%</u> of her budgeted compensation.

Because she was not originating business, Ms. Brazzano's success at the Firm (like other partners who did not have their own clients to keep them and others busy), was inextricably linked to being sought out by other partners (or other partners' clients) to work on the matters those other

---

[5] "Billable" work means work that is billed to a client for which the client then pays the Firm. Partners also perform "non-billable" work such as administrative work, that does not generate revenue. Billable work is the only real source of revenue for the law firm.



Andrea Reddy, Investigator
February 23, 2023
Page 8

partners originated.  Ideally, these partners without their own origination get "repeat business" after doing good work for others' clients.  Either the originating partner or the well-served clients with new matters ask for those partners to work on their matters again.  Unfortunately, this was not Ms. Brazzano's experience.  Besides not originating billable client work for herself, she was also not sought out by others to perform billable client work.

While she did do some work for clients of other partners with large "books of business," she received very little repeat business.  This may have resulted, at least in part, from Ms. Brazzano's reputation as a "heavy biller," meaning she expended more time performing a task or tasks than would be reasonably expected.  This phenomenon is often associated with lawyers (like Ms. Brazzano) that do not have enough work to keep themselves fully occupied.  Or it may be because she was never in the office, as discussed elsewhere.

Whatever the reason, while other partners (male and female) are sought out to work on matters by partners across the Firm, Ms. Brazzano was not sought out frequently enough by other partners to work on matters they brought in.  While Ms. Brazzano contends that she had "an exemplary and otherwise unblemished record of successful performance for the Firm's most important clients," she did not enjoy repeat business from her partners or from their clients.

As a rule of thumb, partners (like Ms. Brazzano) that do not generate client work for others to do are expected to perform at least 1600 hours of client billable work each year.  The last time Ms. Brazzano hit that goal was 2015.  The next year (2016), her billable hours dropped by almost half, to just over 900.  The totals for 2017-2019 were higher, but she still met the 1600-hour



Andrea Reddy, Investigator
February 23, 2023
Page 9

expectation in only one of those three years.  For 2020 and 2021, her billable hour totals were only 567 and 936, respectively – averaging less than half of the expected minimum.  As noted above, in her year-end self-evaluation memo to the Executive Committee for 2020, she affirmatively stated "the billable numbers for 2020 are dismal."  And for 2021, she again admitted her billable numbers for the year were "dismal."

Another contributing factor to her lack of hours may have been the fact that, since before she became a partner, she was seldom in the office to interface and develop relationships with other partners who could have been potential sources of new work.  This included several new partners who joined the New York office after she did.  Because she was almost never in the office in the years before COVID, she missed the opportunity to develop relationships with those potential sources of work.

Ms. Brazzano's bar licensures included New Jersey[6] and Connecticut.  For several years she was the only litigation partner in the New York office with those licensures, which attracted work for other Firm clients because she could appear for and represent clients in matters in those jurisdictions.  Eventually the New York office added several other litigation partners with those licensures, providing other options.

Then, at a time currently unknown to the Firm, Ms. Brazzano decided on her own to relocate to Florida, though she was not licensed to practice there.  Neither she nor the Firm had an

---

[6] For a time, she was the only New York-based litigation partner licensed in New Jersey, which distinguished her from other litigators.



Andrea Reddy, Investigator
February 23, 2023
Page 10

established client base in Florida, and the Firm had no office there (or any other lawyer in the state).  Her decision, reached without <u>any</u> consultation with Firm leadership, did not help her dwindling supply of work.

When her partners were considering which partner to staff their New York, New Jersey or Connecticut litigation with, Ms Brazzano being a thousand miles away in her new Florida home did not help in considering her to do their work.  This decision to move and try to practice in Florida also required her to study for and take the Florida Bar examination, because she was not licensed there when she opted to move.  She could not ever solicit, let alone work for Florida clients without being licensed.  And her prospects of obtaining work from new clients in Florida was then further hindered by the fact that, even after passing the Florida Bar exam, she could not get her Florida license due to a problem with unpaid federal income taxes.  To the best of the Firm's knowledge, she cannot ethically solicit or serve Florida clients to this day.

