**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| REBECCA BRAZZANO,<br><br>                              Plaintiff,<br><br>                    v.<br><br>THOMPSON HINE LLP, RICHARD<br>ANTHONY DEPALMA<br>(in his individual and professional capacities),<br>DEBORAH ZIDER READ (in her individual and<br>professional capacities), and<br>THOMAS LAWRENCE FEHER<br> (in his individual and professional capacities),<br><br>                              Defendants. | Index No.:<br>24-cv-01420 (ALC)(KHP)<br><br>SECOND AMENDED<br>VERIFIED COMPLAINT<br><br><br>JURY TRIAL DEMANDED |

Rebecca Brazzano ("Brazzano" or "Plaintiff"), as her own counsel, by and through Brazzano Law PLLC, as and for Brazzano's Second Amended Verified Complaint (the "Complaint") herein against Thompson Hine LLP ("Thompson Hine" or the "Firm"), Richard Anthony DePalma ("DePalma"), Deborah Zider Read ("Read") and Thomas Lawrence Feher ("Feher") (and together with Read, DePalma and Thompson Hine, the "Defendants") alleges as follows:

**PRELIMINARY STATEMENT**

1.      Justice, with its deliberate rhythm, is an unstoppable force in motion holding those who violate the law, Defendants here, accountable for their unlawful conduct.

2.      The Defendants are determined to conceal (and/or seal) their unlawful and illicit behavior, which includes, among other claims alleged here, sexual harassment, gender discrimination, retaliation, retaliation in the termination process, abuse of process, defamation, and negligent infliction of emotional distress, within an impenetrable ring of wagons, shamelessly lying to protect their undeserved shiny reputations as legal professionals.

3.      As the #MeToo movement reverberated across the United States, exposing predators in diverse professions, BigLaw, the legal community, and Defendants, remained a fortress of secrecy where unlawful sexual harassment flourishes unchecked and unabated.

4.      Thompson Hine cloaks its equity predators, like DePalma, behind the camouflage of its Ivory Tower, and enables rampant and disturbing discriminatory conduct by partners with actual ownership to strategically veil and shelter their unlawful conduct from the unforgiving scrutiny of the Courthouse.

5.      For more than a decade, DePalma ruled the New York office as its Vice Chair of Business Litigation like a toxic boys club locker room, starting with his comment about getting "jerked-off" by a Judge, disturbingly requiring only Plaintiff (and she was singled out) to report her whereabouts to DePalma if she left the building, to his Monday morning meetings that consisted of DePalma's recounting of his weekend escapades making beer and playing in his "boy band," weaponizing his position to exclude Plaintiff from billable work, client interaction, and DePalma was intent on, and did, sabotage Plaintiff's professional career.

6.      Without equivocation, Plaintiff distinctly and explicitly highlighted DePalma's sexual harassment, discriminatory treatment, along with DePalma's open contempt for formidable female litigators like Plaintiff, to equity partners, to Read and other within their equity circles.

7.      Defendants orchestrated efforts here expose a brazen endeavor to obstruct and obscure any lawful scrutiny that might illuminate their targeted sexual harassment, misogynistic and toxic work environment, their discriminatory and retaliatory conduct, all as suffered by Plaintiff.

8.      Plaintiff stands unwavering and resolute against Defendants' intentional efforts to smear Plaintiff's name, tarnish Plaintiff's reputation, and impugn Plaintiff's character, in their

collaborative duplicity, including Thompson Hine and Feher literally lying to the United States Equal Employment Opportunity Commission ("EEOC") to evade the consequences of their collaborative unlawful conduct, hoping to tip the scales of justice with their falsifications to deter any meaningful investigation into the claims Plaintiff interposed before the EEOC.

9.      Neither Thompson Hine nor Feher can hide behind the absolute privilege that would otherwise attach to an administrative proceedings and related submissions, as the words they intentionally stroked and used were not pertinent to the EEOC's investigation, and were so needlessly defamatory and warrant the factual inference of express malice, strips away any semblance of protection afforded by absolute privilege, laying bare their liability to the claims advanced herein for defamation and abuse of process.

10.     This complaint is being amended, to among other things, address Read and Feher's attempted Forrest Gump sprint, claiming that neither is subject to this Court's jurisdiction.

11.     Read and Feher's purposeful and continuous contacts in New York unequivocally establish proper jurisdiction, and their efforts to evade the Court's reach are pathetic.

12.     Too, after filing the complaint, Defendants' lawyer sent along a Rule 11 Safe Habor Letter, ominously threatening to file a sanctions motion against Plaintiff unless the complaint was withdrawn, apparently Plaintiff's telling the truth is against the rules.

13.     The facts remain, Plaintiff expressed complaints about DePalma and his unlawful conduct for more than a decade.

14.     When Plaintiff escalated her complaints in April of 2022, identifying audit results that confirmed that DePalma had falsified New York *pro bono* hours, and reporting obligations, in violation of, *inter alia*, 22 NYCRR §118.1[e][14], and a fraud on the firm (using firm attorneys under the guise of "*pro bono,*" to work on a *faux pro bono* matter, for his own personal and individual benefit in his

side hustle in the world of art arbitration), DePalma's visceral and immediate reaction was to make sure Plaintiff was permanently silenced, and fired; Plaintiff's resignation was demanded by Read just seven (7) days later.

15.    It is alleged here that Plaintiff's exposure of DePalma's sham *pro bono* endeavor, along with Plaintiff's stated intention to close DePalma's ability to enter any new related time entry, triggered a volatile reaction; the prospect of a female lawyer, Plaintiff, exerting authority over DePalma proved insufferable, resulting in a tumultuous and visceral eruption of DePalma's ego and further fueled his discriminatory conduct directed at Plaintiff.

16.    In furtherance of his sexual harassment of Plaintiff, it is no leap that DePalma immediately reached out to his fishing buddy, a member of Thompson Hine's Executive Committee, Joe Koczko ("Koczko"), with the direct and proximate result of Plaintiff's unlawful termination just seven (7) days later.

17.    Defendants were not satisfied with just demanding Plaintiff's resignation (a/k/a "you're fired"), to be sure Plaintiff's humiliation was complete, they weaponized and retaliated against Plaintiff further in the termination process.

18.    Plaintiff understands that the path of righteousness is often fraught with obstacles, Plaintiff nevertheless opted to bring these claims to the fore in a Court of law, where Defendants cannot evade accountability in the shadows of lawless injustice.

19.    Plaintiff will not fall silent into the abyss by Defendants' abusive conduct and is resolute in her belief that the sexual harassment and gender discrimination that she endured over more than a decade was in fact the reason she was shoved out the door.

20.    Despite Defendants' feigned protestations, Plaintiff has no obligation, contractually or otherwise, to arbitrate with Thompson Hine (or their malevolent equity partners) in a secret

forced arbitration, under foreign laws, that is untethered in content or time, to her claims here that are grounded in sexual harassment by DePalma.

21.    It is alleged, upon information and belief, that Thompson Hine has never enforced its arbitration clause against any attorney because when there is a dispute with such any such parties, Thompson Hine just buries its dirty laundry, pays them off, in exchange for a non-disclosure agreement.

22.    Plaintiff is, upon information and belief, the only attorney who essentially told Thompson Hine to pound sand, declined the Firm's pittance "severance" offer, refused to sign their non-disclosure agreement, formally filed a charge against the Firm with the EEOC, obtained a Right to Sue Letter, and instituted a federal lawsuit against it.

23.    Thompson Hine's predispute arbitration clause, that is contained in its partnership agreement, is void and unenforceable for the claims here that are grounded in sexual harassment that arose after the enactment of the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 ("EFAA").

24.    Where, as here, the dispute presents multiple claims – the EFAA confirms that arbitration is not available for any of the claims and the entire case remains in a Court of law, not just the sexual harassment claims, as all of the additional unlawful conduct alleged here is intertwined with Defendants' systematic efforts to retaliate, humiliate, defame  and  silence Plaintiff to prevent the exposure of the claims presented.

21.    Plaintiff is a New York lawyer, a former employee of Thompson Hine, with lawful rights to have her claims adjudicated under New York law, in a New York Courthouse, before a New York Judge and by a New York jury.

22.    Plaintiff presents these claims in this forum, with the awareness that justice derives

its strength and vitality from purposeful illumination of genuine tested truth in a Court of law.

23.    Thompson Hine permitted, allowed, condoned and enabled all of the sexual harassment, discrimination, retaliation (and retaliation in the termination process), abuse of process, defamation and negligent infliction of emotional distress, alleged herein, from the top down and now it can own it.

24.    As the supposed keepers of the law, lawyers and law firms, like Defendants here, bare a profound responsibility to "uphold the rule of law" and their conspicuous and dismal failure to do so here, is unwaveringly "unacceptable" and constitutes a total mission failure.[1]

THE PARTIES

PLAINTIFF

25.    Plaintiff Brazzano is domiciled in the State of Florida.

26.    At all times relevant Plaintiff was an employee of Thompson Hine, in its office located in this Judicial District in the City of New York, State of New York.

27.    At all times relevant, the improper and unlawful acts committed by Thompson Hine, Feher, Read and DePalma against Plaintiff, and against Plaintiff's New York bar license, all had there impact in this District in the City of New York, State of New York.

28.    Plaintiff worked from Thompson Hine's New York City office from 2008-2022.

29.    At all relevant times, Plaintiff met the definition of an "employee" or "eligible

---

[1] *See, Women Lawyers On Guard's Survey on Sexual Misconduct and Harassment in the Legal Profession*, available at https://womenlawyersonguard.org/wp-content/uploads/2020/07/Still-Broken-Full- Report.pdf ("Ultimately, this is all about power and respect (or lack thereof) in the workplace…[T]he powerful still protect each other…there is still enormous pressure not to challenge the powerful. I believe that we still have a long way to go in terms of changing mindsets in the legal profession" "[A]s an associate, you cannot report your superiors and expect to make partner. As a partner, you aren't a team player if you report a fellow partner. As…especially a litigator, you are expected to address these situations yourself, one on one, or suck it up.")(Last visited Feb. 22, 2023).

employee" under all applicable federal, state and city statutes.

**THOMPSON HINE LLP**

30.     Defendant Thompson Hine is a foreign limited liability partnership, with its principle office located at 900 Key Center, 127 Public Square, Cleveland, Ohio 44114, with an office in New York City, now relocated at 300 Madison Avenue, 27th Floor, New York, NY 10017-6232.

31.     At all relevant times, Thompson Hine was and met the definition of an "employer" or "covered employer" under all applicable federal, state and city statutes as they relate to Plaintiff.

32.     Thompson Hine derives substantial revenue from its purposeful activities in this District, and its equity/general partners (DePalma/Read/Feher), and each of them, likewise derive substantial income, compensation, and renumeration, based upon their collective and purposeful activities in this District in New York.

**RICHARD ANTHONY DePALMA**

33.     Defendant DePalma is, upon information and belief, a resident of the State of New York, residing at 27 Deerfield Road, Pound Ridge, New York 10576-1413, and is registered to vote in the State of New York.

34.     At all relevant times, DePalma acted in his personal and professional capacities, was an equity/general partner/owner of defendant Thompson Hine, and in the alternative, acted as an agent of, Thompson Hine and as an agent of his equity partners.

35.     DePalma is a "general partner" (also known as "equity partner") of Thompson Hine LLP, as that term is relevant and defined in Section 4 of the Thompson Hine LLP Partnership Agreement, dated as of November 15, 2017 (the "2017 Partnership Agreement"[2]), and DePalma is a signatory thereto. *See*, Exhibit 1.

36.     At all relevant times, DePalma received renumeration and/or compensation derived from Thompson Hine's provision of legal services to clients in the State of New York.

37.     It is alleged, upon information and belief, that in 2018, DePalma's compensation from Thompson Hine was $758,300.00 (https://www.transparencyusa.org/oh/committee/thompson-hine-good-government-program-1880-pac/contributors?cycle=2018-election-cycle&page=2)(which shows DePalma made a donation of one precent (1%) of his overall compensation in 2018, to wit, $758.30 (which was almost double Plaintiff's compensation), and that in 2022 (the year Plaintiff was told to resign) DePalma's compensation was $436,590 (DePalma again donated one percent of his overall compensation in 2022, to wit, $436.59 (https://www.transparencyusa.org/oh/committee/thompson-hine-good-government-program-1880-pac/contributors?cycle=2022-election-cycle&page=4).

**DEBORAH ZIDER READ**

38.     Defendant Read is, upon information and belief, a resident of the State of Ohio, residing at 23700 Stanford Road, Shaker Heights, Ohio 44122-2673.

39.     Read owns real property in the State of New York located at 38 East 85th Street, Unit 7E, New York, New York 10028.

40.     At all relevant times, Read acted in her personal and professional capacities, was an equity/general partner/owner of defendant Thompson Hine, and in the alternative, acted as an agent of Thompson Hine and as an agent of her equity partners.

41.     Read is a "general partner" (also known as "equity partner") of Thompson Hine LLP, as that term is relevant and defined in Section 4 of the Thompson Hine LLP Partnership

Agreement, dated as of November 15, 2017, and Read is a signatory thereto. *See*, Exhibit 1.[2]

42.     At all relevant times, Read received renumeration and/or compensation derived from her own and Thompson Hine's provision of legal services to clients in the State of New York.

43.     One of the reasons that amendment here was necessary was Read's frantic attempt to escape the inevitable reach of justice in this Court.

44.     Read's effort to evade jurisdiction lacks merit and disregards the fundamental jurisdictional authority of this Court.

45.     True, Plaintiff did not foresee Read scampering to dodge service of process, requiring ten attempts by the process server to serve the complaint upon Read, Plaintiff too did not anticipate that Read would attempt to elude and contest this Court's jurisdiction.

46.     This Court unequivocally has personal jurisdiction over Read, based upon all of the following.

47.     Read personally derives income and profit from her own action and conduct (and off the backs of others), from the State of New York.

48.     Read's own Federal and New York State should reflect that her personal income includes, historically, as follows: in the year 2016, she earned 19.9297% from New York; in the year 2017 she earned 19.7277% from New York; in the year 2018 she earned 20.0583% from New York; in the year 2019 she earned 19.4817% from New York; in the year 2020 she earned 20.0583% from New York; in the year 2021 she earned 17.1810 % from New York; and in the year 2022 she earned 15.0678% from New York.

49.     Extrapolating          other          data          (available          at

---

[2] A true and correct copy of the 2017 Partnership Agreement that was provided to Plaintiff after her departure from Thompson Hine in June 2022 is Exhibit 1 hereto.

https://www.transparencyusa.org/oh/committee/thompson-hine-good-government-program-1880-pac/contributors?cycle=2018-election-cycle&page=2) one percent of Read's overall compensation in 2018 (was $1,277.46 / $1,277,460), and in 2022 (was $1,352.56 / $1,352,560), personally deriving $256,236 and $203,801, respectively from New York income in those years.

50.    During the years 2009-2022, Read earned millions of dollars from New York income.

51.    Read owns real property in this District which she paid $1.6 million dollars for, which is worth far more than her property located outside New York.

52.    Read has sufficient personal contacts in New York for the Court to exercise personal jurisdiction over her person.

53.    Read frequently travels to New York, and is present in Thompson Hine's New York officer more than 5 times in each year between 2009-2022 (and more often in 2012 when she was lobbying New York attorneys for the Managing Partner role).

54.    Read advised Plaintiff that on these "business" trips, Read would combine them to see her daughter, who lived in New York beginning in approximately 2014.

55.    Read accepted gifts from Plaintiff every time she visited New York.

56.    Read provided in person legal advice in New York to New York based clients (from which she derived personal income).

57.    Read called Plaintiff in her New York office, and on her New York cellphone, and sent Plaintiff emails in New York, all dozens of times, and met with Plaintiff in person dozens of times in New York, that were both personal and business related.

58.    Read attended marketing events, parties, and other gatherings in New York, which were attended in both her professional and personal capacity, and she would again combine

those functions/travel with personal visits with her daughter in New York.

59.     Read was a common presence in the Thompson Hine office located in this District.

60.     Read travelled to the New York office during the week of April 25, 2022, with the intent to fire Plaintiff in person in New York without success, so Read phoned Plaintiff on her New YorkY issued cellphone on April 29, 2022 to demand that Plaintiff resign.

61.     Read has engaged in and conducted sufficient in-person activities within New York related to the claims set forth in this Complaint against her that confirm this Court can exercise specific personal jurisdiction over her.

62.     Read's activities in New York were purposeful volitional acts.

63.     Read has continuously availed herself of the privileges of conducting activities within New York, thus invoking the benefits and protections of its laws.

64.     Read has continuously invoked the benefits and protections of New York laws and is subject to this Court's jurisdiction pursuant to CPLR 302(a)(1).

65.     Read's status as an equity partner does not insulate Read from the reach of this Court's jurisdiction.

66.     The Court can exercise its specific personal jurisdiction over Read pursuant to CPLR 302(a)(1) based on Read's own activities along with the activities of her equity partners, who are Read's agents or pursuant to CPLR 302(a)(2) or (3).

67.     Read's desperate attempt to cloak her egregious abuse of process, and negligent intentional of emotional distress, and retaliatory conduct under the guise of privilege is both pathetic and doomed to fail.

68.     The truth always comes to light.

69.     Read's unlawful and despicable conduct will be exposed and dismantled, bringing her to the inevitable justice she has so richly earned.

70.     Read has confirmed that that *Youmans v Smith*, 153 NY 214, 220 [1897]) remains good law in New York:

> If counsel through an excess of zeal to serve their clients, or in order to gratify their own vindictive feelings, go beyond the bounds of reason and by main force bring into a lawsuit matters so obviously impertinent as not to admit of discussion, and so needlessly defamatory as to warrant the inference of express malice, they lose their privilege and must take the consequences. In other words, if the privilege is abused, protection is withdrawn.

71.     Read cannot hide behind any privilege, as any protection was forever stripped by Read's express malice, abuse of process and other unlawful conduct directed at Plaintiff.

72.     The law offers no shield for those that abuse its systems like Read; her reference to a public docket number, under the guise of establishing that Plaintiff is a domicile of Florida was vindictive and was done to expose Plaintiff's family member who sought justice.

73.     Read's reference to that lawsuit was intentional,  it was to signal that no bar is too low for Read, retaliatory for Plaintiff's filing this lawsuit and shameful.

74.     Read's reference to a public docket for a random fact already included in a verified pleading by Plaintiff here was vindictive and cheap; it was neither material, relevant, nor pertinent.

75.     Read's effort to target Plaintiff's family is reprehensible and disgusting.

76.     In the event the Court has further concerns over its exercise of personal jurisdiction, Plaintiff will seek an order of limited jurisdictional discovery with respect to its personal jurisdiction over Read, including discovery of Read's as filed tax returns for years that Feher received any New York income, Read's expense reports for personal reimbursement for trips to New York (as well as all personal trips that were unreimbursed), Read's time entries (and

client invoices) reflecting work she performed in or for New York clients, all calendar entries that reflect Feher's presence in New York, all articles Feher authored and directed at New York, and all call logs, emails and text messages between Plaintiff and Read or that concern New York.

77.    The law in this District confirms that "if discovery reveals such transactions, the propriety of personal jurisdiction would be obvious; in that event, the Court expects and encourages Defendant to concede the existence of personal jurisdiction under CPLR§ 302(a)(1) in this District." (*Blockchange Ventures I GP, LLC v Blockchange, Inc.*, 2021 US Dist LEXIS 136942 [SDNY July 22, 2021]).

78.    This Court has specific personal jurisdiction over Read, a non-domiciliary, based upon her continuous and systematic contact with New York, income from New York, ownership of real property in this District, repeated personal and professional travel to New York, performing legal services for New York client in New York, attending parties in New York, and continuous participation in marketing efforts directed at New York.

79.    Read's activities within and directed at New York State are related to the claims against Read in this action, and sufficiently supports the exercise of specific personal.

THOMAS LAWRENCE FEHER

80.    Defendant Feher is, upon information and belief, a resident of the State of Ohio, residing at 3105 Van Aken Boulevard, Shaker Heights, Ohio 44120.

81.    At all relevant times, Feher acted in his personal and professional capacity, Feher was an equity/general partner/owner of defendant Thompson Hine, and in the alternative, acted as an agent of Thompson Hine and as an agent of his equity partners.

82.    Feher is a "general partner" (also known as an "equity partner") of Thompson Hine LLP, as that term is relevant and defined in Section 4 of the Thompson Hine LLP Partnership

Agreement, dated as of November 15, 2017, and Feher is a signatory thereto. *See,* Exhibit 1 hereto.

83.    At all relevant times, Feher received renumeration and/or compensation derived from his own and Thompson Hine's provision of legal services to clients in the State of New York.

84.    Feher personally derives income and profit from his own actions (and exploits the efforts of others), deriving income directly from the State of New York.

85.    Feher's own Federal and New York State  should reflect that his personal income includes, historically, as follows: in the year 2016, Feher earned 19.9297% of his income from New York; in the year 2017 Feher earned 19.7277% from New York; in the year 2018 Feher earned 20.0583% from New York; in the year 2019 Feher earned 19.4817% from New York; in the year 2020 Feher earned 20.0583% from New York; in the year 2021 Feher earned 17.1810 % from New York; and in the year 2022 Feher earned 15.0678% from New York.

86.    Extrapolating other data (available at Transparency USA) one percent of Feher's overall compensation in 2018 (was $588.24/$588,240) and one percent of Feher's overall compensation in 2022 (was $511.38/$511,380), and thus Feher personally derived $117,990 and $77,053, respectively from New Yor income in those years.

