**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

REBECCA BRAZZANO,                                    Index No.: 24-cv-01420 (ALC)(KHP)

                Plaintiff,

v.

THOMPSON HINE LLP, RICHARD
ANTHONY DE PALMA (in his individual and          **NOTICE OF RECENT AUTHORITY**
professional capacities), DEBORAH ZIDER
READ (in her individual and professional
capacities), and THOMAS LAWRENCE FEHER
(in his individual and professional capacities),

                Defendants.

       Plaintiff respectfully submits this Notice of Recent Authority to bring to the Court's attention an order by the United States Court of Appeals, Second Circuit, that was decided on August 12, 2024, after the defendants' Motion to Compel Arbitration was fully briefed, that is directly relevant to plaintiff's opposition to defendants' motion (currently under submission). The relevant ruling is *Olivieri v. Stifel*, 112 F.4th 74 (2d Cir. 2024) *(Docket No. 23-658-cv)*("*Olivieri* Decision") and is attached here as Exhibit A.

       The *Olivieri* Decision reached the Second Circuit on appeal from the United States District Court, Southern District of New York (Azrack, J.) as follows: "In March 2022, the district court granted a motion to compel arbitration of Olivieri's state and federal gender-based hostile work environment and retaliation claims. Olivieri moved for reconsideration in light of the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 ('EFAA'), which had been enacted earlier that month. On reconsideration, the district court vacated its earlier decision and denied the motion to compel arbitration, concluding that Olivieri's claims

accrued after the EFAA was enacted and that the statute therefore renders her arbitration agreement voidable by Olivieri."

The Court of Appeals affirmed Judge Azrack's decision and order, like this case, involved claims under EFAA, arising out of the plaintiff's causes of action for sexual harassment and hostile work environment (Docket No. 50, ¶¶ *inter alia*, 549-559, SEXUAL HARASSMENT NEW YORK STATE HUMAN RIGHTS LAW (AS AGAINST DEPALMA AND THOMPSON HINE); ¶¶ *inter alia*, 560-568 SEXUAL HARASSMENT, HOSTILE WORK ENVIRONMENT, AND DISCRIMINATION IN VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW (AS AGAINST DEPALMA AND THOMPSON HINE)).

Defendants have argued to this Court that the EFAA does not apply because, they claim, the "EFAA only applies to harassment claims the 'arise[] or accrue[] on or after the date of enactment," to wit, March 2, 2022.

The Second Circuit has rejected defendants argument, in holding that "[a] hostile work environment claim continues to accrue, or reaccrues, each time the defendant engages in an act that is 'part of the ongoing, discriminatory practice that created a hostile work environment."

> The EFAA defines a 'sexual harassment dispute' as 'a dispute relating to conduct that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law.' 9 U.S.C. § 401(4) (emphasis added). This Court has recognized that retaliation for reporting discrimination 'is reasonably related to the underlying discrimination,' such that a plaintiff who exhausts a discrimination claim with the EEOC may also pursue a claim for retaliation. …Under similar reasoning, retaliation resulting from a report of sexual harassment is 'relat[ed] to conduct that is alleged to constitute sexual harassment.' 9 U.S.C. § 401(4). *Olivieri* [WL at 40].

> If Congress wanted the EFAA to apply only to claims that 'first' accrue after its enactment, it could have said so. Congress is clearly familiar with the phrase, which appears in multiple other statutes.…  If Congress had tied the effective date of the EFAA to when a claim *first* accrues, we might reach a different conclusion. But it didn't, and we "do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply. *Id.* [WL at 34].

Plaintiff has pled here, *inter alia*, claims sounding in sexual harassment, aiding and abetting sexual harassment and retaliation for reporting sexual harassment that accrued in some cases prior to the enactment of the EFAA, and clearly those that occurred after the EFAA's effective date, including that defendants "fired Plaintiff in response to decades long allegations of sexual harassment against Thompson Hine's equity partner, DePalma" (Docket 50, ¶656) which conduct occurred on June 29, 2022 (*id.*, ¶311), along with its submission of defamatory and false retalitory statements to the Equal Employment Opportunity Commission in February 2023 (*id.* ¶378; Ex. 2) in direct retaliation for Plaintiff's raising claims for sexual harassment prior to her departure from the firm, on May 6, 2022 (*id.* ¶354).

The Olivieri Decision rejected the defense effort to eclipse the application of the EFAA under the continuing violation doctrine, is controlling precedent, and applies equally here.  It is respectfully submitted that this Court should reject defendants' efforts to evade the EFAA's application to plaintiff's claims and deny defendants' motion to compel forced secret arbitration. (Docket 51).

Dated: September 17, 2024
     New York, New York

                                       BRAZZANO LAW PLLC

                                       By: */s/ Rebecca Brazzano*
                                       Rebecca Brazzano, Esq.
                                       43 West 43rd Street, Suite 264
                                       New York, New York 10036
                                       Telephone: (561) 685-3812
                                       Email: rbrazzano@brazzanolaw.com

# EXHIBIT A

 Neutral
As of: September 14, 2024 6:46 PM Z

# Olivieri v. Stifel

United States Court of Appeals for the Second Circuit

April 3, 2024, Submitted; August 12, 2024, Decided

Docket No. 23-658-cv

**Reporter**
2024 U.S. App. LEXIS 20216 *; __ F.4th __

PATRICIA OLIVIERI, Plaintiff-Appellee, -v.- STIFEL, NICOLAUS & COMPANY, INCORPORATED, NEIL ISLER, IN HIS INDIVIDUAL AND PROFESSIONAL CAPACITY, ROBERT CODIGNOTTO, IN HIS INDIVIDUAL AND PROFESSIONAL CAPACITY, Defendants-Appellants, CHRISTINA SCELTA, IN HER INDIVIDUAL AND PROFESSIONAL CAPACITY, JULIE GAFFNEY, IN HER INDIVIDUAL AND PROFESSIONAL CAPACITY, Defendants.

**Prior History: [*1]** Defendants-Appellants Stifel, Nicolaus & Company, Incorporated, Neil Isler, and Robert Codignotto appeal from the March 31, 2023 order of the United States District Court for the Eastern District of New York (Azrack, J.) declining to compel arbitration of Plaintiff-Appellee Patricia Olivieri's hostile work environment claims.

In March 2022, the district court granted a motion to compel arbitration of Olivieri's state and federal gender-based hostile work environment and retaliation claims. Olivieri moved for reconsideration in light of the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 (*__EFAA__*), which had been enacted earlier that month. On reconsideration, the district court vacated its earlier decision and denied the motion to compel arbitration, concluding that Olivieri's claims accrued after the *__EFAA__* was enacted and that the statute therefore renders her arbitration agreement voidable by Olivieri.

On appeal, we agree with the district court. Based on the continuing violation doctrine, Olivieri's hostile work environment claims accrued after March 3, 2022, the date the *__EFAA__* became effective. Consequently, her arbitration agreement is invalid and unenforceable, and we accordingly AFFIRM the order of the district court denying the motion **[*2]** to compel arbitration.

Olivieri v. Stifel, 2023 U.S. Dist. LEXIS 57001, 2023 WL 2740846 (E.D.N.Y., Mar. 31, 2023)

**Disposition:** AFFIRMED.

## Core Terms

accrue, accrual, hostile work environment claim, retaliation, alleges, sexual harassment, statute of limitations, retroactive, continuing violation doctrine, hostile work environment, district court, license, arbitration agreement, effective date, arbitration, compel arbitration, cause of action, retaliatory, harassing, started, limitations period, accommodation, complaints, quotation, reaccrue, marks, sexual assault, reconsideration, inappropriate, employees

## LexisNexis® Headnotes

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability
Business & Corporate Compliance > Alternative Dispute Resolution > Arbitration > Arbitrability

Labor & Employment Law > ... > Sexual Harassment > Scope & Definitions > Sexual Harassment

Business & Corporate Compliance > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements
Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

*HN1*[ ] **Arbitration, Arbitrability**

In broad strokes, the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 (*__EFAA__*) renders arbitration agreements invalid and

2024 U.S. App. LEXIS 20216, *2

unenforceable, at the election of the complainant, in sexual assault and sexual harassment cases.

Labor & Employment Law > ... > Title VII Discrimination > Statute of Limitations > Continuing Violations

Labor & Employment Law > ... > Harassment > Racial Harassment > Statute of Limitations

Labor & Employment Law > ... > Civil Actions > Time Limitations > Continuing Violations

Labor & Employment Law > ... > Harassment > Sexual Harassment > Hostile Work Environment

Labor & Employment Law > ... > Sexual Harassment > Scope & Definitions > Sexual Harassment

*HN2*[⬇] **Statute of Limitations, Continuing Violations**

By its terms, the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 (***EFAA***) applies with respect to any dispute or claim that accrues on or after the Effective Date. Pub. L. No. 117-90, § 3, 136 Stat. at 28. The term accrue means the same thing under the ***EFAA*** as it does in the statute-of-limitations context. Pursuant to the continuing violation doctrine, the statute of limitations for hostile work environment claims runs from the time of the last act in the continuing course of discriminatory or retaliatory conduct.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

*HN3*[⬇] **Standards of Review, Abuse of Discretion**

Orders granting reconsideration are reviewed for abuse of discretion. But because a district court necessarily abuses its discretion when it makes an error of law, the appellate court reviews legal determinations without deference.