B.    <u>The Executive Committee Decision</u>.

The process of annual partner evaluation at the Firm is long and detailed.  It generally starts with year-end meetings between each partner and his/her Practice Group Leader where they discuss the prior year's performance and prospects for the coming year.  Then, in early January, the Executive Committee meets with each Practice Group Leader to discuss the partners in his/her group or office.  Later, the Committee meets and conducts internal discussions regarding each partner to adjust the financial shares (e.g., compensation) or address partners whose practices are struggling.



Andrea Reddy, Investigator
February 23, 2023
Page 11

In December 2021, Ms. Brazzano had her annual year-end meeting with Brian Lamb, her Practice Group Leader. In their meeting, Ms. Brazzano acknowledged to Mr. Lamb her need to change her "trajectory" of substandard and ever-decreasing levels of work. She told Mr. Lamb, for the first time, that she had moved to Florida and that she was hoping to bring her hours up by finding new clients in Florida. She also indicated that she was not yet licensed in Florida (which, as noted above, meant that it was illegal for her to solicit clients there).

Ms. Brazzano also advised Mr. Lamb that she was planning to take the MPRE exam (required for licensure in Florida) in March.[7] Mr. Lamb expressed his concern that her decision to move to Florida sent a signal to her partners in the New York office that she was not available to do work for their New York, New Jersey, and Connecticut clients and matters, making it even harder for her to source the additional work she needed. He suggested that Ms. Brazzano send a communication to the New York partners letting them know that she was available and anxious to help on their cases. She agreed that would be a good idea. As far as Mr. Lamb is aware, Ms. Brazzano never did so.

Consistent with the usual process, in early 2022, Mr. Lamb met with the Executive Committee to discuss each of the Business Litigation partners, including Ms. Brazzano. In that

---

[7] As of today, it does not appear that Ms. Brazzano (or anyone with the last name "Brazzano") is licensed to practice in Florida, assumedly because of the tax issue. See, https://www.floridabar.org/directories/find-mbr/?lName=Brazzano&sdx=N&eligible=N&deceased=N&pageNumber=1&pageSize=10 Last visited 2.23.2023



Andrea Reddy, Investigator
February 23, 2023
Page 12

meeting, he relayed what he had learned from Ms. Brazzano, as well as his concerns that her move

to Florida was not going to help her efforts to increase her work levels.[8]

The Executive Committee subsequently conducted their annual meeting to review partners.

When the discussions turned to Ms. Brazzano, there was considerable surprise that she had moved

to Florida, and even more surprise that she had done so without consulting any member of

management.  A ***female*** member of the Committee asked whether there was reason to believe Ms.

Brazzano had a future with the Firm.  The unanimous consensus of all members of the Committee

was that it was time to "call the question" on her future and tell Ms. Brazzano she should look for

another position.  That decision was reached based only on the Committee's consideration of the

facts as they understood them, including her perpetual lack of productivity and the lack of a viable

plan for changing that "trajectory."  The decision was reached without any input or arguments

from Mr. De Palma, and without consideration of her gender.

The Executive Committee understands that lawyers can have years where their production

is down, for a variety of reasons.  In each case, the Committee exercises its judgment whether they

have reason to believe the situation will be corrected within a reasonable time.  As to Ms. Brazzano,

she had a long history of low production and two straight years of admittedly "dismal" production.

On top of that, she had unilaterally changed her situation to one where she was likely to lose even

---

[8] The Executive Committee also meets with Partners-in-Charge of each office to get input on partners from their office.  When the Committee met with the New York Partner-in-Charge, Todd Mason, he also confirmed that he had only recently learned of the move and expressed his opinion that the move to Florida would work against Ms. Brazzano finding much needed work.



Andrea Reddy, Investigator
February 23, 2023
Page 13

more access to work.  The only new feature of Ms. Brazzano's plan for correcting the continuing

problem was her stated intention of obtaining new clients in Florida to fill that hole.  But that plan

did not appear likely to succeed any time soon (indeed, it was already thwarted because she wasn't

licensed and was therefore ethically prohibited from soliciting clients for the foreseeable future).

To be clear, if the Committee thought there was a reasonable likelihood that Ms.

Brazzano's practice would recover, they would have not made the decision to end the relationship.

But without any viable plan for a turnaround, *all eight members* of the Executive Committee,

including the three female members, one of who is the Managing Partner, voted to conclude the

relationship.  Ms. Brazzano's gender had nothing to do with the decision.