87.    Feher's average compensation for the years 2018 and 2020, and adding that amount for the period of 2009-2022, confirms that Feher derived personal income from both his own legal practice in New York (and the practice of others) at an estimated $1.2 million dollars.

88.    Feher has sufficient personal contacts in New York for the Court to exercise personal jurisdiction over his person.

89.    Feher frequently travels to New York.

90.    Feher's own firm bio touts his "Credentials" as including "Admission" to the

"U.S. Court of Appeals for the Second Circuit."

91.      Feher also highlights on his Thompson Hine biography that he has New York centric experience in New York Courts, including Feher's citation to: "*In re Thelen LLP*, 24 N.Y.3d 16, 20 N.E.3d 264, 995 N.Y.S.2d 534, 2014 N.Y. LEXIS 1577, 2014 NY Slip Op 4879, 2014 WL 2931526 (law firm liability)"; and "*Geron v. Robinson & Cole LLP*, 476 B.R. 732, 2012 U.S. Dist. LEXIS 128678, 56 Bankr. Ct. Dec. 269 (law firm liability)(listed twice); *Geron v. Seyfarth Shaw LLP (In re Thelen LLP)*, 736 F.3d 213, 2013 U.S. App. LEXIS 23123, 58 Bankr. Ct. Dec. 198, 2013 WL 6037232 (law firm liability)."

92.      Feher has likewise appeared in other New York matters, including *Schiff v ZM Equity Partners, LLC*, 2020 US Dist LEXIS 268269 [SDNY Sep. 14, 2020, No. 19cv4735]).

93.      Feher has provided legal advice to New York clients in New York (from which he derived income).

94.      Feher has attended mediations in New York and drafted legal documents in New York.

95.      Feher is the author or, and has published, articles about New York legal opinions, rules, negotiations, etc., and does so to with intent to market his legal services to New Yorkers on the Thompson Hine website:

1.   "*Screen-surveillance not required for remote depo, SDNY says, but sets other limits*" - July 16, 2020;

2.   "*Extortion or just negotiations? That slippery slope*"- February 14, 2019;

3.   "*Loose lawyer lips give NYT reporter a scoop: confidentiality lessons*"- September 28, 2017; and

4.   "*Another bar association weighs in on legal ethics of advising clients on*

*marijuana"* - July 2, 2015.

96.      Feher called Plaintiff in her NY office, and on her NY cellphone, and sent Plaintiff emails received in New York, met with Plaintiff in person in New York, all dozens of times.

97.      Feher attended marketing events, functions, parties, and other gatherings in New York, all purposeful activities in New York.

98.      In addition, Feher, as Thompson Hine's supposed "Loss Prevention Partner" was advised to remove Plaintiff appearance under Plaintiff's bar licenses from all firm client matters upon Plaintiff's termination, including three then pending cases in the Supreme Court, State of New York, in Kings and Ulster County, and in the United Stated District Court, Northern District of New York: Feher intentionally failed to do so for days, weeks and months.

99.      Feher is the reason that documents have been spoliated by the Defendants because Defendants never issued the required litigation hold.

100.      Feher authored the February 23, 2023 defamatory letter to the EEOC, New York Division, with the intent that it be received in this District (the "Defamatory Letter").[3]

101.      Feher inked the wretched and defamatory statements in the EEOC Response.

102.      The EEOC Response could have been signed by "Thompson Hine," akin to how audit letters are signed, but Feher wanted to sign the letter himself.

103.      The EEOC response that Feher drafted and signed and submitted to the EEOC New York office, included purposely false and misleading statements (lies), and was meant to retaliate against Plaintiff for raising claims of sexual harassment and gender discrimination and as a warning to Plaintiff to drop her claims.

104.      Feher purposefully included criminal accusations against Plaintiff in the EEOC

Response that he knows are false.

105.     It is not simply Plaintiff's "belief" that Feher lied to the EEOC, the falsity of Feher's vindictive ink is confirmed by documentary evidence and witnesses with personal knowledge ready to testify under oath that Feher flat out lied, making multiple *per se* defamatory statements about Plaintiff.

106.     Feher's motives in lying to the EEOC were twofold: to thwart the EEOC investigation of rampant gender discrimination, sexual harassment and the toxic boys' locker room environment that permeated the New York office and monetary self-preservation.

107.     Feher has in his personal and professional capacity engaged in, and conducted, sufficient in-person activities within New York related to the claims set forth in this Second Amended Complaint against him that confirm this Court can properly exercise specific personal jurisdiction over Feher.

108.     Feher's activities in New York were all purposeful volitional acts and Feher has continuously availed himself of the privileges of conducting activities within New York.

109.     Feher has continuously invoked the benefits and protections of New York laws and is subject to this Court's jurisdiction pursuant to CPLR 302(a)(1).

110.     Feher's status as an equity partner does not insulate Feher from the reach of this Court's jurisdiction.

111.     The Court can exercise its  specific personal jurisdiction over Feher pursuant to CPLR 302(a)(1) based on Feher's own activities  along with the activities of his equity partners, who are Feher's agents or pursuant to CPLR 302(a)(2) or (3).

112.     Feher's desperate attempt to cloak his egregious abuse of process, defamation, and retaliatory conduct under the guise of privilege is both pathetic and doomed to fail.

113.    The truth always comes to light.

114.    Feher's unlawful and despicable lies will be exposed and dismantled, bringing him to the inevitable justice he has so richly earned.

115.    Feher has confirmed that that *Youmans v Smith*, 153 NY 214, 220 [1897]) remains good law in New York:

> If counsel through an excess of zeal to serve their clients, or in order to gratify their own vindictive feelings, go beyond the bounds of reason and by main force bring into a lawsuit matters so obviously impertinent as not to admit of discussion, and so needlessly defamatory as to warrant the inference of express malice, they lose their privilege and must take the consequences. In other words, if the privilege is abused, protection is withdrawn.

116.    Feher cannot hide behind any privilege, as any protection was forever stripped by Feher's express malice, defamatory statements and other unlawful conduct directed at Plaintiff.

117.    Feher wrote it, he can own it.

118.    The law offers no shield for liars like Feher; his defamatory statements will never be material, never be relevant, never be pertinent, as lies just don't qualify.

119.    In the event the Court has further concerns over its exercise of personal jurisdiction, Plaintiff will seek an order of limited jurisdictional discovery with respect to its personal jurisdiction over Feher, including discovery of Feher's as filed tax returns for years that Feher received any New York income, Feher's expense reports for personal reimbursement for trips to New York (as well as all personal trips that were unreimbursed), Feher's time entries (and client invoices) reflecting work he performed in or for New York clients, all calendar entries that reflect Feher's presence in New York, all articles Feher authored and directed at New York, and all call logs, emails and text messages between Plaintiff and Feher or that concern New York.

120.    The law in this Court confirms that "if discovery reveals such transactions, the propriety of personal jurisdiction would be obvious; in that event, the Court expects and encourages Defendant to concede the existence of personal jurisdiction under CPLR§ 302(a)(1) in

this District." (*Blockchange Ventures I GP, LLC v Blockchange, Inc.*, 2021 US Dist LEXIS 136942 [SDNY July 22, 2021]).

121.    This Court has specific personal jurisdiction over Feher, a non-domiciliary, based upon his continuous and systematic contact with New York, income from New York, travel to New York, performing legal services in New York, attending meetings and mediations in New York, participation in marketing efforts directed at New York, writing articles and publishing them that are directed at New York.

122.    Feher's activities within and directed at New York State are related to the claims against Feher in this action, and sufficiently supports the exercise of specific personal.

### JURISDICTION AND VENUE

123.    The Court has original subject matter jurisdiction over this civil action pursuant to 28 U.S.C. §§1331 and 1343 as this action involves federal questions about the deprivation of Plaintiff's rights under federal law.

124.    The Court likewise has original diversity jurisdiction over this action pursuant to 28 U.S.C. §1332, as there is diversity of citizenship between Plaintiff, a resident of Florida, and Defendants, who are either, residents of the State of New York or the State of Ohio, or are headquartered in the State of Ohio with an office in the State of New York, and this action involves a matter in controversy that far exceeds $75,000, exclusive of interest and cost.

125.    This Court has supplemental subject matter jurisdiction over Plaintiff's related state and local law claims pursuant to 28 U.S.C. §1367(a).

126.    Venue is proper in this district pursuant to 28 U.S.C. §1391 because all, or a substantial part of, the events or omissions giving rise to these claims as alleged in this action, including sexual harassment, discrimination, retaliation, retaliation in the termination process,

abuse of process, defamation, and negligent infliction of emotional distress, occurred in New York.

127.    Thompson Hine maintains a law office in this District in which DePalma, Read and Feher derive substantial renumeration and compensation for the activities conducted by each of them and by Thompson Hine, its employees and general partners, in this District.

### ADMINISTRATIVE PROCEDURES

128.    Prior to commencing this action, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission on July 1, 2022 (Charge No.: 520-2022-06410) alleging claims against Thompson Hine for its unlawful conduct pursuant to Title VII of the Civil Rights Act of 1964, 42 USC § 2000e ("Title VII"), the New York State Human Rights Law, NY. Exec. Law § 290 et seq., and New York City Human Rights Law, NYC Admin. Code § 8-107, and alleging that gender discrimination at the firm is emblematic of a broader and systemic pattern and practice at Thompson Hine LLP.

129.    Thompson Hine, with Feher as the author, penned a response to Plaintiff's Charge on February 23, 2023 (*see*, Defamatory Letter, Exhibit 2 hereto).[3]

130.    Plaintiff submitted her Rebuttal to the EEOC on August 23, 2023 with its 28 exhibits.

131.    On December 28, 2023, the EEOC issued Plaintiff a "Right to Sue Letter."[4]

132.    Pursuant to NYCHRL §8-502, Plaintiff served a copy of the Second Amended Verified Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel within ten days of filing the Second Amended Verified Complaint, thereby satisfying the notice requirements of this action.

133.    Plaintiff has complied with all other prerequisites to filing this action.

---

[3] A true and correct copy of the February 23, 2023 Thompson Hine and Feher's Defamatory Letter is annexed hereto as Exhibit 2 hereto.

**FACTUAL ALLEGATIONS RELEVANT TO ALL CLAIMS THAT PLAINTIFF HAS EMPLOYEE STANDING UNDER THE LAWS THAT PROTECTS AGAINST DEFENDANTS' DISCRIMINATION**

134.     Plaintiff began her employment with Thompson Hine in September 2008 as "Of Counsel."

135.     For the years 2008 through 2012, Plaintiff received renumeration from Thompson Hine and was issued a W-2.

136.     In 2013, Plaintiff was elevated to "Income Partner" in the New York office, which is a meaningless title more akin to an albatross to wear while income partners languish in the firm's holding cell, billing hours and generating millions in revenue that is split by the equity partners is some secret way, waiting for elevation to equity partner ownership or to be shoved out the door under pretext, as Plaintiff was here.

137.     As an income partner, Plaintiff was not permitted to share any of Thompson Hine's profits/losses or liabilities.

138.     Plaintiff was not permitted or entitled to purchase any capital in the Firm.

139.     Plaintiff had no internal access to compensation information for any partner, general, or income.

140.     Plaintiff had no input or influence over Thompson Hine's hiring, firing, policies, rules, or decisions.

141.     Since Plaintiff was not entitled or permitted to vote, Plaintiff had no influence over Thompson Hine's management, who joined the firms' partners' ranks, or even who was promoted to partner, or from income partner to equity/general partner.

142.     Thompson Hine's Executive Committee controlled Plaintiff's compensation during this period, with input from her direct supervisors to whom Plaintiff reported, Todd Mason (Mason"), as Office Partner in Charge New York, and Firmwide Practice Group Leader, Business

Litigation, Brian Lamb ("Lamb").

143.    All Thompson Hine income partners are treated as employees.

144.    The 2017 Partnership Agreement is only signed by equity/general partners, there is no signatory line or provision for any income partner to ink their agreement.

145.    The 2017 Partnership Agreement is specifically relevant here, as Thompson Hine seeks to hide behind its borders asserting to the EEOC that Plaintiff's title of income partner strips her of the protections afforded by Title VII, as well as the protections under New York State Human Rights Law, N.Y. Exec. Law, 290 *et seq*., and the New York Human Rights Law, N.Y.C. Admin. Code §8-107.

146.    Regardless of the title, Plaintiff was in fact an employee of Thompson Hine during the entirety of her tenure at the firm.

147.    For the tax years 2013-2022, Thompson Hine issued Plaintiff a K-1 that confirms she had zero percent (0%) ownership interest in the firm.

148.    Plaintiff inquired of the Internal Revenue Service ("IRS"), submitting IRS Form 4506 with the requisite payment for a copy of Thompson Hine partnership return for tax year ending 12/31/2022 (during a year Plaintiff was considered an "income partner"), to which all partner owners would be entitled; the IRS declined to provide copies to Plaintiff, ostensibly based upon Plaintiff's lack of ownership in the Firm based upon the Firm K-1 issued to Plaintiff showing zero ownership.

149.    All Thompson Hine income partners, including Plaintiff, were treated, and are employees, as that term is used for purposes of the laws that protection against discrimination.

**PLAINTIFF'S EMPLOYMENT AT THOMPSON HINE**

150.     Plaintiff commenced her employment with Thompson Hine in September 2008.

151.     At the genesis of her association, Plaintiff was recruited as an "Of Counsel" luminary and was designated as a "service" attorney, a role in the legal industry domain that connotes one bereft of an independent clientele but rather devoted to servicing the clients of the Firm's partners.

152.     Read, who was the hiring partner at the time, interviewed Plaintiff and declined the request that Plaintiff be hired as a partner, and instead firm records confirm that Plaintiff came to the firm "*as a service attorney to service*" a particular partner's clients.

153.     Upon arrival, Plaintiff was excited to work with then New York Vice Chair of Litigation, Douglas Grover, Esq. ("Grover"), the New York Office Partner in Charge, George Walsh, Esq., the New York representative on the firm's executive committee, John Gould, Esq., along with firmwide head of the Business Litigation, William Jacobs, Esq. (then based in Cleveland).

154.     Plaintiff was the only Of Counsel in the New York Business Litigation Group, and there were no female partners in the group when Plaintiff joined in 2008.

155.     Plaintiff had a thriving and successful legal practice before Thompson Hine, and Plaintiff continued her path of success and accomplishment in her professional journey.

156.     Plaintiff's prowess drew clients to her, partners from other practice groups and partners from various firm office outposts sought her invaluable counsel.

157.     Plaintiff forged her reputation as a premier "go-to" attorney for all things complex and challenging, earning the respect of those Plaintiff practiced alongside.

158.    During Plaintiff's final year with the Firm, one female equity partner from the Firm's Cleveland office referred to Plaintiff as the "client whisperer" confirming Plaintiff's unique abilities to manage important firm clients.

159.    Plaintiff's colleagues esteemed her not only for her legal finesse and professionalism but also for the sincere and unapologetic care she demonstrated for the well-being of the legal teams under Plaintiff's purview.

160.    Plaintiff indeed had numerous "repeat" litigation clients, and they sought out her legal expertise and exceptional advocacy style (which is evident from public litigation filings and Firm records, and further confirmation that Feher lied to the EEOC in his Defamatory Letter).

### STEERING WORK TO SERVICE INCOME PARTNERS WAS STANDARD OPERATING PROCEDURE

161.    Thompson Hine, like most law firms, provides management level designations to equity partners who manage the influx and flow of client billable work.

162.    The role of Vice Chair of Business Litigation at Thompson Hine is no different, and by design for each of the firm's offices, is the point where all litigation is funneled.

163.    By way of explanation, other Firm offices and/or other partners who had clients that required New York (of New Jersey or Connecticut) legal counsel, would reach out to the Vice Chair of Business Litigation in New York.

164.    This was the practice of the Firm when Plaintiff arrived, and Mr. Grover was the Vice Chair of Litigation in New York.

165.    When Mr. Grover received an inquiry from attorneys outside New York, he would evaluate the synergy of available attorneys in New York to perform the needed client

work.

166.     Mr. Grover routinely determined that Plaintiff's legal acumen was the right fit and connected Plaintiff with firm attorneys across offices who sought New York legal counsel.

167.     This Firm practice continued in other firm offices (by way of example only, when a new Vice Chair of Litigation was put in place in Cincinnati, Lamb (then and current firmwide head of the Business Litigation Group) informed *that* Vice Chair that being the actual Vice Chair would significantly increase her hours. Lamb continued, telling the new Vice Chair that litigation work incoming to Cincinnati would flow directly through her as Vice Chair. Lamb explained that she would be responsible for delegating and distributing that work based upon her best judgment of synergy between the needs of the client and the business litigators in her office, including herself as running point on new litigation matters.

168.     Then DePalma joined Thompson Hine.

169.     Then Mr. Grover stepped down as Vice Chair of Litigation in New York at the end of 2010.

170.     At the time, Plaintiff was already fully cognizant of DePalma's bias (looking to only subordinate those female attorneys that were demure) and disturbing conduct directed at Plaintiff.

171.     This included, but was not limited to, soliciting Plaintiff's company for shopping excursion under the pretext of impressing a female client, constantly bragging about his second marriage to his former associate, his overreaching boys club demeanor, jokes and colloquy, his failure to protect his own secretary from his male clients' sexual harassment

(demanding that she sit on his clients' lap),[4] his kissing other female lawyers in his entourage "hello" at firm meetings and his ever disturbing and improper interest in Plaintiff's whereabouts, demanding that Plaintiff advise him if she was leaving the office; DePalma's unwarranted interest in Plaintiff's activities only served to compound the discomfort and distress inflicted by his actions, as he had no legitimate reason to demand to track Plaintiff's presence in the office, and he did not require such from male litigators or anyone else for that matter, in the New York office.

172.    DePalma's obsessive behavior in this regard as to Plaintiff's physical location, even though Plaintiff had no active litigation matters with DePalma, began to permeate the New York office and other male equity partners began to ask Plaintiff if she was in the office (those inquiries were stalking in nature, because Plaintiff was not working on any active matter with those inquiring partners who were outside of the litigation group).

173.    DePalma's demand to know where Plaintiff was at any given moment were devoid of any discernible business purpose, but was solely to ensure and interject his dominance over her professional interactions.

174.    DePalma's creepy stalking behavior in wanting to know where Plaintiff was working continued throughout her employment.

---

[4] In that incident, when DePalma's assistant GL entered a meeting that DePalma was conducting with clients, the client harassed GL and demanded that GL come and sit on his lap. DePalma's assistant reported this sexual harassment conduct to the office manager, and DePalma knew, as he was present during the harassment. Neither DePalma nor the firm did anything about it. The firm thereafter fired GL on Sunday, May 10, 2015, Mother's Day. Who does that? Perhaps because GL sat outside DePalma's office for years, watching and observing the closed door policy that only applied to a particular pandering female associate it seeks to preemptively discredit her in advance of sworn testimony in its Defamatory Letter to the EEOC, *see* Ex. 2.

### DePalma is Anointed as Vice Chair of the Business Litigation Group – NY

175.    When Mr. Grover advised Plaintiff that DePalma was going to be anointed as the new Vice Chair, Plaintiff pleaded with Mr. Grover to remain in the Vice Chair role, and said in sum and substance at the time, that if DePalma takes the reins of litigation in New York, he will destroy Plaintiff's professional career at the firm.

176.    In assuming the mantle of New York Vice Chair of Business Litigation, DePalma swiftly enacted his misogynistic and discriminatory agenda, reshaping the cultural landscape into a warped reflection of his exclusive locker room vision.

177.    DePalma implemented and perpetuated the old boys' network and created a hostile frat boy work environment in the Business Litigation Group in the New York Office, including his command performance litigation meetings where he merely recanted tales of his weekend escapades which were off topic and off color.

178.    As Vice Chair, DePalma was supposed to evaluate the incoming work for distribution to available attorneys best suited for the legal needs of the incoming New York client matter.

179.    Instead, DePalma disregarded that long standing protocol, and made sure that the litigation workflow into the firm's New York office was either horded by DePalma himself to falsely increase his own billable hours or he directed the work to male attorneys in New York, and to the specific exclusion of Plaintiff.

180.    DePalma intentionally created a biased and discriminatory culture by excluding Plaintiff from any billable workflow, and specifically steering billable hourly work to male attorneys (including himself) to the exclusion of Plaintiff and other junior female attorneys (as Plaintiff was the only Of Counsel, continuing into 2013, there were still no female partners (either

general partners (a/k/a equity partners or income partners)).[5]

181.    From the time DePalma assumed the Vice Chair position until Plaintiff's departure from the firm twelve years later in 2022, there was not a single occasion where DePalma steered incoming New York work in Plaintiff's direction or bothered to convey that a particular matter was well-suited for Plaintiff's professional strengths or that a specific matter was a perfect match for Plaintiff's demonstrative legal skill set.

182.    DePalma's intent was unremarkable, DePalma knew that Plaintiff had voiced complaints about his unlawful behavior (to Read, Lamb, Mason, and others), and he was determined to improperly use his power and influence to exclude Plaintiff from any opportunity to gain billable hours, as he knew that to be the primary measure used by the firm as it relates to compensation.

183.    Indeed, immediately following DePalma's undeserved elevation to New York Vice Chair of Business Litigation, DePalma targeted and sexually harassed and discriminated against Plaintiff because of her female gender.

184.    DePalma's unmistakable decade long hostility and sexual harassment was obvious and well known in the New York office, as well as by the Executive Committee members, including Read.