Business & Corporate Compliance > ... > Arbitration > Federal Arbitration

Act > Arbitration Agreements
Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

Labor & Employment Law > ... > Sexual Harassment > Scope & Definitions > Sexual Harassment

*HN4*[⬇] **Federal Arbitration Act, Arbitration Agreements**

In general, the Federal Arbitration Act (FAA) mandates that agreements to arbitrate are valid, irrevocable, and enforceable. 9 U.S.C.S. § 2. The Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 (***EFAA***) is codified directly into the FAA and limits the scope of this broad mandate to enforce arbitration agreements. 9 U.S.C.S. § 402(a).

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability
Business & Corporate Compliance > Alternative Dispute Resolution > Arbitration > Arbitrability

Labor & Employment Law > ... > Sexual Harassment > Scope & Definitions > Sexual Harassment

Business & Corporate Compliance > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements
Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

*HN5*[⬇] **Arbitration, Arbitrability**

A predispute arbitration agreement is any agreement to arbitrate a dispute that had not yet arisen at the time of the making of the agreement. 9 U.S.C.S. § 401(1). A sexual assault dispute refers to a dispute involving a nonconsensual sexual act or sexual contact, as such terms are defined in 18 U.S.C.S. § 2246 or similar applicable Tribal or State law, including when the victim lacks capacity to consent. § 401(3). And a sexual harassment dispute is a dispute relating to conduct that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law. § 401(4).

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

2024 U.S. App. LEXIS 20216, *2

Business & Corporate Compliance > Alternative Dispute Resolution > Arbitration > Arbitrability

Labor & Employment Law > ... > Sexual Harassment > Scope & Definitions > Sexual Harassment

Governments > Legislation > Statute of Limitations > Time Limitations

### HN6[⤓]  Arbitration, Arbitrability

By its terms, the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 (*EFAA*) applies with respect to any dispute or claim that arises or accrues on or after the date of enactment of this Act—i.e., March 3, 2022. Pub. L. No. 117-90, § 3, 136 Stat. 26, 28 (2022). It makes no legal difference that this provision is codified in a statutory note, not the main body, of the United States Code.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability
Business & Corporate Compliance > Alternative Dispute Resolution > Arbitration > Arbitrability

Labor & Employment Law > ... > Sexual Harassment > Scope & Definitions > Sexual Harassment

### HN7[⤓]  Arbitration, Arbitrability

Whether the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 (*EFAA*) governs turns on the meaning of the phrase "any claim accrues." Pub. L. No. 117-90, § 3, 136 Stat. at 28.

Civil Rights Law > Protection of Rights > Procedural Matters > Continuing Violations

Torts > ... > Statute of Limitations > Begins to Run > Continuing Violations

Labor & Employment Law > ... > Title VII Discrimination > Statute of Limitations > Continuing Violations

Governments > Legislation > Statute of Limitations > Time Limitations

Labor & Employment Law > ... > Civil

Actions > Time Limitations > Continuing Violations

### HN8[⤓]  Procedural Matters, Continuing Violations

The concept of accrual is tightly bound with the operation of statutes of limitations. Thus, when a claim accrues turns on the law applicable to the type of claim in question. In the context of claims subject to the continuing violation doctrine, a claim first accrues when the plaintiff has an actionable claim; but because such a claim is a single and indivisible claim arising from numerous specific acts undertaken in a continuing course, the claim reaccrues—it is essentially reborn—with each successive act that is part of that continuing course.

Governments > Legislation > Statute of Limitations > Time Limitations

### HN9[⤓]  Statute of Limitations, Time Limitations

The question of whether and when a claim accrued is almost invariably tied to the question whether it is timely under the applicable statute of limitations. As a general matter, the Supreme Court has explained, a statute of limitations begins to run when the cause of action accrues—that is, when the plaintiff can file suit and obtain relief.

Governments > Legislation > Statute of Limitations > Time Limitations

### HN10[⤓]  Statute of Limitations, Time Limitations

The Supreme Court has recognized that it is theoretically possible for a statute to create a cause of action that accrues at one time for the purpose of calculating when the statute of limitations begins to run, but another time for the purpose of bringing suit, but said it would not infer such an odd result in the absence of any such indication in the statute.

Governments > Legislation > Statute of Limitations > Time Limitations

### HN11[⤓]  Statute of Limitations, Time Limitations

Generally, a right accrues when it comes into existence—i.e., when the plaintiff has a complete and

present cause of action.

Governments > Legislation > Statute of
Limitations > Time Limitations

*HN12*[⬇] **Statute of Limitations, Time Limitations**

Accrual is the date on which the statute of limitations
begins to run. For this reason, courts often refer to a
claim accruing and the limitations period starting as two
sides of the same coin.

Governments > Legislation > Statute of
Limitations > Time Limitations

*HN13*[⬇] **Statute of Limitations, Time Limitations**

In short, the time a claim accrues means the point at
which the statute of limitations clock starts ticking.

Governments > Legislation > Statute of
Limitations > Time Limitations

*HN14*[⬇] **Statute of Limitations, Time Limitations**

When a claim accrues—that is, when the limitations
period starts to run—depends on the nature of the
claim, and is informed by common law principles.
Different causes of action accrue differently, so there
are hazards inherent in attempting to define for all
purposes the point at which a cause of action accrues.
Federal law determines when federal causes of actions
accrue, just like state law determines when state-law
claims accrue, Within each body of law, there are
different accrual rules depending on the nature of the
cause of action.

Civil Rights Law > Protection of Rights > Procedural
Matters > Continuing Violations

Torts > ... > Statute of Limitations > Begins to
Run > Continuing Violations

Labor & Employment Law > ... > Title VII
Discrimination > Statute of Limitations > Continuing
Violations

Governments > Legislation > Statute of
Limitations > Time Limitations

Labor & Employment Law > ... > Civil
Actions > Time Limitations > Continuing Violations

*HN15*[⬇] **Procedural Matters, Continuing Violations**

Some claims arise when the defendant commits the
injurious act. Some arise when the plaintiff experiences
the injury. Some causes of action accrue serially: they
accrue (and reaccrue) pursuant to the continuing
violation doctrine. That doctrine provides an exception
to the normal knew-or-should-have-known accrual
date—meaning an exception to how accrual normally
works. For claims that are composed of a series of
separate acts that collectively constitute one unlawful
practice, the continuing violation doctrine lays out an
alternative framework for evaluating accrual. Because
such claims are made up of a series of acts, they accrue
and reaccrue with each successive act that is part of the
singular unlawful practice.

Civil Rights Law > Protection of Rights > Procedural
Matters > Continuing Violations

Labor & Employment Law > ... > Title VII
Discrimination > Statute of Limitations > Continuing
Violations

Labor & Employment
Law > ... > Harassment > Racial
Harassment > Statute of Limitations

Labor & Employment Law > ... > Civil
Actions > Time Limitations > Continuing Violations

Labor & Employment
Law > ... > Harassment > Sexual
Harassment > Statute of Limitations

*HN16*[⬇] **Procedural Matters, Continuing Violations**

A common type of claim subject to the continuing
violation doctrine is a hostile work environment claim.
Those claims are subject to the continuing violation
doctrine because, unlike discrete acts, their very nature
involves repeated conduct. A hostile work environment
generally doesn't occur on any one day; it emerges over
a series of days or perhaps years. It is this constellation
of events that gives rise to a hostile work environment
claim. As a result, the continuing violation doctrine

2024 U.S. App. LEXIS 20216, *2

provides that such claims do not accrue—and the statute of limitations period does not begin to run—until the last discriminatory act in furtherance of the hostile work environment. That means that such claims accrue, and reaccrue, each time the defendant commits an act that is part of the same course of harassing conduct. If an act contributing to the hostile environment occurs within the filing period, the hostile work environment claim is timely, and a factfinder can hold a defendant liable for the entire time period of the hostile environment, including the period falling outside of the limitations period.

Labor & Employment
Law > ... > Harassment > Sexual
Harassment > Hostile Work Environment

Labor & Employment
Law > ... > Harassment > Racial
Harassment > Hostile Work Environment

Labor & Employment
Law > ... > Harassment > Sexual
Harassment > Statute of Limitations

**HN17**[ ]  **Sexual Harassment, Hostile Work Environment**

A hostile work environment claim continues to accrue, or reaccrues, each time the defendant engages in an act that is part of the ongoing, discriminatory practice that created a hostile work environment.

Labor & Employment Law > ... > Civil
Actions > Time Limitations > Continuing Violations

Labor & Employment
Law > ... > Harassment > Sexual
Harassment > Hostile Work Environment

Labor & Employment
Law > ... > Harassment > Sexual
Harassment > Statute of Limitations

Labor & Employment
Law > ... > Harassment > Racial
Harassment > Hostile Work Environment

Labor & Employment
Law > Discrimination > Disparate

Treatment > Statute of Limitations

**HN18**[ ]  **Time Limitations, Continuing Violations**

Because hostile work environment claims continue to accrue until the last discriminatory act in furtherance of the hostile work environment, such claims can have multiple accrual dates.

Civil Procedure > ... > Alternative Dispute
Resolution > Arbitration > Arbitrability
Business & Corporate Compliance > Alternative
Dispute Resolution > Arbitration > Arbitrability

Labor & Employment Law > ... > Sexual
Harassment > Scope & Definitions > Sexual
Harassment

**HN19**[ ]  **Arbitration, Arbitrability**

If Congress wanted the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 (**EFAA**) to apply only to claims that "first" accrue after its enactment, it could have said so. Congress is clearly familiar with the phrase, which appears in multiple other statutes.