C.    **The Baseless Allegations Against Richard De Palma Were Irrelevant to the Executive Committee's Decision.**

Ms. Brazzano's Charge is difficult to follow, but her second overall argument appears to

blame Ms. Brazzano's lack of productivity (and therefore the Executive Committee's decision) on

her former partner, Richard De Palma.  She asserts that Mr. De Palma did not like her and that he

behaved badly,[9] treating male attorneys better than female attorneys (including her), and "steering"

---

[9] The Charge alleges:  "De Palma has perpetuated the *old boys'* network and created a hostile frat boy work environment in the Bus. Lit. Group in the NY Office." "De Palma … retaliates against any female attorney who does not embrace his misogynistic culture or agrees to his sexist submissive behavior…, excluding them from client pitches and invitation-only Friday drinking gatherings in his office."   "De Palma made it clear he did not like women, like me, who would not subordinate themselves to him."



Andrea Reddy, Investigator
February 23, 2023
Page 14

work to men.[10]  That contention is erroneous for a multitude of reasons.  First, Mr. De Palma was a staunch supporter of several female lawyers.  One in particular is Emily Matthieu who has worked closely with Mr. De Palma for a decade.  When she was considered for partner in 2018, he was in full support.  Ultimately, the Executive Committee voted to make Ms. Matthieu a partner, and she remains one today.

Second, Mr. De Palma did not "steer" work to Mr. Kazan, Mr. Koczko, Mr. DeBari or any other partner.  At most, he might suggest to other partners in the Firm which New York associates (i.e., junior attorneys) might be available to help on matters.  But he did not have any role in suggesting – let alone determining – what matters partners like Ms. Brazzano worked on.

It does seem clear that Mr. De Palma and Ms. Brazzano did not get along – both complained about each other at different points over the years (though Ms. Brazzano did not complain of De Palma's allegedly "misogynistic" behavior to anyone in management before her termination).  Mr. De Palma was not a fan of Ms. Brazzano's approach to work.  Well before she was elected to partnership in 2013, he expressed concern that she did not work from the office enough, choosing instead to work from home.  He believed the in-office interaction was important for her growth as an attorney and to build internal relationships at her then-new firm.  For those reasons, Mr. De

---

[10] The Charge alleges: "De Palma steered … work to male attorneys to the exclusion of the majority of female attorneys."  "De Palma … always steered work [to male associates]." "De Palma [steered work to] … Rich DeBari and Barry Kazan, [and] Joe Koczko.



Andrea Reddy, Investigator
February 23, 2023
Page 15

Palma did not support her elevation to partner. The Charge makes much of this, even purporting to quote two partners that said she would not make partner unless she "kissed the ring."

But those alleged statements were wrong. The Executive Committee disagreed with Mr. De Palma and recommended that the partners elect Ms. Brazzano in 2013 (which they did). Notably, Ms. Brazzano's attendance in the office did not increase after her election in 2013; long before the COVID-19 pandemic in 2020, she was known as someone that never came to the office. Her absence was so constant that no one in the New York Office even noticed when she moved to Florida. As noted above, Firm leadership in the New York office was unaware of her relocation until December 2021 when she informed Brian Lamb of her move to Florida.

Regardless of these two partners' mutual dislike, Mr. De Palma played no role in the Executive Committee's decision-making. Indeed, because she had already been a partner for over nine years, there is simply no support for the claim that Ms. Brazzano's relationship with the Firm was impacted in any way by Mr. De Palma.

Likewise, there is no factual basis for the allegation that Mr. De Palma works against the success of women in the New York office or anywhere else. He has a long track record of working well with female attorneys. In the time that Mr. De Palma has been the vice chair of Business Litigation Practice Group in the New York office, three women have been elected as partners in the Practice Group. All three remain partners in the Firm, working and interacting in the New York office with Mr. De Palma.



Andrea Reddy, Investigator
February 23, 2023
Page 16

During that same time, four males in the New York office were also elected to partner, but only one of them (Riccardo DeBari) remains employed at the Firm because the Executive Committee also elected to sever relationships with the other three male partners for the same reason as Ms. Brazzano - because they lacked sufficient work. That included Mr. Kazan (to whom the Charge asserts Mr. De Palma sent billable work). Mr. De Palma had precisely the same effect on the termination of these men as he had on the decision regarding Ms. Brazzano - none.