185.    DePalma's harassment was not physically threatening, but it was in fact purposefully humiliating and demeaning.

186.    DePalma demanding that Plaintiff account to DePalma if Plaintiff was going

_____

[5] *See*, Kate Gibson, CBS News, Sexual harassment rife in the legal profession, Feb. 5, 2019 (https://www.cbsnews.com/news/sexual-harassment-rife-in-the-legal-profession/ (Last visited January 24, 2024) ("Why would you mess with a female attorney?" The resounding answer is because "sexual harassment is more pervasive in male-dominated professions, and law firms remain the ultimate "boys-club").

to be out of the office, DePalma bad mouthed Plaintiff at every opportunity, told lawyers not to work with Plaintiff, excluded Plaintiff from his Friday night office network gatherings, made snotty comments to Plaintiff when she actually attended his command performance meetings ("nice of you to show up" type comments), thought it was worthy of a patronizing comment when Plaintiff had to leave an afterhours meeting because it was her wedding anniversary that since he was twice divorced, he could stay in attendance, all of which took an unreasonable toll on Plaintiff's work performance, and had a direct and derogatory impact on Plaintiff's professional reputation.

187.    The hostile work environment paradigm of sexual harassment under the laws confirm that the misconduct shown need not be severe or pervasive but must demonstrative enough to create an objectively hostile or abusive work environment and/or the victim must also subjectively perceive that environment to be abusive and/or that the Plaintiff has been treated less well than others.  Plaintiff has plead exactly that here.

187.    Plaintiff specifically pleads that she was subjected to an objectively hostile and abusive work environment and that she was treated less well than Plaintiff's male colleagues by DePalma for more than a decade, that DePalma singled Plaintiff out because of her gender (because Plaintiff would not subordinate herself to DePalma's misogynistic values) and rallied his discriminatory efforts against her.

188.    DePalma's sexual harassment did not go completely unnoticed, as Lamb asked DePalma, upon information and belief, to step down as Vice Chair of Business Litigation in 2019, and DePalma steadfastly refused to relinquish his grip on the power of the position.

189.    DePalma's conduct and unlawful sexual harassment violates federal, state and city prohibitions against sex discrimination based upon DePalma's creation, perpetuation, and the

Firm's indifference to, the hostile and abusive work environment in the New York office.

**DEPALMA'S LEWD AND PERVERSE DESCRIPTION OF**
**GETTING JERKED OFF BY A JUDGE ECHOED RESOUNDINGLY**

190.     During the period when DePalma was Plaintiff's direct supervisor, DePalma lured Plaintiff into his office under the guise of discussing participating in appellate *pro bono* work, as DePalma knew of Plaintiff's keen and demonstrated interest in providing *pro bono* legal services to under privileged clients who could not otherwise afford legal counsel.

191.     Plaintiff was specific in her actions of never being in an office alone with DePalma, because she was fearful of his sexual harassment and did not want either to be the subject of his misogynistic behavior.

192.     It was during this meeting that DePalma described a new *pro bono* opportunity that was at the appellate level, and stated that "judges know lawyers who provide legal services are working on a *pro bono* basis, and it's like getting jerked off by a judge."

193.     The sexual images of DePalma masturbating with a Judge were truly disturbing and disgusting, and that is the image that stuck with Plaintiff.

194.     Every time DePalma demanded a litigation meeting/lunch, Plaintiff was left with the image of DePalma masturbating with a Judge, and that thought was repulsive for obvious reasons.

195.     DePalma deliberately made his lewd and vulgar comment in his office and only to Plaintiff to elicit a reaction from Plaintiff and to degrade and humiliate her.

196.     During this same period of time, DePalma as Plaintiff's supervisor, advised Plaintiff in her annual review in May of 2012, that he would absolutely not recommend Plaintiff for admission into the firm partnership.

197.     Plaintiff contemporaneously shared DePalma's May 2012 masturbating

comments and his description of being jerked off by a Judge, with equity partners in the New York, Cleveland and Atlanta offices, but no investigation or remedial action was ever taken.

### DePalma Was Enraged When He Could Not Block Plaintiff 2013 Income Partner Designation

198.　　In 2013, Plaintiff was daubed with the ostensibly meaningful but ultimately hollow title of "income partner" within the confines of the Business Litigation Group, in New York.

199.　　Plaintiff's ascent to income partner did not just stir the waters; it unleashed a tempest of controversy because of the outspoken venomous opposition from DePalma, who vociferously proclaimed his disapproval.

200.　　During this period, DePalma spewed his critical views of Plaintiff and spared no effort in broadcasting his vehement objections, extending well beyond the walls of the firm's New York office.

201.　　DePalma, with audacious disregard, tarnished Plaintiff's reputation wide and far with a relentless campaign of defamation, disseminating his prejudiced views to any audience that would heed his prejudiced words.

202.　　DePalma traveled to the firm's Atlanta office during this period and confirmed (it was not a secret that DePalma was adamantly opposed to Plaintiff's elevation) to Russell Rogers (who was aware of DePalma's personal animus and hostility toward Plaintiff) that he intended to block Plaintiff's elevation to partner.

203.　　At the time, Mr. Muccia informed Plaintiff that unless Plaintiff "kissed the ring" and "made nice" with DePalma, Plaintiff would never be considered for partner.

204.　　It was the later intervention of Mr. Muccia and Mr. Grover, who wrote a memorandum for the business case to support Plaintiff's election to partner that they sent to DePalma to encourage his reconsideration of Plaintiff's candidacy.

205.    In his continuing effort to stifle Plaintiff's professional career, DePalma, even with the memorandum from Messrs. Muccia and Grover in hand that recommended Plaintiff be elevated to partner, DePalma remained steadfast in his personal objection, counting on the fact that his vote was needed to put Plaintiff in the queue for partner consideration in 2012.

206.    As DePalma was adamantly opposed, the prospects were indeed grim that Plaintiff could surmount DePalma's formidable equity based and public objection.

207.    Before becoming income partner, and ever since, it was widely known in the New York office and repeatedly expressed by DePalma, that he strongly opposed Plaintiff's elevation from counsel to partner in the firm.

208.    DePalma trashed the memorandum's recommendation and Plaintiff, and refused to call a meeting amongst the litigation partners to consider Plaintiff's elevation.

209.    To her credit, Kathie Brandt, who was the New York Office Partner in Charge at the time, was made aware by someone of the Muccia/Grover memorandum on Plaintiff's behalf, and Ms. Brandt directed and demanded an all hands on deck New York partners meeting where a vote was taken, over DePalma's fierce objections, to elevate Plaintiff for further consideration as income partner.

210.    During this meeting, all of the New York partners voted in favor of Plaintiff's candidacy, many equity partners spoke on Plaintiff's behalf and her partner qualifications, except DePalma, who voted no, and two non-litigation female equity partners (members of the DePalma fan club entourage at the time) one abstained and the other voted no with DePalma.

211.    Despite Thompson Hine's heralding of Plaintiff's promotion to income partner as a triumph, it paradoxically fueled DePalma's deep-seated and fervent animosity and he leaned into his ongoing sexual harassment and discriminatory treatment of Plaintiff.

212.    Even though DePalma no longer had a strangle hold on Plaintiff's compensation, he was still the Vice Chair of Business Litigation in New York, and had a vice-grip over the billable work that was directed into the New York Office, and who got it.

213.    DePalma made sure Plaintiff did not get a single billable hour through his intentional effort to exclude Plaintiff from any incoming work, forcing Plaintiff to forge relationships with partners outside New York to try and obtain the billable work directly.

214.    Indeed, far from quelling DePalma's disdain, Plaintiff's elevation only served to amplify DePalma's poisonous hatred, discrimination and demonstrative toxic work environment as applied to, and directed at, Plaintiff.

215.    DePalma's hostility remained unabated, fueling by his relentless efforts to undermine and sabotage Plaintiff's career and seize every opportunity to subject her to humiliation, question her legal qualifications and continued to exclude her from billable hours in New York and beyond.

216.    Since DePalma was an equity (general) partner, and Plaintiff was an income partner, DePalma still had improper influence and sway over Plaintiff's career, as his lackey Koczko was on the Executive Committee, and used that position to further DePalma's hateful agenda against Plaintiff.

217.    As an income partner, Plaintiff knew her place, and knew she could not accuse an equity partner of discrimination, harassment, or any other legally cognizable theory, as her career would be in direct jeopardy as the result of DePalma's hostile and unlawful sexual harassment of Plaintiff.

218.    During these years of Plaintiff's employment with Thompson Hine, the #MeToo phrase had not yet entered the lexicon, and the social movement and awareness campaign

against sexual harassment was nowhere to be found.

219.    Lawyers who spoke up about sexual harassment and discrimination were passively demoted, ignored, and "blackballed" in the legal community.

220.    Gretchen Carlson had not yet sued then Fox News chairman and CEO Roger Ailes for harassment, discrimination and retaliatory conduct (2016) or teamed up with political consultant Julie Roginsky, in their creation of Lift Our Voices (2019).

221.    Carlson and Roginsky have now forever transformed the legislative landscape with their unapologetic efforts in getting bipartisan support and enactment of EFAA.

222.    During this period, unlawful sexual harassment went unchecked at Thompson Hine; instead, predators like DePalma, were shielded from any consequence for their actions

223.    Plaintiff knew all of this and kept her head down and performed exceptionally for her clients, both internal and external, and avoided DePalma like the plague.

224.    DePalma specifically and intentionally retaliates against any female attorney (including Plaintiff) who did not embrace his misogynistic culture or agree to his sexist submissive behavior by engaging in a campaign to end their employment, by freezing them out of billable litigation firm work, his pattern is unmistakenly pervasive.

225.    There can be no legitimate dispute that Plaintiff endured and reported DePalma's misogynistic and unlawful conduct to Thompson Hine's management for literally more than a decade, including Read, who is now finally out of the firm-wide Managing Partner role, after more than a dozen years at the helm.

226.    Read knew of the toxic and harassing work environment and unlawful discriminatory conduct that permeated Plaintiff's professional life in the New York office and did

precisely and exactly nothing and allowed it to continue (the *Queen Bee Syndrome*[6] is alive and well at Thompson Hine, irrespective of the artificial accolades and trophies that clutter its marketing narrative).

227.    Thompson Hine's unsworn Defamatory Letter to the EEOC claims in secretive missives offered in the shadows, posturing that Plaintiff raised her claims only after being asked to resign, serve as a covert attempt to mask their decade-long failure to take any action, is false.

228.    The Federal Rules of Civil Procedure, Rule 11, will compel Defendants to substantiate their lies and false assertions, as consequences for duplicity exist and are enforced in this forum, in essence, put up or shut up.

229.    DePalma's demand that Plaintiff acquiesce to his distorted ideology, positioning himself as the patriarch, and marginalizing female lawyers, Plaintiff here, who refused to bow to his grandiose self-concept, was raised by Plaintiff with each of the following equity partners who stood in her line of firm supervision from 2013-2022, Read (both before she was elected Managing Partner, and after), Brian Lamb and Todd Mason (amongst others not named here as they were outside Plaintiff's reporting/supervision structure).

230.    Likewise, Plaintiff had the same discussions with income partners and attorneys across the firm's offices, as well as paralegals and secretaries.

---

[6] *See*, Olga Khazan, *Why Do Women Bully Each Other at Work?* https://www.theatlantic.com/magazine/archive/2017/09/the-queen-bee-in-the-corner-office/534213/ ("The bitches… came in three varieties. She categorized them on her personal blog, in a post titled 'Beware the Female BigLaw Partner.' First was the "aggressive bitch" - a certain kind of high-ranking woman at the firm where she worked who didn't think twice about 'verbally assaulting anyone.'… Next was the two-faced 'passive-aggressive bitch,' whose 'subtle, semi-rude emails' hinted that 'you really shouldn't leave before 6:30.' She was arguably worse than the aggressive bitch, because you might never know where you stand…'tuned-out, indifferent bitch,'… 'is so busy, both with work and family, that they don't have time for anything…This partner is not trying to be mean, but hey, they got assignments at midnight when they were associates. So you will too.'" (Last visited Feb 21, 2024).

231.    Plaintiff specifically warned new female lawyers and staff in New York of DePalma's sexually inappropriate tendencies, of DePalma's harassment of female lawyers and staff who did not subordinate themselves and his unbridled efforts to sabotage female lawyers and staff who did not "kiss his ass."

232.    Equally important, Plaintiff unapologetically highlighted DePalma's abusive behaviors and misuse of power through the manipulation of billable hours in the New York office under his covenanted Vice Chairmanship to Read, Lamb and Mason year after year.

233.    Mason, as the New York Office Partner in Charge, (a position that DePalma volleyed for and wanted to expand his powerbase, but was rejected) in his effort to bring "peace," (but did not commence an appropriate fulsome investigation of DePalma's unlawful conduct) offered to "mediate" the decade long complaints Plaintiff had voiced against DePalma; Plaintiff respectfully declined because she could not afford to arm DePalma with the knowledge that his sexual harassment and discriminatory conduct was crippling her professional advancement, as that would only serve to drive him to intensify his unlawful conduct.

234.    Plaintiff did not just complaint about DePalma with regard to his disgusting behavior toward her, she complained on behalf of other female attorneys as well.

235.    True, Plaintiff, well versed in employment law, was specifically careful in her written communications with Read, Lamb and Mason, and others, not to write the words describing DePalma as "misogynistic," "sexist," "sexual harasser," "androcentric bigot," "chauvinistic pig," "woman- hating," "anti-feminist," "biased," "male supremacist," "male chauvinist," "woman-disparaging," "anti-women," "offender," "gender-biased," or as "predator," because as an income partner employee, accusing a male equity partner of unlawful discriminatory and sexual harassment in fulsome written form would have unequivocally put Plaintiff's career in

jeopardy.

236.    Plaintiff has seen Thompson Hine's playbook in this regard, and it is a worn out blueprint that when women make complaints: no meaningful investigation takes place or one that is wholly biased, blame the victim accuser of poor performance, support the abusive equity partner, and buy silence.

**PENÉLOPE[7]**

237.    When Penélope joined the firm, Plaintiff recognized her as a female litigator with great potential, and immediately and specifically warned her of DePalma's unlawful conduct and warned her to be careful in her personal and professional interactions with him.

238.    Plaintiff's prescient warnings to Penélope were not to be taken lightly, as events unfolded exactly as foretold.

239.    DePalma, with laser-focused intent, later directed his discriminatory and harassing rhetoric squarely at Penélope when she too declined to subordinate herself and resisted becoming a pawn in DePalma's ominous entourage.

240.    The accuracy of Plaintiff's cautionary words became chillingly evident as Penélope found herself ensnared in the crosshairs of DePalma's targeted animosity.

241.    When Penélope specifically complained in writing about DePalma's discriminatory and sexist conduct towards her based on her race, gender and pregnancy, and his ongoing retaliatory campaign to get her terminated (during 2016 and 2017), the firm failed to conduct any proper or meaningful investigation, leaving DePalma unleashed to continue to target

---

[7] Henceforth in this Amended Verified Complaint, at times, Plaintiff has employed pseudonyms to shield the identities of the female attorneys and others referenced herein, unless explicit consent has been obtained to divulge their names. This measure is undertaken to spare these individuals the indignity of revisiting instances of sexual harassment or other abusive behavior endured at Thompson Hine, or any potential adverse repercussions to their reputations or employment.

Penélope upon her return from maternity leave by, among other purposeful humiliation, openly denying her an opportunity to engage in any billable firm work and disparaging her professionally to partners in the firm.

242.    DePalma, along with his sidekick, Koczko (and at the time "Larry") were tagged and known in the New York Office as the "three-blind mice," or the "three stooges," because once DePalma zeroed in on a female attorney for harassment and mistreatment, they piled on.

243.    DePalma was relentless in his sexual harassment, gender, pregnancy and racial bias and discrimination against Penélope, weaponizing his position as NY-Vice Chair of Business Litigation against her.

244.    It was only after Penélope inked her written and formal complaint, that the firm and DePalma ramped up and leaned into to their discriminatory mistreatment and retaliation against her.

245.    Thompson Hine then too, and thereafter, circled the wagons claiming that others (beyond DePalma) had some unknown issues with Penélope; yet neither of these attorneys remain at the firm, one was asked (upon information and belief) to leave involuntarily and the other departed to join a client, leaving DePalma as the sole source of Penélope's forced departure.

246.    DePalma repeatedly disparaged Penélope's reputation to attorneys in the litigation group, including to Plaintiff, in attendance at meetings in New York, refused to give Penélope any billable work upon her return from maternity, until she was literally physically and mentally beaten down and humiliated sufficiently.

247.    Plaintiff intervened, despite knowing that her involvement would further enrage DePalma and increase his hostility and discriminatory focus on Plaintiff – Plaintiff could not stand by and watch another female attorney, a new mother, be repeatedly humiliated and her

professional career trashed by DePalma.

248.    Plaintiff attempted to negotiate a severance package for Penélope, advising the firm and its equity and income partners alike that if Penélope filed suit against the firm and DePalma, and Plaintiff was deposed, Plaintiff would not lie to coverup or shield DePalma's unlawful discriminatory conduct against Penélope.

249.    Ultimately, Thompson Hine rallied behind DePalma and treated Penélope as an inconsequential afterthought, and consigned her and her earnest grievances to the depths of disregard.

250.    Penélope was shoved out the door by DePalma and paid to shut up by Thompson Hine's hush money, and silenced under a perpetual shackling non-disclosure agreement; DePalma's unlawful behavior was again swept under Thompson Hine's rug of shame.

251.    DePalma had improperly and unlawfully used his authority to humiliate, intimidate and harass Penélope from further complaints about him and had a ruinous impact on Penélope's career trajectory.

252.    Thompson Hine's utter and stark lack of initiative in investigating, addressing, or penalizing DePalma's documented, and well-known discriminatory, harassing, and retaliatory behaviors served as a damning confirmation of its pattern here as against Plaintiff.

253.    In the face of this institutional inertia, Plaintiff's awareness solidified: embarking on the arduous path of filing a formal complaint against DePalma as an equity partner for sexual harassment or gender discrimination in this time frame would, regrettably, prove to be a futile endeavor with the potential to irreversibly end her professional career at the firm.

254.    Thompson Hine's pattern of complicity, both then and now, in the face of unlawful sexual harassment, discrimination and disparate treatment, combined with its failure to

take any action to remedy the known unlawful pattern of conduct by its equity partner DePalma, remains indefensible, even as it now attempts to disingenuously feign ignorance.

255.    After Penélope's departure, DePalma, with the firm's blessing, and no consequence for his conduct directed at Penélope, redoubled his efforts to sabotage Plaintiff in a concerted pattern of discriminatory conduct as he was furious that Plaintiff had come to Penélope's aide and that she wasn't just fired and tossed out with the trash.

256.    DePalma was enraged that Plaintiff helped Penélope secure an exit strategy from the firm and that she was not simply fired as the result of the tsunami of lies DePalma spread about her and her legal acumen and performance.

257.    In a pivotal moment, when a female partner, Miranda Fritz, rightfully suggested to DePalma that he be thankful that Plaintiff had navigated a path for the firm to escape the high six figure fall out of his unlawful behavior directed at Penélope and sparing the firm from potential legal repercussions, DePalma's visceral reaction was palpable.

258.    DePalma's physical display of anger was immediate, and he adamantly refused to engage or even talk to Ms. Fritz (another female litigator) for months.

**READ: THE QUEEN BEE SYNDROME**

259.    Thompson Hine anticipated attempt to showcase having a former female managing partner during the relevant time, as if it could somehow overshadow or excuse the pervasive unlawful conduct in the New York office, is nothing but an empty gesture.

260.    Thompson Hine paraded and pandered Read as a shield to distract the EEOC, and will likely do the same in this Court, from the prevalent and systemic discrimination and sexual harassment in the New York office and such holds no substance.

261.    Now that Anthony White is the Managing Partner of the Firm, it will shift the

narrative from supporting "women" to their empty support for "diversity".

262.     Plaintiff repeatedly and consistently raised concerns about DePalma's unlawful treatment of Plaintiff in the New York office, his lewd comments and his tight vice grip on the flow of billable work directly to Read, and she did nothing.

263.     One of the few, if only written example, following a meeting with Read on August 25, 2017, Plaintiff wrote the very next day: "Thanks for your time yesterday – always good to catch up and appreciate your insights on my BD strategies…Lit Vice chair issues – definitely need a change – and although I'm not equity would volunteer – we have 16 practice group leaders – 2 women, and in Lit we have 6 vice chairs, 1 woman…"

264.     In the verbal conversations with Read throughout the years, Plaintiff was more direct in her descriptions of DePalma's unlawful conduct, but was cautious not to put anything in writing, as such would have triggered a formal investigation, and put Plaintiff's professional career in dire jeopardy.

265.     Read too was specifically informed by Plaintiff of DePalma's "jerking off" comments, Friday night invitation only networking/drinking parties in DePalma's office, his parading his divorce document details on the firm's system and weekend escapades littering the New York office with his filth and Plaintiff repeatedly advised Read of DePalma's strangle hold on the flow of litigation work in the New York office and the negative impact it had on Plaintiff's billable performance numbers.[8]

266.     Regrettably, and consistently, Read comfortably ensconced in her Cleveland enclave, repeatedly watched from the bleachers, knowing of the plight of women income partners

---

[8] "Sexist and sexually suggestive comments were the most common forms of harassment" See, 5 Barney Thompson, Sexual harassment and bullying rife in legal profession, Financial Times, May 14, 2019 (https://www.ft.com/content/cf4517ac-7657-11e9-be7d-6d846537acab) (Last visited Jan. 29, 2024).

in New York, who have stood up and tried to voice the inequitable distribution of work and discrimination by male equity partners overseeing the New York office, seeking her counsel and guidance, and she did literally nothing.