Labor & Employment
Law > ... > Harassment > Sexual
Harassment > Hostile Work Environment

Labor & Employment Law > ... > Sexual
Harassment > Scope & Definitions > Sexual
Harassment

**HN20**[ ]  **Sexual Harassment, Hostile Work Environment**

When Congress uses language that has an established legal meaning, absent an indication to the contrary, we should be wary of inferring that it actually meant something else. In short, the ordinary public meaning of a claim accrues is the same as the established legal meaning, including that hostile work environment claims accrue with each wrongful act. The presumption that Congress intended this meaning of accrual is particularly appropriate here because the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 (**EFAA**) applies to sexual harassment disputes, 9 U.S.C.S. § 402, which are prototypical

hostile work environment claims.

Governments > Legislation > Effect & Operation > Retrospective Operation

*HN21*[📥]    **Effect & Operation, Retrospective Operation**

Statutory retroactivity has long been disfavored. As a result, courts have fashioned a presumption against retroactivity that is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic. In light of this presumption, courts decline to give a statute retroactive effect unless such construction is required by explicit language or by necessary implication.

Governments > Legislation > Effect & Operation > Retrospective Operation

*HN22*[📥]    **Effect & Operation, Retrospective Operation**

The Supreme Court has provided a three-step process for determining whether a statute should be retroactively applied. First, courts ask whether Congress has expressly prescribed the statute's proper reach, and in the absence of language as helpful as that we try to draw a comparably firm conclusion about the temporal reach specifically intended by applying our normal rules of construction. If that effort fails, courts next consider whether applying the statute to the person objecting would have a retroactive consequence in the disfavored sense of affecting substantive rights, liabilities, or duties on the basis of conduct arising before its enactment. If the answer to that question is yes, then courts apply the presumption against retroactivity by construing the statute as inapplicable to the event or act in question.

Governments > Legislation > Effect & Operation > Retrospective Operation

*HN23*[📥]    **Effect & Operation, Retrospective Operation**

Congress may, within constitutional limits, enact laws that operate retroactively. The potential unfairness of retroactive civil legislation is not a sufficient reason for a court to fail to give a statute its intended scope.

Business & Corporate Compliance > ... > Harassment > Sexual Harassment > Civil Enforcement Actions
Labor & Employment Law > ... > Harassment > Sexual Harassment > Civil Enforcement Actions

Labor & Employment Law > ... > Sexual Harassment > Scope & Definitions > Sexual Harassment

*HN24*[📥]    **Sexual Harassment, Civil Enforcement Actions**

The Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 (***EFAA***) defines a sexual harassment dispute as a dispute relating to conduct that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law. 9 U.S.C.S. § 401(4). Retaliation for reporting discrimination is reasonably related to the underlying discrimination, such that a plaintiff who exhausts a discrimination claim with the EEOC may also pursue a claim for retaliation. Under similar reasoning, retaliation resulting from a report of sexual harassment is related to conduct that is alleged to constitute sexual harassment. 9 U.S.C.S. § 401(4).

Civil Procedure > Appeals > Appellate Briefs

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

*HN25*[📥]    **Appeals, Appellate Briefs**

Absent some showing of manifest injustice, arguments not made in appellant's opening brief are waived even if the appellant pursued those arguments in the district court or raised them in a reply brief on appeal.

**Counsel:** David E. Gottlieb, Alfredo J. Pelicci, Wigdor LLP, New York, NY, for Plaintiff-Appellee.

Kevin B. Leblang, Izabel P. McDonald, Kramer Levin Naftalis & Frankel LLP, for Defendants-Appellants.

Shelby Leighton, Ellen Noble, Public Justice, Washington, DC, Jeffrey R. White, American Association for Justice, for Amici Curiae Public Justice, American Association for Justice, and the New York Chapter of the National Employment Lawyers

2024 U.S. App. LEXIS 20216, *2

Association in support of Plaintiff-Appellee.

**Judges:** Before: RAGGI, ROBINSON, Circuit Judges, and RAKOFF, District Judge.[1]

**Opinion by:** ROBINSON

# Opinion

ROBINSON, *Circuit Judge*:

While a motion to compel arbitration in this case was pending in the district court, Congress enacted the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 ("*EFAA*"). *See* Pub. L. No. 117-90, 136 Stat. 26 (2022) (codified at 9 U.S.C. §§ 401-402). **HN1**[⬆] In broad strokes, the *EFAA* renders arbitration agreements invalid and unenforceable, at the election of the complainant, in sexual assault and sexual harassment cases. The question on appeal is whether the *EFAA* applies to this case, meaning it may stay in federal court, or whether it doesn't, meaning it must go to arbitration.

In 2021, Plaintiff-Appellee Patricia Olivieri sued her employer, Stifel, Nicolaus & Company, Incorporated ("Stifel"), under the New York State Human Rights Law ("NYSHRL"). Olivieri **[*3]** alleged that Neil Isler, her manager, sexually assaulted and repeatedly sexually harassed her. After she reported him to the company, Stifel and the other defendants allegedly subjected her to a hostile work environment characterized by discrimination and retaliation. Through subsequent amendments, Olivieri added claims under Title VII of the Civil Rights Act of 1964 ("Title VII") and named individual defendants Isler and Robert Codignotto (collectively with Stifel, "Defendants").

The defendants moved to compel arbitration, citing an arbitration provision in Olivieri's employment agreement. The U.S. District Court for the Eastern District of New York (Joan M. Azrack, *Judge*) granted the motion on March 28, 2022, compelling arbitration of Olivieri's claims. *See Olivieri v. Stifel, Nicolaus & Company, Inc.*, 2022 U.S. Dist. LEXIS 55560, 2022 WL 900713, at *5 (E.D.N.Y. Mar. 28, 2022) ("*Olivieri I*"). The court's order did not mention the *EFAA*, which had just been enacted a few weeks earlier on March 3, 2022 (the "Effective

Date"). In light of the new law, Olivieri moved to amend her complaint to add additional allegations and defendants, and asked the district court to reconsider its decision compelling arbitration.[2]

In its March 31, 2023 order granting Olivieri's motions, the district court applied the continuing violation doctrine and concluded that, as alleged **[*4]** in the Second Amended Complaint ("SAC"), Olivieri's ongoing hostile work environment claims accrued after the Effective Date. *See Olivieri v. Stifel Nicolaus & Company, Inc.*, 2023 U.S. Dist. LEXIS 57001, 2023 WL 2740846, at *6-7 (E.D.N.Y. Mar. 31, 2023) ("*Olivieri II*"). As a result, the *EFAA* applied, and Olivieri was permitted to void her arbitration agreement. 2023 U.S. Dist. LEXIS 57001, *[WL]* at *7. The district court consequently vacated its earlier order ruling to the contrary and denied Defendants' motion to compel arbitration. *Id.* Defendants now appeal that order.

As we explain below, we agree with the district court that the *EFAA* applies in this case. **HN2**[⬆] By its terms, the statute applies with respect to "any dispute or claim that accrues on or after" the Effective Date. Pub. L. No. 117-90, § 3, 136 Stat. at 28. The term "accrue" means the same thing under the *EFAA* as it does in the statute-of-limitations context. Pursuant to the continuing violation doctrine, the statute of limitations for hostile work environment claims runs from the time of the last act in the continuing course of discriminatory or retaliatory conduct. Olivieri began to experience a retaliatory hostile work environment before the Effective Date, but the continuing course of conduct that underlies her retaliatory hostile work environment claim persisted *after* the *EFAA* was enacted. Her claim thus accrued after the **[*5]** Effective Date, the *EFAA* applies in this case, and she was permitted to invalidate her arbitration agreement. Accordingly, we AFFIRM the district court's order.

## BACKGROUND

For purposes of this appeal, we accept as true the allegations in Olivieri's SAC. *See Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 113 (2d Cir. 2012).

## I. Pre-*EFAA* Facts

---

[1] Judge Jed S. Rakoff, of the United States District Court for the Southern District of New York, sitting by designation.

[2] The Second Amended Complaint added Christina Scelta and Julie Gaffney as defendants.

In 2018, Patricia Olivieri started work as a Client Services Associate at Stifel, a financial services firm. In that role, she provided support and assistance in managing more than 1,500 clients and hundreds of millions of dollars of assets, as well as procuring more than $11 million in assets that clients invested with Stifel.

When she started, Olivieri reported to multiple manager-level employees with the understanding that she would later be assigned to report directly to one of them. One of those employees was Neil Isler, Senior Vice President of Investments. Isler visited her cubicle on a daily basis, often stopping by multiple times a day. Olivieri suspected that Isler was attempting to establish a relationship so that she would eventually be assigned to work directly for him. A few months later, her suspicions were validated. She was assigned to report directly to Isler in June 2018.

As Olivieri's direct manager, **[*6]** Isler took it upon himself to increase Olivieri's compensation. At first, he guaranteed her a $10,000 annual bonus. A few months later, he increased it to $15,000. It was unusual to get such a large bonus; most of Olivieri's peers at the company received just a few hundred dollars each.

Once Olivieri began reporting to Isler, the harassment started. He would call her into his office during the workday for long, closed-door meetings, during which he brought up topics ranging from his sex life with his wife to rape. On numerous occasions, Isler discussed an incident in which a friend of his had raped a woman he knows, providing lurid details "with a big grin on his face." Jt. App'x at 307. He chatted about cheating on his wife, having a threesome during his lunch break, and his children finding a used condom in his car after he had sex in the car with a woman who was not his wife. During these conversations, Isler shared graphic details about his sexual predilections and asked Olivieri about hers.