Nothing about any of the Charge's rambling allegations of Mr. De Palma's attitude toward women[11] have anything to do with Ms. Brazzano or the Firm's decisions about her. The fact is that neither Mr. De Palma nor any other local vice chair of a practice group have anything to do with how *partners* find billable work to do. Finding and keeping that work is the job of every partner, including Ms. Brazzano. Ms. Brazzano had been a partner since 2013. In those nine years, it was her job – not Mr. De Palma or anyone else's – to make sure she had enough work to support

---

[11] The charge makes allegations about Mr. De Palma's interactions with women identified as "GV" and "GL." "GV" appears to refer to a former associate with significant performance problems who left in 2016. Two <u>female</u> partners identified GV's performance problems, one of which stated that she would not give GV any new cases. And despite the Charge's efforts to paint a different picture, GV never asserted that she had been discriminated against by Mr. De Palma.

"GL" appears to refer to a former secretary that worked for Mr. De Palma and others, including Ms. Brazzano. Notably, what the Charge specifically alleges is that GL was mistreated *by a client*, not Mr. De Palma. Regardless, GL had a long history of performance problems, including disagreements with lawyers and secretaries of both genders. Indeed, even *Ms. Brazzano* demanded a new secretary because she couldn't get along with GL. And although GL regularly complained about many things, she never complained of harassment by Mr. De Palma to anyone in management. GL was ultimately terminated in 2015 because she was unable to act appropriately, especially with female coworkers.



Andrea Reddy, Investigator
February 23, 2023
Page 17

her salary, benefits and overhead.  The claim that Mr. De Palma prevented Ms. Brazzano from getting work also does not account for the few years when Ms. Brazzano *did* have acceptable hours - notwithstanding his supposed longstanding campaign against her.

## III.  <u>Investigation</u>.

The Charge next suggests that Thompson Hine was aware of misconduct by Mr. De Palma, but failed to investigate.[12]  It asserts that "(T)he Firm did not investigate and took no remedial action," and "whenever a female attorney has spoken up to the Firm management and reported Mr. De Palma's unlawful conduct, they have been retaliated against by being denied any billable work (frozen out), given menial or "housekeeping" tasks to perform, and eventually asked to resign with a "package" or be terminated."  The Charge is full of innuendo, but lacks substance.

As an initial matter, the Firm is committed to maintaining a workplace atmosphere free from bias of any kind and has been recognized for its achievements in this area, as described below. Among the many ways it works to further that goal, the Firm conducts annual anti-harassment training, attendance at which is mandatory for all employees, including Ms. Brazzano.  The Firm also requires annual acknowledgement of its written Anti-harassment Policy by all employees,

---

[12] Her Charge alleges: "I reported Mr. De Palma's vulgar comments and discriminatory behavior on various occasions to Debbie Read, Brian Lamb, Todd Mason, and other equity partners in the Firm." "The Firm knew about Mr. De Palma's unlawful conduct and sexist discrimination against me and other female attorneys in the New York office, including against former income partner TB and associates CH and GV, and it did nothing."



Andrea Reddy, Investigator
February 23, 2023
Page 18

including Ms. Brazzano.  Part of both the training presentation and the written policy is the emphasis on reporting any concerns about bias or mistreatment of the kind Ms. Brazzano alleges.

Ms. Brazzano is an experienced attorney, who regularly advocates for clients.  She also advocated for herself with management on other issues many times during her tenure with the Firm.  She attended these trainings and signed documents attesting to the fact that she had read and understood the Policy, including those parts that encouraged reporting of any mistreatment based on gender.  Indeed, Ms. Brazzano herself taught anti-harassment sessions for employees of clients.  Yet, until her call with Ms. Read in May 2022, *after* she had learned of the Executive Committee's decision, Ms. Brazzano – an experienced employment lawyer - never suggested to anyone (at least no one in management) that Mr. De Palma was discriminating against her.

Ms. Brazzano also asserts that the Firm did not investigate her Complaint.  That is not true.  When she did finally make her belated allegation, Ms. Read told Ms. Brazzano that the Firm took such allegations seriously and that she wanted Ms. Brazzano to cooperate in the investigation of her claims.  When the female partner assigned to investigate the claim contacted Ms. Brazzano to discuss the facts, she declined to have any discussion without her lawyer present.  Thus, the investigation focused on other individuals with knowledge, including Mr. De Palma and Mr. Lamb.