267.    Read's pattern of shameful indifference and utter lack of leadership is evident in the case of Mildred Quinones Holmes, a former income partner in New York.

268.    Ms. Holmes too experienced the gender discrimination in the New York office and lodged a complaint to Read regarding Irv Apar.

269.    Apar, who continues to be the male equity lead of the firmwide Commercial & Public Finance group (with the associated perks and payment for that position), systematically directed work to select male equity partners, deliberately excluding Ms. Holmes.

270.    Rather than address Ms. Holmes' claims of disparate treatment, the firm gave Ms. Holmes the unpaid kitchen duty role of New York Diversity Vice Chair.

271.    As Read follows the revenue, not the law, she sided with Apar and took no action to investigate or address the glaring discriminatory or disparate treatment suffered by Ms. Holmes, eventually driving her to resign.

272.    Read's hollow and resounding silence in the face of such unlawful circumstances speaks volumes about Read's glaring lack of support for women income partners in New York or for the rule of law.

273.    Read's failure to instill a sense of lawful conduct is stark, as she instead chose to align herself with, and remain loyal to, and lean into, and was allegiant only to, the firm's revenue stream.

274.    Confirming Read's apathetic pattern, Ms. Maranda Fritz, another former female income partner, became yet another a victim of the glaring gender discrimination within

the New York office.

275.    Ms. Fritz raised her complaints to Read about the inequitable, discriminatory and disparate treatment by Norman Block, the then firmwide chair of White Collar and an equity male partner.

276.    Ms. Fritz's complaints to Read again fell on indifferent ears.

277.    Block unapologetically hoarded white collar work and purposefully excluded Ms. Fritz from her rightful area of specialty, affirming his steadfast clench on the flow of work and the resulting discriminatory treatment of Ms. Fritz.

278.    Adding to the injustice, work that rightfully belonged in New York that Ms. Fritz was perfectly suited to handle was dispatched to Washington, DC male equity partners.

279.    Despite Ms. Fritz's complaints, Read's stance remained unchanged, as she aligned herself with the male equity partner, Block, signaling her support for the discriminatory status *quo*.

280.    Block's treatment of female lawyers was miserable.

281.    The ostrich analogy aptly captures Read's response, as she chose to bury her head in the sand rather than confront the pervasive gender bias and discriminatory conduct in New York.

282.    Read's alignment with the male equity revenue stream hoarders perpetuates a system riddled with bias and discrimination.

283.    Plaintiff's complaints here specifically adds to the systemic pattern of gender bias and discrimination, as DePalma misdirected work to himself and other male equity attorneys, and intentionally excluded Plaintiff and other strong women litigators; Read knew about it, and again, lacking any leadership, did nothing.

284.    Read's actions, and inaction, confirm that she, and by extension Thompson

Hine, condoned the unlawful and harmful conduct inflicted upon Plaintiff and now they can own the consequences of those failures.

### THE EVENTS LEADING UP TO READ DEMANDING PLAINTIFF'S RESIGNATION AND ULTIMATE RETALIATION

285.    DePalma's fury, which ultimately led to the orchestrated discriminatory termination (aided by his confederate Koczko, an Executive Committee member) of Plaintiff was triggered by her denial of approval for a *pro bono* expense in mid-March 2022.

286.    A seemingly trivial incident given the allegations outlined in this Amended Verified Complaint, yet Plaintiff's declination of DePalma's request somehow affronted his masculinity and further ignited his discriminatory rage against her.

287.    In March 2022, in an effort to undermine Plaintiff's position as then uncompensated Firmwide Chair of the *Pro Bono* Committee, DePalma requested that Plaintiff approve an expense to a vendor with regard to a pending *pro bono* matter he was pursuing.

288.    Plaintiff responded and relayed to DePalma that such expenditures were contrary to Thompson Hines *pro bono* policy.

289.    Plaintiff declined to approve the expenses request.

290.    DePalma dismissed Plaintiff's decision entirely, despite Plaintiff providing the explanatory basis that was embodied in a contemporaneous email from Read.

291.    DePalma was not going to be told "No" by a woman, and certainly not Plaintiff, who he had spent more than a decade sexually harassing.

292.    Instead, DePalma ignored Plaintiff and went to a male equity attorney, Business Litigation Practice Group Leader, Lamb, to undermine and override Plaintiff's directive.

293.    DePalma would not have disregarded a male Firmwide Chair decision, and Lamb would not have questioned the interpretation of a firm policy if it had been conveyed to him by

a male attorney.

294.    Lamb then emailed Plaintiff seeking an explanation for declining the DePalma expense request and challenged Plaintiff's interpretation of the firm *pro bono* policy.

295.    Plaintiff advised Lamb in writing that under DePalma's supervision, the "*pro bono*" case at issue had already spent $15k in hard and soft costs (that had not been approved by Plaintiff), that 350 hours against that case had been entered into the system, which amounted to approximately $228,500 in attorney time and that the case in question "stretches the boundaries of our policy" as it was a straight up contract dispute for $1.2 million dollar over damages to significant art work in a storage unit, which does not meet the firm's policy requirements to be a *pro bono* matter in the first place.

296.    DePalma had opened a *pro bono* matter that sought $1,280,000 million in damages for artwork/paintings that were damaged in a flooding at a storage unit; this client and case never qualified as a *pro bono* client under the firm's strict policy, the client is not indigent, and the matter does not concern an impactful community cause.

297.    DePalma engaged in false and deceptive conduct by falsely portraying the case as *pro bono*, in a calculated effort to advance and promote his self-created "Art Law" group (and groupies) which is in fact a violation of firm policy and in direct contravention of 22 NYCRR §118.1[e][14]; the fraud on the firm of using firm attorney time under the guise of a *faux pro bono* matter, for DePalma's personal benefit in promoting his "art law" is unlawful.

298.    Lamb never responded to Plaintiff's offer to discuss the issue further.

299.    DePalma purposely disregarded Plaintiff's decision as firmwide Chair of the *Pro Bono* Committee (that if rendered by a male partner would have been accepted) and sought the funds directly from Lamb.

300.     Lamb too disregarded Plaintiff's directives concerning the Thompson Hine's *pro bono* policy as applied to payment for expenses in *pro bono* cases and approved DePalma's demand for payment (from some other fund), that was in fact violative of the very policy that Read had reminded Plaintiff to enforce on March 15, 2022 (Read writing "we do not pay costs in connection with pro bono work, so I hope the charity has some dollars to pay for any registration fees, filing fees, etc.").

301.     Following this complete disregard for Plaintiff's function as protector of the firm's *pro bono* policy, Plaintiff collaborated with members of the *Pro Bono* Committee.

302.     Together, the *Pro Bono* Committee embarked on an investigation into the firm's *pro bono* portfolio, thoroughly examining each open and closed matter on the firm's *pro bono* roster.

303.     As Plaintiff, in collaboration with Thompson Hine's ethics experts, had previously modified the *pro bono* engagement template to address expenses and payment responsibilities, the goal in the audit was to ensure we had a comprehensive overview of the portfolio and the appropriate engagement letters for each open case, having uncovered DePalma's fraud on the firm.

304.     On April 22, 2022, Plaintiff sent an email to all New York City office attorneys with open *pro bono* matters.

305.     Fellow *pro bono* committee leads for each office sent similar emails for attorneys in their respective offices with open *pro bono* matters.

306.     The communication instructed that moving forward, Plaintiff was to be designated as the "billing attorney for all New York office *pro bono* matters" to streamline and track billing on these matters and monitor expense management, and the other office liaisons sent similar

communications to attorneys in their offices reflective of the audit inquiry with the same changes outlined in Plaintiff communication.

307.    The April 22, 2022 email further requested responses by May 6, 2022, and cautioned that matters lacking details beyond this date would be closed and time entries disabled.

308.    DePalma was among the recipients of Plaintiff's April 22, 2022 and seemingly became incensed and enraged by Plaintiff's oversight of the New York *pro bono* matters, including his *faux pro bono* matter which was the genesis of the *pro bono* audit.

309.    Plaintiff was terminated (asked to resign) just seven (7) days after her April 22, 2022 audit communication in a call from Read.

**APRIL 29, 2022**

310.    Despite an exemplary and unblemished record of successful performance for the firm's most important clients, Read called Plaintiff at 1:35pm on April 29, 2022, and asked her to resign under the pretext that Plaintiff's billable hours were too low.

311.    When Read called on Friday April 29, 2022, Plaintiff was in the midst of drafting a memorandum of law in support of a motion to dismiss for Key Bank, N.A., its Board of Directors and leadership team, as counsel of record for all of them.

312.    Plaintiff's response to Read was straightforward and pragmatic – she could not afford the disruption of being asked to resign (i.e., if you don't resign your fired) while immersed in important client legal work product that demanded her attention with a Court Ordered deadline later that day.

313.    Plaintiff's call with Read lasted 9 minutes, as Plaintiff informed Read that she would coordinate with Read's secretary to schedule a suitable time the following week for what essentially amounted to her termination; Plaintiff did not have time to be fired, she was too busy working on April 29, 2022.

314.     Read's admission during that April 29, 2022 telephone call that she was oblivious to Plaintiff's steep involvement in a crucial Key Bank matter during the termination call exposed a significant lapse in Read's judgment and was demonstrative of her unfortunate and negligent lack of awareness of the firm's client needs in New York or Plaintiff's ongoing critical legal work for vital firm clients.

315.     The PACER entry for that consequential day confirms the KeyBank filing on Aril 29, 2022.

316.     Plaintiff was literally stunned by Read's demand that she resign, no one had ever, in writing, orally, or otherwise, ever hinted that Plaintiff's employment with the firm was in any jeopardy.

317.     Plaintiff was subjected to profound humiliation as a result of Read's groundless demand, fully aware that her initiation of the *pro bono* audit and her notification to DePalma regarding the *Pro Bono* Committee's scrutiny of his spurious *pro bono* matter, along with his decade long sexual harassment and gender discrimination against Plaintiff were the precise factors underlying the directive for her resignation.

318.     Plaintiff was thrust into an impossible professional conundrum as the direct result of Read's negligent call on April 29, 2022: either persist diligently in her work on KeyBank's critically important memorandum of law, supporting declaration and dozens of exhibits or stay paralyzed in the knowledge that DePalma's Machiavellian and misogynistic tactics to derail Plaintiff career had reached its apex.

319.     Plaintiff could not inform her team that she was asked to resign during that afternoon, because that would have distracted their work product for the client, and that decision weighed heavily on Plaintiff.

320.    Plaintiff was besieged by profound emotional apprehension, stress, and anxiety in the continued performance of her work for KeyBank that afternoon – the dissonance of continuing to bill hours for the firm as the firm was shoving Plaintiff out the door permeated and reverberated over and over in Plaintiff's mind and in every action she took after Read elected to unlawfully terminate Plaintiff's employment.

321.    Despite enduring discriminatory and unlawful treatment, Plaintiff knew that her unwavering commitment to KeyBank had to sustain the pursuit of legal excellence after her call with Read.

322.    Read owed Plaintiff a duty not to interfere with Plaintiff's ability to perform her legal services for KeyBank on April 29, 2022, and breached that duty by unlawfully demanding Plaintiff resign mid-afternoon.

323.    Read was fully negligent, if not reckless, in not being fully informed of the firm matters that Plaintiff was working on April 29, 2022, Read could have informed herself, but did not bother.

324.    Read knew that calling Plaintiff in the midst of that Friday afternoon would have a profound and negative impact on Plaintiff's ability to perform at her professional best.

325.    As a direct and proximate result of Read's negligent failure to inquire of Plaintiff's firm docket (that is available to literally every person in the firm), Read created circumstances that essentially guaranteed genuine harm to Plaintiff.

326.    With the United States District Court filing deadline looming, Plaintiff knew she could not allow DePalma's sexual harassment, gender discrimination and long game to ruin her career, or Read's utter incompetence in demanding her resignation during a critical KeyBank project, to negatively impact the client legal interest.

327.    Plaintiff knew she had to compartmentalized her emotions, metaphorically relegating them to metaphorical box on the shelf to get through the rest of that day.

328.    Amidst a deluge of incoming client emails demanding her attention on KeyBank and other legal matters, with her team requesting revisions and confirmations on exhibit conformity to her supporting declarations, along with diligent citation checks to ensure the accuracy of decisional law, every key stoke she typed was weighted with stress and anxiety soaring to unprecedented emotional levels, but Plaintiff remained steadfast in her commitment to providing exceptional work product to her client, a commitment she unwaveringly upheld until the very moment she signed the last document and waited for the KeyBank filing to be completed.

329.    Plaintiff leveraged her decades of legal experience and expertise, tapping into every reserve of professionalism to fulfill her obligations, Plaintiff diligently completed the requisite KeyBank filing as mandated. (The Motion to Dismiss and its accompanying filings made by Plaintiff's April 29, 2022, on behalf KeyBank and its leadership, was ultimately granted by the Court).

330.    The negligent infliction of emotional distress by Read was entirely preventable had she bothered to intelligently assess Plaintiff's workload, reviewed the firm's docket, contact Plaintiff after business hours, or explore alternative timing of her unlawful resignation demand; instead it is clear that the decision to terminate Plaintiff just seven days after her *pro bono* audit email, which had evidently incensed DePalma and sparked his egotistical frenzied reaction, was given precedence over important client legal deadlines.

331.    Read should be ashamed of her utter failure to contemplate the impact of her negligence, her valiant salute to DePalma's sexual harassment and discrimination of Plaintiff of which she was fully cognizant, and her deplorable decision and pathetic choice to toss Plaintiff's fourteen

year allegiance to Thompson, and its most important clients, into the trash.

332.    Plaintiff ultimately had the fulsome conversation with Read on May 9, 2022 and reiterated her decade long complaints of DePalma's misogynistic and discriminatory conduct to ensure that after Plaintiff's departure, no other female attorney would be subjected to the unlawful gender discrimination and sexual harassment that Plaintiff suffered.

333.    Read's unsupportive response was "I can't believe YOU'RE doing this," and advised that Read would inform the firm counsel and Plaintiff should expect a termination agreement to follow.

334.    What followed was a sham investigation of nothing, and a termination agreement and process that was retaliatory.

## THOMPSON HINE'S SHAM INVESTIGATION OF SEXUAL HARASSMENT AND GENDER DISCRIMINATION

335.    Thompson Hine's meandering effort to cloak DePalma's creepy and unlawful behavior behind the silence of its whitewashed walls, to protect its unwavering allegiance to revenue and shielding its elitist equity partner, is shameful.

336.    Thompson Hine's glaring failure to adhere to even the most rudimentary investigative procedures in response to years long complaints about discrimination inflicted by DePalma is nothing short of purposeful ignorance and feigned blind oblivion to the facts and unlawful conduct of which it was firmly aware.

337.    Thompson Hine advised the EEOC that Plaintiff declined to engage in the "investigation" without her counsel present, a spin on the actual events that transpired.

338.    What actually transpired is, once Plaintiff advised Thompson Hine that she had retained counsel, and that they were open to having a dialogue, Thompson Hine never contacted Plaintiff again about its phony investigation.

339.     Instead, predictable, it circled the wagons, closed ranks and readied its perjurious lies to later obstruct and obfuscate the EEOC's investigation.

340.     Thompson Hine employment lawyers have conducted hundreds of these types of client investigations, and the first rule of the road, higher impartial counsel so that the results of the investigation cannot be challenged as biased.

341.     Thompson Hine is perfectly willing to bill client's substantial sums for comprehensive investigations; however, when its own wrongdoing is under scrutiny, it conducts a clandestine and biased investigation that only serves to justify and approve its and its equity partner's creepy and unlawful behavior.

342.     Thompson Hine's circle the wagon investigation was just that, talk to the perpetrator DePalma and self-validate its biased findings.

343.     The facts confirm that Thompson Hine partner Deborah Brenneman reached out to Plaintiff on May 11, 2022, writing "I understand that you have raised concerns regarding potential gender issues in the New York office.  I have been asked by the Firm's Office of General Counsel to investigate those concerns.  Could we set up a time to talk when you get back to the office?  Thanks! Debbie."

344.     Plaintiff responded on May 16, 2022 that she was open for a call on that Friday (May 20) or Monday (May 23).  Brenneman wrote back on May 19, 2022 "Hey Rebecca sorry I am just now getting back to you.  Would you have some time Wednesday Thursday or Friday of next week?" (May 25, 26 or 27).  Brenneman wrote on May 27, 2023 "Hi Rebecca – following up again.  Could we talk on Tuesday after the holiday?"  Plaintiff again replied that day: "Good afternoon.  Thank you for your note.  I have procured the Linesch Firm as my counsel, and they are open to engaging in a dialogue with the firm as part of its investigation.  Cheers Rebecca."

345.     Plaintiff never heard from Brenneman again.

346.     Thompson Hine did not conduct any meaningful investigation of Plaintiff's sexual harassment or gender discrimination claims and she never declined to participate in that investigative process.  Thompson Hine claims to the EEOC otherwise were false.

347.     Thompson Hine's *faux* investigation was limited to selective inner circle equity partners.

348.     During that purported "investigation" that Thompson Hine claims to have conducted, only after the fact, conveniently excluded any meaningful communication with Plaintiff nor did it engage in discussions with any of the partners (whether income or equity) or staff with whom Plaintiff collaborated with or worked with over the past decade.

349.     Instead of conducting any meaningful investigation, and prior to Plaintiff's last day at the firm in June 2022, DePalma was already scheming to step into and take over Plaintiff's billable cases in New Jersey, despite lacking admission (or qualification) to the New Jersey Bar.

350.     DePalma wrote on June 2, 2022 to a New York paralegal:

When you have a chance, can you look and see what the rules are for NY admitted attorneys getting admitted (permanently, not pro hac vice) to NJ? Is there reciprocity?  If so how long must you be admitted to NY, any thing else, etc.

351.     Before Plaintiff was even out the door, DePalma was already on the hunt to capture the billable work that Plaintiff had performed for firm clients under her New Jersey law license. Really pathetic.

352.     A pathetic scene that definitively confirmed DePalma's excitement of the success of sexual harassment and discriminatory conduct in having Plaintiff ousted.

353.     Wielding his authority as the New York Vice Chair, he shamelessly took advantage of the vacuum in workflow and billable hours left in Plaintiff's wake, exposing a

calculated intent to capitalize on the fallout from his own orchestrated discriminatory and sexually harassing conduct.

354.    Further, Thompson Hine confirmed its violation of its own policies by its utter failure to conduct an investigation of Plaintiff's claims of misogynistic and discriminatory conduct by DePalma that was conveyed by Plaintiff to Read in a phone call on May 6, 2022.

355.    It was during this second termination call that Plaintiff again complained that DePalma's unlawful conduct be investigated and dealt with, while it would not alter Plaintiff's professional trajectory, perhaps it would save another woman from DePalma's despicable and disgusting conduct in the future.

356.    Read's feigned surprise that Plaintiff wanted an investigation to prevent further harassment even after Plaintiff's departure was truly awful, Read knew of DePalma's unlawful conduct and was annoyed that Plaintiff was not going to go quietly into the night.

357.    Read offered Plaintiff six months of salary, and Plaintiff could continue working for the firm (and billing clients) will looking for a job at the ripe young age of 53, and report to the firm on her progress in her search for a new career.

358.    Read's promise of a fulsome investigation was an empty gesture.

359.    Thompson Hine utterly failed to follow its policies or even its own advice to clients, never conduct an investigation yourself, as the institutional bias will cloud the conclusion.

360.    Thompson Hine excluded Plaintiff from the investigation by failure to ever even take her fulsome statement, failed to interview the countless witnesses to DePalma's unlawful behavior both inside New York and beyond, failed to interview the attorneys and staff that worked with Plaintiff for a decade, instead, they interviewed DePalma, circled the wagons and later offered the EEOC a false and fraudulent account of Plaintiff's career at the firm.

361.    Defendants' fraud on the EEOC is self-evident from the flat out lies it inked, the omissions it failed to include and its effort to alter the playing field to gain an unfair advantage as alleged herein.

362.    Hold your gasps for the jaw-dropping moment in the firm "investigation" when DePalma, in a brilliant display of selective memory (fraud), somehow missed the chance to admit his own shining moments as a male chauvinist pig and the charming instances of sexual harassment and discrimination against Plaintiff. Oh, and let us not forget his subtle exploitation of a personal relationship with side-kick Executive Committee Member Koczko (who go fishing together in Montauk with their significant others) to seamlessly engineer Plaintiff's termination – all because she dared to intrude into his utterly faux *pro bono* endeavors and had dared to expose his decade long sexual harassment and gender discrimination. Case closed with the shocking discovery that Thompson Hine's biased and self-serving investigation of nothing, yielded precisely nothing.

363.    Similarly, the voices of associate attorneys and Thompson Hine staff, who Plaintiff interacted with daily, who were fully aware of the DePalma's gender bias that permeated his interactions with and as against Plaintiff, were never heard – instead they too were silenced –  and completely disregarded by the secretive and wholly selective review.

364.    Thompson Hine's attempt at an investigation appears to be nothing more than a facade to back fill the hole it dug by its failures to protect Plaintiff, a New York employee, from unlawful sexual harassment and discriminatory conduct.

365.    The fact remains, the timeline contemporaneously articulated in Plaintiff's EEOC Charge, that DePalma, and his fishing buddy and discriminatory cohort Koczko, sought and used the Executive Committee as the instrumentality to terminate Plaintiff as the direct result of DePalma's long game in forcing Plaintiff's unlawful termination, coupled with Plaintiff's

ousting of DePalma's *faux* pro bono case and client, in the ultimate act of discrimination, terminating Plaintiff's employment with the firm, under the later formed guised pre-text, of low hours.