In addition to verbally sexually harassing Olivieri, Isler acted inappropriately toward her. He watched pornography in view of Olivieri, put his hand on top of hers to move her computer mouse, **[*7]** and leaned into her so that his crotch was close to touching her. On one occasion, while she was in his office, Isler stood up from his chair and walked over to where Olivieri was standing, pretended to reach for something from his briefcase, and then placed his palm on her buttocks.

Olivieri alleges Isler's harassment continued until a temporary hiatus during the COVID-19 pandemic. Stifel

shuttered its offices in March 2020, and Olivieri worked from home until August. But when she returned, Isler's harassment picked up where he left off. For example, he repeatedly tried to enter Olivieri's cubicle, despite her pleas for him to keep his distance to prevent the spread of COVID-19.

By September 2020, Stifel employees were back in the office full time. Olivieri decided she wanted to sit for the Financial Industry Regulatory Authority's (FINRA) Series 9 and 10 exams to obtain a license to be a General Securities Sales Supervisor. She raised the topic with Robert Codignotto, a Senior Vice President of Investments and the Branch Manager of the Garden City office. He told her that Stifel would be happy to sponsor her for the exams and that Olivieri was undervalued at the company. Codignotto **[*8]** wanted her to get the license as soon as possible because he needed someone to take on the General Securities Sales Supervisor role immediately. He also told her that her salary could double with the license.

Codignotto was also Isler's supervisor, so during their meeting, Olivieri asked Codignotto if she could be transferred from reporting to Isler because she felt that Isler was disrespectful toward her. Codignotto asked if there was anything specific Olivieri wanted to discuss. Olivieri thought that Codignotto inferred that something was wrong, so she left it at that.

On September 14, 2020, Codignotto called Olivieri into his office. A few days earlier, Olivieri had used a day of paid time off ("PTO") because heavy rain made it unsafe for her to drive to work. Codignotto told her that Isler complained that she made the request to Codignotto rather than to Isler, and that Isler complained about Olivieri taking intermittent leave to care for her mother.

Codignotto assured Olivieri that she did nothing wrong and didn't need to worry, stating that Isler had a "power issue." Jt. App'x at 314. He also encouraged her to take the Series 9 and 10 exams as soon as possible and said that he might **[*9]** transfer her to another manager even before she obtained her license. Olivieri was concerned that she'd have to forgo her bonus payments if she were transferred from Isler, but Codignotto assured her that her compensation wouldn't be affected.

On September 21, 2020, after Olivieri indicated that she was not comfortable meeting with Isler in his office, he called her instead of visiting her in person. During the call, he asked Olivieri: "Do you like me? Because I like you." Jt. App'x at 312. Isler's question made her uncomfortable, so she didn't respond. After a few

moments, Isler asked if she felt pressured to say yes, and Olivieri stated that she did. Isler reassured her that he wanted her to be happy and told her he hoped to work with her "forever." *Id.*

A few days later, on September 25, 2020, Isler emailed Olivieri to complain about her work on a project he had given her with open parameters and no clear time frame. Olivieri then called Codignotto and told him that Isler was retaliating against her for avoiding him and refusing to engage in nonwork discussions. Again, Codignotto reassured Olivieri, stating that there was nothing Isler could do to her and that she might be able to **[*10]** work out of the Melville office. Codignotto encouraged her to discuss her problems with Human Resources ("HR"), but Olivieri was hesitant to complain out of fear of retaliation and losing her job. Ultimately, Codignotto suggested they talk the next week so that Olivieri could decide how she wanted to proceed.

Before Olivieri had a chance to discuss the issue in more depth with Codignotto, Isler confronted her. When she arrived at work on September 29, Isler told her that he wanted to discuss her projects and assignments. Olivieri went to Codignotto's office to complain that Isler had just confronted her, and to explain that she was uncomfortable working in the same office as Isler. Codignotto stated he needed more time to evaluate the situation because he had been looking into her compensation and had not previously been aware that Isler guaranteed her a $15,000 bonus. He told Olivieri to take the next day off.

After Olivieri returned to her desk, Isler went to Codignotto's office and accused her of being "trouble." Jt. App'x at 316. Isler claimed that Olivieri had once said that Codignotto had told her that she "looked nice in her jeans." *Id.* Isler reported that Olivieri thought that **[*11]** Codignotto's comment was inappropriate. After Isler left Codignotto's office, Codignotto called Olivieri back in, recounted what Isler told him, and asked Olivieri if they had a problem.

Olivieri denied making the statement about Codignotto—she didn't even wear jeans to work—and explained that Isler was making false accusations against her because of her complaints about him. At Codignotto's request, Olivieri took a day off while she figured out the situation.

On October 4, Olivieri called Codignotto and explained she was anxious about complaining about Isler and how her complaints would affect her pay, job security, and Stifel's support of her pursuit of a securities license.

Though he didn't guarantee her pay would remain the same if she were transferred to a different supervisor, Codignotto reiterated that Olivieri would not face retaliation. He also said that Olivieri would not be promoted even if she obtained her General Securities Sales Supervisor license because he needed someone to take on the role right away. Codignotto also stated that Olivieri's complaints needed to be escalated to HR.

This prompted an internal investigation. On October 5, 2020, Olivieri received a call from **[*12]** Zack Anderson, an HR employee at Stifel who investigated her complaints about Isler. Over the course of an hour-long call, Olivieri detailed Isler's sexually harassing behavior. At the end of the call, Anderson told Olivieri to take the next day off.

The following day, Anderson told Olivieri that he would be speaking with Isler the next day; he indicated that he didn't share any details of her complaint with Codignotto. Anderson also mentioned that Codignotto acknowledged she was a strong performer and had shown initiative. He assured her there would be a full investigation, but noted it was a "he said, she said" situation.

Anderson later followed up with Olivieri and told her that Isler had been directed not to speak to her and that the investigation should be complete by the end of the week. On October 8, he told Olivieri to keep her complaints confidential and asked her several follow up questions. In particular, he asked whether she had made any inappropriate comments during her conversations with Isler, and asked when Olivieri became aware that Isler had issues with her performance. Olivieri responded that she had never engaged in inappropriate comments or behavior with Isler and **[*13]** that she had already discussed Isler's false allegations regarding her performance with Codignotto. At the end of the call, Anderson said Olivieri would be placed on administrative leave and should stay home until further notice.

The next day, Anderson called Olivieri again and admitted that Isler had made inappropriate comments and that his behavior would be addressed, though Anderson didn't explain how. He also accused Olivieri of making inappropriate comments at work, despite her insistence the day before that she had never made any such comments.

Anderson presented Olivieri two options: she could either return to work at the Garden City office, where Isler would still be working, or she could move to the

Melville office and work for another manager. Olivieri was hesitant because these arrangements could impact her professional development. The other managers for whom she could work managed approximately $2 million in assets, whereas Isler managed over $300 million.

Anderson told Olivieri that Stifel would increase her base salary from $47,470 to $55,000 with a bonus between $3,000 and $5,000. But that reduction in her bonus would result in a reduction to Olivieri's current total compensation. **[*14]** Olivieri reiterated that Isler sexually assaulted and sexually harassed her and that Stifel's response was unacceptable. Anderson gave Olivieri a few days to think about the offer.

On October 12, Olivieri informed Stifel that she had retained a lawyer. She remained on administrative leave for the next month. In the meantime, she gave Stifel a detailed written description of the extensive sexual harassment she had experienced, as well as the retaliation following her complaints. She also stated that she intended to pursue litigation.

Olivieri finally returned to work on November 12, 2020. She alleges that Stifel essentially stripped her of all of her job responsibilities. Rather than assigning Olivieri to support a different investment professional, Codignotto informed her that she was expected to spend her working hours preparing for the Series 9 and 10 certifications. Meanwhile, Isler faced no repercussions.

On January 5, 2021, Olivieri filed her complaint against Stifel in this case, alleging NYSHRL claims involving gender discrimination, a hostile work environment, and retaliation. A few months later, on May 20, 2021, Olivieri filed an amended complaint, which named Neil Isler **[*15]** as a defendant and asserted additional claims, including gender-based hostile environment and retaliation claims under Title VII.

Eight days later, in what Olivieri alleges was another instance of retaliation, Codignotto told Olivieri that he was transferring her from the Garden City office to Melville to work for four different advisors. Over the course of several emails, Olivieri asked Codignotto if she would be fired if she did not agree to the transfer, and he said yes: "If you choose not to accept this role and report to the Melville office on June 1, we will consider this your resignation." Jt. App'x at 327.

Olivieri tried to arrange to work remotely instead of reporting to the Melville location, because she was pregnant and vulnerable to COVID-19 complications.

But she was ultimately unable to get permission to work remotely and reported to Melville on June 1.

When she arrived, she discovered that her assigned workstation was dirty and had obviously not been cleaned after a previous employee used it. Olivieri also learned that one of her colleagues was being transferred to Garden City because she had been promoted to work as an Administrative Assistant to the Branch Manager. About **[*16]** three months earlier, Olivieri had applied to the position at Codignotto's suggestion; he said Olivieri would have been a perfect fit. The position required additional licenses, and at the time, Olivieri had already gotten her Series 9 license and was in the process of getting her Series 10 license. Olivieri had also previously obtained Series 7 and Series 63 licenses. The candidate who received the position had none of these licenses.