In subsequent discussions with Ms. Brazzano's counsel, he repeatedly referred to the Firm's "refusal to investigate" her claims because the investigator declined to have further discussions with her counsel involved.  But her additional participation was unnecessary because



Andrea Reddy, Investigator
February 23, 2023
Page 19

Ms. Brazzano had already laid out the facts she claimed demonstrated the discrimination. As described above, discussions with other members of the Firm did occur, including Mr. De Palma, Mr. Lamb and members of the Executive Committee. Additionally, given that her claims were based on the false assumption that Mr. De Palma had responsibility for or impact upon her workload, there was nothing else to learn through further discussions with her. If Ms. Brazzano actually believed that Mr. De Palma was responsible for her workload, it demonstrated a fundamental misunderstanding of the workings of her law firm for the last decade or more. But the truth was – and is – that Ms. Brazzano always understood that it was her responsibility to find the work to keep herself busy, as demonstrated in many of her communications with her Practice Group Leader and the Executive Committee. Her claim is not credible.

**IV.    <u>Thompson Hine's Management Supports and Promotes Female Lawyers</u>.**

Ms. Brazzano's Charge asserts that the Firm "systemically discriminates against New York[13] female attorneys by assigning them management and administrative roles which do not include additional compensation or credit towards their billable hour targets, unlike the roles assigned to male attorneys who receive additional compensation and/or billable hours credits towards their target billable hours."

---

[13] Ms. Brazzano specifically lists five other female partners that have been "assigned" the supposedly undesirable Committee Chair assignments. None are from New York.



Andrea Reddy, Investigator
February 23, 2023
Page 20

There are many reasons why Ms. Brazzano is wrong is her attempts to characterize Thompson Hine as a partnership unfriendly to women.  Thompson Hine devotes substantial thought, cost and action to addressing historical disadvantages and impediments to success within the legal industry at large – and those efforts are very successful.

Without recognizing the irony of her position, Ms. Brazzano criticizes the Firm for assigning women to lead important committees – most of which were created to address inequality: the ESG[14] Collaborative Committee, the Diversity, Equity & Inclusion Initiative Committee, and the Woman's Initiative Committee.  These are not undesirable assignments – they are important, coveted positions sought after by some of the Firm's most successful attorneys.  And the fact that these Committees exist and take time to run is proof of the Firm's commitment to improving opportunities, not proof of a "culture" seeking to hold women back.

By pointing to a very few selective facts, Ms. Brazzano's charge seems to argue that the Firm does not support and promote women to leadership positions and that this supposed "gender discrimination is emblematic of a broader and systemic pattern and practice at Thompson Hine LLP."  But the facts demonstrate just the opposite.  Thompson Hine has been very conscious, for a long time, to provide opportunities to and support for female lawyers to succeed inside and outside the Firm:

---

[14] ESG is "Environmental, Social and Corporate Governance," which is a concept in the corporate world in which companies commit to conducting themselves ethically in those three general areas.



Andrea Reddy, Investigator
February 23, 2023
Page 21

- In 2012 (shortly before the partners elected Ms. Brazzano to the partnership) the Executive Committee nominated Deborah Read to be the Managing Partner of the Firm and the partners elected her.  Since that time, at least three of the Executive Committee's current eight slots have been occupied by several different female partners.

- Female partners have been Office Partner-in-Charge of five of the Firm's seven long time offices.   Women have led all of the Firm's largest offices – Cleveland, Cincinnati, New York City, Atlanta and Dayton.   During most of Ms Brazzano's tenure in the New York office, a female was the Office Partner-in-Charge.

- Female lawyers have also led at least eight of the Firm's 14 practice groups.

- Women have led, as noted above, the Firm's most important committees, including the Diversity, Equality and Inclusion Committee, the ESG Collaborative Committee and the Lawyer Personnel Committee.

- The Firm's "Spotlight on Women" initiative was started almost 20 years ago.  Spotlight on Women is a firmwide program to which the Firm devotes substantial resources (and money) designing and hosting events designed to foster female attorneys' exposure and leadership in the Firm and Community.

- The Firm's efforts to address matters of concern for female attorneys has been recognized nationally.  Thompson Hine achieved certification for Diversity Lab's Mansfield Rule 4.0 initiative and is pursuing Mansfield 5.0. (Mansfield is recognized as the leading, independent, certification of diversity within the legal industry.)