366.    Indeed, fluctuating hours is directly linked to the sexual harassment claims here, "[s]exual harassment is one reason attorneys suffer from anxiety, depression, trauma, and reduced productivity and focus at work." *See, Sexual Harassment and Retaliation in the Legal Profession: How To Stop It,* December 15, 2021 (https://nysba.org/sexual-harassment-and-retaliation-in-the- legal-profession-how-to-stop-it/) (Last visited January 24, 2024).

367.    What follows is the actual timeline of events that followed Plaintiff's departure that rendered the termination process entirely retaliatory, as evidenced by the contemporaneous communications, and renders the firm's bogus investigation an empty self-serving gesture.

368.    On or about May 9, 2022, Thompson Hine, through Feher, sent Plaintiff a separation document rife with ludicrous demands (the "Initial Demand"), including that Plaintiff would continue working at Thompson Hine though October of 2022 (which would give the firm the ability to bill all of Plaintiff's time), Plaintiff had to agree that Ohio law governed, and that secret arbitration would be the only forum available to Plaintiff for any redress.

369.    Plaintiff flatly rejected the Initial Offer.

370.    Thompson Hine revised and issued a Second Offer that was even worse.

371.    The Second Offer still demanded that Plaintiff waive her right to a judicial proceeding, required application of Ohio law, sought to incorporate the firm's 2017 Partnership Agreement, required Plaintiff to continue to represent firm client in a pending matter in Atlanta, and demanded that Plaintiff "remain available, including after the Separation Date, and undertake any reasonable efforts to be available for consultation regarding any matter or issue related to her

practice or other matters while at the Firm", without compensation.

372.     The Second Offer was met with an unequivocal rejection.

373.     Plaintiff, resolute and unyielding, took a definitive stance, adamantly rejecting Thompson Hine's insidious offer to buy her silence with tainted ink.

374.     Plaintiff too was unwavering in her conviction, making a bold choice, refusing to barter her voice for the ink Thompson Hine sought to use as a tool of suppression.

375.     In facing this formidable decision, Plaintiff understood the weight of her actions: if she succumbed to Thompson Hine's offer and accepting its piddly settlement offer, she would effectively perpetuate a culture of toxicity, sexism, discrimination, and gender biases, thereby endangering the prospects of future women lawyers who might later pass through Thompson Hine's New York office and be subject to DePalma's toxicity, sexism, discrimination, and gender biases.

### PLAINTIFF INSTEAD FILED A CHARGE WITH THE EEOC

376.     On July 1, 2022 Plaintiff submitted, under penalties of perjury, her sworn EEOC and NYS Commission on Human Rights Charge of Discrimination against Thompson Hine.

377.     The EEOC Charge included allegations against Thompson Hine of unlawful conduct pursuant to "Title VII of the Civil Rights Act of 1964, 42 USC § 2000e ("Title VII"), the New York State Human Rights Law, NY. Exec. Law § 290 et seq., and New York City Human Rights Law, NYC Admin. Code § 8-107. The gender discrimination is emblematic of a broader and systemic pattern and practice at Thompson Hine LLP."

378.     On February 23, 2023 Thompson Hine submitted its Defamatory Letter, inked by Feher to the EEOC. *See*, Exhibit 2 hereto.

379.     Plaintiff was provided a copy of Thompson Hine's Defamatory Letter on June

9, 2023 as it was just then released by the EEOC.

380.    On August 23, 2023, Plaintiff submitted, through then counsel of record, a Rebuttal to Thompson Hine's Position Statement.

381.    Thompson Hine's February 23, 2023 Defamatory Letter is not entitled to any privilege, as Thompson Hine and Feher defamed Plaintiff, lied to the EEOC, abused the process, and as such, no privilege attaches to its submission.

382.    For avoidance of doubt, the Defamatory Letter and the lies included therein are specifically addressed and rebutted in detail here.

383.    In reviewing Plaintiff's original EEOC Charge, and then reviewing Thompson Hine's position statement, what is most illuminating is the lack of response, the details that are intentionally omitted and the utterly false picture stroked with vengeful ink.

384.    Thompson Hine's response reads more like a firm puff marketing piece reaching for national stature than an EEOC position statement responsive to the sworn statement that evidenced intentional unlawful discriminatory and disparate treatment against Plaintiff in violation of, *inter alia*, Title VII.

385.    Plaintiff's EEOC Charge confirms that in Thompson Hine's New York office, DePalma engaged in abhorrent behavior served as a distressing portrayal of misogyny, as he consistently engaged in discriminatory, demeaning and derogatory treatment of women, and specifically directed his toxic biased and unlawful conduct towards Plaintiff.

386.    With an unwavering grip on his prestigious role as Litigation Vice Chair-NY, he shamelessly weaponized the redistribution of billable legal work, perpetuating the pervasively and absolutely hostile and discriminatory work environment.

387.    Let it be unequivocally known that the unsworn statement presented by

Thompson Hine's internal "counsel," aiming to depict Plaintiff's ongoing complaints against DePalma as some recent fabrication at the time of Plaintiff's separation from the firm, is a brazen lie.

388.    Thompson Hine dares to cloak this falsehood in an unsworn submission to the EEOC, seeking to shield it from scrutiny under the guise of absolute privilege and frustrate the EEOC rightful investigation.

389.    Plaintiff's clients (both internal partners who steered Plaintiff work) and Plaintiff's outside clients, were all informed, advised and contemporaneously aware of DePalma disgusting and unlawful conduct over the last decade and can attest to that knowledge under oath rendering Thompson Hine's unsworn pixie dust submission simply and fully irrelevant.

390.    In its Defamatory Letter, Thompson Hine deliberately sidesteps the significance of the Title VII employee issue, relegating it to an inconsequential footnote.

391.    Thompson Hine's hollow claim that Plaintiff was classified as a partner, therefore exempt from Title VII protection, lacks support in the law and is contrary to every Court decision that has issued on the topic across this country.

392.    Thompson Hine is clearly attempting to evade the law.

393.    Protected in the very fabric of Second Circuit jurisprudence lies an incontrovertible truth – while Thompson Hine possesses the latitude to artfully sculpt its partnership agreement, weaving a tapestry of empty partnership status among its employees, it has crafted a document that only rewards its equity partners with any true partnership benefits.

394.    There is no ambiguity here, Plaintiff had no authentic ownership interest – listed as 0% on the tax documents issued by Thompson Hine, no fiduciary alliance with or from anyone, no share in the fortunes and misfortunes, no grip on the helm of management, no voting

prowess, and zero sway over firm decisions.

395.    Indeed, the 2017 Partnership Agreement does not even bother to provide a line where Plaintiff could ink any agreement thereunder, those signature lines are reserved for the elitist equity partners only.

396.    Plaintiff was in fact a diligent employee, entitled to the robust protections granted by *inter alia*, Title VII.

397.    The insidious discrimination, the glaring disparate treatment that Plaintiff endured, a product of DePalma's despicable gender bias and sexual harassment of Plaintiff, and he punished Plaintiff when she steadfastly rejected his demand that she subordinate herself.

398.    Such unlawful conduct violates the protections afforded under Title VII.

399.    Plaintiff reported to the EEOC in her Rebuttal that there is no legitimate dispute that Plaintiff reported DePalma's misogynistic and unlawful conduct to the firm management for literally more than a decade.

400.    Without hesitation, Plaintiff distinctly and explicitly highlighted DePalma's discriminatory treatment, along with his open contempt for Plaintiff.  DePalma's demand that women acquiesce to his distorted ideology, positioning himself as the patriarch, and marginalizing those who refused to bow to his grandiose self-concept, was unequivocally raised with equity partners, including Read, from 2012-2022.

401.    Plaintiff too had the same discussions with income partners and attorneys across the firm's offices, as well as paralegals and secretaries.

402.    Equally, Plaintiff unapologetically highlighted DePalma's misuse of power through the manipulation of billable hours under his covenanted Vice Chairmanship of Business Litigation in New York.

403.     Thompson Hine conceded that it was "clear that Mr. DePalma and Ms. Brazzano did not get along – both complained about each other at different point over the years…"

404.     What is missing from Thompson Hine's missive, is Plaintiff's complaints about DePalma were grounded in unlawful conduct.  DePalma's complaints about Plaintiff were sexist, discriminatory, and permeated with defamatory and reputational insults.

### THOMPSON HINE'S MISSING FACTS AND DUPLICITOUS LIES TO THE EEOC AND DEPALMA'S VICE CHAIRMANSHIP REIGN ENDS

405.     Thompson Hine's Defamatory Letter clammers on from its Ivory Tower in Cleveland about its covenanted equity partner DePalma, but failed to advise the EEOC that it was only after Plaintiff's formal complaint to the EEOC filed in July 2022, that the firm finally knocked DePalma off his eleven yearlong perch as Vice Chair Litigation – New York, on December 7, 2022 (a title he still hangs onto in his "art law" propaganda (*see*, https://www.cafa.world/arbitration/pool/richard_de_palma/ ("Richard is a partner of the law firm Thompson Hine LLP, resident in its New York Office, and Vice Chair of its Business Litigation Group, head of its International Arbitration practice, founder and head of its Arts Law practice")(Last Visited Jan. 19, 2024).

406.     Accordingly, Thompson Hine's empty accolades towards DePalma in its Defamatory Letter resoundingly confirms its lack of credibility, given the fact that it demoted DePalma and consequently stripped away the lucrative salary perks tied to the coveted "Vice Chair" position and title and failed to advise the EEOC of this the fact.

407.     Removal of DePalma from his management position illustrates and confirms the fact that he did indeed abuse his position weaponizing the flow of billable work, and directed his hostile, discriminatory and disparate treatment, and sexual harassment, at Plaintiff during his reign.

408.    Thompson Hine's deliberate omission of DePalma's ceremonial demotion only serves to erode the credibility (and lack thereof) of its EEOC submission and its perverted and improper purpose.

409.    Thompson Hine too extensively whined to the EEOC about Plaintiff's alleged financial under-performance, but it provided scant evidence to support its gas lighting claims, confirming its penchant for fabrication and flak jacket style.

410.    Thompson Hine's venomous energy is boundless against anyone who dares to chip away at its white equity armor.

411.    Despite Thompson Hine's after the fact claims to the EEOC, no one, ever, consulted Plaintiff about her client billing, her hours (low or high), her performance, as clients repeatedly asked for Plaintiff, including the firm's largest paying clients by far.

412.    Thompson Hine's fraud on the EEOC included its newly minted story that Plaintiff was a "heavy biller," it demands inquiry, did Thompson Hine share that view with the top firm clients Plaintiff routinely provided legal services to? Or just a specious attempt to cloak its discriminatory determination of Plaintiff?  The facts scream that it is the latter.

413.    Indeed, since Lamb, Plaintiff's direct supervisor, took on the role as Firmwide Chair for Business Litigation, he never once told Plaintiff that she had a reputation of being inefficient, or of being a "heavy biller," or that Plaintiff's job was ever in jeopardy due to any of the foregoing.

414.    In fact, after the April 29, 2022 phone call with Read, but before Plaintiff advised the firm that she had retained counsel (May 25, 2022), Lamb wrote to Plaintiff on May 4, 2022 as follows:

Rebecca: I am writing to say thank you.  As part of a strategic initiative to explore what BizLit associates think our group and firm are doing right and what we could be doing

better, we engaged an outside consultant to conduct a one-on-one interviews with each BizLit associate. The consultant then gave me a summary of their feedback, but without attributing any particular comments to any particular associate. As part of the interviews, the consultant asked each associate, among other things, "if they wanted to name anyone who was particularly helpful or meaningful at the firm." Your name was provided by one or more associates. I want to thank you for making a positive impact on our BizLit associates. You have always gone above and beyond in looking out for them. Regards, Brian. [Lamb]

415.    Clearly not the messaging of a supervisor on a mission to permanently separate Plaintiff from the firm.

416.    Lamb never communicated anything to Plaintiff that the firm attributes to him in its shameful campaign to revise history, fabricating groundless pretextual performance issues that literally never happened in a transparent bid to defame Plaintiff's character under the reach for protections and privileged (to which none of them are entitled) that would otherwise attach to an EEOC submissions to cloak its deception. But, it is expected that Lamb will tow the line for his equity brethren, if only for his own financial self-preservation.

417.    Likewise, Thompson Hine's revisionist history offered to the EEOC that there was some concern over Plaintiff's relocation to Florida is literally made up.

418.    Lamb never raised any concern over Plaintiff's remote work from Florida, as he knew that many of the firm's lawyers, including Plaintiff, had scattered during COVID-19 when the firm's offices were shuttered, especially in New York where law firms were not included in those essential businesses by Executive Order that could remain "open."

419.    Lamb equally knew that during COVID closures, DePalma worked remotely from Connecticut, Norman Block was in Rhode Island with his grandchildren and other members of the New York BusLit group were working remotely from other states, including Florida.

420.    Lamb was an ever constant supporter of Plaintiff, including her dedication to the firm's *pro bono* efforts as well as Plaintiff's billable work, he wrote in response to a slow

billable period identified by Plaintiff, in September 2021, "Thank, Rebecca. If something good comes up, I'll steer it your way. Have a great weekend. -Brian."

421.    As such, Thompson Hine's miserable assertion that partners do not engage in steering work to one another is a big fat lie.

422.    The question of steering work can likewise be verified by former income partners Ms. Holmes, Ms. Fritz and Ms. Heather Hawkins, as noted *supra*.

423.    Plaintiff complained for years that DePalma steered the New York billable work to himself and other male attorneys to Plaintiff's exclusion, weaponizing the Vice Chair designation and position as against Plaintiff because of her female gender.

424.    In a predictable display of its well-worn disingenuous tactics, Thompson Hine's EEOC Defamatory Letter echoes the same standard toxicity it employs whenever an employee dares to expose the cracks in its facade of credibility.

FEHER'S REACH FOR IMPRECISION: LIAR

425.    Thompson Hine's reliance on Feher to draft its lackluster EEOC response is perplexing, particularly with a wealth of seasoned employment lawyers in its ranks.

426.    Perhaps it was Feher's profound awareness of Plaintiff's exceptional legal acumen through years of working collaboratively that renders his authorship of such a shameless and mythical narrative the epitome of irony.

427.    Indeed, when Feher sought exceptional New York counsel for his own family member's sexual harassment contingency case that he brought to the firm, Feher did not seek legal counsel from either of the equity litigators in New York (DePalma or Koczko), instead he turned to Plaintiff to run point for his family's high stakes dispute.

428.    Plaintiff achieved an exceptional outcome, such that Feher's family member

was ensured maximum benefit, and that very benefit ultimately led the firm and Plaintiff's team to lose billable hours and caused the firm further financial losses.

429.    While Feher reaches to reshape the narrative of Plaintiff's tenure with the firm, and futilely claims that Plaintiff was responsible for the firm's dismissal from a client matter in early 2022, this audacious assertion stands in stark contradiction to his own and the client's contemporaneous communications, which all confirm he is lying: Feher himself described the results Plaintiff achieved for the client to be literally "perfect."

430.    Feher likewise omits the fact that once Thompson Hine improperly terminated Plaintiff, two of her clients were not satisfied with the Thompson Hine lawyer who was staffed to replace Plaintiff in a complex RICO/ERISA claim then running hot in Atlanta, Georgia.

431.    An equity partner from Atlanta reached out to Plaintiff, after the firm had terminated Plaintiff, knowing that Plaintiff had been terminated, and upon information and belief, with Feher's blessing, inquiring if Plaintiff would take on the clients and continue representing them.

432.    If as Feher claims to the EEOC, Plaintiff was such an inept lawyer, why would Thompson Hine refer Plaintiff clients?

433.    The answer is obvious, Feher just lied to the EEOC to gain an unfair advantage and stomp on the scales of justice.

434.    Notably, Thompson Hine's submission omits all these vital details, as it endeavors to craft a distorted and egocentric account of events in hindsight to camouflage its unlawful conduct here.

435.    Thompson Hine, mired in its own web of deceit and evasion, fails to provide any valid attestation to its submission and instead offers cryptic accounts of events that never

happened or allude to words that were never spoken.

436.    Thompson Hine and Feher's very fabric of fraud on the EEOC is interwoven with verifiably false information and deflections, often cunningly hidden away in footnotes.

437.    Yet, when subjected to scrutiny, the evidence here highlights Thompson Hine, and Feher, lied to the EEOC.

438.    If Thompson Hine had engaged counsel to conduct a proper investigation of Plaintiff's claims here, perhaps it would not have to spin the story so hard that it boomerangs to reveal its subversion.

439.    It was regrettable but necessary to burden the EEOC with the weight of undeniable evidence, laying bare Thompson Hine's fraudulent response where it reaches to shield itself from accountability for fostering an environment rife with systemic discriminatory and disparate treatment.

440.    Thompson Hine's pretentious act of defiance seeks to conceal its true nature, but its dismal effort to cover its tracks crumble in the face of the unwavering truth and is equally demonstrative of the length and lies it will spin to deflect attention of a legitimate and fulsome investigation by the EEOC.

441.    Feher offered (and lied) in the Defamatory Letter, footnote 3, that:

[t]he client immediately fired Ms. Brazzano and the Firm. The Firm was ultimately paid only about 30% of the time Ms. Brazzano billed. As discussed below, this was an example of Ms. Brazzano's apparent problems with (and reputation for) inefficiency, which was a likely contributor to her problem from finding sources of consistent work.

442.    The client that is the subject of the firm's footnote 3, was brought to the firm with an urgent matter by a now former female income partner in January 2022.

443.    As such, the normal formalities of Thompson Hine, obtaining a significant financial retainer for litigation and the provision of a formal budget to the client, were not in place.

444.    Plaintiff was not the originating or billing attorney; instead, Plaintiff was asked to run point in New Jersey, file a complaint and obtain, by order to show cause, a temporary restraining order and shut down a former employee from unlawful competition.  And Plaintiff did just that. In an extraordinary display of efficiency and skill, in the span of merely twenty- five days, between January 13, 2022, and February 7, 2022, Plaintiff conducted research, drafted and filed the complaint, conducted expedited written discovery, liaised with the client on almost a daily basis, and secured an Order that temporarily restrained the former employee and his company.

445.    Additionally, the Court there set an accelerated schedule for further discovery and briefing on a preliminary injunction – a series of decisive achievements that precisely aligned with the client's stated legal objectives.

446.    In early February, the female income partner sent a bill to the client and the client was shocked by its amount, as it was in excess of $100,000 (based on the Thompson Hine's EEOC response, as Plaintiff did not see the bill before it issued) and the time spent on certain matters.

447.    It was at this point that Feher was alerted that the client was extremely agitated about the bill and had raised billing issues.

448.    On the morning of February 7, 2022 Feher, after having apparently audited and reviewed the client invoice, wrote as follows: "As I read the charges, Rebecca charged 15.5 hours for drafting the complaint and 10.1 on the TRO.  [Partner], I'm going to suggest that you respond to him so that we can have a nice exhibit if we ever need it.  You can indicate that he can talk to Todd as he requests (we'll refer to him as Managing partner in NY).  Can you draft something that includes some history (including the volumes of documentation we had to prepare on a short leash) the perfect results and then the fact that he rejected your efforts to talk to him about the bill?"

449.     The income partner then wrote to the client:

I am very surprised by your reaction. You retained us to file a complaint and seek an emergency TRO against a former employee…In other words, you saw for yourself the tremendous amount of work that the team did on a very expedited time frame. On top of that, we achieved exactly the result you wanted…I understand that you feel differently, and, at this point, we agree it would be best for a change of counsel as soon as possible. Although I 100% stand by the work done by the team…Please have new counsel contact us by no later than tomorrow – today if possible…In the meantime, [Plaintiff] will reach out with some deliverable for today and some next steps that your new counsel may consider taking.

450.     This confirms too that Feher lied, as the income partner offer the it would be "best for a change of counsel" the Firm was resigning, not the "firing" Feher lied about.

451.     Indeed, the client responded, in part requesting an explanation from Plaintiff with regard to the number of hours billed to draft the complaint, as the client mistaken thought the invoice had billed 25 hours on the complaint (as confirmed by Feher's own audit of the invoice), that was not the case.

452.     The next communication Plaintiff has from this client reads "…Rebecca Brazzano, you[r] work product is excellent and I thank you very much.  Thanks."

453.     Feher lied to the EEOC when he advised Plaintiff got Plaintiff and the firm fired – Plaintiff was thanked by the client for her excellent work.

454.     Plaintiff was later informed that Read wanted to avoid any confrontation with the client concerning the firm's billings, and instructed that a deal be struck.  At the end of the day the firm discounted the invoice by a percentage, which impacted all who worked on the matter.

455.     Accordingly, Thompson Hine's after the fact reach back to a February 2022 client issue as a basis for Plaintiff's unlawful termination on April 29, 2022 is demonstrably false.

456.     The clients' own parting words thanking Plaintiff, not anyone else at the firm, for her excellent work.

457.      Feher's reach for an excuse that is tied to Plaintiff's unlawful termination in timing utterly fails.

458.      Likewise, Feher's Defamatory Letter seeks to throw shade over DePalma offering that "three women have been elected as partners in the Practice Group. All three remain partners in the Firm, working and interacting in the New York office with Mr. De Palma."

459.      This statement is misleading and in all events false, three women were "hired," not "elected," as Feher purposely misleads to give an improper impression that these women were elevated from Thompson Hine's own ranks, they were not.