Nevertheless, Olivieri didn't get the job. She didn't even get an interview. After her transfer, Codignotto continued to retaliate against Olivieri and diminish her role. In response to the additional conduct, Olivieri filed a supplemental complaint in this case on June 16, 2021, adding Codignotto as a defendant.

## II. Return from Maternity Leave Post-*EFAA*

On October 29, 2021, Olivieri went on maternity leave. When she was ready to return to work, she alleges that Stifel frustrated her arrival by dilatorily processing her request for a remote work accommodation. Ten days before she was set to return, she reached out to HR to coordinate an accommodation. Stifel took more than a week to provide Olivieri forms for her and her medical provider to complete, leaving **[*17]** Olivieri only two days to complete the forms before she was scheduled to return. Contrary to Stifel's established practice of providing employees an interim accommodation while paperwork was being processed, Stifel did not extend such accommodation to Olivieri. It also withheld her pay while the request was pending. Olivieri contends Stifel's conduct toward her was retaliation for this lawsuit.

Eventually, Olivieri returned to work on March 10, 2022. But when she returned, Stifel had placed her in a completely different and unrelated role reporting to Neal Manfredi, Central Supervision Supervisor. Olivieri alleges that, over the following months, Stifel had a pattern of reassigning her position and limiting her job responsibilities.

The week after Olivieri returned from maternity leave,

Scelta scheduled a meeting to discuss Olivieri's medical accommodation with Olivieri and Codignotto. Olivieri was surprised that Scelta had involved Codignotto, one of Olivieri's accused harassers whom she had sued in this lawsuit. Olivieri told Scelta that making her discuss her medical needs with Codignotto felt "like a continuation of Stifel's efforts to harass and intimidate" her. Jt. App'x at 337. **[*18]**

In a March 25 email, Stifel confirmed it was still attempting to find a role for Olivieri. It also mentioned that the company had revoked her privileges to access systems that were essential to her previous role as a Client Services Associate.

In her new role, Olivieri alleges that Stifel undermined her ability to fulfill her responsibilities. For example, on March 31, 2022, Olivieri's supervisor, Manfredi, encouraged her to reach out to the IT department to request an additional monitor to help her work more efficiently at home. After she did, however, Scelta scolded Olivieri for not first getting Codignotto's approval—even though Scelta was aware that requiring Olivieri to communicate with Codignotto would cause her unnecessary distress.

Olivieri also alleges that the company treated her differently, and more harshly, than other employees. On April 5, 2022, she stepped away from her desk for a brief period to attend a doctor's appointment. In a deviation from its longstanding practice in such situations, Scelta docked Olivieri's PTO in 15-minute increments while she was away from her computer. Stifel did not dock the PTO of any other employee in a similar manner.

Stifel's behavior prompted **[*19]** Olivieri to send an email to Julie Gaffney, a Senior HR Business Partner, on April 8, 2022, memorializing her concerns. Citing her shifting job responsibilities, among other things, she said she was continuing to be subjected to "retaliation and a hostile work environment." Jt. App'x at 340. Gaffney advised Olivieri that she no longer needed to obtain additional securities licenses as such licenses were not necessary for a "support role" at Stifel, which Olivieri understood to mean that she was no longer being considered for advancement. *Id.* at 341.

In addition, following her return from maternity leave, Stifel took steps to exclude Olivieri at the company. On May 23, 2022, for example, Stifel held a mandatory semi-annual compliance meeting, but it failed to take measures to include Olivieri. In addition, Stifel didn't communicate announcements about early dismissals to

her, requiring her to work when other employees were allowed to leave. And Stifel again dragged its feet when it came to giving her necessary supplies. It took until July 2022—months after Olivieri had made a request—for Stifel to give her office supplies and shipping labels. On July 8, 2022, Scelta informed Olivieri **[*20]** that Stifel had further docked her PTO for the time in which Olivieri's earlier accommodation request had been pending, which was not Stifel's ordinary practice.

### III. Procedural Background

Throughout the district court proceedings, and at the time of this appeal, Olivieri has remained employed at Stifel. As mentioned above, Olivieri filed her first complaint on January 5, 2021. Federal jurisdiction was predicated on diversity. In that initial pleading, Olivieri named only Stifel as a defendant and alleged two NYSHRL claims: one claiming gender discrimination and a hostile work environment, and another claiming retaliation.

Olivieri amended her complaint in May 2021. This amended complaint added Isler as a defendant and three additional claims, including two claims under Title VII paralleling her initial NYSHRL claims. Olivieri filed a supplemental complaint the following month, on June 16, in which she added Codignotto as a defendant.

Defendants subsequently moved to compel arbitration of Olivieri's claims in August 2021, citing the arbitration clause in Olivieri's employment agreement.

While the motion was under consideration, Congress passed the *EFAA*, which took effect with the President's **[*21]** signature on March 3, 2022. No party alerted the court to its passage. A few weeks later, without any mention of the *EFAA*, the district court granted Defendants' motion, sending Olivieri's claims to arbitration on account of her prior agreement with Stifel. *Olivieri I*, 2022 U.S. Dist. LEXIS 55560, 2022 WL 900713, at *5.

Olivieri subsequently filed a motion for reconsideration of the district court's arbitration order based on the *EFAA*. Throughout all this time, Olivieri continued to work at Stifel, so she also sought leave to file another complaint—the SAC—updating her allegations and adding Scelta and Gaffney as individual defendants.

In March 2023, the district court granted Olivieri's motion for reconsideration and denied Defendants' motion to compel arbitration. *See Olivieri II*, 2023 U.S. Dist. LEXIS

57001, 2023 WL 2740846, at *7. The district court concluded that reconsideration was warranted in light of the intervening change in law and held that Olivieri's hostile work environment claims constituted ongoing claims subject to the continuing violation doctrine of accrual. 2023 U.S. Dist. LEXIS 57001, *[WL]* at *6-7. It concluded that the **_EFAA_** applied, and that the arbitration agreement was unenforceable. 2023 U.S. Dist. LEXIS 57001, *[WL]* at *7. As a result, it vacated its earlier order granting Defendants' motion to compel arbitration and held that Olivieri's claims would be adjudicated **[*22]** in court. *Id.* The district court also granted Olivieri's motion to file the SAC. *See* 2023 U.S. Dist. LEXIS 57001, *[WL]* at *3-4.

Defendants Stifel, Isler, and Codignotto timely appealed, challenging the district court's reconsideration order declining to compel arbitration.[3] *See* 9 U.S.C. § 16(a)(1)(C) (allowing interlocutory appeal of denial of application to compel arbitration); *Moss v. First Premier Bank*, 835 F.3d 260, 264 (2d Cir. 2016) (holding interlocutory appellate jurisdiction extends to appeal from vacatur of prior order compelling arbitration). The district court stayed proceedings pending this appeal.

## DISCUSSION

*HN3*[↑] ] We review orders granting reconsideration for abuse of discretion. *See Cohen v. UBS Financial Services, Inc.*, 799 F.3d 174, 177 (2d Cir. 2015) (reconsideration). But because "a district court necessarily abuses its discretion when it makes an error of law," we review legal determinations without deference. *Sacerdote v. Cammack Larhette Advisors, LLC*, 939 F.3d 498, 507 (2d Cir. 2019); *see also Meyer v. Uber Technologies, Inc.*, 868 F.3d 66, 72 (2d Cir. 2017) (explaining that we review orders denying a motion to compel arbitration without deference to the district court's legal conclusions).

Congress enacted the Federal Arbitration Act (FAA) in 1925 so that courts would put arbitration agreements "on equal footing with all other contracts" and enforce them according to their terms. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443, 126 S. Ct. 1204, 163 L. Ed. 2d 1038 (2006). *HN4*[↑] ] In general, the FAA mandates that agreements to arbitrate are "valid,

irrevocable, and enforceable." 9 U.S.C. § 2. Enacted in 2022, the **_EFAA_** is the first major **[*23]** amendment in the history of the FAA. *See* David Horton, *The Limits of the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act*, 132 YALE L.J. FORUM 1, 1 (2022).

The **_EFAA_** is codified directly into the FAA and limits the scope of this broad mandate to enforce arbitration agreements. In relevant part, in provides that:

> Notwithstanding any other provision of this title, at the election of the person alleging conduct constituting a sexual harassment dispute or sexual assault dispute, or the named representative of a class or in a collective action alleging such conduct, no predispute arbitration agreement or predispute joint-action waiver shall be valid or enforceable with respect to a case which is filed under Federal, Tribal, or State law and relates to the sexual assault dispute or the sexual harassment dispute.

9 U.S.C. § 402(a).

*HN5*[↑] ] A "predispute arbitration agreement" is "any agreement to arbitrate a dispute that had not yet arisen at the time of the making of the agreement." *Id.* § 401(1). A "sexual assault dispute" refers to "a dispute involving a nonconsensual sexual act or sexual contact, as such terms are defined in [18 U.S.C. § 2246] or similar applicable Tribal or State law, including when the victim lacks capacity to consent." *Id.* § 401(3). And a "sexual harassment dispute" is "a dispute relating to conduct that is alleged to constitute sexual **[*24]** harassment under applicable Federal, Tribal, or State law." *Id.* § 401(4).