Achieving and maintaining partnership is a difficult proposition for all lawyers.  Not all will succeed, male or female, but any lack of success is not because the Firm has a culture that makes their success more difficult for females than it is for males. Thompson Hine demonstrates - in words, actions and spending - a strong commitment to providing the opportunity for all attorneys to succeed, regardless of gender or other demographic characteristics.   The Firm provides substantial assistance to female attorneys designed to ensure they have the tools to overcome barriers.  Many have done so and many are among the Firm's leaders.



Andrea Reddy, Investigator
February 23, 2023
Page 22

**V.      Other Allegations.**

The Charge contains several other statements that are difficult to understand, at least in the context of a claim regarding the ending of the relationship between Thompson Hine and Ms. Brazzano.  One involves Ms. Brazzano's role as Chair of the Firm's Pro Bono Committee, a position she did not assume until 2018.  Among other things, the Charge asserts: "(A)s Firmwide Chair of the Pro Bono Committee for years, I never received any additional compensation or billable hours credit.  Instead, the Firm used my gender, female, to attract and recruit more female attorneys to take on the majority of pro-bono matters.  My male counterparts who hold Chair or similar leadership positions are awarded additional pay and/or billable hour credit."

These false statements misapprehend many things, especially the role of non-billable work at Thompson Hine.  First, the Firm is engaged in numerous pro bono projects that assist individuals and better the community at large.  It devotes many thousands of unpaid hours to such engagements every year.  These matters better the community and also serve as great opportunities for junior lawyers to gain practical litigation experience in a world where many clients resist paying for the work of young attorneys that lack actual litigation experience.  The Firm encourages all attorneys, male and female, to participate.

As described above, there is a difference in the kind of work any given lawyer may do.  Some work is billed to and paid by clients.  That is "billable" work.  Work that is not billed to a client is called "non-billable" and comes in a variety of types.  Some non-billable time is devoted to administrative tasks, some to client development activities, and some to management functions.



Andrea Reddy, Investigator
February 23, 2023
Page 23

There is much non-billable work that has to be performed in running a large national law firm, and for the most part, it is partners that perform it. That nonbillable work is performed in addition to – not in lieu of – their billable work. To encourage newer, non-partner attorneys to participate, some "billable" credit is given for the time they spend on pro bono matters. That is important because their compensation is tied directly to the number of billable hours they perform.

Partners, however, do not receive billable "credit" for their non-billable work. So, while it is true that Ms. Brazzano did not get billable credit for her work heading the pro bono committee, the same is true for all partners engaged in such activities – male and female alike. Non-billable work is considered to be important, but it is only one part of the overall picture.

Ms. Brazzano was treated the same as all partners: the Executive Committee looks at the entire picture of contributions to the Firm, including non-billable work, in determining their share of the partnership's revenue, and continued partnership. Ms. Brazzano's work for the Pro Bono Committee was important and appreciated by the Executive Committee. But it was not more important than her billable work, and not more important than the non-billable work done by other partners.

Ms. Brazzano's Charge also asserts that she had discussions with Mr. De Palma and Mr. Lamb about an expense issue for a pro bono matter being handled by De Palma and partner Emily Mathieu. Ms. Brazzano maintains that this request was contrary to the Firm's pro bono policy and seems to claim that the Firm should not have been handling the case in any event. She asserts that



Andrea Reddy, Investigator
February 23, 2023
Page 24

his request that the Firm pay for an expense incurred representing this pro bono client was made

"in an effort to undermine my position as Firmwide Chair of the Pro Bono Committee."

It is hard to understand the argument as to how making the request was designed to

undermine anything, but more difficult to understand is how Ms. Brazzano contends this incident

impacted her position with the Firm.  What is clear, however, is that no one on the Executive

Committee was even aware of this issue or these discussions.  Indeed, the discussions with Mr.

De Palma and Mr. Lamb occurred in March 2022 according to the Charge (precisely March 16-

17, 2022), well after the Executive Committee made its decision regarding Ms. Brazzano.  Again,

Ms. Brazzano's myriad of complaints about Mr. De Palma simply have nothing to do with her

relationship to the Firm.

**VI.    <u>Conclusion</u>.**

Ms. Brazzano's Charge should be dismissed as it establishes no cause to support a claim

of unlawful discrimination.

Very truly yours,

Thomas L. Feher, Esq.