460.      Between September 2008 and the date of this Plaintiff's February 2024 verified complaint (16 years), exactly 1 women (other than Plaintiff) was elevated to income partner in New York in the Business Litigation Group, and 0 elevated from income partner to equity partner.

461.      As to the magic 3 Feher is referring "Sharon," "Sophie," and "Shelia," Sharon had already left the firm at the time Feher submitted the Defamatory Letter (perhaps Feher did not notice her departure), then there were 2, and since February 2023, Sophie resigned.

462.      The retention rate of women in the New York Business Litigation Group is abysmal because of the toxic boys' club environment DePalma perpetuates.

**THE FABRICATED "EARLY 2022" ALLEGED EXECUTIVE COMMITTEE VOTE**

463.      In its false narrative construction, Thompson Hine painstakingly highlighted to the EEOC that the firm Executive Committee vote that purportedly led to Plaintiff's separation, and how each of the women on the Executive Committee voted, pinpointing it as occurring in the ambiguous period and wholly unspecified time frame of "early 2022."

464.      No date is stated, no minutes of the meeting were offered to the EEOC, and any attempt by Thompson Hine to hereafter pinpoint that date will be fabricated.

465.     Thompson Hine has permanently waived its opportunity to establish the timing of the undated vote in any later defense.

466.     In this calculated concealment, Thompson Hine failed to reveal to the EEOC and deliberately withheld the date of this alleged pivotal decision.

467.     Thompson Hine's glaring omission of the date of the "vote" only serves to confirm that the timing of its alleged decision perfectly aligns with Plaintiff's complaints regarding DePalma's dubious fraud on the firm in his fake *pro bono* case, just a week before Plaintiff was terminated.

468.     Indeed, if Thompson Hine was so intent on Plaintiff's separation in "early 2022," why did the firm give Plaintiff a $3,500 bonus in February 2022?  Why would Read wait from "early 2022" until April 29, 2022 to finally make the call demanding that Plaintiff resign?

469.     Further demonstrative of Thompson Hine's lack of integrity in Plaintiff's unlawful termination, less than an hour after Read delivered the termination message, Anthony White, an Executive Committee member, an heir apparent to the Managing Partner Role effective May 2024, apparently then having received Read's communique that the call ending Plaintiff's longtime career with the firm had been made, so he urgently approached Plaintiff to complete an extensive Order to Show Cause for a significant case involving his most prominent client.

470.     As if Thompson Hine, and Anthony White, now wanted to squeeze every last bit of billable work from Plaintiff before throwing her out of the proverbial building.

471.     Thompson Hine's deliberate evasion and lack of transparency only serves to fortify the case against its complicity in orchestrating a pretextual termination.

472.     As Thompson Hine shrouds the truth in ambiguity and withholds crucial information, its actions inadvertently provide further weight to the mounting evidence that exposes

its involvement in a deceitful and unlawful and discriminatory termination.

**THOMPSON HINE RELEGATES FEMALE ATTORNEYS TO HOUSEKEEPING FUNCTIONS**

473.     As detailed in Plaintiff's original EEOC Charge, Thompson Hine relegates the housekeeping functions to female income partners and reserves its paid more important firm management roles for equity male partners.

474.     By definition, the kitchen work committee leads at Thompson Hine were income partner women, like Plaintiff, running the firm's *Pro Bono* Committee for years, and such was not incident to the management or leadership of the firm, as those management positions were reserved for the equity partners.

475.     Thompson Hine's attempt to characterize these unpaid positions hoisted upon income female partners (ESG Collaborative Committee, the Diversity & Inclusion Initiative Committee, the Women's Initiative Committee and the Pro Bono Committee), claiming that these "coveted positions sought after by some of the Firm's most successful attorneys" is utterly propaganda.

476.     Thompson Hine's acknowledgment of Plaintiff's status as one of its "most successful attorneys," entrusted with running the *Pro Bono* Committee for years, creates an inherent contradiction. If these positions are indeed deemed "important" to the firm, then it becomes puzzling why the firm steadfastly refuses to compensate female income partners for their literally thousands of hours of dedicated work and effort.

477.     In the last four years alone, Plaintiff worked close to 500 hours for Thompson Hine's *pro bono* committee with no compensation.

478.     Yet equity partners who had similar administrative roles were in fact generously compensated, including New York equity partners, DePalma, Block and Apar.

479.    After Plaintiff was terminated in June 2022, and through February 2024, there was no Chairperson of the firm's *pro bono* Committee, apparently Thompson Hine did not consider it an important enough role to fill.

480.    While it was the audit of the *pro bono* committee that Plaintiff initiated that enraged DePalma, it was done as part of Plaintiff's unpaid responsibilities as firm-wide committee chair.

481.    Despite Thompson Hine's attempts to showcase to the EEOC its supposed commitment to supporting women and diversity through a laundry list of initiatives, and box-checking strategies, Plaintiff knows, and its employees know, that it fails woefully short of any meaningful progress.

482.    Thompson Hine spins the talking points, pours money into meaningless dinners and panels, but fails to support or protect its own employees, including Plaintiff.

483.    The glaring truth of its statistics is far from impressive and paints a dismal picture of its Ivory Tower hallways filled with ageing white men, with a speck of color and gender added as mere souvenir tokens.

484.    Thompson Hine's hustle to the EEOC reeks of desperation and hollowness as it attempts to elude accountability and promote a subterfuge that strains credibility.

485.    First, Thompson Hine's offer that long before Plaintiff was elected as an income partner, DePalma "expressed concern that she did not work from the office enough, choosing instead to work from home.  He believed the in-office interaction was important for her growth as an attorney and to build relationships at her then-new firm" is indeed true: DePalma was the only person who fixated, objected and complained about Plaintiff's physical presence in the New York office, which was creepy in any event.

486.     Indeed, despite making a conscious efforts to steer clear of any professional interaction with DePalma once he ascended to the Vice Chair position in February 2011, like avoiding the plague, DePalma continued to harbor a bizarre discontent about Plaintiff's physical proximity.

487.     It becomes increasingly evident that DePalma's Vice-Chair role, a role that the firm steadfastly failed to wretch form his clenched fists, and only did so after Plaintiff filed the formal EEOC Charge, was weaponized against Plaintiff as alleged here.

488.     DePalma's whing about Plaintiff's physical presence bore a striking resemblance to that of a Grand Poobah, etched at the end of a meaningless conference table, or during COVID- 19, a computer monitor, exercising some feigned control and authority over where Plaintiff worked for firm clients.

489.     Yet, it was in fact Plaintiff's proficiency with remote work that proved to be an exceptional skill to have when the COVID-19 pandemic rolled across the county.

490.     The COVID-19 pandemic prompted a universal shift to remote work, offering a humorous spectacle as DePalma and the rest of the firm's old, and white, management hastened to acclimate.

491.     In contrast, Plaintiff had long ago honed her skills in the remote environment, seamlessly serving firm clients with ease while the older white males scrambled to navigate the complexities of remote system connections, and working without a secretary at their beck and call, including DePalma who required outside "coaching" to help him figure it out.

492.     Thompson Hine's newly minted assertion to the EEOC that Plaintiff's change of residency to Florida went unnoticed within the New York office likewise rings hollow like the 13th chime on a broken clock.

493.    In reality, the New York office was shuttered at the time due to the global pandemic in 2020, there was literally no one in the building to notice anything.

494.    It was only DePalma as Vice Chair of Litigation, that was preoccupied by Plaintiff's physical whereabouts.

495.    This is equally disturbing because Plaintiff had no client matters with DePalma in the decade long time he was Vice Chair of Litigation in New York.

496.    Thompson Hine's purported concern about Plaintiff's physical whereabouts during COVID is nothing more than an afterthought, as it is evident that other firm groups and offices faced no such scrutiny.

497.    This glaring disparity renders its reliance on proximity as mere pretextual rubbish.

498.    By way of example only, the firm's New York real estate group expressed no issue with the pandemic movements of its lawyers when Karen M. Kozlowski permanently relocated to Florida during COVID, in New Port Richey, Florida and registered to vote in Florida.

499.    Moreover, the firm had no issue with the extended stays of male equity partner and Executive Committee Member (now Managing Partner), Anthony White, at his Anna Maria Island, Florida residence.

500.    The Firm made no issue of "Dominic's" (corporate group), an income partner in Chicago, who actually lives in Texas and works entirely remote. Or with "Eva" (in the environmental and real estate groups), an income partner in New York, who lives in Connecticut and works remotely fulltime. It was only Plaintiff's remote work that seems to disturb Thompson Hine after the fact in its reach to justify her unlawful termination.

501.    Thompson Hine's contrived whining about Plaintiff's physical presence in the

New York office is simply a failed effort to deflect from its real discriminatory motives in carrying out DePalma's long game of biased and toxic hostility.

502.    Ninety five percent of Plaintiff's billable work emanated from the Atlanta and at times the Ohio offices, so being in the (closed) New York office was irrelevant.

503.    And, since the Courthouses in New York and New Jersey were literally shut during the COVID-19 pandemic, Thompson Hine's feeble echoes longing for the now faded era where lawyers were chained to their desks so the firm could squeeze every last billable hours are long past.

504.    Thompson Hine's failure to embrace the concept that true excellence transcends physical boundaries leaves them paying for fancy brick and mortar offices, with stunning views of nothing, whining "she was not at her desk" like a good inferior income partner, screeches of old school pondering.

### THE FIRM'S AVERSION TO HYBRID WORK: THE JULIA SYNDROME

505.    In truth, and upon information and belief, Thompson Hine's aversion to remote work has nothing to do with Plaintiff (or the feigned need to build relationships with hoarding equity partners in New York) but instead stems from its own unlawful conduct in 2011 that lingers heavily on its conscious.

506.    Thompson Hine then discovered, upon information and belief, that one of its own equity partners, Julia,[9] who often worked and entertained clients from her lavish home had in fact billed clients for millions of dollars of work without performing any related legal services.

---

[9] In the original complaint, Plaintiff shielded the names of certain individuals to avoid their being named and referenced in this lawsuit.  Defendants complained (*see*, Docket 36, wherein Defendants' counsel advised the Court that "The allegations supporting these claims span more than a decade and involve at least 38 individuals, including 16 who Plaintiff has not identified by name." As such, equity partners that still work at the Firm have been identified herein as necessary.

507.    When, upon information and belief, the firm finally discovered the unethical conduct, akin to the 1990's movie "*The Firm*" (wherein attorneys commit mail and wire fraud by unlawfully billing clients for work never performed, *i.e.*, RICO amil and wire fraud), it booted Julia from the partnership, voting her out as an equity partner and handsomely paying her off with fulsome return of her equity.

508.    Upon information and belief, the firm's deliberate failure to report Julia's fraud and ethical violation to the bar, combined with its hushed reimbursement of over $2 million to clients who were ripped off and fell victim to her fraud, reveals a calculated effort to shield itself at all costs, irrespective of the law or ethics, to any public review of its unlawful conduct.

509.    Thompson Hine's submission to the EEOC here too bares the same dirty fingerprint and blueprint of deception, camouflaging DePalma's discriminatory conduct, as well as the Firm's own complicity in concealing the *pro bono* fraud Plaintiff uncovered and was actively trying to rectify before the Firm demanded her resignation.

510.    The Firm's criminal like accusations against Plaintiff of being a heavy biller, are literally false, and it is rich that when the Firm confirmed one of its own equity partners was indeed billing heavy, they quietly swept it under the rug.

**THE PARTNERSHIP AGREEMENT, PLUS THE EXPIRED LETTER AGREEMENT, EQUAL NOTHING**

511.    In 2013, Plaintiff was provided with a copy an October 28, 2011 Partnership Agreement.

512.    However, unbeknownst to Plaintiff, the firm equity partners amended their partnership agreement in 2017, and it was never provided to Plaintiff.

513.    Plaintiff first saw the contents of the 2017 agreement after Read called to terminate her employment.

514.    Plaintiff did not sign either the 2011 or the 2017 Partnership Agreement and

neither contemplate signatures by the inferior income partners.

515.    Thompson Hine relies upon that document and its annual Letter Agreement that incorporated the Partnership Agreement by reference, to demand that Plaintiff arbitrate (even though the predispute clause is void under governing federal law).

516.    Each Letter Agreement Plaintiff received expired by its own terms on December 31 of the year it was provided: "is anticipated that you will continue as an Income Partner pursuant to this letter agreement until at least December 31" of the date of the letter.

517.    The last letter agreement Plaintiff signed with Thompson Hine, as evidenced by the firm's Initial Offer, was dated January 1, 2021, and expired by its own terms on December 31, 2021.

518.    As such, as of January 1, 2022, and thereafter, Plaintiff was not bound by any agreement with the firm.  The firm never sent Plaintiff a letter agreement in 2022.

519.    While the firm reaches to cloak Plaintiff's dispute under the shadows of a future clandestine arbitration, on its home turf in Ohio, governed by Ohio law, that effort will fail.

520.    Thompson Hine cannot ever legitimately say it intended for Plaintiff to be bound by the 2017 Partnership Agreement, where it only provides signatures by its select and elitist equity partners.

### PLAINTIFF'S RELOCATION TO FLORIDA: BLESSED BY FIRM MANAGEMENT

521.    Thompson Hine's after the fact revisionist tale that they were unaware of Plaintiff's intentions to move and service firm clients based in Florida is unequivocal perjury, and does not in any event support its reach for a non-pretext basis for Plaintiff's termination.

522.    Considering the firm's Florida client base, in which the firm derives a significant percent of its reportedly $252,988,000 million in annual revenue for 2022, its calculated

attempt to deceive and deny that its management knew of Plaintiff plans, was an intentional deflection to obstruct the EEOC's investigation, evidenced by the firm's own contemporaneous blog and communications from Plaintiff in 2020 and 2021.

523.    The Firm's claims of lack of knowledge is both unlawful and morally bankrupt.

524.    The evidence confirm that on May 18, 2020, Plaintiff reached out to the firm's then ethics expert, Karen Rubin, and explained her plan to take the Florida bar, along with the client financial details noted above, and inquired if there was any ethical problem or concern with her continued practice for Plaintiff's New York, New Jersey and Connecticut clients from Plaintiff's planned residency in Florida.

525.    Ms. Rubin then consulted with Frank DeSantis, then Chair of the firm's Ethics Committee.

526.    Plaintiff later spoke with Mr. DeSantis directly and confirmed there was no ethical or other issue with Plaintiff practice law for non-Florida clients.

527.    The one issue that Mr. DeSantis raised was whether there would be any tax consequence to the firm for Plaintiff's Florida presence and practice. At that point in time, the taxation and finance issue discussion was tabled as premature.

528.    Firm management was well-informed of Plaintiff's explicit intentions to not only bear the cost of taking the Florida Bar but also to change her residency to Florida, all with the aim of offering enhanced litigation client service to the Firm's Florida-based clients, of which, upon information and belief, the Firm derives tens of millions in revenue.

529.    The firm's denial and feigned astonishment in its EEOC submission is nothing more than a concoction of deceitful excuses.

530.    Indeed, three months after Plaintiff's discussions with Rubin and DeSantis,

Rubin wrote about her findings based upon Plaintiff's Florida inquiry on the firm's Ethics Blog on July 9, 2020. That article titled: "It's five o'clock somewhere: Lawyers working remotely from other jurisdictions during COVID-19" is available at: https://www.thelawforlawyerstoday.com/2020/07/5101/.

531. Defendant Feher then wrote another Florida article, published on the firm's legal blog dated August 20, 2020 titled: "Your Florida house is safe!" (available at https://www.thelawforlawyerstoday.com/2020/08/your-florida-house-is-safe /(specifically addressing a New Jersey licensed attorney living in Florida and providing legal services for his New Jersey clients).

532. Ms. Rubin likewise alerted Plaintiff to the August 17, 2020 advisory Opinion from the Florida Bar Standing Committee on the Unlicensed Practice of Law, FAO#2019-4, Out-of- State Attorney Working Remotely From Florida Home: Proposed Advisory Opinion that Mr. Feher highlighted in the above firm Blog.

533. Thompson Hine's after the fact feigned "surprise," is pure rank dishonesty and fraud upon the EEOC, as it issued Plaintiff's tax documents for 2021 and 2022 to Plaintiff's Florida address.

534. Thompson Hine offering to the EEOC, desperate to cloak it's shameful and unlawful conduct, served up sweeping falsehoods to tilt the scales of justice.

535. As a result of the unlawful conduct alleged herein, Plaintiff has suffered severe damage to Plaintiff's reputation, severe and utter humiliation, chronic sleeplessness, night terrors, anxiety, stress, and the physical manifestations of each, all as a direct result of Defendants collective unlawful misconduct.

536. Defendants used their positions of power to sexually harass, discriminate

against, and retaliate against Plaintiff, a former Thompson Hine employee.

537.    Thompson Hine further retaliated against Plaintiff in the termination process in the unauthorized use of her attorney bar licenses.

### UNAUTHORIZED USE OF PLAINTIFF'S BAR LICENSES IN NEW YORK AND CONNECTICUT

538.    On June 9, 2022, Thompson Hine was advised that Plaintiff:

Plaintiff "is currently counsel of record for several Thompson Hine clients in New York, New Jersey, and Connecticut, and she has signed various affirmations admitting other firm attorneys *pro hac vice* in these jurisdictions. In light of [Plaintiff's] impending termination, and the associated termination of her Firm computer access privileges we are concerned about her ability to file the appropriate paperwork in these cases reflecting her withdrawal. Specifically, [Plaintiff's] notices of appearance and pro hac vice petitions in these cases require the immediate need to reflect [Plaintiff's] withdrawal and the replacement of [Plaintiff's] existing authorizations by successor counsel. Please provide written confirmation of the Firm's compliance with this notice.

539.    Thompson Hine's deafening silence in response to Plaintiff's demand to be replaced as counsel of record speaks volumes, revealing a deliberate and calculated decision by Thompson Hine to continue exploiting Plaintiff's her New York and Connecticut bar licenses without any semblance of authorization, hijacking Plaintiff's licenses for its own use.

540.    As a direct consequence of Thompson Hine's vindictive and retaliatory conduct throughout the termination process, Plaintiff refrained from notifying clients involved in various matters of her termination and imminent departure, as such parties were under the blanket representation of Thompson Hine's engagement letters to which Plaintiff had no access.

541.    Fueled by apprehension and driven by fear of further reprisal from Thompson Hine, compounded by the uncertainty of the implications to Plaintiff, the firm and the professional duties they each owed to the respective clients, Plaintiff did not reach out to advise these clients of her termination or imminent departure, or the requirement that new counsel make a formal appearance in each matter.

542.    Thompson Hine put Plaintiff's professional bar licenses in jeopardy as follows:

A.    *New York*: Thompson Hine used Plaintiff's attorney license and admission without authority to in the United States District Court, Northern District of New York, in the matter Index No.: 1:20-cv-01167-JLS (June 10, 2022 - June 22, 2022);

B.    *New York*:  Thompson Hine used Plaintiff's attorney license and admission without authority in the New York Supreme Court, County of Ulster, in the matter Index No.: EF2022-872 (June 10, 2022 through July 1, 2022 (NYSCEF 23));

C.    *New York*: Thompson Hine used Plaintiff's attorney license and admission without authority in the New York Supreme Court, County of Kings, in the matter Index No.: 511501/2021 (June 10, 2022 through April 27, 2023 (NYSCEF 36));

D.    *Connecticut*:  Thompson Hine used Plaintiff's attorney license and admission without authority in the United States District Court, District of Connecticut, in the matter Index No.: 3:21-cv-00417-VAB (from June 10, 2022 through February 14, 2023).

543.    Thompson Hine had no authority to use Plaintiff's law license (which is Plaintiff's property) in the State of Connecticut or New York after her departure, and Thompson Hine's use of Plaintiff's bar licenses was an abuse of process, unethical and violative of the Rules of Professional Conduct in New York.

544.    On June 16, 2022 a Preservation Letter was sent to Thompson Hine, so any efforts to destroy or alter evidence after that date is demonstrative spoliation.

545.    The age-old depiction of blindfolded Lady Justice embodies the principles of impartiality, equity and justice; this legal symbolism must never be distorted or wielded as a sword by the powerful, affluent and arrogant, as seen in the unlawful actions of Defendants here.

546.    Ironically, after the original complaint was filed, on May 8, 2024, Defendants' counsel sent Plaintiff a Rule 11 Safe Harbor Letter demanding that Plaintiff withdraw the

complaint as follows (*salutations omitted*):

As you know, I represent Defendants Deborah Read and Thomas Feher in the above referenced action. I provide this letter in a good faith effort to avoid incurring further defense costs and to obviate the need to file a motion for sanctions pursuant to Rule 11. If you decide against dismissing your meritless claims against Ms. Read and Mr. Feher, our next step will be to file a letter requesting a pre-motion conference with the Court in advance of filing a motion for sanctions pursuant to Rule 11, as set forth in the accompanying notice of motion.

As you also know, Rule 11 provides that attorneys may be subject to sanctions for presenting claims for which there is no legal support and no reasonable argument to extend, modify or reverse the law as it stands. *Fishoff v. Coty Inc.*, 634 F.3d 647, 654 (2d Cir. 2011) (*quoting Morley v. Ciba-Geigy Corp.*, 66 F.3d 21, 25 (2d Cir. 1995)). Putting aside the outright falsity of many of your factual contentions, your claims with respect to Ms. Read and Mr. Feher fail as a matter of law and your filing of the Amended Complaint therefore violates Rule 11.