*HN6*[↑] ] By its terms, the **_EFAA_** applies "with respect to any dispute or claim that arises or accrues on or after the date of enactment of this Act"—*i.e.*, March 3, 2022.[4]

---

[3] On appeal, Defendants do not challenge the district court's grant of Olivieri's motion for leave to file the SAC, included in the same order as the district court's rejection of Defendants' motion to compel arbitration.

[4] It makes no legal difference that this provision is codified in a statutory note, not the main body, of the United States Code. *See U.S. Nat. Bank of Oregon v. Independent Ins. Agents of America, Inc.*, 508 U.S. 439, 448, 113 S. Ct. 2173, 124 L. Ed. 2d 402 (1993) ("Though the appearance of a provision in the current edition of the United States Code is 'prima facie' evidence that the provision has the force of law, 1 U.S.C. § 204(a), it is the Statutes at Large that provides the 'legal evidence of laws,' § 112, and despite its omission from the Code [the relevant provision] remains on the books if the Statutes at Large so dictates."); *see also Cameron v. McDonough*, 1 F.4th 992, 995 (Fed. Cir. 2021) (concluding an effective date from the Statutes at Large appearing as a statutory note in the United States Code was law); *Johnson v. Everyrealm, Inc.*, 657 F. Supp. 3d 535, 559 n.19 (S.D.N.Y.

Pub. L. No. 117-90, § 3, 136 Stat. 26, 28 (2022).

The central issue in this appeal is whether Olivieri's claims accrued "on or after" the Effective Date—March 3, 2022—such that the **_EFAA_** applies to this case. In assessing this question, we first consider what it means for Olivieri's claims to "accrue" under the **_EFAA_**. We then consider Olivieri's operative complaint to determine whether Olivieri's claims accrued on or after the Effective Date of the statute.

## I. Accrual under the _EFAA_

_HN7_[↑] Whether the **_EFAA_** governs turns on the meaning of the phrase "any . . . claim . . . accrues." Pub. L. No. 117-90, § 3, 136 Stat. at 28. Defendants argue that Olivieri's claims accrued before the Effective Date, so the **_EFAA_** doesn't apply and Olivieri's arbitration agreement is therefore valid and enforceable. According to them, a claim accrues when it first becomes actionable. Olivieri filed her retaliatory hostile work environment claim in 2021, before the **_EFAA_** was enacted. So, Defendants reason, her claims must have accrued—meaning they became actionable—before [**\*25**] she filed them. To hold otherwise would be illogical, they claim, because it would mean her claims accrued both before and after the **_EFAA_**, making her claims somehow both arbitrable and not. And it would lead to impermissibly retroactive application of the **_EFAA_**.

Olivieri disagrees. She argues that her hostile work environment claims are subject to the continuing violation doctrine and that, as a result, they accrued _after_ the Effective Date. As alleged in the SAC, she continued to experience a retaliatory hostile work environment after the **_EFAA_** was enacted, so her claims continued to accrue post-**_EFAA_** under the continuing violation doctrine. As a result, she argues the arbitration agreement she signed is invalid and unenforceable.

_HN8_[↑] We agree with Olivieri. To get there, we consider what it means for a claim to "accrue," and conclude that the concept is tightly bound with the operation of statutes of limitations. Thus, when a claim accrues turns on the law applicable to the type of claim in question. In the context of claims subject to the continuing violation doctrine, a claim _first_ accrues when the plaintiff has an actionable claim; but because such a claim is a single and indivisible claim [**\*26**] arising from numerous specific acts undertaken in a continuing

course, the claim reaccrues—it is essentially reborn—with each successive act that is part of that continuing course. We reject Defendants' arguments that in the **_EFAA_** Congress intended the phrase "any . . . claim . . . accrues" to mean only when a claim "first accrues," that the term in the **_EFAA_** has something other than its accepted legal meaning, that our interpretation leads to absurd results, and that we are impermissibly applying the **_EFAA_** retroactively.

### A. Accrual and Statutes of Limitations

_HN9_[↑] The question of whether and when a claim accrued is almost invariably tied to the question whether it is timely under the applicable statute of limitations. "As a general matter," the Supreme Court has explained, "a statute of limitations begins to run when the cause of action accrues—that is, when the plaintiff can file suit and obtain relief." _Heimeshoff v. Hartford Life & Acc. Ins. Co._, 571 U.S. 99, 105, 134 S. Ct. 604, 187 L. Ed. 2d 529 (2013) (internal quotation marks and citation omitted).

_HN10_[↑] The Supreme Court has recognized that "it is theoretically possible for a statute to create a cause of action that accrues at one time for the purpose of calculating when the statute of limitations begins to run, but another time for the purpose [**\*27**] of bringing suit," but said it would "not infer such an odd result in the absence of any such indication in the statute." _Reiter v. Cooper_, 507 U.S. 258, 267, 113 S. Ct. 1213, 122 L. Ed. 2d 604 (1993).

_HN11_[↑] And the Court has recently explained that generally, "[a] 'right accrues when it comes into existence'—_i.e._, 'when the plaintiff has a complete and present cause of action.'" _Corner Post, Inc. v. Board of Governors of Federal Reserve System_, 144 S.Ct. 2440, 2451, 219 L. Ed. 2d 1139 (2024) (first quoting _United States v. Lindsay_, 346 U.S. 568, 569, 74 S. Ct. 287, 98 L. Ed. 300 (1954); then quoting _Gabelli v. SEC_, 568 U.S. 442, 448, 133 S. Ct. 1216, 185 L. Ed. 2d 297 (2013)). In all of these cases considering when a claim _accrues_, the Court was considering _when the limitations period started running_.

This Circuit has likewise observed the connection between the concept of a claim accruing and the running of the limitations period. In _Benzemann v. Citibank N.A._, we rejected an interpretation of the Fair Debt Collection Practices Act that suggested a cause of action accrued at one time for the purpose of calculating when the statute of limitations begins to run, and at a

2023) (same for the **_EFAA_**).

different time for the purposes of when the plaintiff could actually bring suit. 806 F.3d 98, 101 (2d Cir. 2015) ("The Supreme Court teaches that courts should avoid interpreting statutes of limitations in a way that creates such an anomaly.").

*HN12*[↑] And we have frequently recognized that "[a]ccrual is the date on which the statute of limitations begins to run." *Valdez ex rel. Donely v. United States*, 518 F.3d 173, 185 (2d Cir. 2008) (quoting *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990)). *See also Williams v. Binance*, 96 F.4th 129, 142 (2d Cir. 2024) ("[L]imitations **[\*28]** periods begin to run when the cause of action accrues—that is, *when the plaintiff can file suit and obtain relief.*") (quoting *California Public Employees' Retirement System v. ANZ Securities, Inc.*, 582 U.S. 497, 504-05, 137 S. Ct. 2042, 198 L. Ed. 2d 584 (2017)); *City of Pontiac General Employees' Retirement System v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011) ("Only after a plaintiff can adequately plead [a] claim can that claim be said to have accrued, and only after a claim has accrued can the statute of limitations on that claim begin to run."); *Hoelzer v. City of Stamford, Conn.*, 933 F.2d 1131, 1132 (2d Cir. 1991) ("[A] crucial legal issue is presented involving accrual of the cause of action—that is, when the statute of limitations begins to run on the [plaintiff's] claim.").

For this reason, we often refer to a claim accruing and the limitations period starting as two sides of the same coin. *See, e.g., 53rd Street, LLC v. U.S. Bank National Association*, 8 F.4th 74, 78 (2d Cir. 2021) ("For a mortgage payable in installments, separate causes of action accrue for each installment that is not paid, and the statute of limitations begins to run, on the date each installment becomes due.") (citation omitted, internal quotation marks omitted, and alteration adopted); *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1104 (2d Cir. 1988) ("Generally, a cause of action under the Clayton Act accrues and the statute of limitations begins to run, when a defendant commits an antitrust violation that injures a plaintiff's business.").

*HN13*[↑] In short, the time a claim "accrues" means the point at which the statute of limitations clock starts ticking.[5]

### B. Different Claims, Different Accrual

So when does a claim accrue? As it turns out, it depends. *HN14*[↑] When a claim "accrues"—that is, when the limitations period starts to run—depends on the nature of the claim, and is informed by common law principles. *See McDonough v. Smith*, 588 U.S. 109, 116, 139 S. Ct. 2149, 204 L. Ed. 2d 506 (2019) (discussing, in the context of 42 U.S.C. § 1983, how the Supreme Court often decides accrual questions by referring to the common law). Different causes of action accrue differently, so there are "hazards inherent in attempting to define for all purposes" the point at which a cause of action accrues.[6] *Crown Coat Front Co. v. United States*, 386 U.S. 503, 517, 87 S. Ct. 1177, 18 L. Ed. 2d 256 (1967). Federal law determines when federal causes of actions accrue, *see Kronisch v. United States*, 150 F.3d 112, 123 (2d Cir. 1998), just like state law determines when state-law claims accrue, *see Personis v. Oiler*, 889 F.2d 424, 426 (2d Cir. 1989). Within each body of law, there are different accrual rules depending on the nature of the cause of action.