First, neither Ms. Read nor Mr. Feher is subject to personal jurisdiction in New York, generally or specifically. Neither resides in New York, was served in New York, or took any actions alleged in the Amended Complaint while physically present in New York. Both are Cleveland based attorneys barred to practice law in the state of Ohio. Neither "continuously and systematically does business in New York" so as to subject themselves to general personal jurisdiction. *Dong Chul Kim v. Harte Hanks, Inc.*, 425 F. Supp. 3d 246, 254 (S.D.N.Y. 2019).

Second, regardless of personal jurisdiction, Mr. Feher's alleged conduct is protected by absolute privilege. Your claims against Mr. Feher are predicated solely on your allegations that he prepared and submitted Thompson Hine's position statement (the "Position Statement") responding to the allegations in your EEOC charge. Statements made to the EEOC are absolutely privileged, and cannot form the basis for defamation or any other claims. *Bernstein v. Seeman*, 593 F. Supp. 2d 630, 636 (S.D.N.Y. 2009); *Farzan v. Wells Fargo Bank*, 2013 U.S. Dist. LEXIS 11121, at *11 (S.D.N.Y. Jan. 25, 2013) ("It is well settled in New York . . . that statements made in quasi-judicial proceedings, including proceedings by agencies such as the EEOC, are protected by an absolute privilege.").

Third, a great number of your allegations in the 578-paragraph Amended Complaint are simply false. In particular, the Position Statement itself refutes your allegations about it, and the document therefore will control. *Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000) (where "documents contradict the allegations of the amended complaint, the documents control and this Court need not accept as true the allegations in the amended complaint").

Rule 11 required your allegations about the Position Statement to "have evidentiary support." They do not. For example, you repeatedly allege that the Position Statement accused you of "illegal" and "criminal" misconduct. *See, e.g.,* Amended Complaint ¶¶

510–11. Those accusations appear nowhere in the Position Statement. While the Position Statement discusses your reputation as someone who would "expend more time performing a task or tasks than would be reasonably expected," there is no statement anywhere in the Position Statement accusing you of billing more time than actually spent, nor any criminal or illegal conduct.

You likewise allege that the Position Statement "conveyed to the EEOC that Plaintiff was violating the Rules of Professional Conduct." Amended Complaint ¶ 510. Again, this allegation is demonstrably false. What the Position Statement stated is that, because you are not barred in Florida and therefore could not solicit new clients there, your unilateral decision to move there (a thousand miles away from the states in which you do hold law licenses) was not a viable plan for addressing your lack of work. *E.g.*, Position Statement at 10. The Position Statement does not say that you did solicit clients in Florida, or did anything else that violated ethical rules in Florida (or elsewhere).

We also note that numerous paragraphs in your Amended Complaint make allegations about individuals having nothing to do with your claims and about whom you have no actual knowledge. These include false statements about events occurring more than a decade before your association with Thompson Hine ended, and which predate your partnership by years. And while you opted to use pseudonyms for some people, you specifically (and unnecessarily) mentioned many current and former individuals and clients by name with the obvious purpose to harass and embarrass them. As you know, facts about clients and client matters are protected by Rule of Professional Conduct 1.6, and there is no exception that applies here. All of these statements were plainly made for the improper purpose of embarrassing and harassing the defendants, in violation of Rule 11.

Your claims against Ms. Read and Mr. Feher violate Rule 11(b)(1) and (2) because they are unfounded in law and fact and are also filed for an improper purpose. If you fail to timely dismiss Ms. Read and Mr. Feher, as noted above, we will serve the attached Notice of Motion seeking sanctions pursuant to Rule 11.

As stated above, this letter and notice is provided in a good faith effort to resolve the specific issues addressed herein. This letter is without prejudice to any of the defendants' rights and claims and waives nothing related to any other defense or arguments regarding the insufficiency of your claims.

547.    On May 25, 2024 Plaintiff responded to the Defendants' Rule 11 Safe Harbor

Letter as follows (*salutations and exhibits omitted*):

At the outset, my professional condolences in having to defend such wretchedly arrogant clients, although, even Harvey Weinstein and Ghislaine Maxwell were entitled to legal representation with zeal.

Plaintiff hereby responds to the hilariously weak attempt at a Rule 11 safe harbor letter dispatched by your secretary on May 8, 2024 (the "Fairless Letter"). The Fairless Letter is

palpably void of legal or factual substance, misrepresents facts, misstates governing legal standards and is merely a testament to the futility of Read and Feher's desperate reach to bury the truth and escape the reach of justice, and is more akin to the Forrest Gump sprint.

In particular, Read's efforts to involve my son as a target in her scamper to avoid a Court of law and the reach of New York justice over her, in offering Plaintiff's Floridian domicile is off the rails. Read could have merely sauntered down the shallow Ivory halls of Thompson Hine to the finance department and take a peek at the K-1 issued (noting its zero percent ownership) that evidences Plaintiff's domicile. As the "Managing Partner of the Firm" at the time, Read's submission, Docket No. 40, footnote 1, is reference to a lawsuit, that is of course public record, but Read's reference to it is an abuse of process, used for an improper purpose, to intimidate Plaintiff and silence the truth here from illumination in a Court of law.[10] If Read, with her firm and equity partner sidekicks in tow, are all intent on that path, please inquire of your client Feher, and ask him to explain why he was in Plaintiff's personal hotel room, inquire of his state of intoxication, inquire of Plaintiff's actions to assist Feher in avoiding lewd and unlawful conduct, all while Plaintiff was attending a firm litigation meeting. Or, ask Feher how he met his current wife, and where she worked a[s an] associate [at the Firm] (which is of course relevant and pertinent, as having the Fox as the overseer of the Hen House of ethics at the firm: a foolproof recipe that allowed rampant gender discrimination and sexual harassment to flourish).

Please also inquire of Read how she used Plaintiff to acquire off-book information about the ongoings in the New York office (during in person conversations in NY, all related to jurisdiction as Read kept her finger on the pulse of the NY office), including information about the NY Office Partner in Charge [Mason], the firing/PIP/resignation of almost a dozen female associate attorneys/staff who were unfortunate enough to have worked at the firm's NY office who too were shoved out the door, or the equity partner [Robyn Minter Smyers] (now member of the firm's Executive Committee) rant that Plaintiff must self-identify as a particular minority to check a box on the firm's vacant diversity head count (after she explained how she had "used" her own biracial status to advance her own career at the firm) and the demeaning tantrum Plaintiff was subject to when she declined, or inquire why Plaintiff (and others) were labelled as racist by an equity partner if they did not travel to JFK airport to offer pro bono representation to migrants, or whether the NY Executive Committee member [Koczko] was still running his mouth revealing firm confidential information to the staff, or whether DePalma had taken his divorce papers off the firm document system, or the repeated conversations with Plaintiff about DePalma's unlawful conduct (gender discrimination and sexual harassment) alleged in the Amended Complaint, whether that be his "jerking off" comments to Plaintiff or his creepy interactions with females in the NY office.

Plaintiff's substantive response to the Fairless Letter can be reviewed on the docket for this

---

[10] Likewise, Defendants' empty whine that the Amended Complaint is violative of Rule of Professional Conduct 1.6 is literally vacuous. All of Plaintiff's factual allegation are a matter of public record in this regard. *See, e.g.*, NYSCEF and PACER. If Defendants actually believed what the Fairless Letter spews, each defendant "lawyer" would be required to act as Officers of the Court and report such, they have not, because they cannot. If Defendants are so "embarrass[ed]" by their own conduct, tell them to grab a mirror and own it.

matter, available on PACER Docket Nos: 42, 43 and 44, and are attached hereto, and each is incorporated as if fully set forth herein. Plaintiff's diligence reveals that Defendants counsel has not ever filed a Rule 11 Motion in the United State District Court, Southern District of New York, if that diligence is accurate, please be mindful of all of the following Rookie Mistakes before Defendants hit submit:

• **Cite Procedurally Relevant Law**: When offering the Court a preview of an anticipated motion to dismiss/compel (or actually filing one) do not cite case law that is irrelevant and deficient (e.g., decisions made on summary judgment, after a jury trial, on appeal, etc.) or substantively unrelated or untethered to the pertinent facts that are at issue;

• **Adhere to Formatting Rules**: Do not manipulate font size or fudge margins to bypass the District Court's three-page pre-motion submission limit, signals that clients' position is weak before a word is even read. The Judge's Law Clerk and opposing counsel will notice, making the submission appear amateurish and sloppy. Follow the Rules; they apply universally;

• **Differentiate Legal Concepts**: Do not elevate case law that confuses discrimination based upon sexual orientation, pregnancy or race with gender discrimination and sexual harassment, they are inherently different, and such confusion confirms desperation;

• **Use Updated Legal Precedents**: Do not rely on outdated New York decisional law that opines on the applicable standard for evaluating sexual harassment and discrimination claims, the law was dramatically amended five years ago, rendering cited cases obsolete;

• **Ensure Factual Accuracy**: Interview the client and verify all facts before filing to ensure that the client's public admissions do not completely eviscerate offered legal arguments;

• **Review Client Publications**: Before criticizing an employee plaintiff, check the client's website to ensure it is not still using legal articles authored by the plaintiff in firm marketing materials;[11]

• **Be Realistic About Digital Footprints and Limits of Digital Cleansing**: If advising a client to change a bio photo on the firm website to make the client [DePalma] appear less creepy after lawsuit is filed (and uploading new head shot on April 20, 2024, that had been perched on the firm website since June 7, 2013), understand that the technology to completely scrub the internet of previous imagery is beyond reach;

---

[11] Plaintiff has not been an employee of Thompson Hine since June 2022. The firm's use of her written legal materials in their marketing efforts, whilst listing Plaintiff's old firm email address and NY cellphone number, 908 208 9466, is both disturbing and irritating. It is disturbing because the firm is now attributing articles written by Plaintiff to male partners, one of whom is not admitted to the NY bar, and the other who is not a member of the "Labor & Employment Team". Please instruct the firm to take Plaintiff's name and former contact information down, as the person who now has that cellphone would like folks to stop calling Plaintiff at that number. *See*, March 19, 2020 https://www.thompsonhine.com/insights/new-york-state-enacts-paid-sick leave-for-covid-19-quarantines-lowers-percentage-employees-allowed-onsite/; and August 13, 2019 https://www.thompsonhine.com/insights/new-york-changes-the-landscape-of-state-workplace discrimination-and-harassment-litigation/.

• **The Double Jump**: When citing legal authority, ensure both the cited case and the case(s) it references are reviewed. The second case may contradict or derail the position offered in the first case;

• **Don't Ask the Court if you can 'Cheat'**: Do not ask the Court to join another motion to avoid the Federal 25-page limit, ask for permission to enlarge the page limitation if unable to fit legal argument into the standard form – but note, if the argument cannot be said in 25 pages, no one is likely reading/listening after that anyway;

• **Don't Let Personal Feelings Drive Legal Strategy**: The laws apply equally to all, do not let clients who believe in their own arrogance and entitlement sway the legal strategy. Use governing decisional law to craft factually relevant and legally persuasive arguments;

• **Lawyers**: Clients who are lawyers, but not litigators, should be educated on the inherent rigorous demands of meaningful litigation. Advise them to get a helmet, or better yet, give them one of yours;

• **Law School Lessons**: If the lesson learned is from first year of law school, for example, the International Shoe saga, unlikely that Court will buy a newly minted effort to unwind decades of legal jurisdictional precedent because client is trying to dodge the Court's jurisdictional reach;

• **If Your Throw Shade, Expect a Tsunami**: Zealous litigation is encouraged by all, going off the rails to be vindictive and intentionally harmful to opposing counsel or their clients or their family usually boomerangs. Opposing counsel has the same tools and might use them more effectively;

• **The Climb**: In the journey to success, remember that the people clients stomp on today are the same ones they will encounter when they eventually fall from grace. Treating others with respect and integrity is not just ethical; it's practical. The alliances and relationships built on the way up are crucial, and those harmed can become obstacles when fortunes change. So, rise with grace and honor, because the higher the climb, the farther the fall;

• **Watch Your Tone**: When the adverse party holds all the evidence, witnesses, and clients are ready to testify against the client, clamoring for secret arbitration only spotlights their lack of credibility;

• **Threatening Sanctions as a Tactic**: Thinking of brandishing Rule 11 safe harbor letters as a scare tactic? Think again. In reality, such letters are usually useless and not so scary to seasoned litigators. Attempts to intimidate or bully a well-prepared adversary on a scorched earth path is a costly effort, but brace for blowback;

• **New York Jurors**: Jurors will recognize the iconic line from My Cousin Vinny, "Everything that guy just said is bullshit. Thank you." They will not tolerate lawyers who are liars;

• **Transparency Matters**: Trying to shield a client's actions through secrecy only raises screaming red flags. Embrace transparency to maintain credibility and trustworthiness in the eyes of the Court and Law Clerk;

• **Privilege Is Not Absolute**: Efforts to cloak misconduct behind mystic privilege to escape accountability is an obtuse strategy. The legal system is designed to ensure justice, and privilege cannot be used as a shield for unethical or unlawful conduct; and

• **Litigation Hold**: Issuance is critical; failure to issue is spoliation of evidence. Understand the consequences. Pursuant to governing New York law, neither arrogance, elitism, wealth, underserved fancy reputations, or feigned power, are available as affirmative defenses.

cc: Edward (Ned) Babbitt, Esq.[12]

548.    To date, Defendants have not filed their threatened motion to silence Plaintiff's truth.

## FIRST CAUSE OF ACTION

### SEXUAL HARASSMENT NEW YORK STATE HUMAN RIGHTS LAW
### (AS AGAINST DEPALMA AND THOMPSON HINE)

549.    Plaintiff hereby repeats, reiterates, and realleges each and every allegation in each of the preceding paragraphs of this Second Amended Verified Complaint, as though fully set forth herein.

550.    Plaintiff has set forth facts that constitute sexual harassment, hostile work environment, and discrimination on the basis of gender as against DePalma herein.

551.    DePalma and Thompson Hine's conduct is a violation of the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290 *et seq*.

552.    Having specifically alleged unlawful conduct by DePalma constituting a sexual harassment dispute, neither of DePalma or Thompson Hine can cloak their unlawful and

---

[12] It seems odd to copy Mr. Babbitt on this correspondence, as he is an employee of defendant Thompson Hine LLP and ethical rules would in the normal case foreclose direct communications with him. However, since he was selected as the sacrificial lamb to enter his appearance as counsel of record, he is copied here. If Defendants have a different view, please advise.

unenforceable predispute arbitration clause upon Plaintiff, as Plaintiff's claims here arose, at earliest upon her termination on April 29, 202,2 or on July 1, 2022, when she filed her EEOC Charge, both of which fall after the EFAA trigger date of March 22, 2022. 9 U.S.C. § 402(a).

553.     The EFAA defines a "sexual harassment dispute" as "a dispute relating to conduct that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law."

554.     The unlawful conduct here alleged constituted sexual harassment under New York law.

555.     By the acts described above, Thompson Hine and DePalma discriminated against, and sexually harassed Plaintiff based on her gender, in violation of Executive Law of New York, § 296 *et seq*. by subjecting Plaintiff to sexual harassment, disparate treatment, retaliation based upon her gender including, but not limited to, subjecting her to unlawful sexual harassment, and a hostile work environment.

556.     Defendants are liable under the NYSHRL as Plaintiff's "employer."

557.     As a direct and proximate result of DePalma and Thompson Hine's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and will continue to suffer economic harm entitling her to an award of monetary damages and other relief, including attorneys' fees, costs, and expenses.

558.     As a direct and proximate result of DePalma and Thompson Hine's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, emotional distress and mental anguish entitling her to an award of monetary damages and other relief, including attorneys' fees, costs, and expenses.

559.     DePalma and Thompson Hine's unlawful and discriminatory actions were

intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYSHRL, entitling Plaintiff to an award of punitive damages.

### SECOND CAUSE OF ACTION

### SEXUAL HARASSMENT, HOSTILE WORK ENVIRONMENT, AND DISCRIMINATION IN VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW (AS AGAINST DEPALMA AND THOMPSON HINE)

560.    Plaintiff hereby repeats, reiterates, and realleges each and every allegation in each of the preceding paragraphs of this Second Amended Verified Complaint, as though fully set forth herein.

561.    Plaintiff has set forth facts that constitute sexual harassment, hostile work environment, and discrimination on the basis of gender as against D DePalma and Thompson Hine herein in violation of the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §8-502 *et seq.*

562.    Thompson Hine and DePalma's unlawful conduct described above confirm that they sexually harassed and discriminated against Plaintiff based on her gender in violation of the Administrative Code of the City of New York, §8-107 *et seq.* by subjecting Plaintiff to disparate treatment based upon her gender, but not limited to, subjecting her to sexual harassment, and a hostile work environment.

563.    Thompson Hine and DePalma are liable under the NYCHRL as Plaintiff's "employer," and because they coerced, intimidated, threatened or interfered with, or attempted to

coerce, intimidate, threaten, or interfere with, Plaintiff's exercise or enjoyment her rights granted or protected under Section 8-107 of the Administrative Code of the City of New York.

564.　　As a direct and proximate result of Thompson Hine and DePalma's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered and will continue to suffer economic harm entitling her to an award of monetary damages and other relief, including attorneys' fees, costs, and expenses.

565.　　As a direct and proximate result, Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of monetary damages and other relief.

566.　　Thompson Hine and DePalma unlawful, discriminatory, and retaliatory actions constitute malicious, willful, and wanton violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

567.　　Thompson Hine and DePalma's unlawful and discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYCHRL entitling Plaintiff to an award of punitive damages.

### THIRD CAUSE OF ACTION

### AIDING AND ABETTING/INCITING/COMPELLING/COERCING IN VIOLATION OF THE NYSHRL (AS AGAINST ALL DEFENDANTS)

568.　　Plaintiff repeats and realleges each allegation of this Second Amended Verified Complaint, as though fully set forth herein.

569.　　Defendants knowingly or recklessly aided and abetted the unlawful employment practices, discrimination, sexual harassment, and retaliation against Plaintiff in violation of the NYSHRL.

570.　　As a direct and proximate result, Plaintiff suffered and continues to suffer

monetary and/or economic harm, including, but not limited to, loss of past income, future income, compensation, and benefits, for which she is entitled to an award of monetary damages and other relief.

571.     As a direct and proximate result, Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of monetary damages and other relief.

572.     Defendants unlawful, discriminatory, and retaliatory actions constitute malicious, willful, and wanton violations of the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

### FOURTH CAUSE OF ACTION

### AIDING AND ABETTING/INCITING/COMPELLING/COERCING
### IN VIOLATION OF THE NYCHRL
### (AS AGAINST ALL DEFENDANTS)

573.     Plaintiff repeats and realleges each allegation in this Second Amended Verified Complaint, as though fully set forth herein.

574.     Defendants each knowingly or recklessly aided and abetted the unlawful employment practices, discrimination, sexual harassment, and retaliation against Plaintiff in violation of the NYCHRL.

575.     As a direct and proximate result, Plaintiff suffered and continues to suffer monetary and/or economic harm, including, but not limited to, loss of past income, future income, compensation, and benefits, for which she is entitled to an award of monetary damages and other relief.

576.     As a direct and proximate result, Plaintiff has suffered, and continues to suffer, emotional distress for which Plaintiff is entitled to an award of monetary damages and other relief.

577.     Defendants unlawful, discriminatory, and retaliatory actions constitute malicious, willful, and wanton violations of the NYCHRL, for which Plaintiff is entitled to an award of

punitive damages.

## FIFTH CAUSE OF ACTION

### RETALIATION AND POST-EMPLOYMENT RETALIATION
### IN VIOLATION OF THE NYSHRL
### (AS AGAINST ALL DEFENDANTS)

578.    Plaintiff repeats and realleges each allegation in this Second Amended Verified Complaint, as though fully set forth herein.

579.    By the acts described above Defendants retaliated against Plaintiff in the terms and conditions of Plaintiff's for opposing unlawful employment practices, rejecting advances, in violation of the Executive Law of New York, § 296 *et seq.,* by, *inter alia¸* ignoring Plaintiff's protected complaints about the discriminatory treatment of Plaintiff and other employees, subjecting Plaintiff to increased scrutiny and harassment, ultimately terminating Plaintiff, then afterwards engaging in an ongoing campaign to disparaging Plaintiff, lying to the EEOC, and using threats and actual legal abuse of process to dissuade Plaintiff and other employees from bringing and maintaining claims against Defendants.

580.    Defendants are liable under the NYSHRL as Plaintiff's "employer."

581.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered and will continue to suffer economic harm entitling her to an award of monetary damages and other relief, including attorneys' fees, costs, and expenses.

582.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, emotional distress and mental anguish, entitling Plaintiff to an award of monetary damages and other relief, including attorneys' fees, costs, and expenses.

583.     Defendants' unlawful and retaliatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYSHRL entitling Plaintiff to an award of punitive damages.

### SIXTH CAUSE OF ACTION

### RETALIATION AND POST-EMPLOYMENT RETALIATION IN VIOLATION OF THE NYCHRL (AS AGAINST ALL DEFENDANTS)

584.     Plaintiff repeats and realleges each allegation in this Second Amended Verified Complaint, as though fully set forth herein.

585.     By the acts described above, Defendants retaliated against Plaintiff in the terms and conditions of Plaintiff's employment for opposing unlawful employment practices, in violation of the Administrative Code of the City of New York, §8-107 *et seq*.

586.     Defendants are liable under the NYCHRL as Plaintiff's "employer," and because they coerced, intimidated, threatened or interfered with, or attempted to coerce, intimidate, threaten, or interfere with, Plaintiff's exercise or enjoyment of rights granted or protected under Section 8- 107 of the Administrative Code of the City of New York.