*HN15*[↑] Some claims arise when the defendant commits the injurious act. *See, e.g., Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338, 91 S. Ct. 795, 28 L. Ed. 2d 77 (1971) (holding that Clayton Act claims "accrue[] and the statute begins to run when a defendant commits an act that injures a plaintiff's business"). Some arise when the plaintiff experiences the injury. *See, e.g., Snyder v. Town Insulation, Inc.*, 81 N.Y.2d 429, 432-33, 615 N.E.2d 999, 599 N.Y.S.2d 515 (1993) (slip-and-fall negligence claim). Others don't accrue until a plaintiff discovers, or should have discovered, **[\*30]** the injury caused by a defendant's conduct. *See, e.g., Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 644, 130 S. Ct. 1784, 176 L. Ed. 2d 582 (2010) (describing the discovery rule as "a doctrine that delays accrual of a cause of action until the plaintiff has 'discovered' it" and that emerged because "something

---

2022) (noting that tolling "is conceptually distinct from accrual of a limitations period"). Like accrual, tolling affects when claims are timely. But tolling doesn't come into the picture until and unless claims have already accrued.

---

[6] This is fully consistent with the Supreme Court's recent guidance in *Corner Post*. In rejecting Justice Jackson's dissenting view that "different claims accrue at different times," *Corner Post*, 144 S. Ct. at 2475 (Jackson, *J.*, dissenting), the majority was rejecting the argument that "the same words 'right of action first accrues' *in a single statute* should mean different things in different contexts," *id.* at 2457 (majority op.).

---

[5] Once a claim accrues, the limitations period may *stop* **[\*29]** running due to tolling. *See Valdez*, 518 F.3d at 185 ("Tolling doctrines stop the statute of limitations from running even if the accrual date has passed." (quoting *Cada*, 920 F.2d at 450)); *see also Koral v. Saunders*, 36 F.4th 400, 413 (2d Cir.

different was needed" because "a defendant's deceptive conduct may prevent a plaintiff from even *knowing* that he or she has been defrauded"); *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 144, 150 (2d Cir. 2012) (claim of unwitting buyer of counterfeit wine purported to have belonged to Thomas Jefferson accrued when the plaintiff "discovered or should have discovered the injury" (internal quotation marks and citation omitted)).

But that's not all. Some causes of action accrue serially: they accrue (and reaccrue) pursuant to the continuing violation doctrine. That doctrine "provides an exception to the normal knew-or-should-have-known accrual date"—meaning an exception to how accrual normally works. *Tassy v. Buttigieg*, 51 F.4th 521, 532 (2d Cir. 2022) (quoting *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015)). For claims that are "composed of a series of separate acts that collectively constitute one 'unlawful . . . practice,'" the continuing violation doctrine lays out an alternative framework for evaluating accrual. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002) (quoting 42 U.S.C. § 2000e-5(e)(1)).

Because such claims are made up of a series of acts, they accrue and reaccrue with each successive act that **[*31]** is part of the singular unlawful practice. *Gonzalez*, 802 F.3d at 220.

## C. Hostile Work Environment Claims

*HN16*[↑] A common type of claim subject to the continuing violation doctrine, and the one relevant to this case, is a hostile work environment claim. Those claims are subject to the continuing violation doctrine because, unlike discrete acts, "[t]heir very nature involves repeated conduct." *Morgan*, 536 U.S. at 115. A hostile work environment generally doesn't occur on any one day; it emerges "over a series of days or perhaps years." *Id.* It is this "constellation of events" that gives rise to a hostile work environment claim. *King v. Aramark Services, Inc.*, 96 F.4th 546, 560 (2d Cir. 2024). As a result, the continuing violation doctrine provides that such claims do not accrue—and the statute of limitations period does not begin to run—"until the last discriminatory act in furtherance of" the hostile work environment. *Tassy*, 51 F.4th at 532 (quoting *Harris v. City of New York*, 186 F.3d 243, 248 (2d Cir. 1999)); *see Green v. Brennan*, 578 U.S. 547, 562, 136 S. Ct. 1769, 195 L. Ed. 2d 44 (2016) (stating that "limitations period for hostile-work-environment claim runs from the last act composing the claim"). That

means that such claims accrue, and reaccrue, each time the defendant commits an act that is part of the same course of harassing conduct. "[I]f 'an act contributing to the hostile environment occurs within the filing period,' the hostile work environment **[*32]** claim is timely, and a factfinder can hold a defendant liable for 'the entire time period of the hostile environment,' including the period falling outside of the limitations period." *King*, 96 F.4th at 560 (alteration adopted) (quoting *Morgan*, 536 U.S. at 117); *see also Morgan*, 536 U.S. at 118 (explaining that if hostile work environment occurred on days 1-400, claim reaccrues with each hostile act even "if sufficient activity occurred by day 100 to make out a claim"); *Almond v. Unified Sch. Dist. No. 501*, 665 F.3d 1174, 1178 (10th Cir. 2011) (Gorsuch, *J.*) ("*Morgan* held that hostile work environment claims accrue each time acts contributing to that environment occur." (emphasis omitted)).

Accordingly, though we agree with Defendants that a claim accrues when it "comes into existence," Appellants' Br. at 3, we disagree that this definition is the end of the matter. *HN17*[↑] A hostile work environment claim continues to accrue, or reaccrues, each time the defendant engages in an act that is "part of the ongoing, discriminatory practice that created a hostile work environment." *King*, 96 F.4th at 561.

## D. Accrual versus "First" Accrual

We thus reject Defendants' argument that Olivieri's claim must have accrued before the **_EFAA_**'s effective date because she *filed suit* before the **_EFAA_**'s enactment. This reasoning might make sense in the context of a claim for which **[*33]** there is a single accrual date, but not in the context of a claim subject to the continuing violation doctrine. Under that doctrine, Olivieri's claim *did* accrue before the **_EFAA_** was enacted. And it *reaccrued* with each successive act that was part of the single continuing course of conduct underlying the hostile work environment claims. *HN18*[↑] Because hostile work environment claims continue to accrue "until the last discriminatory act in furtherance of" the hostile work environment, such claims can have multiple accrual dates. *Tassy*, 51 F.4th at 532 (quoting *Harris*, 186 F.3d at 248).

Defendants admit that the term "accrual" has "'different meanings in different contexts,'" Appellants' Br. at 16-17 (quoting *F.A.A. v. Cooper*, 566 U.S. 284, 300, 132 S. Ct. 1441, 182 L. Ed. 2d 497 (2012)), but they resist the logical consequence of that acknowledgment.

Essentially, Defendants ask us to read the statute in this context as tying a claim's accrual date to the date it *first* accrued.

But **HN19**[⬆] if Congress wanted the ***EFAA*** to apply only to claims that "first" accrue after its enactment, it could have said so. Congress is clearly familiar with the phrase, which appears in multiple other statutes. *See, e.g.*, 28 U.S.C. § 2401 ("[E]very civil action commenced against the United States shall be barred unless the complaint is filed within six years after **[*34]** the right of action *first accrues*" (emphasis added)); *id.* §§ 2415(b), 2462, 2501, 2636(i) (establishing limitations period for other causes of actions when such claim "first accrues"); 42 U.S.C. § 2187(d) (same, but for patent claims). If Congress had tied the effective date of the ***EFAA*** to when a claim *first* accrues, we might reach a different conclusion. But it didn't, and we "do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply." *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341, 125 S. Ct. 694, 160 L. Ed. 2d 708 (2005); *see also id.* (noting "our reluctance is even greater when Congress has shown elsewhere . . . that it knows how to make such a requirement manifest").

### E. Ordinary Public Meaning

We likewise reject Defendants' argument that such an interpretation of accrual is inconsistent with its ordinary public meaning. Accrual is fundamentally a legal concept; it's hard to imagine that claim accrual has an "ordinary" meaning outside of the legal system. **HN20**[⬆] And when Congress uses language that has an established legal meaning, absent an indication to the contrary, we should be wary of inferring that it actually meant something else. *See F.A.A.*, 566 U.S. at 292 ("[W]hen Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to **[*35]** each borrowed word in the body of learning from which it was taken." (citation and internal quotation marks omitted)); *Williams v. Wilmington Tr. Co.*, 345 F.3d 128, 133 (2d Cir. 2003) ("Indeed, when Congress uses in a statute a term of art with a long history of judicial interpretation, we must presume that Congress intends to use the word in its technical sense."). In short, the ordinary public meaning of a "claim . . . accrues" is the same as the established legal meaning, including that hostile work environment claims accrue with each wrongful act.

The presumption that Congress intended this meaning

of "accrual" is particularly appropriate here because the ***EFAA*** applies to "sexual harassment dispute[s]," 9 U.S.C. § 402, which are prototypical "hostile work environment" claims, *see Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986) (describing standard for "'hostile environment' sexual harassment" claims).[7] So in providing that the ***EFAA*** applies to claims that accrue after the effective date of the statute, Congress knew that the accrual rules that apply to hostile work environment claims would come into play in such cases.

### F. Absurd Result

As noted above, there is nothing absurd about concluding that an indivisible but continuing claim accrued both *before* the enactment of the ***EFAA*** and *after*. To the contrary, **[*36]** the Supreme Court has held that hostile work environment claims accrue in just such a manner. *See Morgan*, 536 U.S. at 115-17. The serial accrual is a product of the continuing nature of the conduct supporting the plaintiff's cause of action and the legal framework of the continuing violation doctrine. Insofar as Defendants raise "public-policy considerations" to avoid the statute's plain meaning, Appellants' Br. at 26, such "policy concerns cannot trump the best interpretation of the statutory text," *Patel v. Garland*, 596 U.S. 328, 346, 142 S. Ct. 1614, 212 L. Ed. 2d 685 (2022).[8]

---

[7] Legislative history confirms what is clear on the face of the statute: Congress was aware the statute would apply to hostile work environment claims. See 168 Cong. Rec. H983-09, H987 (daily ed. Feb. 7, 2022) (Rep. Hakeem Jeffries stating that "[t]he women of America have a right to be free of a hostile work environment"); *id.* at H988 (Rep. Sheila Jackson Lee discussing a case involving allegations of "a sexually charged and hostile work environment"); *id.* at H991 (Rep. Bobby Scott discussing a scenario involving a "sexually offensive and hostile environment").