587.     By the actions described above, among others, Defendants retaliated against Plaintiff on the basis of her protected activities in violation of the NYCHRL by, *inter alia*, ignoring Plaintiff's protected complaints about the discriminatory treatment of Plaintiff and others, subjecting Plaintiff to increased scrutiny and sexual harassment, ultimately terminating Plaintiff, then afterwards engaging in an ongoing campaign to disparaging Plaintiff, lying to the EEOC, and using threats and actual legal process to dissuade Plaintiff and other employees from bringing and maintaining claims against Defendants.

588.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered and will continue to suffer economic harm

entitling her to an award of monetary damages and other relief, including attorneys' fees, costs, and expenses.

589.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, emotional distress and mental anguish, entitling Plaintiff to an award of monetary damages and other relief, including attorneys' fees, costs, and expenses.

590.    Defendants' unlawful and retaliatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYCHRL, entitling Plaintiff to an award of punitive damages.

### SEVENTH CAUSE OF ACTION

### WHISTLEBLOWER RETALIATION AND POST-EMPLOYMENT RETALIATION IN VIOLATION OF NYLL § 740 (AS AGAINST DEPALMA AND THOMPSON HINE)

591.    Plaintiff repeats and realleges each allegation in this Second Amended Verified Complaint, as though fully set forth herein.

592.    As detailed above, Defendants subjected Plaintiff to multiple adverse employment actions because Plaintiff disclosed and/or objected to an activity, policy, or practice of Thompson Hine and DePalma that was in violation of a law, rule, or regulation that creates a substantial and specific danger to the public health or safety, including, but not limited to, their false and f*aux pro bono* cases, reporting of same, and quashing Plaintiff's audit of their unlawful conduct by terminating Plaintiff just seven (7) days later.

593.    Defendants retaliated against Plaintiff in violation of the NYLL, because she initiated and was in the process of conducting a firmwide *pro bono* expense and case audit, as Plaintiff had already determined that DePalma's *pro bono* case violated the firm policy and violated 22 NYCRR §118.1[e][14], and constituted fraud on the firm by using firm attorney hours

to personally benefit his "art law" by adversely altering the terms and conditions of Plaintiff's employment and terminating Plaintiff to conceal their unlawful conduct, thereby sabotaging Plaintiff's work, terminating Plaintiff, then afterwards engaging in an ongoing campaign to disparage Plaintiff, lying to the EEOC, and using threats and actual legal process to dissuade Plaintiff and other employees from bringing and maintaining claims against Defendants.

594.    As a direct and proximate result of Defendant's willful and unlawful conduct in violation of the NYLL, Plaintiff has suffered, and continues to suffer, harm for which Plaintiff is entitled to an award of damages, to the greatest extent permitted by law.

595.    The foregoing conduct of Defendants constitutes willful violations of the NYLL for which Plaintiff is entitled to an award of punitive and/or liquidated damages.

## EIGHTH CAUSE OF ACTION DEFAMATION

### (AS AGAINST THOMPSON HINE AND FEHER)

596.    Plaintiff repeats and realleges each allegation of this Second Amended Verified Complaint, as though fully set forth herein.

597.    Thompson Hine and Feher's Defamatory Letter, dated February 23, 2023, as submitted to the EEOC, that contained specific and false statements, including, *inter alia*, that Plaintiff got herself and the firm fired, that she was known as "heavy biller," are statements that impute incompetence, dishonesty and criminality as to the Plaintiff, and are defamatory *per se*, as there is specific reference, direct and indirect, in the words chosen by Thompson Hine and Feher, which connects the charge of incompetence, dishonesty and criminality to the Plaintiff's particular profession as an attorney at law.

598.    The statements contained in the Defamatory Letter are defamatory *per se*.

599.    The Defamatory Statements conveyed to the EEOC that Plaintiff was violating

the Rules of Professional Conduct, engaged in some billing practice that was improper, tagging her as a "heavy biller" (which is criminal, akin to a RICO violation), lying about pretextual reasons for unlawfully terminating Plaintiff in an effort to dissuade the EEOC from further investigation the firm, are all actionable words that were included with malevolent intent injure Plaintiff in her profession as an attorney.

600.    The Defamatory Letter was not a general reflection upon Plaintiff's character or qualities, the choice of word used were specific and intended to convey to the EEOC that Plaintiff was a poor performer with a reputation of illegal "heavy" billing, statements that are untrue, unsupported, directly contradicted by the contemporaneous evidence, repeat client accolades, and improperly associate Plaintiff with improper conduct (and illegal conduct) in Plaintiff's business as a professional attorney at law.

601.    Where, as here, Thompson Hine and Feher's statements have no relevance whatsoever to the heart of the dispute with Plaintiff and that are demonstratively false statements, inherently devoid of truth, and as such can never be deemed relevant, or pertinent, as there very nature precludes any semblance of factual foundation.

602.    Thompson Hine and Feher find themselves bereft of the sanctuary of privilege to conceal the untruths they peddled to the EEOC to avoid its investigatory power.

603.    Thompson Hine and Feher's falsehoods, had they been truthful, might have found some refuge under the aegis of quasi-judicial proceedings, yet Plaintiff has the documentary evidence, and witnesses (other than Plaintiff) with personal knowledge, all of whom will confirm that Feher lied.

604.    Indeed, Thompson Hine and Feher's false statements of fact undeniably expose themselves as egregious falsehoods, devoid of any semblance of truth – a fact that precludes any

possibility of invoking the protective veil of privilege.

605.    The Thompson Hine Defamatory Letter was issued pursuant to regularly issued process.

606.    The content of the Defamatory Letter was stroked with vindictive inked, with an intent to harm Plaintiff, obfuscate Thompson Hine's unlawful conduct, deceive and mislead the EEOC's investigation, attempt to intimidate and humiliate Plaintiff such that Plaintiff would not file this lawsuit, gain an unfair and false advantage in both the EEOC investigation and this lawsuit and each was done without excuse or justification.

607.    The Defamatory Letter was intentionally and malevolently concocted with the purpose of achieving a sinister and improper collateral objective, as outlined herein, including a deliberate and strategic evasion of the EEOC investigation with the intent to manipulate and pervert the results in its favor, coupled with a blatant disregard for professional, ethical, and legal authorities that expressly forbid lawyers from engaging in fraud and treachery upon a tribunal of any kind.

608.    Thompson Hine and Feher cannot shield their lies behind any claim of immunity simply because their lies were submitted to the EEOC.

609.    As Thompson Hine and Feher's written statements were made with specious malice and with the intention to harm Plaintiff and abuse the administrative process at the EEOC, as such they are not entitled to either qualified immunity nor absolute immunity.

610.    Thompson Hine and Feher's Defamatory Letter constitutes defamation *per se.*

611.    As a direct and proximate result of Thompson Hine and Feher malice and unlawful defamation of Plaintiff, Plaintiff has suffered, and continues to suffer, harm and reputational harm, for which Plaintiff is entitled to an award of damages, to the greatest extent

permitted by law.

NINTH CAUSE OF ACTION ABUSE OF PROCESS

(AS AGAINST THOMPSON HINE, READ AND FEHER)

612.    Plaintiff repeats and realleges each allegation of this Second Amended Verified Complaint, as though fully set forth herein.

613.    Thompson Hine, Read and Feher's conduct herein constitutes an abuse of process and tortious injury as against Plaintiff.

614.    The *post hoc* justifications proffered in Thompson Hine's Defamatory Letter to rationalize the demand for Plaintiff's resignation, reveal a desperate reach for a non-discriminatory or non-retaliatory after the fact basis, all of which form a deluge of false factual assertions, including: (A) the false statement of fact that Plaintiff and the firm were fired as a result of Plaintiff's billings to a particular client; (B) the statement that Plaintiff's remote work/relocation to Florida was unknown and unauthorized by Thompson Hine and such impacted and/or hastened the decision to demand Plaintiff's resignation; (C) false statement that Plaintiff was known as a "heavy biller."

615.    Each of the foregoing false fabrications constitutes an abuse of process under New York law, as each was made pursuant to normal process, but with the specific improper purpose of misdirecting and committing fraud upon the EEOC investigation and to derail Plaintiff's stated intention to sue Thompson Hine under the protections afforded by Title VII and other statutes that protect employees from unlawful discrimination.

616.    If Thompson Hine, Read or Feher actually believed in their disparagement of Plaintiff's legal work, ethical obligations would require filing an official complaint and informing firm top tier clients, along with all of the additional clients that Plaintiff worked, that Thompson Hine believed that a lawyer under its authority had billed for legal services that were not provided,

under its term "heavy biller."

617.    Thompson Hine has never identified a single invoice it issued, that included any billable time from Plaintiff, as being "heavy" to any client or any submission by the firm to any ethical body concerning Plaintiff, as it has no legal basis to do so.

618.    Thompson Hine, Read and Feher's endeavor to trash Plaintiff legal performance in the eyes of the EEOC and beyond, which is an improper and unprotected perverted purpose and abuse of process, at the expense of their own clients, in stating (not opining) that Plaintiff was a "heavy biller" is a total mission failure, and the epitome of Thompson Hine, Read and Feher's rancid deceit and abuse of process.

619.    Indeed, Thompson Hine's sits in purgatory, alleging on the one hand, after the EEOC complaint was filed, that Plaintiff was a "heavy biller," and on the other hand, at the same time claims Plaintiff's billable hours were to low: if Thompson Hine is intent on continuing to lie, it should at least lie consistently.

620.    Thompson Hine, Read and Feher, mired in their own web of deceit and evasion, fail to provide any valid attestation to false statements to the EEOC and instead offer cryptic accounts of events that never happened or allude to words that were never spoken.

621.    Thompson Hine, Read and Feher's very fabric of fraud on the EEOC and abuse of process is interwoven with verifiably false information and deflections, that are nothing short of disgraceful.

622.    While Thompson Hine fosters an environment rife with systemic discriminatory and disparate treatment, it is a whole new level of deception and fraud to blatantly lie in response to an EEOC investigation to conceal Thompson Hine's discriminatory and other unlawful conduct.

623.    Thompson Hine's pretentious act of defiance, ineptly scribed by Feher, seeks to conceal the true nature of the unlawful conduct, but their dismal effort to cover their tracks crumble in the face of the unwavering truth and is equally demonstrative of the length and lies Thompson Hine will spin to deflect attention of a legitimate and fulsome investigation by the EEOC or claims like the ones alleged here.

624.    If the Firm had actually engaged counsel to conduct a proper investigation of Plaintiff's claims of unlawful conduct, and provided a truthful response to the EEOC, it would not have to spin the story so hard that it boomerangs to reveal its subversion.

625.    Thompson Hine, and Feher, with upon information and belief, Read's blessing and knowledge, submitted a falsified position statement to the EEOC that contained malevolent, and malice laced false statements, for an improper purpose, that being to gain an unfair advantage in their effort to dissuade the EEOC from its investigatory powers to fairly evaluate Plaintiff's charge.

626.    Thompson Hine, and Feher, upon information and belief, with Read's blessing and knowledge, intentionally tried to harm Plaintiff without excuse or justification.

627.    Thompson Hine, and Feher, upon information and belief, with Read's blessing and knowledge used the EEOC process in a perverted manner to obtain a collateral objective, to interfere with the administrative process, intimidate Plaintiff from pursuing her EEOC charge, by including false statements and defamatory statements therein.

628.    Discovery of Thompson Hine's clients will too confirm that Plaintiff billed millions of dollars for the firm during her 14 year tenure, the firm issued legal invoices that included Plaintiff's time, and never once did Thompson Hine advise a single client that they were owed a "refund" for any of Plaintiff's alleged "heavy" billed time.

629.    In the wake of the Plaintiff's unlawful expulsion and her courageous step of filing a charge with the EEOC, Thompson Hine, Feher and Read stooped to despicable depths in their desperate and improper purpose of distracting the EEOC's inquiring eyes, by intentionally and with malice branding Plaintiff as a "heavy biller," akin to leveling criminal accusations against plaintiff, all of which are demonstrably false and defamatory.

630.    In fact, if Thompson Hine or Feher or Read actually believed the vengeful ink they spewed to the EEOC with regard to heaving billing by Plaintiff, they would be required to render full disclosure and refunds to the identified clients and file ethic complaints in multiple jurisdictions, and they did neither because their false statement was a complete and utter fabrication.

631.    Since no such effort has been undertaken by Thompson Hine, it should *put up* the evidence of heavy billing, or *shut up,* as it has none.

632.    Thompson Hine and Feher and Read's use of the EEOC process for an improper purpose, to state, not opine, that these three factors, improper billing issues, remote/relocation/heavy billing issues specifically lead to Plaintiff's termination constitute an abuse of process as such were made, without privilege, and with an improper purpose: to impede the EEOC investigation, and gain unfair advantage and as scare tactics so Plaintiff would refrain from filing a public complaint.

633.    Liars are not protected by litigation privilege, and thus Thompson Hine and Feher and Read cannot shield their intentional lies under any of the protections it offers.

634.    Liars are not protected by quasi-litigation privilege, and thus Thompson Hine and Feher and Read cannot cloak their intentional lies under its shield either.

635.    The brazen act of Thompson Hine and Feher, facilitated with Read's apparent

endorsement, of making multiple false statements of fact to the EEOC, is both professionally and ethically wretched and unlawful, was done with the malice intent to do harm to Plaintiff without excuse or justification, and their abuse of the legal process was perverted to obtain a collateral and unlawful objective.

636.    By lying to the EEOC, Thompson Hine and Feher and Read sought to obtain a collateral advantage or corresponding detriment to Plaintiff (e.g., retribution for her complaint) which is outside any legitimate ends of the EEOC claims process.

637.    Thompson Hine and Feher and Read should be held accountable for their abuse of process under New York law.

638.    Plaintiff has suffered damages as the result of Thompson Hine and Feher and Read's abuse of process, including costs of suit and reputational damage, in a sum to be determined by a jury, in having to disclose their abuse of process in order to demonstrate a claim (which Thompson Hine and Feher and Read knew and relied upon in putting their abuse of process false statements in the Thompson Hine Defamatory Letter in the hopes such would never be illuminated or scrutinized) and as such punitive damages are available to compensate Plaintiff.

639.    As a direct and proximate result of Thompson Hine, Feher's and Read's abuse of process violations, that were done with intentional malice, Plaintiff has suffered, and continues to suffer, harm and reputational harm, for which Plaintiff is entitled to an award of damages, to the greatest extent permitted by law, including punitive damages.

### TENTH CAUSE OF ACTION  NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### (AS AGAINST THOMPSON HINE AND READ)

640.    Plaintiff repeats and realleges each allegation of this Second Amended Verified Complaint, as though fully set forth herein.

641.     Thompson Hine and Read engaged in conduct negligently inflicting emotional distress upon Plaintiff.

642.     The claim for negligent infliction of emotional distress in New York does not require a physical injury nor extreme or outrageous conduct.

643.     Thompson Hine and Read's conduct in terminating Plaintiff on the afternoon of April 29, 2022 whilst Plaintiff was performing legal services for the firm's most important client, constitute negligence and was intended to put Plaintiff in emotional peril as described and alleged herein.

644.     Thompson Hine and Read owed Plaintiff a duty not to interfere with Plaintiff's ability to perform her legal services for KeyBank on April 29, 2022, and breached that duty by unlawfully demanding Plaintiff resign mid-afternoon.

645.     Read was fully negligent, if not reckless, in failing to inform herself of the firm matters that Plaintiff was working on April 29, 2022, Read could have informed herself, but did not bother.

646.     As a direct and proximate result of Read's negligent failure to inquire of Plaintiff's firm filing docket or any other available avenue of inquiry to determine Plaintiff's workload, Read thereby created circumstances that essentially guaranteed genuine harm to Plaintiff.

647.     With a federal Court filing deadline looming, Plaintiff knew she could not allow DePalma's sexual harassment, gender discrimination and long game success to ruin her career, or Read's utter incompetence in demanding her resignation during a critical KeyBank project.

648.     These actions were taken with the intent to cause, or disregard for, the substantial probability of causing negligent emotional distress.

649.     As a direct and proximate result of Thompson Hine and Read's negligent

conduct, Plaintiff has suffered severe emotional distress.

650.    Thompson Hine and Read's conduct was wanton, malicious, willful and/or cruel, entitling Plaintiff to an award of punitive damages.

**ELEVENTH CAUSE OF ACTION**

**HOSTILE WORK ENVIRONMENT, SEXUAL HARASSMENT AND GENDER DISCRIMINATION UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (AS AGAINST THOMPSON HINE)**

651.    Plaintiff hereby repeats and realleges each allegation of this Second Amended Verified Complaint, as though fully set forth herein.

652.    Thompson Hine has discriminated against Plaintiff on the basis of her gender in violation to Title VII by subjecting Plaintiff to sexual harassment, hostile work environment and disparate treatment based upon Plaintiff's gender, including, but not limited to, subjecting Plaintiff to sexual harassment, a hostile work environment, and disparate treatment.

653.    Title VII of the Civil Rights Act of 1964 provides that it is unlawful for Thompson Hine to discriminate against Plaintiff, an employee, because of that Plaintiff's race, color, or sex. 42 U.S.C.A. § 2000e-2.

654.    Title VII prohibits Thompson Hine's intentional discrimination and disparate treatment of Plaintiff here based upon Plaintiff's gender.

655.    Plaintiff has alleged violation of Title VII herein based upon, *inter alia*, Thompson Hine's discriminatory intent, by both direct or circumstantial evidence, of animus as against Plaintiff.

656.    By the wrongful actions described above, *inter alia*, Thompson Hine discriminated against Plaintiff because of Plaintiff's sex when it, among other wrongful acts, fueled by DePalma sexist biases and misogynistic conduct, fired Plaintiff in response to decades

long allegations of sexual harassment against Thompson Hine's equity partner, DePalma.

657.　　As a result, Plaintiff was denied the opportunity to work in an employment environment free of unlawful discrimination.

658.　　Thompson Hine's actions and conduct violate Title VII of the Civil Rights Act of 1964, as amended.

659.　　Plaintiff was an employee of Thompson Hine at the time of its unlawful conduct and is a protected employee under this statute.

660.　　As a direct and proximate result of Thompson Hine's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which Plaintiff is entitled to an award of monetary damages and other relief.

661.　　As a direct and proximate result of Thompson Hine's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which Plaintiff is entitled to an award of monetary damages and other relief.

662.　　Thompson Hine's unlawful discriminatory and wrongful conduct constitutes a willful and wanton violation of Title VII, was outrageous and malicious, and was intended to injure Plaintiff and was committed with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

### TWELFTH CAUSE OF ACTION

### RETALIATION AND TRANSITION RETALIATION
### UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### (AS AGAINST THOMPSON HINE)

663.　　Plaintiff hereby repeats and realleges each allegation of this Second Amended Verified Complaint, as though fully set forth herein.

664.     Thompson Hine has retaliated against Plaintiff because Plaintiff engaged in protected activity as defined by Title VII of the Civil Rights Act by, *inter alia,* firing her and terminating Plaintiff's employment.

665.     Thompson Hine engaged in unlawful transition retaliation in its conduct as against Plaintiff post termination as described herein.

666.     As a direct and proximate result of Thompson Hine's unlawful retaliatory conduct and transition retaliatory conduction, both of which were done in intentional violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which Plaintiff is entitled to an award of monetary damages and other relief.

667.     As a direct and proximate result of Thompson Hine's unlawful retaliatory and transition retaliatory unlawful conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and for which she is entitled to an award of monetary damages and other relief.

668.     Thompson Hine's unlawful retaliatory and transition retaliatory wrongful conduct constitutes a willful and wanton violation of Title VII, was outrageous, malicious and cruel, was intended to injure Plaintiff and was committed with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Rebecca Brazzano demands judgment against the Defendants, jointly and severally, in an amount to be determined at trial for the following relief:

1.     A declaratory judgment that Plaintiff is an employee and as such is protected against unlawful discrimination pursuant to, *inter alia,* Title VII;

2.     A declaratory judgment that the unlawful actions, conduct, and practices of Defendants here violated federal, New York State, and New York City laws;

3.    An award of economic damages, compensatory damages and punitive damage, plus such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award, in an amount not less than Fifteen Million Dollars ($15,000,000);

4.    An award of monetary damages for mental anguish and emotional distress;

5.    An award of reasonable attorneys' fees, costs, and expenses of this action;

6.    Permanent equitable and injunctive relief as against each Defendant for their unlawful conduct; and

7.    Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: June 21, 2024
       New York, New York

                                                    /s/ Rebecca Brazzano
                                                    Rebecca Brazzano

## VERIFICATION

I, Rebecca Brazzano, pursuant to 28 U.S. Code §1746, do hereby verify under penalty of perjury under the laws of the United States of America as follows:

1.      I have personal knowledge of the allegations contained in the foregoing Second Amended Verified Complaint;

2.      I have read the foregoing Second Amended Verified Complaint and he exhibits thereto, and know the contents thereof. The same are true to my knowledge, except as to those allegation made upon information and belief, as to those, I believe them to be true.

3.      The allegations of the Second Amended Verified Complaint to which this Verification is attached, are of facts admissible in evidence to which the undersigned is competent to testify.

4.      I do hereby verify under the penalties of perjury that the foregoing is true and correct.

I am aware if any of the foregoing statements made by me are willfully false, I am subject to punishment by law.

Executed on this 21st day of June, 2024      /s/ Rebecca Brazzano
                                                                       Rebecca Brazzano