[8] We note that the Eighth Circuit recently held that the ***EFAA*** applied to a lawsuit filed in July 2022 because the "dispute" did not arise until the plaintiff had asserted a claim against the defendant, even though the alleged sexual assault and harassment occurred prior to the ***EFAA***'s March 3, 2022 effective date. *See Famuyide v. Chipotle Mexican Grill, Inc.*, --- F.4th ---, 2024 U.S. App. LEXIS 19449, 2024 WL 3643637, at *1-2 (8th Cir. Aug. 5, 2024) (affirming denial of motion to compel arbitration). Although we need not here decide whether to adopt the Eighth Circuit's reasoning, its decision supports our conclusion that events occurring before the ***EFAA***'s effective date can be relevant to application of the

### G. Retroactivity

Finally, we reject Defendants' contention that the **_EFAA_** cannot apply to Olivieri's case because that would impermissibly give the statute retroactive effect.

**HN21**[⬆️] We recognize that "[s]tatutory retroactivity has long been disfavored." _Landgraf v. USI Film Products_, 511 U.S. 244, 268, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994). As a result, courts have fashioned a presumption against retroactivity that "is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic." _Id._ at 265. In light of this presumption, we decline to give a statute retroactive effect "unless such construction is required by explicit language or by necessary implication." _Fernandez-Vargas v. Gonzales_, 548 U.S. 30, 37, 126 S. Ct. 2422, 165 L. Ed. 2d 323 (2006) (quoting _United States v. St. Louis, S.F. & T.R. Co._, 270 U.S. 1, 3, 46 S. Ct. 182, 70 L. Ed. 435, 62 Ct. Cl. 748 (1926)).

**HN22**[⬆️] The Supreme Court has provided a three-step process for determining whether a statute should be retroactively **[*37]** applied. First, courts ask "whether Congress has expressly prescribed the statute's proper reach, and in the absence of language as helpful as that we try to draw a comparably firm conclusion about the temporal reach specifically intended by applying 'our normal rules of construction.'" _Id._ (internal quotation marks and citations omitted). "If that effort fails," courts next consider "whether applying the statute to the person objecting would have a retroactive consequence in the disfavored sense of affecting substantive rights, liabilities, or duties on the basis of conduct arising before its enactment." _Id._ (internal quotation marks omitted and alterations adopted). If the answer to that question is yes, then courts "apply the presumption against retroactivity by construing the statute as inapplicable to the event or act in question." _Id._ at 37-38.

Our analysis starts and ends at the first step for at least two reasons. First, given the ongoing nature of a hostile work environment claim, which is a singular claim predicated on a series of acts over a course of time, to the extent that Olivieri alleges post-Effective-Date conduct, the application of the statute to a claim arising in part from **[*38]** that conduct can't properly be described as "retroactive." Defendants' contractual rights are affected not just by "conduct arising before [the **_EFAA_**'s] enactment," _Landgraf_, 511 U.S. at 278, but

also by conduct that occurred _after_ its enactment.

Second, even if application of the **_EFAA_** to conduct predating the statute could be considered retroactive, for the reasons set forth above, Congress has expressly indicated that the statute applies to claims that accrue after the statute's effective date—which in the context of continuing claims may involve conduct that predated the **_EFAA_**. As set forth above, Congress has expressed its intent with sufficient clarity to resolve the retroactivity question at the first step.[9]

**HN23**[⬆️] We have recognized that "Congress may, within constitutional limits, enact laws that operate retroactively." _Herrera-Molina v. Holder_, 597 F.3d 128, 133 (2d Cir. 2010). In this case, Defendants have not raised constitutional arguments, and "the potential unfairness of retroactive civil legislation is not a sufficient reason for a court to fail to give a statute its intended scope." _Landgraf_, 511 U.S. at 267.

## II. Application to Olivieri's Claims

Given the above framework, we have little difficulty in concluding that Olivieri's case **[*39]** includes claims subject to the **_EFAA_**. Olivieri's retaliation-based hostile work environment claims under Title VII and the NYSHRL accrued after the Effective Date. _See Carr v. New York City Transit Auth._, 76 F.4th 172, 179 (2d Cir. 2023) (discussing standard for "retaliatory hostile work environment claim"). As discussed above, hostile work environment claims—under both Title VII and the NYSHRL—are subject to the continuing violation

---

[9] Defendants' retroactivity argument is based on the retroactive effect of the statute on claims or disputes that Defendants contend arose before the **_EFAA_**'s effective date. Defendants do not argue that the statute is impermissibly retroactive in effect insofar as it affects the parties' rights under arbitration agreements executed before the statute's effective date. Reply Br. at 13 n.3 ("Whether or not Congress intended the [**_EFAA_**] to apply to arbitration agreements that were entered into before the Act's passage is irrelevant to the question here. The relevant question is whether the Act affects the substantive rights of the parties' under their arbitration agreements '[_on the basis of] conduct arising before [its] enactment._'" (quoting _Fernandez-Vargas_, 548 U.S. at 37)). Because we conclude that Congress expressly prescribed the proper application of the **_EFAA_** to pending claims, we need not decide whether, at step two of the analysis, arbitration agreements create substantive rights or, instead, prescribe procedural rules that may be modified by Congress "without raising concerns about retroactivity." _Landgraf_, 511 U.S. at 275.

doctrine of accrual, meaning they accrue at the last act in furtherance of the hostile work environment. *See King*, 96 F.4th at 559-60 (Title VII); *Lozada v. Hook*, 151 A.D.3d 860, 54 N.Y.S.3d 688, 689 (App. Div. 2d Dep't 2017) (NYSHRL).

President Biden signed the **_EFAA_** on March 3, 2022, while Olivieri was wrapping up maternity leave. By the time she returned to work a week later, the **_EFAA_** was in effect. So, if Olivieri has alleged that upon her return Defendants engaged in acts that are part of the same course of conduct underlying her hostile work environment claims, those claims have accrued after the **_EFAA_**'s effective date.

She has so alleged. For starters, Olivieri alleges Stifel retaliated against her by dragging its feet on processing her accommodation request and, contrary to ordinary practice, withheld her pay while the request was pending. On top of that, Olivieri alleges a persistent pattern of changing her role in **[\*40]** response to her complaints of sexual harassment and misconduct. She alleges she was purposely left out of meetings and kept in the dark about company news, including early dismissals. Moreover, she alleges that Stifel departed from its ordinary practice when it docked her PTO in 15-minute increments when she stepped away from her desk for a doctor's appointment. Accepting these facts as true—as we must for this appeal—we conclude that the retaliatory conduct Olivieri alleges she experienced upon her return is similar in kind to the retaliatory conduct she experienced before her leave, such that it is "part of the [same] course of discriminatory conduct that underlies" her retaliation-based hostile work environment claims. *King*, 96 F.4th at 561.

Defendants briefly argue in their reply brief that the **_EFAA_** does not apply to Olivieri's retaliation claims because such claims do not fall within the definition of a "sexual harassment dispute." Reply Br. at 17, 24-25. The argument is waived for failure to raise it in the opening brief, *see JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005), and also is meritless. **_HN24_**[↑] The **_EFAA_** defines a "sexual harassment dispute" as "a dispute *relating to* conduct that is alleged to constitute sexual harassment under applicable Federal, **[\*41]** Tribal, or State law." 9 U.S.C. § 401(4) (emphasis added). This Court has recognized that retaliation for reporting discrimination "is reasonably related to the underlying discrimination," such that a plaintiff who exhausts a discrimination claim with the EEOC may also pursue a claim for retaliation. *Legnani v. Alitalia Linee Aeree*

*Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001) (internal quotation marks and citation omitted). Under similar reasoning, retaliation resulting from a report of sexual harassment is "relat[ed] to conduct that is alleged to constitute sexual harassment." 9 U.S.C. § 401(4); *see Johnson*, 657 F. Supp. 3d at 551 n.13, 559 (reaching same conclusion).

Accordingly, Olivieri's retaliatory hostile work environment claims accrued after March 3, 2022, and the **_EFAA_** applies to this case.[10]

## CONCLUSION

For these reasons, we **AFFIRM** the order of the district court: Olivieri's case remains in federal court because her arbitration agreement is, at her election, invalid and unenforceable.

---

**End of Document**

---

[10] In their reply brief, Defendants raise for the first time an argument that has been addressed by district courts in other cases. *See, e.g., Johnson*, 657 F. Supp. 3d at 559-61. They argue that even if the **_EFAA_** does apply to Olivieri's retaliation-based hostile work environment claims, it does not reach any claims based on acts of assault and sexual harassment committed by Isler, all of which predated enactment of the **_EFAA_**. Reply Br. at 18-28. **_HN25_**[↑] Absent some showing of manifest injustice, "arguments not made in appellant's opening brief are waived even if the appellant pursued those **[\*42]** arguments in the district court or raised them in a reply brief [on appeal]." *JP Morgan Chase Bank*, 412 F.3d at 428. Accordingly, we deem Defendants' claim-splitting argument abandoned.